**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA,

v.

AMIN KHOURY,

Defendant

Case No. 20-cr-10177-DJC

***Leave to file excess pages granted on***
***March 4, 2021 (ECF No. 32)***

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT AMIN KHOURY'S**
**MOTION TO DISMISS COUNT I OF THE INDICTMENT PURSUANT TO**
**FEDERAL RULES OF CRIMINAL PROCEDURE 12(b)(1) AND 12(b)(3)(B)(v)**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

BACKGROUND .................................................................................................3

ARGUMENT ......................................................................................................6

I.     THE RULE 12(B) STANDARD ..................................................................7

II.    THE GOVERNMENT'S NOVEL PROPERTY THEORY OF MAIL FRAUD
IN COUNT I MUST BE DISMISSED..........................................................7

    A.   A university admissions slot or offer is not "property" for purposes of the
mail fraud statute.........................................................................................10

        1.   An offer to enter into a contract for services is not property. ......................11

        2.   An admissions slot is not a traditional form of property. ...........................13

        3.   The integrity of or a university's "right to control" the admissions
process is not a property right....................................................................18

    B.   The property fraud theory fails because property loss was not an object of the
alleged scheme. ...........................................................................................21

    C.   Even if it is ambiguous whether property is at stake, the rule of lenity warrants
dismissal of the property fraud theory. .......................................................29

        1.   Resolution of an ambiguity in the scope of a property fraud charge
must be in favor of Mr. Khoury. ................................................................29

        2.   Other canons of construction and principles of equity warrant a
narrower interpretation of the property fraud statutes than the
government advances....................................................................................30

III.   THE HONEST SERVICES THEORY IN COUNT I MUST BE DISMISSED
BECAUSE ECONOMIC HARM TO GEORGETOWN WAS NOT
REASONABLY FORESEEABLE.............................................................32

CONCLUSION....................................................................................................35

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Bergeron v. Rochester Inst. of Tech.*,
  2020 U.S. Dist. LEXIS 241125 (W.D.N.Y. Dec. 18, 2020) ....................................................11

*Blaszczak v. United States*,
  2021 U.S. LEXIS 353 (Sup. Ct. Jan. 11, 2021) ................................................................9, 21

*Carpenter v. United States*,
  484 U.S. 19 (1987) ...................................................................................................... *passim*

*Chong v. Northeastern Univ.*,
  2020 U.S. Dist. LEXIS 233923 (D. Mass. Dec. 14, 2020) ...................................................11

*Cleveland v. United States*,
  531 U.S. 12 (2000) ...................................................................................................... *passim*

*De Lima v. Sessions*,
  867 F.3d 260 (1st Cir. 2017) ...............................................................................................12

*Gleason v. Thaw*,
  236 U.S. 558 (1915) ..........................................................................................................12, 13

*Kelly v. United States*,
  140 S. Ct. 1565 (2020) ................................................................................................. *passim*

*McNally v. United States*,
  483 U.S. 350 (1987) ..................................................................................................... *passim*

*Olan v. United States*,
  2021 U.S. LEXIS 93 (Sup. Ct. Jan. 11, 2021) .........................................................................9

*Pasquantino v. United States*,
  544 U.S. 349 (2005) ..............................................................................................................11

*Salerno v. Fla. S. Coll.*,
  2020 U.S. Dist. LEXIS 215349 (M.D. Fla. Sept. 16, 2020) ..................................................11

*Sekhar v. United States*,
  570 U.S. 729 (2013) ..............................................................................................................22

*Skilling v. United States*,
  561 U.S. 358 (2010) ..................................................................................................... *passim*

*Sorich v. United States*,
  555 U.S. 1204 (2009) ..................................................................................................29

*Tyner v. United States*,
  23 App. D.C. 324 (D.C. Cir. 1904) ............................................................................14

*United States v. Abbott*,
  No. 19-cr-10117 (D. Mass.), ECF Nos. 423, 440, 443 ........................................27, 28

*United States v. Alkaabi*,
  223 F. Supp. 2d 583 (D.N.J. 2002) ........................................................................20, 27

*United States v. Alsugair*,
  256 F. Supp. 2d 306 (D.N.J. 2003) ........................................................................12, 13

*United States v. Berroa*,
  856 F.3d 141 (1st Cir. 2017) ..............................................................10, 11, 29, 31

*United States v. Binday*,
  804 F.3d 558 (2d Cir. 2015) ..............................................................................18, 22, 24

*United States v. Bizzack*,
  No. 19-cr-10222 (D. Mass.), ECF Nos. 30, 34 ....................................................27, 28

*United States v. Blaszczak*,
  947 F.3d 19 (2d Cir. 2019) ....................................................................................9, 21

*United States v. Bruchhausen*,
  977 F.2d 464 (9th Cir. 1992) ......................................................................................23

*United States v. Bunting*,
  82 F. 883 (E.D. Pa. 1897) ..........................................................................................14

*United States v. Cianci*,
  378 F.3d 71 (1st Cir. 2004) ............................................................................................7

*United States v. Cochran*,
  109 F.3d 660 (10th Cir. 1997) ....................................................................................33

*United States v. Czubinski*,
  106 F.3d 1069 (1st Cir. 1997) ....................................................................................31

*United States v. Davis*,
  139 S. Ct. 2319 (2019) ............................................................................................1, 8

*United States v. Ernst*,
  2020 U.S. Dist. LEXIS 218928 (D. Mass. Nov. 23, 2020) ............................ *passim*

*United States v. Ernst*,
  No. 19-cr-10081 (D. Mass.), ECF Nos. 486, 505 ........................................................10, 32

*United States v. Finazzo*,
  850 F.3d 94 (2d Cir. 2017)...................................................................................................22

*United States v. Frost*,
  125 F.3d 346 (6th Cir. 1997) ...................................................................................... *passim*

*United States v. Gatto*,
  2021 U.S. App. LEXIS 1146 (2d Cir. Jan. 15, 2021) ......................................................25, 26

*United States v. Isackson*,
  No. 19-cr-10115 (D. Mass.), ECF No. 325..............................................................................9

*United States v. Jain*,
  93 F.3d 436 (8th Cir. 1996) ..................................................................................................33

*United States v. Lemire*,
  720 F.2d 1327 (D.C. Cir. 1983) .......................................................................................34, 35

*United States v. MacFarlane*,
  No. 19-cr-10131 (D. Mass.), ECF No. 340.............................................................................28

*United States v. Martin*,
  228 F.3d 1 (1st Cir. 2000).............................................................................................. *passim*

*United States v. McCormack*,
  31 F. Supp. 2d 176 (D. Mass. 1998), *amended memorandum and order issued*,
  1998 U.S. Dist. LEXIS 21617 (Nov. 13, 1998).......................................................................7

*United States v. Meredith*,
  No. 19-cr-10075 (D. Mass.), ECF No. 18................................................................................9

*United States v. Ngige*,
  780 F.3d 497 (1st Cir. 2015)..............................................................................................3, 7

*United States v. Ochs*,
  842 F.2d 515 (1st Cir. 1988).................................................................................................31

*United States v. Plyler*,
  222 U.S. 15 (1911)..........................................................................................................13, 14

*United States v. Sadler*,
  750 F.3d 585 (6th Cir. 2014) ...............................................................................................23

*United States v. Sidoo*,
  468 F. Supp. 3d 428 (D. Mass. 2020) .......................................................................... *passim*

iv

*United States v. Sidoo,*
 No. 19-cr-10080-NMG (D. Mass.), ECF No. 1042 ................................................................14

*United States v. Sun Diamond Growers of Cal.*,
 138 F.3d 961 (D.C. Cir. 1998) ................................................................33, 34

*United States v. Takhalov,*
 827 F.3d 1307 (11th Cir. 2016), *opinion revised,* 838 F.3d 1168 (11th Cir.
 2016) ................................................................22

*United States v. Vandemoer,*
 No. 19-cr-10079 (D. Mass.), ECF No. 26................................................................28

*United States v. Vinyard,*
 266 F.3d 320 (4th Cir. 2001) ................................................................34

*United States v. Walters.*
 997 F.2d 1219 (7th Cir. 1993) ................................................................20, 23, 24, 25

## Federal Statutes

18 U.S.C. § 371 ................................................................6

18 U.S.C. § 666(a)(2) ................................................................6

18 U.S.C. § 1341 ................................................................16

18 U.S.C. § 1346 ................................................................33, 35

18 U.S.C. § 3731 ................................................................32

3 Act of June 8, 1872, Chapter 335, § 302, 17 Stat. 323 ................................................................13

Act of Mar. 4, 1909, Chapter 321, § 215, 35 Stat. 1130 ................................................................13

Bankruptcy Act, Pub. L. 95-598, 92 Stat. 2549 (1978) (codified at 11 U.S.C.
 § 523(a)(2)(A)) ................................................................13

## Rules

Fed. R. Crim. P. 12 ................................................................7

## Other Authorities

U.S.S.G. § 2B1.1 Comment n.3(A)(iii) ................................................................28

Georgetown Univ., *Policy on the Awarding of Honorary Degrees*,
 https://governance.georgetown.edu/honorary-degrees/ ................................................................16

*Georgetown University Common Data Set 2014-2015*, available at
   https://georgetown.app.box.com/s/6wrzbqcxo8lwcqa95268t12qf44r02cl ............................16

*Georgetown University Common Data Set for 2015-2016*, available at
   https://georgetown.app.box.com/s/8vtoy67rj039e2tw6fk9knax92rhkpm3 ...........................16

Georgetown University, *Honorary Degree Recipients*,
   https://governance.georgetown.edu/honorary-degrees-list/ .....................................16

Black's Law Dictionary 1076 (2d ed. 1910)..............................................................12

# INTRODUCTION

The federal mail and wire fraud and federal programs bribery statutes proscribe defined categories of conduct. The Supreme Court has consistently curtailed attempts to use these statutes to punish conduct beyond their narrow scope, and has rebuffed efforts by the U.S. Attorney's Office to "criminaliz[e] all acts of dishonesty." *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020); *see Skilling v. United States*, 561 U.S. 358, 408-09 (2010). As the Court has repeatedly emphasized, it is for Congress, not the U.S. Attorney's Office, to define what conduct constitutes a federal crime. *See, e.g.*, *United States v. Davis*, 139 S. Ct. 2319, 2332-33 (2019). And it is the role of the courts to police the boundaries of zealous prosecution and dismiss indictments that fail to state a cognizable offense under the federal criminal statutes. *Kelly* and the line of Supreme Court cases it reinforces make invariably clear that the executive branch may not "use the criminal law to enforce (its view of) integrity" in policymaking and decisionmaking. *Kelly*, 140 S. Ct. at 1574. This reasoning applies just as much, if not more so, to private processes as to those of public officials.

This Indictment is one of several in a sprawling government prosecution known as "Varsity Blues." In the Varsity Blues cases, the government advances novel theories under the RICO, mail and wire fraud, honest services mail and wire fraud, federal programs bribery, money laundering and conspiracy statutes. The prosecutors seek to punish the parents of college-aged children, college coaches, and college athletics administrators for an alleged "conspiracy" to influence undergraduate admissions at selective universities by taking advantage of the deference that university admissions officers historically give to coaches and development officers.[1] In other

---

[1]      The majority of the defendants in the Varsity Blues cases worked with a private college counselor named William "Rick" Singer, who partnered with college coaches and administrators at schools like Georgetown University and the University of Southern California to facilitate the admission of children of wealthy families in exchange for

words, the government claims that parents should be deemed felons and criminal co-conspirators under federal law for engaging in the sort of time-honored philanthropy at private colleges and universities across the country that (for better or for worse) has long given wealthy applicants an advantage over others. It also claims—in separate but parallel prosecutions, resulting in distinct and at times conflicting legal rulings—that coaches and athletic administrators broke the law by doing what they and others in their positions have long and legally done: facilitating the admission of certain, favored applicants over others.

The Indictment against Defendant Amin Khoury alleges that Mr. Khoury conspired to commit (a) mail fraud, (b) honest services mail fraud, and (c) bribery concerning programs receiving federal funds (Count I), and that he committed substantive bribery concerning programs receiving federal funds (Count II), by paying his former college teammate, then the Georgetown University tennis coach, Gordon Ernst, to designate Mr. Khoury's daughter as a tennis recruit and facilitate her admission to Georgetown. The Indictment does not allege (nor can it) that Mr. Khoury's daughter did not play tennis, or that there were any false statements on her application to Georgetown. Instead, it alleges only that Mr. Khoury, Mr. Ernst, and an unnamed tennis recruiter brokered a deal to facilitate Mr. Khoury's daughter's admission to Georgetown in exchange for a payment to Mr. Ernst.

Count I of this Indictment, or at a minimum two of its theories of prosecution, must be dismissed. **First**, the mail fraud conspiracy alleged in Count I is defective as a matter of law because the specific property the Indictment alleges Mr. Khoury schemed to deprive Georgetown of—an admissions slot—is not "property" as required by the mail fraud statute. The government knows its Indictment is defective, because the very same property theory was dismissed as a matter

---

what the parents believed was a legitimate donation to the school's athletic program. Mr. Khoury is not alleged to have met or worked with Mr. Singer.

of law as to Mr. Ernst in his ongoing prosecution in another session of this District for this very same conduct. *See United States v. Ernst*, 2020 U.S. Dist. LEXIS 218928, at *24, *27 (D. Mass. Nov. 23, 2020) (Talwani, J.). *But see United States v. Sidoo*, 468 F. Supp. 3d 428, 441 (D. Mass. 2020) (Gorton, J.) (permitting a property theory to proceed in a Varsity Blues case). Under the rule of lenity and principles of equity, the government cannot pursue this legally flawed theory as to Mr. Khoury.

**Second**, the honest services theory of Count I must be dismissed because the Indictment does not allege any facts to support the requirement under *United States v. Martin*, 228 F.3d 1, 17 (1st Cir. 2000), that economic harm to Georgetown was reasonably foreseeable as a result of the alleged scheme to defraud.

## BACKGROUND

The Indictment (ECF No. 1) alleges the following:[2/]

Between May 2014 and 2016, Mr. Khoury conspired with Mr. Ernst, the head coach of men's and women's tennis at Georgetown, and with an unnamed tennis recruiter to "commit mail fraud, honest services mail fraud and federal programs bribery … by bribing Ernst to fraudulently designate Khoury's daughter as a tennis recruit" at Georgetown and therefore obtain her admission to the university. Indictment ¶¶ 4, 8, 10.

Specifically, the Indictment alleges that "[t]he admissions office at Georgetown allots a set number of admissions slots to each head coach of a sport for that coach's recruited athletes," and that the office "applies different criteria when evaluating applications from" students "with demonstrated athletic abilities," "with the expectation that recruited athletes will be contributing members of the university's athletic teams once enrolled." *Id.* ¶ 7.

---

[2/] For purposes of this motion, the Court must take the facts alleged in the Indictment as true. *See United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015).

In May 2014, Mr. Khoury allegedly agreed to pay Ernst "approximately $200,000 in exchange for designating Khoury's daughter as a purported recruit to the Georgetown tennis team with little or no regard for her athletic ability." Indictment ¶ 10(a). The Indictment does not allege that Mr. Khoury's daughter did not actually play tennis or did not intend to play tennis at Georgetown. To the contrary, the Indictment indicates that Mr. Khoury's daughter did in fact play tennis. In July 2014, Mr. Khoury emailed the director of college counseling at his daughter's high school and told him that he had discussed with Mr. Ernst that his daughter "had the raw ability to lead the team if she was 'red-shirted' and if [Mr. Ernst] gave her the coaching that is required to advance a talented but raw kid into a varsity leader at the Georgetown level." *Id.* ¶ 10(c). A letter of recommendation for Mr. Khoury's daughter, submitted with her college application, stated that she played "#6 singles and third doubles" on her high school tennis team. *Id.* ¶ 10(d).

In October 2014, Mr. Khoury's daughter submitted her application to Georgetown with the letter of recommendation regarding her tennis *bona fides*. Indictment ¶ 10(d). A few days later, Mr. Khoury emailed the director of college counseling at his daughter's high school letting the counselor know that he had been in touch with Mr. Ernst and that Mr. Ernst wanted "the application ASAP after quarter grades." *Id.* ¶ 10(e). Thereafter, "Ernst emailed a Georgetown admissions officer and identified Khoury's daughter as a potential tennis recruit," and later sent Mr. Khoury's daughter's grades and standardized test scores to the officer. *Id.* ¶ 10(f)-(g). The Indictment alleges that when Mr. Ernst identified Mr. Khoury's daughter as a potential tennis recruit to the admissions officer, he did not disclose that he "had previously agreed to designate Khoury's daughter as a recruit in exchange for a bribe." *Id.* ¶ 10(f). Thereafter, Mr. Ernst allegedly instructed Mr. Khoury to tell his daughter to proceed with a Georgetown alumni interview and to tell the interviewer that

4

"Gtown is where I want to be" and that she "really want[ed] to be part of their tennis team." *Id.* ¶ 10(h).

In December 2014, Georgetown sent Mr. Khoury's daughter a "likely letter," indicating that "the Committee on Admissions had conducted an initial review of her application at Ernst's request, and had rated her admission as 'likely,'" meaning that she had "a greater than 95 percent chance of being admitted to Georgetown" during the final decision phase in the spring. Indictment ¶ 10(i). Mr. Khoury's daughter was subsequently accepted to Georgetown. *Id.* ¶ 10(j). The Indictment does not allege that Mr. Khoury's daughter was unqualified for admission to Georgetown, or that there were any false statements on Mr. Khoury's daughter's application. Instead, the Indictment alleges that Mr. Khoury, Mr. Ernst, and the tennis recruiter engaged in a criminal conspiracy by "[p]aying and receiving cash bribes" and "[d]esignating Khoury's daughter as a purported tennis recruit, with little or no regard for her athletic ability." *Id.* ¶ 9.

In May 2015, after his daughter's acceptance at Georgetown, Mr. Khoury allegedly withdrew $200,000 in cash, and met with the unnamed tennis recruiter in Massachusetts. Indictment ¶ 10(j)-(k). He allegedly gave the recruiter approximately $180,000 in cash to give to Mr. Ernst, and an additional $20,000 for the recruiter. *Id.* ¶ 10(k). The recruiter gave $170,000 in cash to Mr. Ernst's spouse (keeping an extra $10,000 for himself) and then drove Mr. Ernst's spouse to a bank, where she rented a safe deposit box. *Id.* ¶ 10(*l*)-(m). The Indictment alleges sporadic subsequent communications between Mr. Khoury, the recruiter, and Mr. Ernst between October 2015 and July 2016. *Id.* ¶ 10(n)-(r).

The Indictment contains two counts. Count I alleges conspiracy to commit mail fraud and honest service mail fraud and bribery concerning programs receiving federal funds in violation of

18 U.S.C. § 371. With respect to mail fraud and honest services mail fraud, the Indictment alleges

that Mr. Khoury conspired with others to commit mail fraud and honest services mail fraud by

> devis[ing] and intending to devise a scheme and artifice to defraud and to obtain
> money and property, to wit, admission to Georgetown, by means of materially false
> and fraudulent pretenses, representations and promises, and to deprive Georgetown of
> its right to the honest and faithful services of its employee, Gordon Ernst, through
> bribes and kickbacks....

Indictment ¶ 12(a). With respect to federal programs bribery, the Indictment alleges that Mr.

Khoury conspired with others to commit federal programs bribery "to corruptly give, offer and

agree to give [something] of value to any person, with intent to influence and reward … Gordon

Ernst, an agent of Georgetown, in connection with any business, transaction and series of

transactions of such organization involving anything of value of $5,000 or more...." *Id.* ¶ 12(b).

Count II alleges bribery concerning programs receiving federal funds in violation of 18

U.S.C. § 666(a)(2).

## **ARGUMENT**

Count I of the Indictment should be dismissed or narrowed because the charges leveled

against Mr. Khoury represent a prosecutorial overreach that exceeds the statutory and judicially

imposed limits on the mail and wire fraud, honest services fraud, and federal programs bribery

statutes. With respect to two of the alleged theories of prosecution in Count I, the government has

failed to properly allege a requisite element. Under the property theory of Count I, there is no

"property" that is an object of the scheme to defraud. Under the honest services theory of Count I,

economic harm to Georgetown was not reasonably foreseeable to Mr. Ernst at the time of the

scheme, putting the alleged self-dealing outside the reach of the honest services fraud statute.

Where certain counts of an indictment fail to state an offense, they must be dismissed, or as is

required here such counts must be limited to those theories upon which the government may properly proceed as a matter of law.

## I.       THE RULE 12(B) STANDARD

Under Federal Rule of Criminal Procedure 12(b)(1), a party may "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Certain defects must be raised by pretrial motion, including the failure to state an offense.

On a motion to dismiss, a court must determine whether the indictment "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend…." *United States v. Cianci*, 378 F.3d 71, 81 (1st Cir. 2004) (citation omitted); *see United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015). Although "it would normally be sufficient for the Government to . . . track the language of the statute in the indictment and include enough facts to put the defendant on notice of which conduct is challenged," an indictment will be subject to more exacting review where a motion to dismiss raises questions of law. *See United States v. McCormack*, 31 F. Supp. 2d 176, 180 (D. Mass. 1998), *amended memorandum and order issued*, 1998 U.S. Dist. LEXIS 21617 (Nov. 13, 1998). If the indictment fails to state an offense under the governing law, it must be dismissed as a matter of law. Fed. R. Crim. P. 12(b)(3)(B)(v).

## II.      THE GOVERNMENT'S NOVEL PROPERTY THEORY OF MAIL FRAUD IN COUNT I MUST BE DISMISSED.

The mail and wire fraud statutes are confined to schemes to obtain "money or property." *See, e.g.*, *Cleveland v. United States*, 531 U.S. 12, 19 (2000); *McNally v. United States*, 483 U.S. 350, 360 (1987) ("we read § 1341 as limited in scope to the protection of property rights"). The Supreme Court has long rebuffed expansive interpretations of the mail and wire fraud statutes, carefully scrutinizing the alleged "property" and permitting only things that very obviously and historically constitute "property" to satisfy the statutory criteria. *Kelly*, 140 S. Ct. at 1571;

*Cleveland*, 531 U.S. at 19-20; *McNally*, 483 U.S. at 356-60. In so doing, the Supreme Court has policed the boundaries of zealous federal prosecutions to prevent "a sweeping expansion of federal criminal jurisdiction." *Kelly*, 140 S. Ct. at 1574 (quoting *Cleveland*, 531 U.S. at 24).

The rationale behind the Supreme Court's open hostility to expansive definitions of "property" is simple and amply supported: federal crimes are defined by Congress, and Congress alone can expand the scope of what constitutes a federal crime. *See McNally*, 483 U.S. at 356-60; *see also Kelly*, 140 S. Ct. at 1574. Absent clear direction from Congress, then, courts may not extend the scope of the federal criminal statutes or accept novel theories about their enforcement. *McNally*, 483 U.S. at 360; *see Cleveland*, 531 U.S. at 20.

The Supreme Court's caution with respect to mail and wire fraud charges is compounded by the rule of lenity, which itself requires clear proscriptions for the punishment of behavior as criminal. *See Davis*, 139 S. Ct. at 2333 ("the rule of lenity[] teach[es] that ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor"; the rule "is founded on the tenderness of the law for the rights of individuals to fair notice of the law and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department" (internal quotation marks and citations omitted)). When applied to the mail and wire fraud statutes, the Supreme Court has made clear that only those charges that fit squarely and clearly into the statutory elements pass muster. *See, e.g.*, *Cleveland*, 531 U.S. at 25.

This caution is especially evident when it comes to the "money or property" element of mail and wire fraud. Over the last thirty-plus years, the Supreme Court has consistently rejected applications of the mail and wire fraud statutes *except* where the "property" forming the basis for the charge or conviction rests on solidly historical grounds and has strong links to established common-law concepts of criminal fraud. *See Kelly*, 140 S. Ct. at 1571; *Cleveland*, 531 U.S. at 24;

8

*McNally*, 483 U.S. at 356-60. Most recently, the Supreme Court explained that even where property is impacted by an alleged scheme, a property fraud charge may proceed only where the loss of property to the alleged victim is an *object* of the fraud. *See Kelly*, 140 S. Ct. at 1573. "[A] property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme." *Id.*[3/]

The "property" that is the object of the alleged fraud here does not pass the Supreme Court's stringent test. Another session of this District recently held as much in the prosecution of Mr. Khoury's alleged co-conspirator, Mr. Ernst, when it ruled that the government may not pursue the *same* property fraud theory against Mr. Ernst. *Ernst*, 2020 U.S. Dist. LEXIS 218928, at *24, *27. In other words, another session in this *same* District found that the *same* admission slot that is the subject of the fraud count in this case against Mr. Khoury was insufficient to qualify as property, as a matter of law. The government did not appeal that ruling, and should not be permitted to pursue it here.

The Indictment alleges that Mr. Khoury engaged in a conspiracy to commit mail fraud in order to obtain admission for his daughter at Georgetown. Indictment ¶¶ 8, 12(a). The "property" alleged is an offer of admission to a university.[4/] An offer of admission to a university or an

---

[3/]    Since its decision in *Kelly*, the Supreme Court vacated a judgment affirmed by the Second Circuit in *United States v. Blaszczak*, 947 F.3d 19 (2d Cir. 2019). In *Blaszczak*, the Second Circuit held that confidential information regarding contemplated regulatory action held by a government agency was "property" for purposes of the wire fraud statute because the agency had a "property right in keeping confidential and making exclusive use of its nonpublic predecisional information." *Id.* at 32-33 (internal quotation marks omitted; quoting *Carpenter*, 484 U.S. at 26). In a two-sentence opinion, the Supreme Court granted the petition for a writ of certiorari, vacated the judgment, and remanded the case to the Second Circuit for further consideration in light of *Kelly*. *See Blaszczak v. United States*, 2021 U.S. LEXIS 353 (Sup. Ct. Jan. 11, 2021); *Olan v. United States*, 2021 U.S. LEXIS 93 (Sup. Ct. Jan. 11, 2021). This remand suggests that the Supreme Court continues to impose limits on overly expansive government theories of liability under the federal property fraud statutes.

[4/]    This is the position the government has consistently taken across the Varsity Blues cases. *See, e.g.*, Waiver of Indictment & Plea to Information Hr'g Tr. at 25:14-19, 26:2-9, ECF No. 325, *United States v. Isackson*, No. 19-cr-10115 (D. Mass. May 1, 2019) (Government: "In this case, we would consider the property to be … the admission slots that they have a right to control and use how they see fit."); *id.* at 26:10-12 (Court: "So your view is, in any event, that the admissions slot is the property you're talking about?" Government: "Yes, your Honor."); Gov't Resp. to Ct.'s Mar. 14, 2019 Order at 3, ECF No. 18, *United States v. Meredith*, No. 19-cr-10075 (D. Mass. Mar. 15, 2019)

"admissions slot" is not a traditional form of property. Nor does a university's "right to control" the admissions process render that decisionmaking process or the admissions offers controlled by it "property" of the university. Moreover, the Indictment does not allege—nor can it—any intended loss of Georgetown's property (or anyone else's property) as a central purpose of the alleged fraudulent scheme, or that Georgetown suffered any tangible economic harm from the alleged deprivation of property.

For all these reasons, and for those on which Judge Talwani based her conclusion in the case involving Mr. Ernst, as a matter of law, the government may not pursue its property theory of mail fraud under Count I. Even if there were some ambiguity about this, the rule of lenity requires that this Court construe the term "property" not to include this intangible alleged property right that has not been traditionally recognized by courts.

### A.     A university admissions slot or offer is not "property" for purposes of the mail fraud statute.

The Supreme Court has consistently and unambiguously held that "§ 1341 protects property rights only." *Cleveland*, 531 U.S. at 19; *see United States v. Berroa*, 856 F.3d 141, 148 (1st Cir. 2017). There is no authority (other than Judge Gorton's recent decision, discussed below) supporting the conclusion that an admissions slot or offer is "property" in the hands of the university.

To constitute "property" for purposes of the mail and wire fraud statutes, the property right at stake must be one that "has long been recognized as property." *Carpenter v. United States*, 484 U.S. 19, 26 (1987); *see Kelly*, 140 S. Ct. at 1571; *Cleveland*, 531 U.S. at 19-20, 24; *McNally*, 483 U.S. at 357. This determination is made based on historical cases, statutes, and legal treatises.

---

("Here, the term 'property' refers to a place in the incoming class at Yale University, and Yale's right to control the composition of that class."); *see also* Motion Hr'g Tr. at 36:8-15, ECF No. 486, *United States v. Ernst*, No. 19-cr-10081 (D. Mass. July 1, 2020).

*Carpenter*, 484 U.S. at 26. In addition, "the thing obtained must be property in the hands of the *victim*"; it is not sufficient "that the object of the fraud may become property in the recipient's hands." *Cleveland*, 531 U.S. at 15 (emphasis added). The Supreme Court, the courts of appeals, and the district courts have continued to apply the framework of *Carpenter* and *Cleveland* by assessing historical sources to determine if the "property" alleged is of the type long recognized as property at common law. *See, e.g.*, *Berroa*, 856 F.3d at 149 (discussing *Cleveland*'s application of "traditional concepts of property").[5/] Further, as discussed above, the property at stake must be an actual "object of the fraud." *Kelly*, 140 S. Ct. at 1573 (citation omitted).

No "property" satisfying this definition is alleged in the Indictment. An offer to enter into a contract for services, or even the service itself, is not considered property; an admissions slot has not historically been recognized as a form of property; and a university's right to control the admissions process is not a form of property for these purposes.

### 1.   *An offer to enter into a contract for services is not property.*

The government's property theory ignores the fact that an admissions offer is just that: an offer. It is an invitation to enter into a services contract with a university.[6/] An offer of any kind is not a traditional or long-recognized form of property. It is an invitation to engage in a future transaction in which various interests—be they property or money or services—will be exchanged.

---

[5/]     In *Pasquantino v. United States*, 544 U.S. 349, 355-57 (2005), for example, the Supreme Court consulted Blackstone and Kent's Commentaries, its own prior decisions, and other sources to conclude that, under the "common law of fraud," Canada's right to uncollected excise taxes on imported liquor was "property" in the hands of Canada, because it was "an entitlement to collect money" from the defendants that bore "economic equivalence [to] money in hand." The Supreme Court reasoned that this conclusion was "consistent with *Cleveland*." *Id.* at 356.

[6/]     A recent batch of class action lawsuits arising out of universities' modification of their services due to the COVID-19 pandemic illustrates that everyone—students, parents, and schools alike—understands the relationship between students and universities to be a contractual one for services. *See, e.g.*, *Chong v. Northeastern Univ.*, 2020 U.S. Dist. LEXIS 233923 (D. Mass. Dec. 14, 2020); *Bergeron v. Rochester Inst. of Tech.*, 2020 U.S. Dist. LEXIS 241125 (W.D.N.Y. Dec. 18, 2020); *Salerno v. Fla. S. Coll.*, 2020 U.S. Dist. LEXIS 215349 (M.D. Fla. Sept. 16, 2020). Several of the initial decisions in these cases have rejected the plaintiffs' conversion claims against the universities, concluding that in-person learning (a service) or status as a student is not a form of tangible property. *See, e.g.*, *Salerno*, 2020 U.S. Dist. LEXIS 215349, at *15-16; *Bergeron*, 2020 U.S. Dist. LEXIS 241125, at *27-28.

We have not found any source that supports the proposition that an offer—even an offer of property—is property in and of itself to the person making the offer.

Even if the alleged scheme is framed as one to deprive the universities of something offered in exchange for a spot in an incoming class, this still does not salvage the government's property theory. When Mr. Khoury's daughter accepted the offer of admission to Georgetown, paid tuition, and enrolled, Georgetown provided Mr. Khoury's daughter with educational *services*, not property. In other words, universities do not exchange *property* for tuition payments, they exchange *educational services* for those payments. *See supra*, at 11 n.6.

At common law, services were generally not considered property. For example, in *Gleason v. Thaw*, 236 U.S. 558, 561 (1915), the Supreme Court observed that the "meaning [of property] as employed in ordinary speech and business" does not include "professional services," and held that such services did not qualify as "property" under a bankruptcy statute that exempted from general discharge any property obtained by false pretenses. *See also De Lima v. Sessions*, 867 F.3d 260, 266 (1st Cir. 2017) (acknowledging that "the traditional common-law definition of theft was limited to property, and … services were not considered property in many common-law jurisdictions"); *United States v. Alsugair*, 256 F. Supp. 2d 306, 314 (D.N.J. 2003) ("[T]here is no authority to support the proposition that services are a traditional property interest. Generally, services are *not* a traditional property interest …." (emphasis added)); *see also Skilling*, 561 U.S. at 401-03 (the right to honest services is not a traditional property right); *Service*, Black's Law Dictionary 1076 (2d ed. 1910) (defining "service" as "[t]he being employed to serve another; duty or labor to be rendered by one person to another"). Multiple federal statutes show that when Congress wants to criminalize deprivation of services, it does so expressly. *See McNally*, 483 U.S.

at 356-61.[7/] As the court in *Alsugair* observed, relying on a Ninth Circuit decision and *McNally*, many states have separate statutes that criminalize theft of services; this supports the proposition that "services are not considered traditional property interests." 256 F. Supp. 2d at 314. Where neither services nor an offer for services constitutes property for purposes of the federal mail fraud statute, an offer to enroll in a school and obtain its educational services is not property.

### 2. *An admissions slot is not a traditional form of property.*

Similarly, there is no support in the historical record for the proposition that an admissions slot in an incoming university class is a traditional or long-recognized form of property. To the extent the historical record addresses anything akin to "admissions slots," it suggests that they are *not* traditional forms of property. In *United States v. Plyler*, 222 U.S. 15 (1911), for example, the Supreme Court recognized that including false information in an application to gain admission to the federal civil service does not deprive the government of "property." This decision came shortly after Congress added the "money or property" limitation to the mail fraud statute in 1909, and reflects the contemporaneous understanding of what counts as "property."[8/] In *Plyler*, the Court held that the defendant's forgery of documents in support of his application to serve as a letter carrier in the civil service violated Section 5418 (a specialized fraud statute designed to protect the government, and inapplicable here), even though the slot in the civil service did *not* constitute a property interest, because under the applicable statute, it was "not essential to charge or prove an actual financial or property loss to make a case under [Section 5418]." *Plyler*, 222 U.S. at 17 (internal quotation marks and citations omitted). *Plyler* thus stands for the proposition that

---

[7/]    See also, for example, courts' continued application of the Supreme Court's holding in *Gleason* until Congress amended the bankruptcy statute to expressly cover "services" alongside "property." *See* Bankruptcy Act, Pub. L. 95-598, 92 Stat. 2549 (1978) (codified at 11 U.S.C. § 523(a)(2)(A)).

[8/]    Congress enacted the mail fraud statute in 1872 and added the express "money or property" limitation in 1909. *See* 3 Act of June 8, 1872, ch. 335, § 302, 17 Stat. 323; Act of Mar. 4, 1909, ch. 321, § 215, 35 Stat. 1130.

falsifying an application does *not* constitute a property deprivation.[9] If it did, it would have been superfluous for the Supreme Court to explain in its decision that "[i]t *now* must be regarded … that 'it is *not essential* to charge or prove an *actual financial or property loss*'" under the applicable statute. *Id.* at 17 (emphasis added; citations omitted). A fraudulently obtained "admission slot" in the civil service or at a competitive university are effectively the same. To the extent there is any historical guidance on this issue, *Plyler* counsels that offers of admission, like an offer to join the civil service, are not "property" of the entity making the offer.

In its briefs in opposition to similar motions filed in other Varsity Blues prosecutions, the government has relied on a single Sixth Circuit decision, *United States v. Frost*, 125 F.3d 346, 367 (6th Cir. 1997), to support its position that admissions slots are a university's property. Judge Gorton, when presented with this question on similar facts recently, concluded that *Frost* provided sufficient support to hold that an admissions slot is a university's "property" for purposes of the mail and wire fraud statutes. *See Sidoo*, 468 F. Supp. 3d at 441-42. Judge Talwani, when presented with the same question as to Mr. Khoury's alleged co-conspirator, concluded that *Frost* was not instructive. *Ernst*, 2020 U.S. Dist. LEXIS 218928, at *16-20. When taken in light of the Supreme Court's admonishment that the "property" requirement is to be construed narrowly, Judge Talwani's assessment of *Frost* is the better one. An ill-reasoned, out-of-circuit, and out-of-date opinion cannot be the sole basis for extending the definition of "property" to encompass a college admissions spot.

---

[9] Before *Plyler*, lower court decisions also reflect that falsifying an application to obtain a slot in the civil service was generally understood *not* to involve a deprivation of government "property." *See United States v. Bunting*, 82 F. 883, 884 (E.D. Pa. 1897); *see also Tyner v. United States*, 23 App. D.C. 324, 361-63 (D.C. Cir. 1904) (holding that fraudulent applications to the Civil Service Commission did not fall under the revised fraud statutes because they caused no "pecuniary injury," but that they did fall under new government-focused statutes that did not include a property element). For a more detailed discussion of the historical context and background of the *Plyler* decision, see Defendants' Memo. of Law at 11-15, ECF No. 1042, *United States v. Sidoo*, No. 19-cr-10080-NMG (D. Mass. Apr. 1, 2020).

In *Frost*, the Sixth Circuit held that professors owe a fiduciary duty to their university employer to protect the university's property, including unissued degrees. While this discussion of a university's "property" might seem facially relevant, it is not. *Frost* is distinguishable for precisely the reasons Judge Talwani identified in her decision rejecting its relevance. In *Frost*, the defendants were charged with depriving the university of honest services, and not under the federal property fraud statutes. *Ernst*, 2020 U.S. Dist. LEXIS 218928, at *17 (discussing *Frost*, 125 F.3d at 363-67). Because the Sixth Circuit in *Frost* "considered whether the degrees were 'property' solely for purposes of determining whether the defendants were violating their fiduciary duties to the university when fraudulently awarding university degrees," it "did not wrestle with whether the degrees amounted to 'intangible property rights' under the standard set forth in *Carpenter*." *Id.* Moreover, *Frost* predated *Cleveland* and *Kelly*, both seminal cases in defining the scope of intangible property rights for mail and wire fraud purposes. *See id.* at *17-20. As Judge Talwani aptly summarized: "*Frost's* discussion of property in the context of honest services fraud is of little help in defining 'property' after the Supreme Court's subsequent rulings in *Cleveland* and *Kelly* emphatically rejected novel and expansive interpretations of the term." *Ernst*, 2020 U.S. Dist. LEXIS 218928, at *22.[10/]

The rationale the government seeks to derive from *Frost*—that the mere potential for spillover economic consequences rendered unissued degrees into property, and therefore it must do the same for admissions slots—would transform any deprivation of "honest services" into a deprivation of property too. But as the legislative history responding directly to the Supreme

---

[10/]    Even if the Sixth Circuit had concluded that unissued degrees were property for purposes of the mail and wire property fraud analysis, there are critical differences between unissued diplomas (to students who are already enrolled and have completed some coursework) and admissions slots (offered to prospective students who have no pre-existing contractual relationship with the university).

Court's interpretation of the mail fraud statute reflects, honest services fraud is a *separate* crime, and the mail fraud statute plainly does *not* penalize the same conduct.[11/]

Frost is also uninstructive here because its assumptions about college are inapplicable to the twenty-first century competitive college admissions process. For example, *Frost* observed that "[t]he number of degrees which a university may award is finite." *Frost*, 125 F.3d at 367. That is simply not true today, if it was even true then.[12/] Judge Gorton relied on this concept, and extended it to the college admissions process, reasoning that "[t]he object of the alleged conspiracy in this case was to obtain those inherently limited 'admission slots' at universities because they would, presumably, lead to degrees." *See Sidoo*, 2020 U.S. Dist. LEXIS 110149, at *22. This rationale makes numerous assumptions well beyond the indictment in the *Sidoo* case and well beyond the Indictment in this case. Among them are that admissions slots are inherently limited (they may not be limitless, but they are not precisely limited either) and that the goal of obtaining admission to a school is to obtain a degree from the school (a generous assumption when high school students routinely apply to dozens of colleges despite being able to enroll in only one).

---

[11/]     In 1987, in *McNally*, the Supreme Court explained that the mail fraud statute did not extend to "schemes to defraud citizens of their intangible rights to honest and impartial government." 483 U.S. at 355, 360. A year later, "Congress amended the law specifically to cover one of the 'intangible rights' that lower courts had protected under § 1341 prior to *McNally*: 'the intangible right of honest services.'" *Cleveland v. United States*, 531 U.S. 12, 19-20 (2000) (citing 18 U.S.C. § 1346). But, as the Supreme Court recently explained, "the vagueness of that ['intangible right to honest services'] language led [the Supreme] Court to adopt 'a limiting construction,' confining the statute to schemes involving bribes or kickbacks." *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) (citing *Skilling v. United States*, 561 U.S. 358, 405, 410 (2010)).

[12/]     In the 2013-14 academic year, Georgetown awarded 1,794 bachelor's degrees along with a variety of advanced degrees and certificates. *Georgetown University Common Data Set 2014-2015*, available at https://georgetown.app.box.com/s/6wrzbqcxo8lwcqa95268t12qf44r02cl. In the 2014-15 academic year, Georgetown awarded 1,830 bachelor's degrees plus advanced degrees and certificates. *Georgetown University Common Data Set for 2015-2016*, available at https://georgetown.app.box.com/s/8vtoy67rj039e2tw6fk9knax92rhkpm3. Georgetown also awards nearly a dozen honorary degrees each year to individuals who did not enroll in the school and complete the degree requirements, but Georgetown's board deems worthy of special recognition. *See* Georgetown Univ., *Policy on the Awarding of Honorary Degrees*, https://governance.georgetown.edu/honorary-degrees/ (Amended Apr. 2019); Georgetown University, *Honorary Degree Recipients*, https://governance.georgetown.edu/honorary-degrees-list/ (last accessed Mar. 5, 2021). There is no limit on how many earned or honorary degrees Georgetown may confer.

Leaving *Frost* aside, and using the framework established by the Supreme Court described above, it is clear that an admissions slot at a university is not a form of property. *See Ernst*, 2020 U.S. Dist. LEXIS 218928, at *23 ("there is little indication that university admissions slots can be considered 'property' under the Supreme Court's construction of the term"). One need look no further than *Cleveland* for an apt analogy. The same indicia that led the Supreme Court to conclude that the video poker licenses in *Cleveland* were not property in the hands of the issuer support the conclusion that admissions slots are not property in the hands of the university. Like the unissued licenses in the hands of the state tasked with issuing the licenses in *Cleveland*, university admissions slots have no inherent economic value in the hands of the university. *See Cleveland*, 531 U.S. at 15, 21-22, 23. They offer no revenue or income stream to the university until they are actually offered to prospective students, and those offers are accepted via payment of an enrollment deposit and, later, tuition. *See id.* at 22 ("The State receives the lion's share of its expected revenue not while the licenses remain in its own hands, but only *after* they have been issued to licensees."). Also like the state that issues licenses, and in contrast to a patent holder who holds the rights to a patent, a university does not use admissions slots itself (students use the slots to take classes toward a degree the university issues later upon the student's satisfaction of all graduation requirements), and a university generally "may not sell its … authority" to determine who gets offered an admissions slot and who doesn't. *See id.* at 23 ("Louisiana does not conduct gaming operations itself[] [and] it does not hold video poker licenses to reserve that prerogative…."). A university also does not "sell" admissions slots "in the ordinary commercial sense," *id.*, but rather, like a regulator, determines who should and should not receive a slot from amongst a pool of applicants. How a university decides whom to admit is of no relevance to this analysis, just as how a licensor

17

decides to whom to issue licenses is of no relevance. In all of these senses, an admissions slot is analogous to the licenses that the Supreme Court held unequivocally are *not* property.[13]

### 3. *The integrity of or a university's "right to control" the admissions process is not a property right.*

Perhaps acknowledging that admission to a university is not a property right in the hands of the university, the government has asserted in related Varsity Blues cases that alleged schemes like this one impede universities' "right to control" their admissions processes, and that this right to control is either a property right in and of itself, or an indicium of a property right in the admissions slots allocated through that process. *See supra*, at 9-10 n.4 (collecting the government's assertion of the "right to control" theory in other Varsity Blues cases). Neither the case law nor the Indictment supports this theory.

"Property" may include intangible interests such as the right to control the use of one's assets, but not all intangible rights rise to the level of "property." *See, e.g.*, *Kelly*, 140 S. Ct. at 1572 (the "right to control" does not transform non-property into property); *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015) ("the right to control the asset in question" is a "defining feature of most property," but this right "does not render every transaction induced by deceit actionable"; instead, "the deceit must deprive the victim 'of potentially valuable economic information'" (internal quotation marks and citations omitted)).

In *Carpenter*, the Supreme Court concluded that a newspaper "had a property right in keeping confidential and making exclusive use, prior to publication, of the schedule and contents" of a news column that discussed stock picks. 484 U.S. at 26. The Court went on to explain that

---

[13]    A university's right to select its students is distinguishable from a franchisor's right to select its franchisees for many of the same reasons the Supreme Court distinguished it in *Cleveland*. A university does not "share both losses and gains" with an admitted student or give an admitted student the right to use the university's "trademark, brand name, [or] business strategy." *Cleveland*, 531 U.S. at 24.

"[t]he confidential information was generated from the business, and the business had a right to decide how to use it prior to disclosing it to the public." *Id.* As a result, it was sufficient that the newspaper had "been deprived of its right to exclusive use of the information." *Id.* After *Carpenter*, the Supreme Court rejected efforts to classify intangibles as "property" solely because the victim had a right to control them. In *Cleveland*, for example, the Supreme Court concluded that "the State's right to exclude was not, by itself, sufficient to conclude that the item at issue [the unissued video poker license] was a form of property." *Ernst*, 2020 U.S. Dist. LEXIS 218928, at *19 (describing *Cleveland*, 531 U.S. at 23). And in *Kelly*, the Supreme Court affirmed its prior holding that "a scheme to alter … a regulatory choice is not one to appropriate … property." 140 S. Ct. at 1572 (citing *Cleveland*, 531 U.S. at 23).

*Cleveland* and *Kelly* both stand for the proposition that a right to control that amounts to a regulatory choice, as opposed to an economic asset, is not "property" within the meaning of the property fraud statute. Although *Cleveland* and *Kelly* both involved the exercise of "regulatory power" by governmental actors, the same principles extend to a university's allocation of offers to join its incoming class. In *Cleveland*, the defendants interfered with the state's right to control how and to whom it issues licenses. 531 U.S. at 15, 21-24. In *Kelly*, the defendants interfered with the government's right and ability to control access to lanes on a bridge. 140 S. Ct. at 1569-70. A scheme to alter an admissions decision—to influence or impede the university's right to control admissions decisions—is of the same ilk. In *Cleveland* and *Kelly*, the right may have derived from the government's regulatory authority, but the characteristics are the same as in any decisionmaking authority, whether vested in a public or private actor: the intangible, unquantifiable, noneconomic right to consider whatever information the actor chooses in determining to whom to extend a certain right or privilege, or how to allocate certain resources. A

university cannot use these resources (the spots in the incoming class) itself; it can only control how they are allocated and to whom they are offered.

Whether something is "property" must be looked at from the perspective of the alleged victim, and whether the victim may use, dispose of, and commercialize the alleged property consistent with traditional notions of what constitutes property. *See Cleveland*, 531 U.S. at 15. Admissions spots and the right to control them are thus indistinguishable from the video poker licenses that the state issuing them cannot use directly, and the lanes that the *Kelly* defendants did not (and could not) "walk away with." *Kelly*, 140 S. Ct. at 1573. Even if the Indictment went this far (which it does not), Mr. Khoury's alleged usurpation, with his co-conspirators, of Georgetown's "rights of allocation, exclusion, and control," thereby "alter[ing] a regulatory decision about" the composition of the incoming class, "cannot count as the taking of property." *Id.* (internal quotation marks omitted). This is precisely the conclusion reached by the Seventh Circuit when—pre-*Cleveland* and *Kelly*, but anticipating where the Supreme Court was heading— it rejected the government's theory that a university's loss of the "right to control" who received athletic scholarships was a cognizable property right under the mail fraud statute, and characterized the theory as "an intangible rights theory once removed." *United States v. Walters*. 997 F.2d 1219, 1226 n.3 (7th Cir. 1993). The Supreme Court's analysis in *Cleveland* and *Kelly*, and the Seventh Circuit's analysis in *Walters* (discussed in detail *infra*), demonstrate that the "right to control" admission to a university is *not* a cognizable property right (and does not transform an admissions slot into one) for purposes of the property fraud statutes.[14] *See also United States v. Alkaabi*, 223 F. Supp. 2d 583, 589-91 (D.N.J. 2002) (dismissing mail fraud and related conspiracy charges

---

[14]     As explained more fully *infra*, in Section B, the only interests at stake here, as in *Cleveland* and *Kelly*, are purely regulatory ones. The Indictment does not allege that Mr. Khoury's alleged fraud affected the interests of anyone other than the university, and it is clear for the reasons discussed elsewhere in this brief that the university did not suffer any tangible economic harm from offering a spot to Mr. Khoury's daughter in its incoming class.

because "maintaining the integrity of the [Test of English as a Foreign Language (TOEFL)] testing process" was not a traditionally recognized property interest). It is for these reasons, among others, that Judge Talwani correctly concluded that there is no legal support for a property right in "the integrity of the admissions process." *Ernst*, 2020 U.S. Dist. LEXIS 218928, at *24.

**B.     The property fraud theory fails because property loss was not an object of the alleged scheme.**

The government's property theory also fails because even if any property was impacted by the alleged scheme, the loss of property to Georgetown (or any other alleged victim) was not an *object* of the alleged fraud. Under *Kelly*, "a property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme." *Kelly*, 140 S. Ct. at 1573. Actual loss to the victim "must play more than some bit part in a scheme: It must be an object of the fraud." *Id.* (internal quotation marks and citations omitted); *see Cleveland*, 531 U.S. at 15 ("the thing obtained must be property in the hands of the *victim*"; it is not sufficient "that the object of the fraud may become property in the recipient's hands" (emphasis added)).[15/] As Judge Talwani explained, under *Kelly*, "it is not enough that the scheme incidentally causes a loss of property; instead, the question is whether the loss of property was the *object* of the charged fraud." *Ernst*, 2020 U.S. Dist. LEXIS 218928, at *23. This "object of the fraud" requirement is necessary because, without some direct connection between the scheme and "property," it would be difficult to distinguish property fraud from honest services fraud. *Kelly*, 140 S. Ct. at 1574.

This concept is not new. *Kelly* merely advanced the well-established principle that where the government asserts a property fraud theory based on the victim's "right to control the use of

---

[15/]     The strength of the Supreme Court's conviction that an economic harm or loss must be an "object of the fraud" is demonstrated by its recent vacatur without discussion of a pre-*Kelly* decision in which the Second Circuit, purporting to follow *Carpenter*, declined "to impose a rigid 'monetary loss' criterion" when considering whether confidential information in the hands of the government constituted "property." *United States v. Blaszczak*, 947 F.3d 19, 34 (2d Cir. 2019). *See supra*, at 9 n.3 (discussing the Supreme Court's remand in *Blaszczak v. United States*).

its assets," the government must show that the defendant deprived the victim of "potentially valuable *economic* information," and "[t]he fraudulent scheme must implicate *tangible* economic harm." *Ernst*, 2020 U.S. Dist. LEXIS 218928, at *25 (quoting *United States v. Finazzo*, 850 F.3d 94, 111-12 (2d Cir. 2017)); *cf. Sekhar v. United States*, 570 U.S. 729, 740 (2013) ("[T]he term 'property' plainly does not … extend to everything that might in some indirect way portend the possibility of future economic gain." (Alito, J., concurring in the judgment)).

This holding is consistent with those of several courts of appeal pre-*Kelly* which reasoned that if a fraudulent scheme simply causes a victim to enter a transaction that the victim may have otherwise avoided, or if the transaction does not create (or even contemplate) tangible economic harm (e.g., the fraudster pays full price in the transaction), the mail and wire fraud statutes have not been violated. In other words, if the victim receives the full economic benefit of the bargain, there is no money or property fraud. *See, e.g.*, *Binday*, 804 F.3d at 570 (2d Cir.) ("The 'right to control one's assets' does not render every transaction induced by deceit actionable under the mail and wire fraud statutes….[W]e have repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain."); *Finazzo*, 850 F.3d at 111 (2d Cir.) (depriving the victim of "economic information it would consider valuable in deciding how to use its assets" satisfies the requirement that property be an "object of the scheme" because it "*necessarily* creates a risk of tangible economic harm"); *United States v. Takhalov*, 827 F.3d 1307, 1313 (11th Cir. 2016) (defendant nightclub owners did not fraudulently obtain property from their customers by having female employees pretend to be tourists to induce customers to patronize the club, because "if someone is lured to a bar under false pretenses but nevertheless gets precisely what he pays for, he has hardly been 'deceive[d] or cheat[ed] out of money or property'" (alterations in original)), *opinion revised,* 838 F.3d 1168 (11th Cir. 2016);

*United States v. Sadler*, 750 F.3d 585, 589-91 (6th Cir. 2014) (defendant's submission of false credentials and lies to pharmaceutical distributors to procure drugs could not be basis of wire fraud conviction where defendant bought the drugs from the distributors at full price, because "the government never showed that [the defendant] intended to deprive anyone of property").[16/] In *Sadler*, the court explained that "[e]ven when Congress amended the fraud statutes to cover *some* intangible rights, it did not stretch the statute to cover the right to accurate information before making an otherwise fair exchange." 750 F.3d at 591. Even the Sixth Circuit, in *Frost* (discussed *supra*), acknowledged that "a defendant accused of scheming to defraud another of money or property" has "to intend to inflict an ***economic harm*** upon the victim." 125 F.3d at 369 (emphasis added).

The most instructive pre-*Kelly* decision illustrating the application of this principle is *Walters*. *See* 997 F.2d at 1225. In *Walters*, the Seventh Circuit considered whether a scheme that deceived universities by failing to disclose that certain student athletes had signed with an agent, causing the universities to pay stipends to "professional" athletes against NCAA rules, was within the parameters of the mail fraud statute. Recognizing the theme in the Supreme Court's jurisprudence well before *Kelly*, Judge Easterbrook expressed significant skepticism that the mail fraud statute extends to criminalize schemes that only "incidentally cause losses." *Id.* at 1225-26; *see id.* at 1227 ("Losses that occur as byproducts of a deceitful scheme do not satisfy the statutory requirement [of § 1341]."). Judge Easterbrook went on to observe that a customer of a stock trader "who loses the honesty of the traders, but no money, has not been defrauded of property," and that

---

[16/]    *See also United States v. Bruchhausen*, 977 F.2d 464, 467-68 (9th Cir. 1992) (finding no property interest based on argument that transaction would not have been entered into except for the deceit, in part because there was no monetary loss, and despite the fact that the manufacturers "may have been deceived into entering sales that they had the right to refuse"); *cf. Skilling*, 561 U.S. at 400 (a city government is defrauded of honest services, but not property, if its mayor accepts "a bribe from a third party in exchange for awarding that party a city contract, yet the contract terms were the same as any that could have been negotiated at arm's length").

similarly, "a university that loses the benefits of amateurism likewise has been deprived only of an intangible right, which per *McNally* does not support a conviction." *Id.* at 1226. While the agent who convinced the athletes to sign with him and not to disclose their "professional" status to the university in order to retain their scholarships may have been "a nasty and untrustworthy fellow," the government "did not prove that his efforts to circumvent the NCAA's rules amounted to mail fraud." *Id.* at 1227.

Similar flaws befall the government's theory here. There is only one alleged object of the fraud: admission of Mr. Khoury's daughter to Georgetown. *See* Indictment ¶ 8 ("The principal objects of the conspiracy were to commit mail fraud … by bribing Ernst to fraudulently designate Khoury's daughter as a tennis recruit. The principal purpose of the conspiracy was to facilitate the admission of Khoury's daughter to Georgetown."); *id.* ¶ 12(a) (alleging "a scheme and artifice to defraud and to obtain money and property, to wit, admission to Georgetown, by means of materially false and fraudulent pretenses"). Even if Mr. Khoury or Mr. Ernst had orchestrated the scheme for "bad reasons" and "by resorting to lies," the most the scheme aimed to do or achieved was to "alter" an administrative decision about whom to designate as an athletic recruit and admit to Georgetown. *Kelly*, 140 S. Ct. at 1573. The Indictment does not allege that Georgetown suffered any loss of property or tangible economic harm from this alleged fraud. Nor could it. Mr. Khoury paid a deposit to secure his daughter's spot at Georgetown after she was admitted, and paid full tuition while she was enrolled. Mr. Khoury's daughter was not offered and did not receive any athletic scholarship or financial aid. Georgetown received the "full economic benefit" of Mr. Khoury's daughter's admission through the full payment of all tuition and fees. *See Binday*, 804 F.3d at 570. It received the benefit of that tuition in exchange for providing educational services; it was not deprived of property.

At most, the Indictment alleges that Mr. Ernst failed to disclose Mr. Khoury's alleged promise of financial compensation to Mr. Ernst when Mr. Ernst recommended Mr. Khoury's daughter for admission to Georgetown. Indictment ¶ 10(f)-(g). But even if this were true, and even if (making a huge leap from the allegations in the Indictment) Mr. Khoury's daughter *was* admitted to Georgetown under false pretenses (something the Indictment does not actually allege), Georgetown got exactly what it would have had Mr. Khoury's daughter been admitted to Georgetown absent any false pretenses: the payment of tuition in exchange for the provision of educational services to her. This is compounded by the fact that the Indictment does not allege that Mr. Khoury's daughter's application misrepresented her athletic ability. *See* Indictment ¶ 10(d). Any impact on Georgetown's right to make informed decisions about how to allocate its admissions slots is not "economic" when Georgetown would be (and was) paid in full for the allocation of a spot to Mr. Khoury's daughter. In other words, the only "property" Mr. Khoury is alleged or even could be alleged to have obtained from Georgetown is admission to the school for his daughter; there is no corresponding deprivation of property to Georgetown because Mr. Khoury paid in full for what he received.

Because the Indictment does not allege any economic loss to Georgetown as an object of the scheme, this case is distinguishable from *United States v. Gatto*, 2021 U.S. App. LEXIS 1146 (2d Cir. Jan. 15, 2021). In *Gatto*, the defendants were convicted of a scheme not entirely unlike the one the Seventh Circuit deemed outside the scope of the mail fraud statute in *Walters*. The *Gatto* defendants "engag[ed] in a scheme to defraud three universities by paying tens of thousands of dollars to the families of high school basketball players to induce them to attend the universities … and covering up the payments so that the recruits could certify to the universities that they [complied with NCAA rules] barring student-athletes and recruits from being paid." *Id.* at *2. The

25

student-athletes, in turn, received financial aid from the universities that they were ineligible for because they were not eligible to compete as "amateurs" under NCAA rules. *Id.* at *4-8.

The Second Circuit affirmed the convictions in *Gatto* post-*Kelly*. The Court concluded that "the loss of property—the Universities' funds set aside for [athletic-based] financial aid—was at the heart of the Defendants' scheme." *Gatto*, 2021 U.S. App. LEXIS 1146, at *18. As the Second Circuit explained:

> [The Defendants'] original plan included inducing the Universities to give the Recruits financial aid by concealing from the Universities the payments made to the Recruits' families in fear that if they were discovered the Recruits would not be permitted to compete. ***Importantly, the scheme depended on the Universities awarding ineligible student-athletes athletic-based aid; without the aid, the recruits would have gone elsewhere.*** And if the Recruits' ineligibility had been discovered by the schools, the scheme would have failed.

*Id.* at *18-19 (emphasis added). In other words, "hiding the Recruits' ineligibility was essential to Defendants' scheme—had the Universities known the Recruits were ineligible, they would not have offered them athletic-based aid or roster spots on their basketball teams." *Id.* at *20. The universities "dispense[d] with their property"—athletic-based financial aid—because certain information regarding the recruits' eligibility for that aid was withheld from the universities. *Id.* at *19-20. The economic harm to the universities supporting the wire fraud conviction was the awarding of financial aid to students who otherwise would not have been eligible for it.

The emphasis that the Second Circuit put on the universities' loss of financial aid funds shows the critical distinction between the scheme in *Gatto* and the scheme alleged here. In *Gatto*, "depriving Universities of athletic-based aid was at the *center* of the plan." *Id.* at *19. Here, in contrast, Mr. Khoury is not alleged to have deprived Georgetown of any money or actual property. The scheme rose and fell with an offer by Georgetown for Mr. Khoury's daughter to attend the school, and to pay full price for it. If the scheme secured such an admissions offer, it was

successful. If it did not, it failed. Any economic harm or loss to Georgetown stemming from the success or failure of the scheme was ***merely incidental***.

The analysis is limited by what the government has alleged in the Indictment: that admission of Mr. Khoury's daughter to Georgetown was the object of the fraud. *See* Indictment ¶ 12(a); *see also Ernst*, 2020 U.S. Dist. LEXIS 218928, at *26-27 (government cannot pursue theories not alleged in the indictment because doing so "frustrates Defendants' rights to be indicted by a grand jury"); *Alkaabi*, 223 F. Supp. 2d at 588-89 (same). But even if the government pivots and attempts to redefine the property at stake or the object of the fraud, it will be unable to satisfy this requirement of tangible economic harm. It is difficult to imagine any scenario in which the government could allege an actual economic harm arising from the alleged scheme, which resulted in the payment of full tuition, let alone an actual economic harm that was an ***object*** of the alleged scheme. For example, the government may argue that Georgetown suffered damage to its reputation as a result of the alleged scheme, and that Georgetown's reputation is a property right. *See, e.g.*, USC Victim Impact Statement, ECF No. 30, *United States v. Bizzack*, No. 19-cr-10222 (D. Mass. Oct. 30, 2019). This is not alleged anywhere in the Indictment, but even if it were, such reputational harm would be an "incidental byproduct" of the alleged scheme at most. *See Kelly*, 140 S. Ct. at 1573. Surely it was not an "object" of the scheme—why would a parent pay a bribe to get their child into a school whose reputation the parent intended to damage?

Alternatively, the government may argue that the scheme deprived another student of admission to Georgetown. *See, e.g.*, Gov't Consol. Sent. Memo. at 4-6, ECF No. 423, *United States v. Abbott*, No. 19-cr-10117 (D. Mass. Sept. 6, 2019). Even if it were true that the admission of Mr. Khoury's daughter was at the exclusion of another candidate (something not alleged in the Indictment), denying another student an admissions slot is, again, at most a "byproduct of the

[alleged] scheme" to obtain **Mr. Khoury's daughter's** admission to Georgetown. *See Kelly*, 140 S. Ct. at 1573; *see also* Indictment ¶ 12(a) (object of scheme was to obtain "admission to Georgetown"). Moreover, the property must be "property in the hands of the victim," defined here as Georgetown, not property in the hands of someone else. *Cleveland*, 531 U.S. at 15. Admissions slots have no inherent economic value to universities.[17]

The Indictment does not allege—nor can it—that Mr. Khoury sought to harm Georgetown's reputation or sought to prevent another applicant from getting in. Even taking the Indictment in the light most favorable to the government's claims, Mr. Khoury was just trying to get his own child into college. *Kelly* makes clear that any "costs" or consequences imposed on Georgetown (or anyone else) by this alleged conduct would be an "incidental byproduct," not the object of the scheme. *See Kelly*, 140 S. Ct. at 1572-73. In short, there is nothing the government can do to salvage its property fraud charge in light of *Kelly*. Even if the government were to supersede the Indictment, any alleged economic consequences for Georgetown—be it damaged reputation or goodwill, or less promotional revenue from a theoretically marginally less competitive tennis program (unlikely, given that a sport like tennis is not a revenue-generating sport)—would be incidental byproducts (an ancillary effect), not an object, of the alleged scheme.

---

[17]      One need look no further than the consensus in this District for support for the proposition that admissions slots have no inherent economic value. Several sessions of this District (Judges Gorton, Talwani, Woodlock, and Zobel) have concluded that the alleged scheme to deprive universities of "admissions slots" did not inflict "pecuniary harm" on the universities for purposes of application of the Sentencing Guidelines. *See, e.g.*, Memo. and Order at 4-6, ECF No. 443, *United States v. Abbott*, No. 19-cr-10117 (D. Mass. Sept. 13, 2019) (Talwani, J.); Probation Office's Submission in Response to Court's Order of Sept. 10, 2019, at 3-5, ECF No. 440, *United States v. Abbott*, No. 19-cr-10117 (D. Mass. Sept. 11, 2019); Sentencing Hr'g Tr. at 5:4-18, ECF No. 340, *United States v. MacFarlane*, No. 19-cr-10131 (D. Mass. Nov. 13, 2019) (Gorton, J.); Sentencing Hr'g Tr. at 32:19-25, ECF No. 26, *United States v. Vandemoer*, No. 19-cr-10079 (D. Mass. June 12, 2019) (Zobel, J.); Sentencing Hr'g Tr. at 56:23-57:4, 60:5-63:1, ECF No. 34, *United States v. Bizzack*, No. 19-cr-10222 (D. Mass. Oct. 30, 2019) (Woodlock, J.). This means that any harm that was suffered was "non-economic." *See* U.S.S.G. § 2B1.1 cmt. n.3(A)(iii) (defining "pecuniary harm" as "harm that is monetary or that otherwise is readily measurable in money," and stating that "pecuniary harm does not include … harm to reputation, or other non-economic harm").

**C.**     **Even if it is ambiguous whether property is at stake, the rule of lenity warrants dismissal of the property fraud theory.**

Finally, even if there is some ambiguity as to whether admission to Georgetown constitutes "property," or whether the object of the scheme was a loss of property to the victim, that ambiguity must be resolved in favor of Mr. Khoury, both under principles of lenity and under principles of equity given the legal ruling in the prosecution of Mr. Khoury's alleged co-conspirator, Mr. Ernst. The split within this District itself shows that the statutes are at best ambiguous with respect to the status of college admissions slots as "property," and therefore dismissal is the only appropriate outcome under the rule of lenity.

**1.**     *Resolution of an ambiguity in the scope of a property fraud charge must be in favor of Mr. Khoury.*

Even if this Court interprets *Cleveland* and *Kelly* differently than Mr. Khoury does, the rule of lenity requires resolving any ambiguity as to the meaning of "property" in favor of Mr. Khoury. *See Cleveland*, 531 U.S. at 25; *see also Skilling*, 561 U.S. at 410-11 (applying the rule of lenity in an honest services case). Courts must reject the government's "invitation for federal courts to develop a common-law crime of unethical conduct." *Sorich v. United States*, 555 U.S. 1204, 1207 (2009) (Scalia, J., dissenting from denial of certiorari). Congress must have "spoken in language that is clear and definite" before the courts "choose the harsher alternative" in "deciding what is 'property' under § 1341." *Cleveland*, 531 U.S. at 25 (citation omitted); *see McNally*, 483 U.S. at 359-60.[18] In the absence of any direction from Congress that the property fraud statutes should be interpreted so broadly, the rule of lenity "requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *Berroa*, 856 F.3d at 157 n.8 (citations omitted).

---

[18]     Indeed, in *Skilling*, the Supreme Court cautioned that "[i]f Congress were to take up the enterprise of criminalizing 'undisclosed self-dealing by a … private employee,' … it would have to employ standards of sufficient definiteness and specificity to overcome due process concerns." 561 U.S. at 411 n.44.

The government has not identified in any of the numerous prosecutions currently raising this exact issue *any* squarely applicable authority permitting it to proceed on its novel property theory. In the absence of any persuasive authority requiring this Court to hold that an admissions slot or the right to control the admissions process unambiguously qualifies as property, the rule of lenity dictates that the definition of "property" required for prosecution under the mail fraud statute not be extended to encompass admissions slots.

This is the approach taken by Judge Talwani in ruling on motions to dismiss in the related proceeding against Mr. Ernst, the Georgetown tennis coach alleged to be a co-conspirator with Mr. Khoury. Judge Talwani acknowledged "the Supreme Court's refrain that the federal property fraud statutes should not be used as a backdoor for expanding the scope of federal criminal jurisdiction without a clear statement by Congress." *Ernst*, 2020 U.S. Dist. LEXIS 218928, at *27 (collecting cases; citations omitted). Taking this together with "the foundational principle in criminal law that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity,'" Judge Talwani ruled that admissions slots are *not* property for purposes of similar mail and wire fraud charges. *Id.* at *28 (quoting *Cleveland*, 531 U.S. at 25).[19]

2.   ***Other canons of construction and principles of equity warrant a narrower interpretation of the property fraud statutes than the government advances.***

The rule of lenity should also be applied where the theory advanced by the government would massively expand criminal liability beyond anything Congress could have intended on the face of the statute. *See, e.g.*, *McNally*, 483 U.S. at 356-61; *Skilling*, 561 U.S. at 415-25 (Scalia, J., concurring in part and concurring in the judgment). The Supreme Court has invoked the rule of lenity to reign in overbroad interpretations of the mail and wire fraud statutes. *See, e.g.*, *Skilling*,

---

[19]   In the *Sidoo* case, Judge Gorton did not mention the rule of lenity in his opinion.

561 U.S. at 410-11; *Cleveland*, 531 U.S. at 25; *McNally*, 483 U.S. at 359-60. In *Cleveland*, for example, the Supreme Court rejected "the Government's theories of property rights not simply because they stray from traditional concepts of property," but also because they would effect "a sweeping expansion of federal criminal jurisdiction" into "a wide range of conduct traditionally regulated by state and local authorities." 531 U.S. at 24. Similarly, the First Circuit has closely monitored the bounds of the mail fraud statute with respect to loss of property, and has refused to "recharacterize every breach of fiduciary duty as a financial harm, and thereby let in through the back door the very same prosecution theory that the Supreme Court tossed out the front." *United States v. Ochs*, 842 F.2d 515, 523, 527 (1st Cir. 1988); *see Berroa*, 856 F.3d at 150 (rejecting a property theory advanced by the government under which "virtually any false statement in an application for a medical license could constitute a federal crime"); *see also United States v. Czubinski*, 106 F.3d 1069, 1079 (1st Cir. 1997) (warning that the "broad language" of the fraud statutes should not "be used to prosecute kinds of behavior that, albeit offensive to the morals or aesthetics of federal prosecutors, cannot reasonably be expected by the instigators to form the basis of a federal felony").

The Indictment does not allege *any* misrepresentations on Mr. Khoury's daughter's application, or *any* misrepresentations by Mr. Khoury to Georgetown. Under the government's theory, then, it would be a federal crime for a parent not to contact the admissions department of a college to inform them of any communications they have had with anyone affiliated with the college. Parents of prospective students have communications with college employees *every day*, and these communications are not necessarily captured in their children's college applications or back-end documentation associated with the application. It's not a crime to have a conversation about your child's college application. And it is certainly not a federal crime. But the government's

theory would effectively impose an affirmative duty under federal law to disclose such conversations on parents of college applicants.

Moreover, allowing the government to proceed on its novel property theory in this case would be directly at odds with Judge Talwani's ruling on the same legal question in the prosecution of Mr. Ernst, who is Mr. Khoury's alleged co-conspirator.[20] Deviating from Judge Talwani's ruling would have the troubling and unfair result of allowing the government to proceed on a theory against Mr. Khoury that it has been expressly barred from pursuing against his alleged co-conspirator, Mr. Ernst, for the same alleged scheme in a contemporaneous prosecution.

Finally, there is no prejudice to the government or to the rule of law in this outcome. If the Court dismisses this theory from the Indictment, the government may appeal that ruling on an interlocutory basis, enabling the First Circuit to render an authoritative ruling. 18 U.S.C. § 3731 (first par.). For all these reasons, this Court should hold, consistent with Judge Talwani, "that, as a matter of law, the government cannot secure a conviction on the theory that Defendant[] committed property fraud." *See Ernst*, 2020 U.S. Dist. LEXIS 218928, at *27.

## III.   THE HONEST SERVICES THEORY IN COUNT I MUST BE DISMISSED BECAUSE ECONOMIC HARM TO GEORGETOWN WAS NOT REASONABLY FORESEEABLE

While the property fraud theory in Count I fails because the Indictment does not allege that the object of the conspiracy was to defraud Georgetown of "property," the honest services fraud theory in Count I fails for a similar reason: the Indictment does not allege that economic harm to Georgetown was reasonably foreseeable from the alleged scheme to defraud. Such reasonably

---

[20]     Mr. Ernst's conduct in relation to Mr. Khoury is part of the government's prosecution of Mr. Ernst in the case before Judge Talwani. *See* Second Superseding Indictment ¶¶ 120-132, ECF No. 505, *United States v. Ernst*, No. 19-cr-10081 (D. Mass. Sept. 1, 2020).

foreseeable economic harm is an essential element of an honest services mail or wire fraud charge involving private actors in the First Circuit.

Consistent with its general cabining of the mail and wire fraud statutes, the Supreme Court and lower courts have limited the reach of honest services fraud and have declined to permit broad interpretations of § 1346. In *Skilling*, for example, the Supreme Court held that "§ 1346 criminalizes *only* the bribe-and-kickback core of the pre-*McNally* case law," and does not extend to other types of dishonesty, including "undisclosed self-dealing by a public official or private employee." *Skilling*, 561 U.S. at 409. In a line of pre-*Skilling* cases that the Supreme Court's decision did not expressly overrule, several federal courts of appeal, including the First Circuit, placed another limitation on honest services prosecutions, holding that honest services mail and wire fraud requires a "reasonably foreseeable economic harm" to the employer who has been deprived of its employee's honest services. *See United States v. Martin*, 228 F.3d 1, 17 (1st Cir. 2000).[21] Such limitations are necessary so that § 1346 does not reach—as it surely was not designed to reach—"every employee transgression" (*id.*) and "every breach of contract or every misstatement made in the course of dealing." *United States v. Cochran*, 109 F.3d 660, 667 (10th Cir. 1997); *see United States v. Sun Diamond Growers of Cal.*, 138 F.3d 961, 973 (D.C. Cir. 1998) (not "[e]very material act of dishonesty … [that] deprives the employer of that worker's 'honest services' … is converted into a federal crime by the mere use of the mails or interstate phone system"). Limits are especially necessary where an honest service charge arises among private actors. *See, e.g.*, *United States v. Jain*, 93 F.3d 436, 442 (8th Cir. 1996) ("prior intangible rights convictions involving private sector relationships have almost invariably included proof of actual harm to the victims' tangible interests").

---

[21]     In *Skilling*, the Supreme Court acknowledged in a footnote that circuit courts were split on "whether a defendant must contemplate that the victim suffer economic harm," but did not resolve the split. 561 U.S. at 403 n.36.

Under *Martin*, the government must allege and prove "'a failure to disclose something which in the knowledge or contemplation of the employee poses an independent business risk to the employer,' or creates 'reasonably foreseeable economic harm' to the employer." *Martin*, 228 F.3d at 17 (quoting *Sun Diamond*, 138 F.3d at 973 (further citation omitted)). "[T]he fraud in question need not deprive the employer specifically of money, but may do so indirectly by showing actual harm to tangible interests." *Id.* at 17 n.23. In *Martin*, the First Circuit concluded that a reasonable jury could have found that a co-conspirator's disclosure of confidential information to the defendant was in knowing breach of her fiduciary duty to her employer, and that this failure to disclose her communication with the defendant "posed 'an independent business risk' to [her employer] and created 'reasonably foreseen economic harm' to [her employer]," because she knew that the defendant intended for his company to compete with her employer. *Id.* at 17-18.

Under the *Martin* standard, even when proceeding on an honest-services theory, the government must prove that it was reasonably foreseeable that the fraudulent scheme could result in some more-than-*de minimis* economic harm to the victim. This test is met only when, at the time of the scheme to defraud, "the employee could foresee that the scheme potentially might be detrimental to the employer's economic well-being." *United States v. Vinyard*, 266 F.3d 320, 329 (4th Cir. 2001); *see Frost*, 125 F.3d at 368 (6th Cir.) (explaining that, with respect to honest services fraud, "[t]he prosecution must prove that … the employee foresaw or reasonably should have foreseen that his employer might suffer an economic harm as a result of the breach," and that "[p]roof that the employer simply suffered only the loss of the loyalty and fidelity of the defendant is insufficient to convict" (citation omitted)). As explained in *United States v. Lemire*, 720 F.2d 1327, 1337 (D.C. Cir. 1983), upon which the First Circuit relied in *Martin*:

> So long as the jury finds the non-disclosure furthers a scheme to abuse the trust of an employer in a manner that makes ***an identifiable harm*** to him, ***apart from the***

34

***breach itself***, reasonably foreseeable, it may convict the employee of wire fraud. The crucial determination must be whether the jury could infer that the defendant might reasonably have contemplated some ***concrete business harm*** to his employer stemming from his failure to disclose the conflict along with any other information relevant to the transaction." (Emphasis added; citations omitted.)

This reasonably foreseeable economic harm requirement is not met here. There are no allegations in the Indictment (nor could there be) that Mr. Ernst could or did foresee at the time he allegedly agreed to put forth Mr. Khoury's daughter as a tennis recruit that the scheme could in any way be detrimental to Georgetown's *economic* well-being or cause it any "concrete business harm." *See Lemire*, 720 F.2d at 1337; *see also Martin*, 228 F.3d at 17. Indeed, admission of Mr. Khoury's daughter to Georgetown was and at the time would have been understood to be an economic benefit to Georgetown: admission of a full-pay student who is not alleged to have (and did not) receive any financial aid, scholarship, or discount. The prosecution of Mr. Khoury under this theory is even more dubious because his involvement is once removed—the standard is whether *Mr. Ernst* as the employee reasonably could have foreseen any harm to Georgetown, not whether *Mr. Khoury* could have. The judicially defined parameters on § 1346 prosecutions exist for a reason. Where the Indictment does not satisfy a requisite limiting factor on an honest services charge, as a matter of law, the government cannot secure a conviction of Mr. Khoury on Count I on the theory that he engaged in a conspiracy to commit honest services fraud.

<u>CONCLUSION</u>

For these reasons, Mr. Khoury respectfully requests that the Court dismiss the money/property fraud and honest services fraud theories of prosecution as objects of the alleged conspiracy in Count I of the Indictment.

Respectfully submitted,

AMIN KHOURY

By his attorneys,

/s/ Eóin P. Beirne
R. Robert Popeo (BBO #403360)
Mark E. Robinson (BBO #423080)
Cory S. Flashner (BBO #629205)
Eóin P. Beirne (BBO #660885)
Mathilda S. McGee-Tubb (BBO #687434)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
 (617) 542-6000
RRPopeo@mintz.com
MERobinson@mintz.com
CSFlashner@mintz.com
EPBeirne@mintz.com
MSMcGee-Tubb@mintz.com

Dated: March 5, 2021

## CERTIFICATE OF SERVICE

     I, Eóin P. Beirne, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 5, 2021.

/s/ Eóin P. Beirne
Eóin P. Beirne