# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | ) |
| | ) **Case No. 20-cr-10177-DJC** |
| **AMIN KHOURY** | ) |
| | ) |

---

## MEMORANDUM AND ORDER

**CASPER, J.**                                                          **July 2, 2021**

## I.       Introduction

Defendant Amin Khoury ("Khoury") has moved to dismiss Count I of the indictment against him.  D. 33.  For the reasons stated below, the Court DENIES the motion.

## II.      Factual Background

For consideration of a motion to dismiss an indictment, the Court presumes the allegations of an indictment to be true.  United States v. Dunbar, 367 F. Supp. 2d 59, 60 (D. Mass. 2005); United States v. Bohai Trading Co., Inc., 45 F.3d 577, 578 n.1 (1st Cir. 1995).  Accordingly, the Court summarizes the relevant facts based on the allegations in indictment, D. 1.

Georgetown University ("Georgetown") is a highly selective private university with athletic teams that compete in Division I.  Id. ¶¶ 2, 6.  Georgetown sets aside a specific number of admissions slots to each head coach of an athletic team for that coach's recruited student athletes ("Recruits").  Id. ¶ 7.  Recruits have a substantially higher chance of being admitted than non-Recruits with similar grades and standardized test scores.  Id.  Georgetown expects Recruits to be contributing members of its athletic teams once enrolled.  Id.

1

As alleged, in or about May 2014, Khoury agreed to pay Gordon Ernst ("Ernst"), then employed at Georgetown as the head men's and women's tennis coach, $200,000 in exchange for designating Khoury's daughter as a Georgetown tennis team ("Team") Recruit. Id. ¶¶ 4, 10(a). Ernst agreed to pay an unnamed tennis recruiter $10,000 to act as a middleman in the transaction between Ernst and Khoury, and Ernst understood that Khoury would also pay additional compensation to the tennis recruiter. Id. ¶ 10(b).

On or about July 21, 2014, Khoury emailed the director of college counseling at his daughter's high school that Ernst was "willing to energetically recruit" his daughter onto the Team. Id. ¶ 10(c). When Khoury's daughter later applied to Georgetown, on or about October 13, 2014, an accompanying letter of recommendation stated that she played number six singles and third doubles on her high school team, below the level of a typical Recruit. Id. ¶ 10(d). Several days later, Khoury reiterated to the high school director of college counseling that he was in touch with Ernst and that "[i]t's looking really good." Id. ¶ 10(e). Then, on or about October 19, 2014, Ernst emailed a Georgetown admissions officer and named Khoury's daughter as a Recruit, suggesting that the director of college counseling at her high school approached him, but not disclosing his prior agreement with Khoury to designate his daughter as a Recruit. Id. ¶ 10(f). Ernst later forwarded Khoury's daughter's grades and standardized test scores to the admissions officer. Id. ¶ 10(g). On or about November 15, 2014, Khoury texted Ernst to ask whether his daughter should participate in a Georgetown alumni interview. Id. ¶ 10(h). Ernst told Khoury that she should participate in the interview and suggested that she tell the interviewer she wanted to play on the Team. Id. On or about December 9, 2014, Georgetown sent Khoury's daughter a letter explaining that the admissions committee had conducted an initial review of her application at Ernst's request

and had rated her prospect of admission as "likely," which corresponds to a greater than 95 percent chance of later being admitted.  Id. ¶ 10(i).

Khoury's daughter was accepted to Georgetown.  Id. ¶ 10(j).  In early May 2015, Khoury withdrew $200,000 in cash from a bank in Florida and flew to his home in Massachusetts where he met with the tennis recruiter and gave him the money:  $180,000 for Ernst and $20,000 for the tennis recruiter.  Id. ¶¶ 10(j-k).  The tennis recruiter then met Ernst's spouse and gave her $170,000, keeping $10,000 for himself.  Id. ¶ 10(l).  After May 2015, Khoury communicated on several occasions with Ernst and the tennis recruiter about paying the remaining money that Khoury owed Ernst, and in July 2016, Khoury and Ernst made plans to meet for the additional payment.  Id. ¶ 10(n-r).

## III.    Procedural History

Based on the allegations in the indictment, a grand jury has indicted Khoury for one count of conspiracy to commit mail fraud and honest services mail fraud and bribery concerning programs receiving federal funds in violation of 18 U.S.C. § 371 (Count I) and one count of bribery concerning programs receiving federal funds in violation of 18 U.S.C. § 666(a)(2) (Count II).  D. 1.  Khoury has now moved to dismiss Count I, the conspiracy to commit fraud count, of the indictment.  D. 33.  The Court heard oral argument on the motion and took the matter under advisement.  D. 57.

## IV.    Discussion

For a mail or wire fraud charge, an indictment must allege that the defendant engaged in a scheme where the object was to deprive the victim of "money or property."  See Kelly v. United States, __ U.S. __, 140 S. Ct. 1565, 1571 (2020) (citing McNally v. United States, 483 U.S. 350, 358 (1987); Cleveland v. United States, 531 U.S. 12, 26 (2000)).  Khoury challenges two of the

government's theories alleged in Count I: the property theory of mail fraud and the honest services theory. <u>See</u> D. 34. First, Khoury argues that the Court should dismiss the government's property theory of mail fraud in Count I because 1) an admissions slot is not "property," 2) property loss was not an object of the scheme, and 3) the rule of lenity warrants dismissal due to ambiguity in the mail fraud statute. <u>Id.</u> Second, Khoury challenges the government's theory of honest services fraud, arguing that economic harm to Georgetown was not reasonably foreseeable. <u>Id.</u> The Court addresses each argument in turn.

### A. <u>Property Theory</u>

#### *1. Admissions Slots as Property*

Khoury contends that a college admissions slot is not "property" covered by the mail fraud statute. D. 34 at 18–28. Specifically, Khoury characterizes an admissions slot as educational services, not property, argues that an admissions slot has not been recognized by courts as a traditional form of property, and asserts that Georgetown's "right to control" its admissions process is not a property right. <u>Id.</u> The government asserts that Georgetown has tangible property interests in admissions slots because they are valuable and finite, and a property right to control who receives those slots. D. 41 at 9–16.

As an initial matter, the admissions slots here are property, not services. While the "mail fraud statute is limited to the protection of property rights, [] the concept of property 'is to be interpreted broadly.'" <u>United States v. Dray</u>, 901 F.2d 1132, 1142 (1st Cir. 1990) (quoting <u>McNally</u>, 483 U.S. at 356); <u>see</u> <u>United States v. Rosen</u>, 130 F.3d 5, 9 (1st Cir. 1997) (describing "broad" scope of mail fraud statute). An offer to attend Georgetown, alleged to be finite, includes not just the conferral of a degree or the provision of educational instruction, but also access to a host of other benefits that Georgetown has to offer, from its facilities to its network and reputation.

Here, the indictment alleges both that Georgetown set aside a limited number of admissions slots for coaches to designate Recruits to take, and that Recruits have less stringent admissions criteria than non-Recruits. D. 1 ¶ 7. Thus, the slot at issue here has tangible value, not just from what it offers to prospective students, but also from the limited nature of it. See United States v. Sidoo, 468 F. Supp. 3d 428, 441–42 (D. Mass. 2020) (concluding that offer of admission is property in part because admissions slots are "both limited and highly coveted"); United States v. Frost, 125 F.3d 346, 367 (6th Cir. 1997) (explaining that university had property right in unissued degrees because "[a]warding degrees to [unqualified] students . . . will decrease the value of degrees in general . . . hurt the reputation of the school and thereby impair its ability to attract other students willing to pay tuition, as well as its ability to raise money");[1] United States v. Hedaithy, 392 F.3d 580, 596–97 (3d Cir. 2004) (concluding that testing company had property right in its score reports, even though the "reports represent the end result of the services provided" since "they are nonetheless tangible items produced" and company "reserves the right to convey [the reports] only to those individuals who meet its prescribed conditions").

---

[1] Khoury relies upon United States v. Ernst, 502 F. Supp. 3d 637, 648 (D. Mass. 2020) to distinguish Frost on the basis that the Sixth Circuit "considered whether the degrees were 'property' solely for purposes of determining whether the defendants were violating their fiduciary duties to the university when fraudulently awarding university degrees." Id. Such reading perhaps construes Frost too narrowly. There, the Sixth Circuit determined whether an unissued degree was property by relating and distinguishing it from other cases that determined whether something was property under the mail fraud statute at issue here, as well as a civil case alleging deprivation of property without due process. See Frost, 125 F.3d at 367 (citing Brotherton v. Cleveland, 923 F.2d 477, 481 (6th Cir. 1991); Crook v. Baker, 813 F.2d 88, 98–99 (6th Cir. 1987); United States v. Kato, 878 F.2d 267, 269 (9th Cir. 1989); United States v. Salvatore, 110 F.3d 1131, 1139–43 (5th Cir. 1997)). Moreover, the Sixth Circuit noted that because it was considering honest services fraud in the private sector, they "have construed the intangible right to honest services in the private sector as ultimately dependent upon the property rights of the victim." Id. at 369.

The right to control one's property is a longstanding property right and has been recognized in the context of fraud schemes where the victim of the scheme is deprived of "information it would consider valuable in deciding how to use its assets" or "dispense with its property." United States v. Gatto, 986 F.3d 104, 114, 116–17 (2d Cir. 2021) (quoting United States v. Finazzo, 850 F.3d 94, 111 (2d Cir. 2017)); United States v. Carlo, 507 F.3d 799, 801-02 (2d Cir. 2007) (citing Carpenter v. United States, 484 U.S. 19, 25 (1987)) (explaining that "[w]hile the interests protected by the mail and wire fraud statutes do not generally extend to intangible rights . . . they do extend to all kinds of property interests, both tangible and intangible" and that "[s]ince a defining feature of most property is the right to control the asset in question, we have recognized that the property interests protected by the statutes include the interest of a victim in controlling his or her own assets"). In these cases, misrepresentations or non–disclosure of information must result in tangible economic harm, which can either be direct, "such as by increasing the price the victim paid for a good," or indirect, "such as by providing the victim with lower–quality goods than it otherwise could have received." Finazzo, 850 F.3d at 111. Here, the alleged scheme facilitated the withholding of valuable information from Georgetown—Khoury agreed to pay Ernst in exchange for Ernst designating his daughter as a Recruit—that may have caused Georgetown not to give Khoury's daughter an admissions slot (i.e., dispense with their property). See Gatto, 986 F.3d at 116–17; Finazzo, 850 F.3d at 113–114 (affirming conviction where evidence showed scheme to defraud caused victim to purchase lower quality products than it otherwise would have).

Khoury relies upon instances where the Supreme Court narrowed the scope of what constituted "property" under the mail and wire fraud statutes to argue that the same applies here, but that reliance is misplaced. In Cleveland, 531 U.S. at 20, for example, the Court held that an unissued video poker license was not property when it was in the hands of the regulator. Id.

Khoury attempts to analogize the unissued licenses to the offers of admission here. D. 34 at 24. As numerous courts have explained, however, "the result in <u>Cleveland</u> was based upon the conclusion that the issuance of government licenses is an exercise of a state's police powers to regulate," and "as a component of the state's regulatory scheme, the license was held not to be property in the hands of the regulator." <u>Hedaithy</u>, 392 F.3d at 600 (concluding that reasoning in <u>Cleveland</u> is "wholly inapplicable" where private testing company "provides a service and reports test results in pursuit of a profit-seeking endeavor" and had "no sovereign power to regulate"); <u>see In re Ranbaxy Generic Drug Application Antitrust Litig.</u>, No. 19-MD-02878-NMG, 2019 WL 6341298, at *11 (D. Mass. Nov. 27, 2019) (explaining that "<u>Cleveland</u> stands for the proposition that a government regulator does not own licenses; instead, it holds the regulatory power to issue licenses"). The same is true for <u>Kelly</u>, 140 S. Ct. at 1570, which overturned the convictions of state employees that engaged in a scheme to divert a transportation agency's resources for the purpose of political retribution. <u>Id.</u> On this point, <u>Kelly</u> merely affirmed the holding and other courts' reading of <u>Cleveland</u>, stating that the scheme "was a quintessential exercise of regulatory power" because "a scheme to alter such a regulatory choice is not one to appropriate the government's property." <u>Id.</u> at 1572. <u>Kelly</u>, therefore, did not alter the Court's precedent regarding what constitutes property. For the reasons articulated above, this case differs from <u>Cleveland</u> and <u>Kelly</u>. Georgetown is a private actor and Khoury's alleged scheme was to deprive that institution of its property, an admissions slot.

### 2. *Object of the Scheme*

Khoury next asserts that, post-<u>Kelly</u>, the government's property theory fails because the object of the alleged fraud was not a loss of property to Georgetown. D. 34 at 28. The Supreme Court clarified in <u>Kelly</u> that "property must play more than some bit part in a scheme: It must be

an 'object of the fraud.' . . . . [A] property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme." <u>Kelly</u>, 140 S. Ct. at 1573 (citation omitted). Because in that scheme, "the officials' only goal was political retaliation . . . and the officials were indifferent about the unintended additional costs of carrying out the plan, they were not guilty of property fraud." <u>Gatto</u>, 986 F.3d at 116 (discussing <u>Kelly</u>, 140 S. Ct. at 1573). In both <u>Kelly</u> and <u>Cleveland</u>, the objective was regulatory (getting gaming licenses in <u>Cleveland</u> and reallocating bridge lane access in <u>Kelly</u>) and the loss (labor costs in both) was incidental to the regulatory objective, as defendants never "sought to obtain the services that the employees provided." <u>Kelly</u>, 140 S. Ct. at 1574 (discussing <u>Cleveland</u>, 531 U.S. at 355).

But here, like in <u>Gatto</u>, "the loss of property," the admissions slots set aside for Recruits, "was at the heart of [the alleged] scheme." <u>Gatto</u>, 986 F.3d at 116. As alleged, in exchange for payment from Khoury, Ernst designated Khoury's daughter as a Recruit for the Team despite her tennis standing below that of a typical Recruit. D. 1 ¶ 10(d); <u>see</u> <u>Gatto</u>, 986 F.3d at 116–17 (noting that "hiding the Recruits' ineligibility was essential to Defendants' scheme — had the Universities known the Recruits were ineligible, they would not have offered them athletic-based aid or roster spots on their basketball teams").

Khoury argues that the property loss here was incidental, and thus not covered by the mail fraud statute, because his daughter paid full price tuition and thus Georgetown lost nothing from his scheme. D. 34 at 32. That argument, however, ignores the inherent value associated with the admissions slots set aside for qualified Recruits. Moreover, Khoury's reliance upon <u>United States v. Walters</u>, 997 F.2d 1219 (7th Cir. 1993), to argue that obtaining Georgetown's property was not the object of the alleged scheme is unpersuasive. There, the defendant intended to profit off then-college athletes who signed with him to play professional sports, in violation of NCAA rules. <u>Id.</u>

at 1221.  The Seventh Circuit determined that while there was property loss in the scheme, for had the defendants' "clients told the truth [about their professional contracts], the colleges would have stopped their scholarships, thus saving money," "[the colleges] were not out of pocket to [the defendant] since he planned to profit by taking a percentage of the players' professional incomes, not of their scholarships."  Id. at 1224.  Here, however, Khoury's alleged scheme was to pay a bribe for a limited admissions slot Georgetown had reserved for qualified Recruits.

### 3.    Rule of Lenity

Finally, Khoury asserts that the rule of lenity "requires resolving any ambiguity as to the meaning of 'property'" in his favor.  D. 34 at 36.  "The rule of lenity provides that in a criminal case, a court must resolve statutory ambiguity in favor of the accused . . . [b]ut the *sine qua non* for the rule's application is genuine ambiguity, and a statute is not ambiguous simply because litigants (or even an occasional court) question its interpretation."  United States v. Dwinells, 508 F.3d 63, 69–70 (1st Cir. 2007) (citations omitted); United States v. Trask, 143 F. Supp. 2d 88, 92 (D. Mass. 2001) (explaining that "[i]f there is ambiguity, then the [r]ule of [l]enity is, in effect, a tie-breaker").  Given the analysis above, the Court concludes there is no "genuine ambiguity" in the statutory language at issue here that warrants the rule of lenity.  Cf. United States v. Fernandez, 722 F.3d 1, 40 (1st Cir. 2013) (Howard, C.J., concurring) (quoting Reno v. Koray, 515 U.S. 50, 65 (1995)) (noting that courts "apply the rule of lenity 'only if, after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended'").[2]

---

[2] Even if one session of this Court has had a conflicting interpretation of whether admissions slots are property, that does not render the statutory text ambiguous.  See Ernst, 502 F. Supp. 3d at 652; but see Sidoo, 468 F. Supp. at 441-42.  Nor does it, as the Court raised *sua sponte* at the motion hearing, see D. 58 at 41, implicate the law of the case doctrine, which states that a court's decision on a rule of law "should continue to govern the same issues in subsequent stages in the same case." Pepper v. United States, 562 U.S. 476, 506–07 (2011) (citation omitted).  First, the doctrine "directs a court's discretion," not its "power."  Id.  Second, for reasons related to Ernst's other

### B.     Honest Services Theory

Khoury asserts that the honest services theory of Count I should be dismissed because economic harm or "actual harm" to Georgetown of "tangible interests" was not reasonably foreseeable from the fraud scheme.  D. 34 at 39–41.  Khoury contends that "reasonably foreseeable economic harm is an essential element" of honest services fraud in the First Circuit.  Id. at 40 (citing United States v. Martin, 228 F.3d 1, 17 (1st Cir. 2000)).  Given the Court's conclusion above regarding the value of an admissions slot, Khoury's argument necessarily fails:  the indictment alleges a *quid pro quo*, that Khoury paid a bribe to Ernst to designate his daughter as a Recruit, despite her athletic qualifications being below that of a typical Recruit, and secure one of Georgetown's limited admissions slots reserved for qualified Recruits.  See United States v. Berroa, 856 F.3d 141, 154–55 (1st Cir. 2017); Ernst, 502 F. Supp. 3d at 654 (concluding on issue of intent to commit honest services fraud that allegations in indictment were enough to survive motion to dismiss and that "factual sufficiency of the charges is a question for the jury").

## V.     Conclusion

For the foregoing reasons, the Court DENIES Khoury's motion to dismiss Count I the indictment, D. 33.

**So Ordered.**

/s/ Denise J. Casper
U.S. District Judge

---

alleged conduct, see D. 58 at 14–15; United States v. Ernst, No. 1:19-cr-10081-IT (D. Mass. Mar. 5, 2019), D. 1 (charging Ernst in indictment with other coaches, athletic directors, test takers and college admissions company for Ernst's alleged role with respect to at least 12 other students), D. 505 (second superseding indictment), Khoury is not charged in the same case or indictment as Ernst.