IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 20-10177-PBS |
| | ) | |
| AMIN KHOURY, | ) | |
| | ) | |
| Defendant | ) | |

**GOVERNMENT'S INITIAL PROFFER AND LEGAL BASIS FOR ADMISSION OF
CO-CONSPIRATOR STATEMENTS PURSUANT TO FED. R. EVID. 801(d)(2)(E)**

At trial, the government anticipates introducing various statements of the defendant's co-conspirators. Those statements will be admissible on a variety of grounds, including for notice, state of mind, to provide context for the defendant's statements, and as co-conspirator statements pursuant to Fed. R. Evid. 801(d)(2)(E) and *United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977). In connection with this last ground, and pursuant to the Court's Order, the government submits this pretrial proffer as to the existence of the charged conspiracy, including when it began and when it ended.

Count I of the Indictment charges defendant Amin Khoury with conspiracy to commit mail fraud, honest services mail fraud, and federal programs bribery, in violation of 18 U.S.C. § 371. Dkt. No. 1. The government herein proffers evidence sufficient to establish, by a preponderance of the evidence, that the defendant entered the charged conspiracy starting in May 2014 and continued to participate in the conspiracy through *at least* July 2016. The government also provides accompanying case law to support that finding. Statements made by the defendant's alleged co-conspirators between May 2014 and at least July 2016, in furtherance of the charged conspiracy, will therefore be admissible under Fed. R. Evid. 801(d)(2)(E) and *Petrozziello*.

## I.     LEGAL BACKGROUND[1]

"Under Rule 801(d)(2)(E), an out-of-court statement made by a party's co-conspirator during and in furtherance of the conspiracy does not constitute inadmissible hearsay, even when admitted for its truth." *United States v. Pena*, 24 F.4th 46, 61 (1st Cir. 2022).  Under *Petrozziello*, the Court must determine whether, "(1) when the statement was made, the declarant was a member of a conspiracy, (2) the defendant was also (or later became) a member of the same conspiracy, and (3) the statement was made in furtherance of that conspiracy." *United States v. Weadick*, 15 F.4th 1, 8 (1st Cir. 2021) (citing *United States v. Saccoccia*, 58 F.3d 754, 778-79 (1st Cir. 1995)); *accord Pena*, 24 F.4th at 61.  There are several important considerations in making this determination.

First, a *Petrozziello* finding is made under a "preponderance of the evidence" or "more likely than not" standard.  *See Petrozziello*, 548 F.2d at 23 ("The judge is ruling on admissibility, not guilt or innocence . . . the ordinary civil standard is sufficient."); *United States v. Geronimo*, 330 F.3d 67, 75 (1st Cir. 2003) (holding that the *Petrozziello* finding is made under a "more likely than not" standard).  Accordingly, "[t]his foundational requirement is satisfied as long as the government proffers sufficient evidence to establish, by a preponderance of the evidence, the existence of a conspiracy embracing both the declarant and the defendant." *United States v. Piper*, 298 F.3d 47, 52 (1st Cir. 2002).

Second, the Court must consider the totality of the evidence—not individual pieces of evidence in isolation—in making a *Petrozziello* determination.  This includes consideration of the co-conspirator statements themselves in determining whether the conspiracy existed.  *See United*

---

[1] Unless otherwise noted, all internal quotation marks, citations, and alterations are omitted herein.

*States v. Mitchell*, 596 F.3d 18, 23 (1st Cir. 2010) (concluding that totality of the evidence, including co-conspirator statements themselves and independent corroborating evidence, was "more than sufficient" to meet preponderance of the evidence standard); *see also United States v. Portela*, 167 F.3d 687, 703 (1st Cir. 1999) ("[T]he determination must rest *at least in part* on corroborating evidence beyond that contained in the statements at issue.") (emphasis added).  The Court may also consider evidence that is not admitted at trial, and even information that is otherwise inadmissible.  *United States v. Paredes-Rodriguez*, 160 F.3d 49, 57 (1st Cir. 1998) (explaining "trial courts may consider any non-privileged evidence, regardless of its admissibility, in making Rule 801(d)(2)(E) determinations" under *Petrozziello*).

Third, the co-conspirator's statement must be "in furtherance of the conspiracy," meaning that "it tends to promote one or more of the objects of the conspiracy."  *United States v. Ciresi*, 697 F.3d 19, 28 (1st Cir. 2012) (citing *United States v. Piper,* 298 F.3d 47, 54 (1st Cir.2002)).  "To be deemed 'in furtherance,' a statement 'need not be necessary or even important to the conspiracy, or even made to a coconspirator, as long as it can be said to advance the goals of the conspiracy in some way.'"  *Id.* (quoting *United States v. Martínez–Medina,* 279 F.3d 105, 117 (1st Cir.2002)).  Whether the person to whom the statement is made is (or later becomes) a "government informant" is "immaterial."  *Id.* (citing *Avilés–Colón,* 536 F.3d at 15).  And further, "once a defendant is found to be a member of the conspiracy, statements in furtherance of the conspiracy are admissible against him even if he does not have specific knowledge of the acts spoken of."  *United States v. Marino*, 277 F.3d 11, 25 (1st Cir. 2002).  As the First Circuit explained in rejecting a *Petrozziello* objection, "each co-conspirator need not know of or have contact with all other members, nor must they know all the details of the conspiracy or participate in every act in furtherance of it."  *United States v. Newton*, 326 F.3d 253, 258 (1st Cir. 2003).

Fourth, the Court must make that *Petrozziello* inquiry at the close of all evidence.  *See, e.g.*, *United States v. Ciampaglia*, 628 F.2d 632, 638 (1st Cir. 1980) (holding that the *Petrozziello* finding is to be made "at the close of all the evidence" and noting that "requiring trial courts to delay *Petrozziello* rulings until the conclusion of all the evidence would not create any significant additional demands or difficulties"); *accord United States v. Mangual-Garcia*, 505 F.3d 1, 8 (1st Cir. 2007) ("[T]his circuit requires the court to delay its final *Petrozziello* determination until the close of all evidence.").  Thus, to the extent the defense objects to the admissibility of co-conspirator statements offered under Fed. R. Evid. 801(d)(2)(E), the Court may nevertheless conditionally admit them and, at the close of all the evidence, make a final determination out of the hearing of the jury.  *Ciampaglia*, 628 F.2d at 638.

## II.   EVIDENTIARY PROFFER AND RELATED CASE LAW

The following initial proffer provides a sufficient basis for the Court to find, by a preponderance standard, that the defendant entered into the charged conspiracy, which began in May 2014 and lasted through *at least* July 2016.

### a.   Anticipated Testimony of the "Middleman" (a Co-Conspirator)

The government anticipates that one of the defendant's co-conspirators who acted as a middleman (the "middleman") between the defendant and Gordon Ernst, the Georgetown tennis coach, will testify at trial.  Below is the sum and substance of the middleman's anticipated testimony.

On May 23, 2014, the middleman attended a Brown University reunion in Rhode Island. The middleman, Ernst, and the defendant knew each other from Brown University, where all three went to college and played on the men's tennis team.  On the night of May 23, 2014, all three attended a dinner at the Capital Grille restaurant before going to a reunion party on the Brown

University campus.  After the party, on the way back to their hotel, Ernst told the middleman that Ernst and the defendant had talked about the defendant's daughter and agreed to do a "deal" to get the defendant's daughter into Georgetown.  Ernst described the basic outline of the deal, which included that the defendant would pay Ernst $200,000 and that the middleman would be compensated for acting as a go-between and creating a buffer between the defendant and Ernst for the "deal."

The middleman, who works as a professional counselor for high school tennis players navigating the college recruitment process, understood that the defendant's daughter was not talented enough to play for the Georgetown tennis team, let alone be considered for a recruitment spot.  Nevertheless, in the months after the Brown University reunion, Ernst presented the defendant's daughter as a tennis recruit to the Georgetown Admissions Committee and asked the Committee to do a "pre-read" of the defendant's daughter's transcript and test scores to confirm that she was academically eligible to be recruited.  During this same timeframe, the middleman worked with the defendant to collect his daughter's academic information and provide it to Ernst so that Ernst could falsely present the daughter as a recruit to the Admissions Committee.  The defendant never provided the middleman with his daughter's tennis-related information, and the middleman never asked for that information (nor did Ernst request it from the middleman).  The middleman understood that no request was made for the daughter's tennis information because she was not a real tennis recruit.  Additionally, the defendant discussed with the middleman that his daughter had a shoulder injury in the event they needed to explain why his daughter was not playing tennis at Georgetown.

In November 2014, the Admissions Committee approved the daughter as a tennis recruit based on Ernst's representation that he wanted to recruit her to the tennis team. The middleman participated in a text message conversation where Ernst discussed the news with the defendant.

In May 2015, after the defendant's daughter was admitted to Georgetown, the middleman was in contact with Ernst and the defendant. The middleman was instructed to go to the defendant's house on Cape Cod, pick up cash from the defendant, and deliver it to Ernst's wife, who was also on Cape Cod. The middleman understood that this cash was the payment made in exchange for Ernst using one of his recruitment slots on the defendant's daughter. The middleman met the defendant at the defendant's house, where the defendant gave the middleman (1) $20,000 in cash, which was the middleman's "cut" for his participation in the scheme, and (2) $180,000 in a brown paper bag, which the defendant instructed the middleman was for Ernst. The middleman then went to his car, took out $10,000 from the paper bag (which was the amount Ernst had agreed to pay the middleman), and then drove to meet Ernst's wife. The middleman observed Ernst's wife count the cash and then drove Ernst's wife to a Bank of America branch nearby so that she could put the money in a safe deposit box.

Given that the defendant still owed Ernst $20,000, the middleman, on behalf of Ernst, exchanged text messages with the defendant on multiple instances in 2015 and 2016 in an attempt to get the defendant to pay the remaining balance. Eventually, in July 2016, Ernst texted both the defendant and the middleman (on a group text) asking the defendant to pay the remaining money. In response, the defendant agreed to meet Ernst.

A few days after Ernst's arrest, the defendant called the middleman to discuss Ernst's arrest and get their stories straight. The defendant told the middleman that, if asked about the exchange of money, he should say that the defendant was paying for tennis lessons.

This proffered testimony is alone sufficient to satisfy the *Petrozziello* standard. The First Circuit has explained that the testimony of a co-conspirator is sufficient to establish the existence of the conspiracy:

> A defendant's conviction for participation in a [] conspiracy may be upheld under a reasonable doubt standard on the basis of the uncorroborated testimony of a cooperating witness alone. **Plainly, then, the testimony of a cooperating witness may be used to satisfy the lower evidentiary burden required by *Petrozziello*.**

*Mitchell*, 596 F.3d at 23 (emphasis added) (rejecting defendant's contrary argument as a "nonstarter" and holding that "the testimony of [] a cooperating witness was extrinsic evidence that was probative of the existence of the conspiracy . . . and [the defendant's] membership in that conspiracy"); *see also, e.g.*, *Newton*, 326 F.3d at 259 (co-conspirator testimony "led the district court to conclude that [defendant] participated in the [] conspiracy"); *Portela*, 167 F.3d at 703 (co-conspirator's testimony about, and in-court identification of, the defendant supported *Petrozziello* finding); *accord Geronimo*, 330 F.3d at 76.

    *b.   Gordon Ernst's Guilty Plea*

Gordon Ernst has already pled guilty to entering into the conspiracy with which the defendant is charged in this case. *See* Rule 11 Hr'g Tr. (Oct. 25, 2021) at 30, *United States v. Ernst*, No. 19-cr-10081-IT. Ernst's guilty plea corroborates the anticipated testimony from the middleman. The Court can consider his guilty plea under *Petrozziello*. *See, e.g.*, *Paredes-Rodriguez*, 160 F.3d at 57 (explaining "trial courts may consider any non-privileged evidence, regardless of its admissibility, in making Rule 801(d)(2)(E) determinations" under *Petrozziello*).

    *c.   Corroborating Statements by the Defendant and Co-Conspirators in Furtherance of the Conspiracy*

The government will present other evidence at trial as to the existence of the charged conspiracy. For example:

- Emails from Ernst to the Admissions Committee in 2014 identifying the defendant's daughter as a recruit for the Georgetown tennis team;

- Emails between the middleman, the defendant, and the defendant's wife exchanging information about the defendant's daughter's application to Georgetown;

- Text messages between Ernst, the middleman, and the defendant, including the following text from Ernst on November 10, 2014, after learning that the defendant's daughter had been approved as a recruit following her "pre-read": "Amazing how fate controls our lives.  The diminutive slammer from Pittsburgh [the middleman] invites you to reunion dinner, and look what we got!!"  Contested Ex. A.  This message references both the "reunion dinner" where Ernst, the middleman, and the defendant came up with the conspiracy, as well as the news that the defendant's daughter had been positively screened by the Admissions Committee to be a tennis recruit (*i.e.*, "look what we got!!").

- Text messages between the middleman and the defendant, including the following text from the middleman on March 14, 2016: "How are things Amo [the defendant]?  Will you be in DC this spring to square things away with Gord [Ernst]?"  The defendant replied on that same day: "Late spring . . . ."  Contested Ex. C.  This message references the portion of the bribe the defendant still owed Ernst.

- Text messages between Ernst, the middleman, and the defendant, including the following text from Ernst on July 15, 2016: "Amo, let's square up soon.  My dad very sick and I need to chip in and help my mom."  The defendant replied on the same day: "Give me a few weeks and I can take another bite out of it."  Contested Ex. F.  Once again, this message references the portion of the bribe the defendant still owed Ernst.

These communications between the alleged co-conspirators further corroborate the middleman's testimony and Mr. Ernst's guilty plea. *Dowdell*, 595 F.3d at 74 (co-conspirator statements "coupled with [defendant's] statements themselves, adequately supported [*Petrozziello*] finding by a preponderance of the evidence"). And the Court can and should consider these communications from 2015 and 2016 in determining whether the conspiracy was already in existence at that point and had been in existence. *See, e.g.*, *United States v. DiMasi*, 810 F. Supp. 2d 347, 364 (D. Mass. 2011), *aff'd sub nom. United States v. McDonough*, 727 F.3d 143 (1st Cir. 2013) ("For *Petrozziello*, as well as other purposes, a defendant's later conduct can provide evidence of his criminal intent.").

### d.  Other Corroborating Testimony and Documentary Evidence

The government anticipates that it will introduce other testimony and documentary evidence further corroborating the existence of the conspiracy. By way of example only, government witnesses will testify that Ernst listed the defendant's daughter as a tennis recruit even though she was not sufficiently talented to play for Georgetown, an NCAA Division I program, and that, after being admitted to Georgetown, she indeed never played for the team. The government will also present evidence that, after the defendant's daughter was told she would be admitted to Georgetown as a tennis recruit, the defendant withdrew $200,000 in cash from his bank account and travelled to Cape Cod, Massachusetts. This was in the same timeframe that Ernst's wife was on Cape Cod and opened a safety deposit box in her name.

## III.   CONCLUSION

For the foregoing reasons, based on the totality of the anticipated evidence—including the testimony from the middleman, statements from the defendant and his co-conspirators, and other corroborating emails, documents, and financial records—the government will demonstrate that it

9

is more likely than not (i) that the charged conspiracy existed, and (ii) that the defendant was a member of that conspiracy.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By: */s/ Christopher J. Markham*
CHRISTOPHER J. MARKHAM
KRISTEN A. KEARNEY
Assistant United States Attorneys

### CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Dated: April 28, 2022

*s/ Christopher J. Markham*
Christopher J. Markham
Assistant United States Attorney