# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>AMIN KHOURY | Case No. 20-cr-10177-PBS |

## DEFENDANT'S MOTION TO DISMISS THE INDICTMENT OR TO DISQUALIFY THE PROSECUTION TEAM, EXCLUDE EVIDENCE AND WITNESSES, AND FOR AN EVIDENTIARY TAINT HEARING

Pursuant to *ex parte* proceedings, Chief Magistrate Judge Kelley granted Mr. Khoury authorization to issue Rule 17(c) subpoenas directed to Middlesex School ("Middlesex") and Donovan Tennis Strategies ("Donovan Tennis"). These entities produced responsive documents to Mr. Khoury (the "Ex Parte Subpoenaed Documents") in February and March, 2022.

Just over a week ago, the government produced to Mr. Khoury copies of the Ex Parte Subpoenaed Documents as discovery that the government purportedly intends to use against Mr. Khoury at trial. When asked by Mr. Khoury's counsel how the government obtained the Ex Parte Subpoenaed Documents, the government stated that Middlesex and Donovan Tennis had "voluntarily" produced them.

Obtaining the Ex Parte Subpoenaed Documents contravenes Magistrate Judge Kelley's order in *United States v. Colburn*, a related *Varsity Blues* case where the government attempted to obtain from the University of Southern California copies of the same documents that USC had produced to the defendants in response to *ex parte* Rule 17(c) subpoenas. No. CR 19-10080-NMG (ECF#1575), 2020 WL 6566508, at *1 (D. Mass. Nov. 9, 2020) (the "*Colburn* Order," attached as

Exhibit A). Magistrate Judge Kelley held that the government was not entitled to the USC subpoenaed documents because "production of the documents would reveal opinion work product of defense counsel" and would "provide the government a window into the legal theories and trial strategies of defense counsel." *Id.* at 4. Magistrate Judge Kelley held that "[t]his is the very information that is most stringently guarded by the work product doctrine." *Id.* Magistrate Judge Kelley warned against the government trying "to bend the law concerning the issuance of Rule 17(c) subpoenas" in order to "gain an unfair advantage in the litigation by perusing documents that clearly spell out defendant's trial strategies." *Id.*

As with the USC documents in *Colburn*, Khoury's Ex Parte Subpoenaed Documents are a "window into the legal theories and trial strategies of defense counsel," "spell out [Khoury's] trial strategies," reveal "defense counsel's selection … of documents in preparation [for trial] that fall within the highly-protected category of opinion work product," "provide[] an important insight into defense tactics, strategy, and problems," and "are targeted documents relevant to defendant's factual and legal theories of the case." *Colburn* Order at 4. When the government obtained Khoury's Ex Parte Subpoenaed Documents, the government should have notified Mr. Khoury, sequestered the documents, and sought Magistrate Judge Kelley's permission before examining them. Because the government intentionally intruded on the opinion work product of the Khoury defense team, Mr. Khoury moves to dismiss the indictment with prejudice. Alternatively, Mr. Khoury moves to disqualify from the prosecution team anyone tainted by exposure to defendant's work-product, to preclude the government from using at trial any documents obtained in violation of defendant's work-product, and for an evidentiary taint hearing.

To the extent that members of the prosecution team have prepared government witnesses to testify against Mr. Khoury, those witnesses should be excluded.

## <u>ARGUMENT</u>

**A.  The Government Was on Notice that Reviewing the Ex Parte Subpoenaed Documents Would Reveal the Opinion Work Product of the Khoury Defense Team**

When the government examined the Ex Parte Subpoenaed Documents, the government knew that the documents would reveal the opinion work product of Mr. Khoury's lawyers. Magistrate Judge Kelley had already considered this issue in an almost identical scenario in *Colburn*, finding that documents produced by USC in response to *ex parte* Rule 17(c) defense subpoenas were protected from government review under the opinion work-product doctrine. In that case, Magistrate Judge Kelley authorized issuance of Rule 17(c) subpoenas directed at USC after the defendants demonstrated that the documents sought were relevant and admissible, critical to their factual and legal defenses, and that the subpoenas were specific in their requests. *Colburn* Order at 1, 4 (citing *United States v. Nixon,* 418 U.S. 683, 698-99 (1974)). The Court allowed the defendants to make the required showing of relevance, admissibility, and specificity *ex parte*, without having to reveal their trial strategy and other protected work product to the government. *Id*. at 2.

Although the Court conducted the *Colburn* proceedings and issued the Rule 17(c) subpoenas *ex parte* in order to *specifically* shield the government from discovering the defendants' protected work product*,* the government issued its own subpoena to USC demanding production of "all documents produced by USC to any defendants in this case." *Id.* at 1. Defendants notified USC that they objected to the government's subpoena because the materials provided to defendants were protected work product, and USC declined to produce the documents to the government in the absence of a court order. *Id.* The government filed a motion to compel, arguing, in relevant part, that (1) the documents were not protected work product; (2) the government was entitled to all the materials produced by USC to the defendants because the reciprocal discovery rules were

3

"insufficient" to protect the government's interests; and (3) defendants had "waived" work product

protection by asking USC for the documents because USC was the "purported victim in this case

with interests adverse to defendants' interests." *Id.* at 3.

Magistrate Judge Kelley disagreed. First, the Court held that the government was not

entitled to the USC documents that the defendants had obtained pursuant to *ex parte* Rule 17(c)

subpoenas because the documents were "a window into the legal theories and trial strategies of

defense counsel," which "is the very information that is most stringently guarded by the work

product doctrine":

> The court has reviewed defendants' ex parte submissions filed in connection
> with this motion in which they explain why the USC documents themselves
> would reveal trial strategy. The court is satisfied that the requests for documents
> to USC were developed after extensive review by defense counsel of
> information and materials provided by the government, the defendants, and
> others, and that the requests targeted documents relevant to defendants' factual
> and legal theories of the case. The court is also satisfied, based on specific
> examples provided by defendants, that even if the government does not see the
> actual subpoenas or defendants' ex parte filings in which they asked for
> permission to issue the subpoenas, *seeing the documents will provide the
> government a window into the legal theories and trial strategies of defense
> counsel. This is the very information that is most stringently guarded by the work
> product doctrine.*

*Id.* at 4 (emphasis added) (internal citations omitted).

Second, the Court rejected the government's claim that the government was entitled to the

documents because, in the government's view, "the reciprocal discovery rules are not sufficient to

satisfy its interests." *Id.* The Court held that the Local Rules adequately provide for the "orderly

production of information before trial," and the government cannot "bend the law concerning the

issuance of Rule 17(c) subpoenas" in order to "gain an unfair advantage in the litigation by

perusing documents that clearly spell out defendants' trial strategies." *Id.*

Finally, the Court held that the defendants did not waive any protections by seeking the documents directly from USC:

> If this assertion were true, the rationale for allowing defendants to seek issuance of Rule 17(c) subpoenas *ex parte* would be meaningless. No defendant would employ the process, *ex parte* or not, because the government, once it discovered the parties to whom Rule 17(c) subpoenas were directed by defendant, would simply request issuance of such subpoenas themselves to command production of whatever material a defendant sought. If, as in this case, the materials themselves reveal defense counsel's thoughts and opinions about the defense of the case, this clearly would subvert a defendant's right to compulsory process, among other constitutional rights.

*Id.* at 5.

The government in this case had ample notice that Magistrate Judge Kelley would view the Khoury Ex Parte Subpoenaed Documents in the same light as in *Colburn*. First, because Magistrate Judge Kelley authorized Mr. Khoury's Rule 17(c) subpoenas *ex parte*, the government knew that Mr. Khoury's trial strategy and other work product were implicated and that Khoury and the Court intended for those matters to remain confidential and protected from government review. *See Colburn* Order at 3 (finding that a Rule 17(c) proceeding is properly held *ex parte* "where a defendant cannot make the required showing of relevancy, admissibility, and specificity without revealing trial strategy and other protected work product" to the government). Indeed, the purpose for Mr. Khoury proceeding *ex parte* before Magistrate Judge Kelley was to wall off the government from discovering Mr. Khoury's selection of documents, trial strategy, and factual and legal defenses. ECF#76; 78.

Second, Magistrate Judge Kelley had already held in *Colburn* that pursuant to *Nixon*, a Rule 17(c) subpoena issues only if the defendant has shown, among other things, that the subpoenaed documents are relevant and evidentiary, and necessary for the defendant to properly prepare his defense. *Colburn* Order at 2 (citing *Nixon*, 418 U.S. at 699-700). Therefore, the

government knew that Mr. Khoury's Rule 17(c) subpoenas, as authorized by Magistrate Judge Kelley, would return specific documents that are relevant, admissible, and necessary for Mr. Khoury to prepare his defense. And because Middlesex and Donovan Tennis are at the heart of this case, the government also knew that responsive documents from these important entities would offer a roadmap to Khoury's defense.[1]

Third, one member of the prosecution team in this case was also on the *Colburn* prosecution team, so there can be no doubt that when the government chose to examine Khoury's Ex Parte Subpoenaed Documents, the government was aware of the *Colburn* precedent and chose to disregard it.

Magistrate Judge Kelley's findings in *Colburn* apply with equal force here. Mr. Khoury's counsel's selection of documents to subpoena from Middlesex and Donovan Tennis "fall within the highly-protected category of opinion work product." *Colburn* Order at 2 (citing *United States v. Horn*, 811 F. Supp. 739, 746 (D.N.H. 1992)), *aff'd in part and rev'd in part,* 29 F.3d 754, 758 (1st Cir. 1994) (affirming disqualification order); *see also United States v. June*, 10-30021, 2011 WL 5330788, at *2 (D. Mass Oct. 19, 2011). The selection process "reveals counsel's mental

---

[1] Middlesex is the boarding school that Mr. Khoury's daughter attended and where she played tennis. The government has identified two witnesses from Middlesex who will testify at trial, Amanda Holcombe and Matt DeGreeff. Amanda Holcombe was Ms. Khoury's tennis coach at Middlesex, and Matt DeGreeff (who Mr. Khoury has also listed as a defense witness) was the Director of College Counseling at Middlesex. Both Holcombe and DeGreeff fully supported the application of Mr. Khoury's daughter to Georgetown as a tennis recruit.

Donovan Tennis Strategies—led by Tim Donovan—is a tennis recruiting firm. Tim Donovan is a tennis recruiter and is listed as a government witness. The government contends that Mr. Khoury paid a bribe to Donovan and to Gordon Ernst, the former tennis coach at Georgetown, to fraudulently designate Mr. Khoury's daughter as a tennis recruit to facilitate her admission to Georgetown.

impressions as to how evidence relates to issues and defenses in the litigation." *Horn*, 811 F. Supp. at 746 (citing *Sporck v. Peil*, 759 F.2d 312, 315 (3d Cir. 1985)). Counsel's opinion work product "encompasses materials 'that contain the mental impressions, conclusions, opinions or legal theories of an attorney,' and is highly-protected, in fact, some courts 'have seemingly concluded that the protection for certain types of opinion work product is ironclad.'" *Colburn* Order at 4 (citing *In re San Juan Dupont Plaza Hotel Fire Litig.*, 859 F.2d 1007, 1014-15 (1st Cir. 1988)). And in a "criminal proceeding where important constitutional rights of due process under the Fifth Amendment and effective assistance of counsel under the Sixth Amendment are at stake, along with the liberty interests of the defendant[], this work product deserves special protection." *Horn*, 811 F. Supp. at 747 (citing *United States v. Nobles*, 422 U.S. 225, 238 (1975)).

To give effect to the special protection afforded opinion work product in a criminal case, the government should have sequestered the Ex Parte Subpoenaed Documents and notified Mr. Khoury and the Court before examining them.[2] *See, e.g.,* Mass. Rule Prof. C. 4.4(b) ("A lawyer who receives a document or electronically stored information relating to the representation of the lawyer's client and knows or reasonably should know that the document or electronically stored information was inadvertently sent shall promptly notify the sender"); 28 U.S.C. § 530B ("An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the

---

[2] Middlesex and Donovan Tennis did not notify Khoury of their intention to produce the Ex Parte Subpoenaed Documents to the government, and the government has not disclosed for how long it has been in possession of the documents. Middlesex and Donovan Tennis made productions to the defense in February and March, 2022, so if simultaneous productions were made to the government, the prosecution team has been in possession of the Ex Parte Subpoenaed Documents for two to three months. It is only now, just a month before the current trial date, that the government disclosed its incursion into the defense's work product.

same extent and in the same manner as other attorneys in that State"); *United States v. Koerber*, 966 F. Supp. 2d 1207 (D. Utah 2013) (§ 530B imposes statutory and due process duty upon prosecutors and their agents to comply with state ethics rules); Fed. R. Evid. 502(b) ("Inadvertent Disclosure: When made in a federal proceeding or to a federal office or agency, the disclosure does not operate as a waiver in a federal or state proceeding if: (1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B)").[3]

Finally, if Middlesex and Donovan Tennis "volunteered" to send copies of the Ex Parte Subpoenaed Documents to the government, as the government appears to say, then the answer is much simpler: The prosecutors should have said no.

## B. Mr. Khoury is Entitled to Relief from the Government's Review of the Ex Parte Subpoenaed Documents

As Magistrate Judge Kelley held in *Colburn*, "[p]roper preparation of a client's case demands that [counsel] assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless

---

[3] *See also* Federal Rule of Civil Procedure 26(b)(5)(B):

> Information Produced. If information produced in discovery is subject to a claim of privilege or of protection as trial-preparation material, the party making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The producing party must preserve the information until the claim is resolved.

interference." *Colburn* Order at 2.  (citing *In re San Juan Dupont Plaza Hotel Fire Litig.*, 859 F.2d 1007, 1014 (1st Cir. 1988) ("Our adversarial system of justice cannot function properly unless an attorney is given a zone of privacy within which to prepare the client's case and plan strategy, without undue interference")). The work product doctrine "applies in civil and criminal cases, and obviously, in the latter, assumes constitutional significance." *Id.* (citing *Nobles*, 422 U.S. at 238) ("Although the work-product doctrine most frequently is asserted as a bar to discovery in civil litigation, its role in assuring the proper functioning of the criminal justice system is even more vital")).

In *Nobles*, the Supreme Court emphasized that lawyers must be allowed to prepare a client's defense without intrusion or interference by opposing parties:

> In performing his various duties, … it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests.

*Nobles*, 422 U.S. at  237.

Mr. Khoury's right to prepare his defense without intrusion by the government included the right to wall off the government from the Ex Parte Subpoenaed Documents. Because "Rule 17(c) implements the Sixth Amendment guarantee that an accused have compulsory process to secure evidence in his favor," *In re Martin Marietta Corp.*, 856 F.2d 619, 621 (4th Cir. 1988), "[f]orcing any defendant to confront the choice between issuing a pre-trial subpoena duces tecum and disclosing his defense to the Government places an unconstitutional limitation on the defendant's [Sixth Amendment] right to compulsory process." *United States v. Beckford*, 964 F. Supp. 1010, 1027 (E.D. Va. 1997); *United States v. Tomison*, 969 F. Supp. 587, 593–94 (E.D. Cal.

1997) ("Since a defendant seeking pre–trial production must make a demonstration of relevancy, admissibility and specificity, requiring that defendant share the showing with the government would effectively force the defendant to reveal his or her theory of the case") (internal citations omitted). As Magistrate Judge Kelley found, Rule 17(c) gives effect to the defendant's "constitutional rights to confrontation and compulsory process." *Colburn* Order at 1 (citing *Nixon*, 418 U.S. at 698-99).

The government engaged in a calculated roundabout of this Court's holding in *Colburn*. The review of the Ex Parte Subpoenaed Documents was a calculated decision that the government knew would reveal "important insight into defense tactics, strategy, and problems," and the "defendant's factual and legal theories of the case." *Colburn* Order at 2, 4. For example, the government's review of the Ex Parte Subpoenaed Documents is allowing the prosecution team to prepare Tim Donovan and other witnesses for cross-examination, and to anticipate topics of examination and confrontation of witnesses with documents that the government did not previously have or of which the government was not unaware.[4] Additionally, the government's actions have also encroached upon Mr. Khoury's Sixth Amendment right to the effective assistance of counsel. *See Massiah v. United States*, 377 U.S. 201, 206 (1964) (finding a Sixth

---

[4] Mr. Khoury has endeavored to file this motion as soon as possible in light of the conduct and remedies sought and the upcoming trial date, and will supplement this motion with declarations of counsel if requested by the Court. However, because Mr. Khoury has established that the government encroached on his Fifth and Sixth Amendment rights and the opinion work product of his counsel, the burden shifts to the government to show that there has been and there will be no prejudice to Mr. Khoury, and the burden is high. *See United States v. Mastroianni,* 749 F.2d 900, 907-08 (1st Cir. 1984) (once the defendant established that a government informant intruded on  joint defense meetings and passed confidential information to the government, "the burden shifts to the government to show that there has been and there will be no prejudice to the defendants…The burden on the government is high…").

Amendment violation where agent surreptitiously listened to defendant's conversation after he was indicted and represented by counsel); *see also Bishop v. Rose,* 701 F.2d 1150, 1156 (6th Cir. 1983) (citing *United States v. Dien,* 609 F.2d 1038, 1043 (2d Cir. 1979) (construing *Weatherford v. Bursey,* 429 U.S. 545, 548 (1977)).

Dismissal of the Indictment is justified when the prosecution's violations of the Fifth and Sixth Amendments is deliberate and prejudicial. *See, e.g., United States v. Voigt,* 89 F.3d 1050, 1066 (3d Cir. 1996); *United States v. Morrison*, 449 U.S. 361, 365, (1981). This determination is based upon the totality of the circumstances, with "no single factor controlling." *United States v. Ofshe,* 817 F.2d 1508, 1516 (11th Cir. 1987).

Dismissal of the Indictment with prejudice is the appropriate remedy here because the government's deliberate conduct is "'shocking to the universal sense of justice' mandated by the Due Process Clause of the Fifth Amendment." *United States v. Russell*, 411 U.S. 423, 432 (1973) (quoting *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246 (1960)); *United States v. Levy*, 577 F.2d 200, 208 (3rd Cir. 1978) (dismissing indictment where government invaded the defense camp and learned defense strategies: "[T]he government's knowledge of any part of the defense strategy might benefit the government in its further investigation of the case, in the subtle process of pretrial discussion with potential witnesses, in the selection of jurors, or in the dynamics of trial itself . . . The government's knowledge of this planned strategy would permit it not only to anticipate and counter such an attack on its witnesses' credibility, but also to select jurors who would be more receptive ….").

Alternatively, Mr. Khoury moves to disqualify from the prosecution team anyone tainted by exposure to defendant's work-product. Federal courts have inherent authority to disqualify counsel, *see, e.g., Wheat v. United States*, 486 U.S. 153, 160 (1988) (disqualifying counsel of

choice based on a potential conflict of interest), pursuant to "the generally accepted rule that the
district court has the duty and responsibility of supervising the conduct of attorneys who appear
before it." *Kevlik v. Goldstein*, 724 F.2d 844, 847 (1st Cir. 1984) (upholding order disqualifying
counsel). Prosecutorial invasion of work product warrants disqualification under this Court's
supervisory authority. *See*, *e.g., Horn*, 811 F. Supp. at 739 (ordering disqualification of both the
prosecutor and agent who obtained possession of defense work). As well, a prosecutor's
circumvention of Rule 17(c) warrants disqualification of the prosecutor and imposition of
sanctions in order to level the playing field, preserve the rule of law, and deter similar intrusions.
*See United States v. Candelario-Santana*, 929 F. Supp. 2d 24, 29 (D.P.R. 2013) ("To preserve the
rule of law, the court must impose the following sanctions…because the record persuasively
indicates that Assistant U.S. Attorney Julia Díaz–Rex was the lead actor behind the abusive Rule
17 practice, the court disqualifies her from this case ... the court will notify the Department of
Justice, Office of Professional Responsibility, of this misconduct … Misconduct of this kind
strikes at the foundation of the court's integrity and its impartiality. As a result, the court has
imposed these sanctions not only as punishment for misconduct, but as deterrence"); *see also
Marvin Lumber & Cedar Co. v. Norton Co.,* 113 F.R.D. 588, 591 (D. Minn. 1986) ("The rules
governing disqualification are designed to protect against the potential breach of such confidences,
even without any predicate showing of actual breach .... The threat or potential threat that
confidences may be disclosed is enough"); *United States v. Kouri-Perez*, 992 F. Supp. 511, 511
(D.P.R. 1997) ("a district court may disqualify an attorney to prevent a lawyer's presence from
tainting a trial, for perceived conflict of interest, to protect the integrity of the judicial process, to
enforce its rules against transgressors, or to maintain public confidence in the legal profession");
*Martinez v. City of Antelope*, 2016 WL 4094864, *2 (D. Neb. Aug. 1, 2016) (affirming magistrate

judge's disqualification of counsel where counsel violated public policy and governing ethical rules by inquiring into information protected by the attorney-client privilege; holding that when courts consider disqualification, they "take into account a party's interest in a trial free from even the *risk* that confidential information has been unfairly used against it") (quoting *Gifford v. Target Corp.*, 723 F. Supp. 2d 1110, 1117 (D. Minn. 2010)); *see also Chambers v. NASCO, Inc.* 501 U.S. 32, 43 (1991) (holding that a federal court "has the power to control admission to its bar and to discipline attorneys who appear before it"); *Colburn* Order at 4 (prosecutors may not "gain an unfair advantage in the litigation by perusing documents that clearly spell out defendant's trial strategies").

Mr. Khoury requests that the court convene an evidentiary taint hearing to identify who had possession of or access to the work-product and to require the government to bear the burden of proving that it has not made, nor will it make, any direct or derivative use of the illegally reviewed work-product. *See generally Kastigar v. United States*, 406 U.S. 441 (1972); *Morrison,* 449 U.S. at 365, 366 ("Our approach has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances … The remedy in the criminal proceeding is limited to denying the prosecution the fruits of its transgression").

Finally, to avoid further unfair prejudice to Mr. Khoury, insofar as tainted members of the prosecution team have prepared government witnesses to testify against Mr. Khoury, those witnesses should be excluded. *Id.*

Respectfully submitted,

AMIN KHOURY,

/s/ Eóin P. Beirne

| | |
|---|---|
| Roy Black (*pro hac vice)* | R. Robert Popeo (BBO #403360) |
| BLACK SREBNICK | Mark E. Robinson (BBO #423080) |
| 201 South Biscayne Boulevard | Cory S. Flashner (BBO #629205) |
| Suite 1300 | Eóin P. Beirne (BBO #660885) |
| Miami, FL 33131 | Mathilda S. McGee-Tubb (BBO #687434) |
| (305) 371-6421 | MINTZ, LEVIN, COHN, FERRIS, |
| rblack@royblack.com | GLOVSKY AND POPEO, P.C. |
| | One Financial Center |
| | Boston, MA 02111 |
| | (617) 542-6000 |
| | RRPopeo@mintz.com |
| | MERobinson@mintz.com |
| | CSFlashner@mintz.com |
| | EPBeirne@mintz.com |
| | MSMcGee-Tubb@mintz.com |

Dated: May 9, 2022

## LOCAL RULE 7.1(a)(2) CERTIFICATION

I hereby certify that I raised the concerns addressed in this motion with counsel for the government.

/s/ Eóin P. Beirne
Eóin P. Beirne (BBO # 660885)

## CERTIFICATE OF SERVICE

I, Eóin P. Beirne, hereby certify that I filed this document through the Electronic Filing System on May 9, 2022.

/s/ Eóin P. Beirne
Eóin P. Beirne (BBO # 660885)

14