1
             IN THE UNITED STATES DISTRICT COURT

2
           FOR THE DISTRICT OF MASSACHUSETTS

3

UNITED STATES OF AMERICA,        )

4
                         )

            Plaintiff       )

5
                         )

      -VS-               )   Criminal No. 20-10177-PBS

6
                         )   Pages 5-1 - 5-280

AMIN KHOURY,              )

7
                         )

            Defendant       )

8

9
               **JURY TRIAL - DAY FIVE**

10

11

12
         BEFORE THE HONORABLE PATTI B. SARIS

           UNITED STATES DISTRICT JUDGE

13

14

15
                    United States District Court

                    1 Courthouse Way

16
                    Boston, Massachusetts  02210

                    June 13, 2022, 9:02 a.m.

17

18

19

20

21

22
                 LEE A. MARZILLI

23
            OFFICIAL COURT REPORTER

          United States District Court

24
         1 Courthouse Way, Room 7200

            Boston, MA  02210

25
            leemarz@aol.com

1    A P P E A R A N C E S :

2        KRISTEN A. KEARNEY, ESQ. and CHRISTOPHER J. MARKHAM, ESQ.,
     Assistant United States Attorneys, Office of the United States
3    Attorney, 1 Courthouse Way, Room 9200, Boston, Massachusetts,
     02210, for the Plaintiff.
4
         EOIN P. BEIRNE, ESQ., MATHILDA McGEE-TUBB, ESQ., and
5    EDMUND P. DALEY, ESQ., Mintz, Levin, Cohn, Ferris, Glovsky
     and Popeo, PC, One Financial Center, 42nd Floor, Boston,
6    Massachusetts, 92111, for the Defendant, Amin Khoury.

7        ROY BLACK, ESQ., HOWARD M. SREBNICK, ESQ. and
     JACKIE PERCZEK, ESQ., Black Srebnick, P.A., 201 S Biscayne
8    Boulevard, Suite 1300, Miami, Florida, 33131, for the
     Defendant, Amin Khoury.
9
         GEORGE P. VARGHESE, ESQ. and JUSTIN METZ, ESQ.,
10   Wilmer Cutler Pickering Hale, 60 State Street, Boston,
     Massachusetts, 02109, for the Movant, Georgetown University.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

MICHAEL FRIED

|  |  |  |  |  |
|---|---|---|---|---|
| By Mr. Srebnick: | 13 |  |  |  |
| By Mr. Markham: |  | 42 |  |  |
| By Mr. Srebnick: |  |  | 48 |  |
| By Mr. Markham: |  |  |  | 50 |

BRENDA SMITH

|  |  |  |  |  |
|---|---|---|---|---|
| By Mr. Black: | 50 |  |  |  |
| By Mr. Markham: |  | 111 |  |  |
| By Mr. Black: |  |  | 117 |  |

KATHERINE KHOURY

|  |  |  |  |  |
|---|---|---|---|---|
| By Mr. Srebnick: | 122 |  |  |  |
| By Mr. Markham: |  | 180 |  |  |

GEOFFREY ALPERT

|  |  |  |  |  |
|---|---|---|---|---|
| By Mr. Srebnick: | 187 |  |  |  |
| By Ms. Kearney: |  | 204 |  |  |

DANIEL E. TRUMP

|  |  |  |  |  |
|---|---|---|---|---|
| By Mr. Black: | 207 |  |  |  |
| By Mr. Markham: |  | 234 |  |  |
| By Mr. Black: |  |  | 240 |  |
| By Mr. Markham: |  |  |  | 241 |

| EXHIBITS | RECEIVED IN EVIDENCE |
|---|---|
| 375 | 106 |
| 376 | 167 |
| 377 | 174 |
| 378 | 180 |
| 370 | 244 |
| 380 | 244 |

P R O C E E D I N G S

THE COURT:  So good morning to everyone.  I'm sure I had a better weekend than you did.  It was probably very busy for all of you.  I did get your objections.  I don't necessarily require you to file them online, but if you want to, you can.  I don't feel strongly about it one way or another.  But I do have a couple of questions, which is, we're hoping to do a charge conference this afternoon, at least start one, but based on what you know, how long do you think the defense case will go at this point?

09:03   MR. BLACK:  I think that what I was estimating, we will rest either before lunch or right after lunch, so we would have time for the charge conference in the afternoon.

THE COURT:  Tuesday?

MR. BLACK:  As far as I -- the way I look at it.

THE COURT:  So that makes a big -- I still think we should start it today so I can start thinking about it, and then we'll see about -- because if it's before lunch and it's at 11:00, I'm going to want to go to the jury tomorrow.  If it's just after lunch and we only have two hours left, I'm not.

09:04   I'm going to go on Wednesday.  So let's just see how today looks.

Who's the first witness.

MR. SREBNICK:  Coach Mike Fried from Wesleyan.

THE COURT:  From Wesleyan.  All right.  And is

1    there -- I do understand with respect to Georgetown that a lot

2    of them were coming in at the last minute for you all, but at

3    least with respect to Wesleyan, I shouldn't have any surprise

4    documents.  Are there any disputes?

5           MR. MARKHAM:  There's only two proposed exhibits.

6    We're objecting to one of them.  The other one is already in

7    evidence.

8           THE COURT:  Okay.  There was a new issue that I hadn't

9    thought of before that was raised by the defense, and it has to

09:04 10    do with the statute of limitations.

11           MR. SREBNICK:  And, Judge --

12           THE COURT:  I've never thought of the issue.

13           MR. SREBNICK:  I'm glad you raised it.

14           THE COURT:  What?

15           MR. SREBNICK:  I'm glad you raised the point because

16    we submitted instructions, but I suppose formally we should

17    move, and I do now move, for a judgment of acquittal, or in the

18    alternative, to dismiss the indictment on the statute of

19    limitations grounds on the basis that, from our view, the

09:05 20    conspiracy, if it ever existed, came to its achieved conclusion

21    by May of 2015, and the indictment was not returned within five

22    years.

23           THE COURT:  Well, it's sort of a -- I read it, just

24    read it literally 15, 20 minutes ago, so I'm still denying it,

25    but I do want to hear thoughts about it.  So when was the last

1    payment, in the government's view?

2           MS. KEARNEY:  In July of 2016 were the last text

3    messages about additional payment.

4           THE COURT:  So you're saying it's sufficient for the

5    government to find that the last payments were within the

6    statute of limitations?

7           MS. KEARNEY:  Yes, your Honor.

8           THE COURT:  Now, with respect to the close of the

9    conspiracy, which ultimately becomes a jury issue, is the

09:06 10   so-called "coverup," which is, you know, "Let's pretend it was

11   for tennis lessons," is it your position that it extended the

12   conspiracy?

13          MS. KEARNEY:  Yes, your Honor, because concealment of

14   how she got into school, she hadn't graduated yet, so it was

15   important that they kept that concealed.  It is part of the

16   conspiracy.  If it were found out that she had gotten in as a

17   fake tennis recruit, that could affect -- and in fact

18   Georgetown did investigate -- the status of her admission.

19          THE COURT:  Well, what's useful for me to have is -- I

09:06 20   don't know the case law on this.  You're quite correct that a

21   cover-up can be part of a conspiracy and extend it, but what if

22   it basically ended, and then years later someone finds out

23   about it, and then there's a coverup, does it revive it?  I

24   mean, what's the legal effect of that?  I don't know.  Do you

25   have cases on that?

1          MR. SREBNICK:  We are working it to submit today a

2   written document, a written memorandum of law on the statute of

3   limitations.  It's as to both counts, to be clear.  And I think

4   the government is referring to text messages.  In terms of the

5   payment, I don't think there was any evidence of an actual

6   payment.  There were the text messages about proposed payments

7   in July of 2016, but Donovan did not testify that any payments

8   were actually made, and that's an important distinction.

9          THE COURT:  Yes.  It certainly would, at the very

09:07 10   least, be a fact question for the jury, so I think I have to

11   send it to them.

12          MS. KEARNEY:  And, your Honor, on that point, the

13   defendant's text messages, his own words, say that he's going

14   to take a bite out of the amount owed.

15          THE COURT:  Yes, there's enough to go to a jury.  It's

16   just I hadn't thought about the issue before.  I just literally

17   hadn't thought about it, so I don't even -- as you point out,

18   it wasn't even raised in the directed verdict or in the

19   openings.  I just hadn't thought about it.  So I was -- that's

09:08 20   the one thing that sort of was like, "Okay, that's a fair

21   point.  I need to think about that."

22          And also, with respect to the end of the conspiracy,

23   did it end in 2016, as you say?  And then what happens if

24   something's ended, and then years later there's an arrest and

25   someone tries to cover up, does that revive it?  I don't know.

         1    I just -- it would be useful to get some case law on it, and

         2    we'll address that at the charge conference as to how to word

         3    that.

         4          And last but not least, I am on the fence about overt

         5    act, leaning towards the defense side on that, because it is

         6    true that both Judge Gorton and Judge Talwani -- we've been

         7    trying to compare the various jury instructions, but we haven't

         8    found a First Circuit case on point yet on overt act -- neither

         9    Judge Talwani nor Judge Gorton required overt acts for two of

09:09   10    the three objects.

        11          MS. KEARNEY:  Yes, your Honor.

        12          THE COURT:  However, we couldn't find a First Circuit

        13    case on point, and the only one my law clerk could find said

        14    there was an overact act requirement for honest services, which

        15    they cite.  So I'm inclined not to have this case go up or down

        16    on that issue, so if there's a case directly on point, I would

        17    like to know it on the overt acts.  I'm only that far, so far,

        18    going through.  Yours are easy to go through.  Yours are taking

        19    me a wee bit longer to go through.  But I thought I would sort

09:09   20    of flag these issues.  And I don't know if you have these smart

        21    kids upstairs, summer interns, maybe looking at stuff, and you

        22    probably have a team back at the office.  But were there any

        23    other major new issues because I'm only halfway through your

        24    objections?

        25          MR. SREBNICK:  I can't think of anything.

         1          THE COURT:  A lot of it was just wording things and

         2   adding this in and maybe --

         3          MR. SREBNICK:  We had some proposed instructions on

         4   the jurisdictional question of federal benefit.

         5          THE COURT:  Okay, I'm not there yet.

         6          MS. KEARNEY:  And just on that note, I know on Friday

         7   Mr. Srebnick cited the *Wind Coop* case.  My understanding is

         8   that that case has been overruled by the Supreme Court's

         9   decision in *Fisher,* so I just wanted to caution about relying

09:10 10   on that.

        11          MR. SREBNICK:  So when I cited it on Friday, I did

        12   note that the Ninth Circuit had retreated from that position in

        13   a footnote in a later decision --

        14          THE COURT:  Well, there are a couple of things upon

        15   which you will be preserving issues, the most salient of which

        16   is what's property.  And as I said at the start of this case,

        17   there's a chance -- the reason I'm isolating out each of the

        18   counts -- that I may direct out property.  I just -- I haven't

        19   really thought it through.  I'll see what the jury does first,

09:10 20   and I'm thinking about that one.  It is not a clear answer to

        21   that question.

        22          So there's nothing else, I think, that's --

        23          MR. SREBNICK:  Just one more.  We may submit one

        24   additional paragraph because we believe at most what the

        25   government's case proves is a gratuity, not a bribe.  And so

 1   after rereading the charge that we've been working with, we may

 2   ask the Court to consider another paragraph defining the term

 3   "gratuity."

 4        THE COURT:  Okay, I'll look forward to that.  I also

 5   was going to say, at some point I need to explain what a

 6   fiduciary duty is, you know.  I think I say it's honest

 7   services is interfering with -- a juror may not know what that

 8   is.

 9        MS. KEARNEY:  We can submit a proposed instruction on

09:11 10   that.

11        THE COURT:  I think that's it.

12        How many jurors do we have now, Maryellen?

13        THE CLERK:  I don't know.  I can go check.  I know we

14   only had like five, but that was 15 minutes ago.

15        THE COURT:  Check before I go and then -- they're not

16   supposed to be here, as you remember, till 9:15.

17        Let me ask you --

18        MR. BLACK:  Your Honor, I think I misunderstood you.

19   I meant to tell you we were going to rest some time today, not

09:12 20   tomorrow.  Maybe I miscommunicated it.

21        THE COURT:  Oh, oh, oh.

22        MR. BLACK:  I thought that we would rest sometime

23   today, probably sometime after lunch.

24        THE COURT:  Then we're definitely going to a jury

25   tomorrow.

```
  1              MR. BLACK:  And then go to the jury tomorrow morning.
  2              THE COURT:  Yes, you're -- by the way, you're right.
  3      I thought you meant tomorrow because -- all right, well, we'll
  4      have to get going on the charge then.
  5              MR. MARKHAM:  I was just going to note, your Honor,
  6      the cross-examinations we anticipate will be very short as
  7      well, so we anticipate that.
  8              THE COURT:  Maybe we'll have the whole afternoon for a
  9      charge.
 10              There was one other thing I wanted to -- you can be
 11      seated.  There's no reason to stay standing.
 12              THE CLERK:  They're all there.  One's in the restroom.
 13              THE COURT:  They're all here?
 14              THE CLERK:  They're all here.  Just a few minutes.
 15      I've got to line them up.
 16              THE COURT:  Oh, I know what the other question I had
 17      for you.  I think there was an argument that each one of the
 18      objects of the conspiracy also had to be -- let me get it.  I
 19      just was reading it this morning.  Oh, here it was.  That there
 20      must be an overt act committed for each of the three objects of
 21      the conspiracy.
 22              MR. MARKHAM:  Yes, your Honor, we are reading that and
 23      looking into it as well.  If we could have, you know, just
 24      after the break, we'll get you our position and case law on
 25      that because we were just looking at that as well.
```

```
 1          THE COURT:  All right.  So it wasn't just for the
 2    conspiracy but each of the objects of the conspiracy.  I'm
 3    thinking of saying that.  I don't think this case should go up
 4    or down on that issue.
 5          MR. MARKHAM:  Understood, your Honor, and we will look
 6    into that issue certainly.
 7          MR. SREBNICK:  Shall I invite the witness in?
 8          THE COURT:  Yes.  That's great.
 9          (Discussion off the record.)
10          (Jury enters the courtroom.)
11          THE COURT:  Good morning to everyone.  I hope you had
12    a lovely weekend.  It was a beautiful weekend.  Did anyone
13    speak about this case, see anything in the press, do any social
14    media communication?  There was one other thing.  Anyway, we're
15    beginning the defense today.  The government rested, if you
16    remember.
17          And so your next witness.
18          MR. SREBNICK:  Thank you, your Honor.  And good
19    morning, everybody.  We call Michael Fried, who's walking into
20    court.
21                      MICHAEL FRIED
22    having been first duly sworn, was examined and testified as
23    follows:
24          THE CLERK:  Can you please state and spell your name
25    for the record.
```

```
  1              THE WITNESS:  Sure.  My name is Michael Fried,
  2      M-i-c-h-a-e-l F-r-i-e-d.
  3              THE COURT:  All right.  So we can't hear a word you're
  4      saying.  Don't forget, the whole world needs to hear it right
  5      here.  So can you go into the mic?
  6              THE WITNESS:  Yeah.  Better?
  7              THE COURT:  So much better.  All right, go ahead.
  8              THE WITNESS:  Sorry.  Michael Fried, M-i-c-h-a-e-l
  9      F-r-i-e-d.
09:17 10              THE COURT:  Perfect, thank you.
 11              THE WITNESS:  Sure.
 12      DIRECT EXAMINATION BY MR. SREBNICK:
 13      Q.   Good morning, Coach.
 14      A.   Good morning.
 15      Q.   Could you introduce yourself to the jury and tell us a
 16      little bit about yourself.
 17      A.   Hi.  Good morning.  My name is Mike.  I am the --
 18              THE COURT:  No, no, no, no, no.
 19              THE WITNESS:  Okay.  Sorry.
 20              MR. SREBNICK:  So if you can pull the microphone
 21      closer.
 22              THE WITNESS:  I'll just lean forward.  Thanks.
 23              THE COURT:  You're leaning into the ball, okay?
 24      A.   I am the men's and women's tennis coach at Wesleyan
 25      University.
```

1    Q.   And tell us a little bit about your background.  Where did

2    you grow up, and where did you go to school?

3    A.   I grew up in Poughkeepsie, New York, went to high school

4    in Poughkeepsie, New York too, went to college at Brown

5    University.

6    Q.   And tell us about your admission to Brown.  Were you a

7    recruited athlete?

8    A.   I was.

9    Q.   And what sport did you play in high school?

09:18 10   A.   Tennis.

11   Q.   And what sport did you play in college?

12   A.   Tennis.

13   Q.   Okay.  And what year did you enroll at Brown University?

14   A.   1987.

15   Q.   And where is Brown University?

16   A.   Providence, Rhode Island.

17   Q.   Okay.  And in what athletic league is Brown University?

18   A.   Ivy.

19   Q.   If you could pull the microphone closer to you, just

09:18 20   because we're going to need to make sure we all hear it.

21   A.   Ivy League.

22   Q.   Okay, so it's what's known as the Ivy League?  And when

23   you arrived at Brown University, did you -- thank you, Roy --

24   were you on the tennis team as a freshman?

25   A.   I was.

1   Q.   Okay.  And tell us who was on that tennis team with you --

2   well, first, do you recognize Amin Khoury here in court today?

3   A.   I do.

4   Q.   Okay.  And who was Amin Khoury to you back in the 1980s

5   when you were at Brown University?

6   A.   Amin was a senior on the tennis team when I was a

7   freshman.

8   Q.   Okay.  And did you and Amin Khoury become friends while

9   you were on the tennis team together?

09:19 10   A.   We did.

11   Q.   And who else -- well, let me -- I'll just run you down the

12   names.  Did you know someone by the name of Donovan, Tim

13   Donovan?

14   A.   Yes.

15   Q.   Okay.  And how did you know Tim Donovan or how did you

16   come to meet him?

17   A.   He was also on the team.  He was a junior when I was a

18   freshman.

19   Q.   Did you know Tim Donovan before you joined the Brown

09:20 20   tennis team?

21   A.   No.

22   Q.   Did you know Amin Khoury before you joined the Brown

23   tennis team?

24   A.   No.

25   Q.   Gordie Ernst or Gordon Ernst, how did you come to know

1  Gordon Ernst?

2  A.   The same.  He was also a junior on the tennis team there

3  when I was a freshman.

4  Q.   And Bobby Ernst, who is he?

5  A.   The brother of Gordie and also --

6       THE COURT:  You know what, I can't believe you yell at

7  the kids on the court.  You have kind of a soft voice.  They

8  need to hear you, not him.  They need to hear you.

9       THE WITNESS:  Sorry, okay.

09:20  10  A.   Bobby Ernst was also on the team at the time and brother

11  of Gordon.

12  Q.   Was there another player named Wyman?

13  A.   Yes.

14  Q.   What was his name?

15  A.   Kevin Wyman also was a junior when I was a freshman.

16  Q.   Okay.  Now, tell the ladies and gentlemen of the jury

17  about the relationships that were forged during your

18  participation as a tennis player at Brown University.

19  A.   Uhm, we did the team -- you know, as I think all teams do,

09:21  20  college teams do, we spent a lot of time together, so not only

21  competing and training but traveling.  And, you know, we'd take

22  our trips together over spring break, and were competing both

23  at home and on the road and training daily for the majority of

24  the year, and pretty good friendships spring from that, and it

25  was a close-knit team.

1    Q.   And for how many years did you play tennis at Brown

2    University?

3    A.   Four.

4    Q.   And for how many years was Amin Khoury your teammate at

5    Brown?

6    A.   Just the one.

7    Q.   And is that because, as you said, he was a senior, so he

8    was graduating at the end of the year that was your freshman

9    year?

09:21 10    A.   Yes.

11    Q.   Okay.  And did you and Amin Khoury become friends during

12    that year?

13    A.   Yes.

14    Q.   Would you say close friends?

15    A.   Yes.

16    Q.   And what about your relationships with Donovan and Gordie

17    Ernst, the same?

18    A.   Yes.

19    Q.   How many more years did you spend with Donovan on the

09:22 20    team?

21    A.   One additional.  He graduated two years prior to me.

22    Q.   And what about the coach -- let's call him Gordie Ernst --

23    how many years were you together with him on the team?

24    A.   Also, he graduated two years ahead of me.

25    Q.   So you were the youngest of the teammates at that point in

1  time?

2  A.    Of that group, yes.

3  Q.    When you graduated Brown University, did you have any

4  further interaction with Amin Khoury who had been your teammate

5  at Brown?

6  A.    Yes.

7  Q.    Tell the ladies and gentlemen of the jury about life after

8  Brown University for you.

9  A.    Uhm, somewhere in the neighborhood of six months after

09:22 10  graduating, I came to work with Amin in Boston at a film

11  production company that he had started with his wife, and did

12  that for -- I don't recall exactly, but probably about nine

13  months or so; and lived with them at the time for a stretch of

14  that, maybe three or four months of that time period; and then

15  subsequently moved to Florida in an unrelated professional

16  capacity.

17  Q.    So let me ask you about those nine months that you worked

18  with Amin Khoury.  More or less what year was that?  Do you

19  recall?  You graduated -- let's start with what year did you

09:23 20  graduate Brown?

21  A.    1991, so it was either the kind of fall-winter of '91 or

22  the, you know, early winter part of '92.

23  Q.    And what kind of work were you and Amin Khoury doing

24  together?

25  A.    Again, it was -- it was -- it was a film production

company.  It did some marketing videos for corporations, and

then the kind of big project for that company was writing,

producing, and kind of, you know, packaging a sitcom pilot.

Q.   And you said you lived with Mr. Khoury, and you mentioned

his wife.  What was the name of the person you referred to as

Amin's wife?

A.   Melanie.

Q.   And so tell us about the living arrangement with you and

Amin Khoury and Melanie.

A.   They had a -- I don't remember -- you know, a two- or

three-bedroom kind of guesthouse.

        THE COURT:  Can you hear?

        THE JURY:  Yes.

        THE COURT:  You can, okay.

A.   Sorry.  I'll come closer.

Q.   Just pretend like you're coming to the net, like it's a

volley, so try to get real close to the net.

A.   I'm kind of a base liner.  I get nervous going forward,

so --

        (Discussion off the record.)

Q.   So tell us about the living arrangements.  First, where

were you all living, in what city, what neighborhood?

A.   Here in Wellesley, Massachusetts.

Q.   Okay.  And whose property or whose home was it that you

all were living in?

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | A.   It was Amin Sr.'s home, on which property was a guesthouse         |
|       | 2  | where Amin and Melanie lived, and I lived with them for that            |
|       | 3  | time.                                                                   |
|       | 4  | Q.   And during that time, did you come to meet Amin Sr.; that          |
|       | 5  | is, Amin who's here in court's father?                                  |
|       | 6  | A.   Yes.                                                               |
|       | 7  | Q.   And were you all then living on the same property, as you          |
|       | 8  | described?  You said you were in the guesthouse?                        |
|       | 9  | A.   Yes.                                                               |
| 09:25 | 10 | Q.   And where did Amin -- let's call him Amin Jr. to avoid             |
|       | 11 | confusion -- Amin Jr., where was he living when you were living         |
|       | 12 | in the guesthouse?                                                      |
|       | 13 | A.   In the guesthouse, same.                                           |
|       | 14 | Q.   Okay.  And Melanie also?                                           |
|       | 15 | A.   Yes.                                                               |
|       | 16 | Q.   Okay, so the three of you were living in a guesthouse of a         |
|       | 17 | few bedrooms?                                                          |
|       | 18 | A.   Yes.                                                               |
|       | 19 | Q.   And for how long did that living arrangement extend?              |
| 09:26 | 20 | A.   Maybe three to four, three to five months.                        |
|       | 21 | Q.   And during that time, were you working with Amin Jr.?             |
|       | 22 | A.   Yes.                                                               |
|       | 23 | Q.   And did you all share meals together and do things that           |
|       | 24 | people do when they're living in a home together?                      |
|       | 25 | A.   Yes, occasionally, for sure.                                       |

```
 1   Q.    Okay.  Did you guys become closer friends?

 2   A.    Yeah.

 3   Q.    Okay.  Sometimes when people live together, they actually

 4   don't, but, in any event, did you come to know about the family

 5   and Amin Jr.'s father?

 6   A.    Yes.

 7   Q.    Okay.  And did you become friendly with him as well to the

 8   extent that you all interacted?

 9   A.    All interactions were significantly less frequent and

10   social, but I came to know him.

11   Q.    Okay.  Tell us then -- we'll do a quick, like, a Cliff

12   Notes version of what happened between after you finished

13   working in the film production with Amin until you became the

14   coach at Wesleyan.  Give us just the Reader's Digest version of

15   that.

16   A.    It's a long stretch of time between the two, but I went to

17   work for a marketing company that was kind of moving around

18   doing projects on college campuses, and from there stayed full

19   time in Florida at a tennis academy, running the business

20   operation of a tennis academy in Florida; and then from there

21   left to pivot and work for a company that was a financial and

22   NASDAQ market maker, and worked in the office for them in South

23   Florida for quite a while, for probably six years; and then did

24   similar trading in South Florida and then up here, and moved

25   back North and was in Boston for two years, in New York for a
```

1    year, before moving to Connecticut about 13 years ago.

2          Shortly, a few years after moving to Connecticut, the

3    opportunity to begin working with the tennis teams at Wesleyan

4    arose, and started very part-time going up to work with the

5    teams; and that transitioned to an opportunity to work with

6    them full time beginning about maybe 2011, 2010 or 2011 too,

7    and I have been there at the university since.

8    Q.   And by the time you joined the Wesleyan tennis team as the

9    coach, were you by then married?

09:28 10   A.   Yes.

11   Q.   Okay.  And what is your wife's name?

12   A.   Jill.

13   Q.   Okay.  Tell the ladies and gentlemen of the jury about

14   Wesleyan University.  Just describe the school's division.

15   A.   It's Division 3, a liberal arts school in athletic

16   conference called the NESCAC, New England Small College

17   Athletic Conference.

18   Q.   And what other teams compete in that conference against

19   Wesleyan?

09:29 20   A.   Amherst, Williams, Middlebury, Bowdoin, Tufts, Bates,

21   Colby, Connecticut College, Trinity, Hamilton.  I think that's

22   all.

23   Q.   So these sound like smaller liberal arts colleges in the

24   New England Northeast area.

25   A.   Yes.

1   Q.   And describe, if you could, for the jury the facilities

2   that are at Wesleyan, particularly for the tennis program.

3   A.   You know, we share athletic facilities with other sports

4   in the university as a whole, but we have sixteen tennis courts

5   outside and four multiuse tennis courts inside, and, you know,

6   strength training, physical therapy, and other kind of

7   facilities there that are common to, you know, the Athletic

8   Department.

9   Q.   And you started as the head coach of the Wesleyan tennis

09:30 10   team in what year?

11   A.   I was there for maybe a year, maybe a little less than a

12   year, as an assistant coach, and so it's been probably ten

13   years since I've been head coach, so maybe 2011 or 2012 that

14   that began.

15   Q.   Describe for the ladies and gentlemen of the jury the

16   process for recruiting, if they have such practices at

17   Wesleyan, describe whatever the recruiting practices are at

18   Wesleyan University.

19   A.   You know, our recruiting practices are designed to try and

09:30 20   find prospective student athletes that fit the profile in terms

21   of their tennis level.  And over the ten years I've been there,

22   our tennis level has been rising considerably, and, you know,

23   we're looking for people who can come in as a freshman and

24   immediately make an impact trying to be competitive in that

25   conference, which is generally the most competitive tennis

conference in Division 3 nationally.  And certainly those
students also have to have an academic profile that makes them
admissible to the school, which has very, very stringent
admissions standards.  And that process begins as early as, you
know, sophomore year in high school, and really ramps up as
high school tennis players are wrapping up their junior year
heading into now the summer before senior year, in most
instances of our timeline.

Q.   Does Wesleyan offer athletic scholarships to students?

A.   No.

Q.   Explain to the ladies and gentlemen of the jury the
difference between an athletic scholarship and other kinds of
financial aid.

A.   As a Division 3 school, the NCAA rule across the entire
division is that athletic scholarships aren't allowed.  That
means, you know, the university is covering tuition expenses
for somebody based on their athletic ability.  Other schools
offer merit scholarships, which is based on their academic
qualifications.  Wesleyan offers neither and is strictly
need-based financial aid which is based on family need.

Q.   Which means, if a really, really strong tennis player
wants to be considered at Wesleyan, the school cannot offer
that student, prospective student athlete, money, a
scholarship, unless the person qualifies for, quote, "financial
aid"?

1    A.    That's correct.

2    Q.    Okay.  As a coach, do you as a coach identify prospective

3    student athletes that you might choose to recruit for the team?

4    A.    Yes.

5    Q.    In that capacity, did you interact with Donovan, Tim

6    Donovan?

7    A.    Yes.

8    Q.    And who by then was Tim Donovan professionally when you

9    joined the Wesleyan University as the head coach of the tennis

09:32 10   team?

11   A.    He had and continues to have a consulting company,

12   basically that is providing recruiting kind of advice and

13   consultation through the recruiting process to prospective

14   college athletes.

15   Q.    And so what did he do in his professional capacity that

16   would bring you to interact with him in a professional

17   capacity?

18   A.    He has every year, you know, a wide range of clients, and

19   wide range meaning wide range of academic credentials, athletic

09:33 20   ability, tennis ranking, etc.  And he, you know, is in a

21   service to them attempting to kind of identify good target

22   schools based on that intersection of their tennis and

23   academics, and connect them with the coaches and navigate that

24   process.

25   Q.    And so throughout the years that you've been a coach at

1   Wesleyan, did Donovan from time to time or routinely bring to

2   your attention potential student athletes?

3   A.   Routinely.

4   Q.   You said "routinely"?

5   A.   Yes.

6   Q.   And over the years, did you end up recruiting and having

7   one of Donovan's clients end up enrolling at Wesleyan as a

8   student athlete?

9   A.   Several.

09:34 10   Q.   Okay.  Your wife Jill, tell the ladies and gentlemen of

11   the jury the work relationship she has with Donovan Tennis

12   Strategies.

13   A.   She does administrative work for him.  Part of his

14   business is, he runs three separate recruiting showcases, two

15   in the summer, one in January, and she handles the registration

16   of information for that.  So she registers the players and kind

17   of coordinates, you know, a block of hotels for each event and

18   food on site, and she handles quite a bit of the administration

19   for those showcases.

09:34 20   Q.   With that background in place, I want to draw your

21   attention to May of 2014, and I'll refer to the event as "the

22   reunion," the Brown reunion of 2014, May.  Tell us, did you

23   attend that reunion in May of 2014?

24   A.   I did.

25   Q.   And had you attended it before?

```
 1   A.   I had.

 2   Q.   And how often had you attended that reunion?

 3   A.   Several times, probably -- so 2014 is 13 years past

 4   graduation.  I might have attended half of the years since

 5   graduating.

 6   Q.   Okay.  You told us that you were living at the Khoury home

 7   in Massachusetts in approximately 1992.

 8   A.   Yes.

 9   Q.   I've now moved us to 2014.  How much interaction had you

09:35 10   had with Amin Khoury, Jr. between the time you all lived

11   together and the Brown reunion in 2014?

12   A.   None.  You know, shortly after I moved to Florida, we lost

13   touch, so sometime in 1992, and honestly we hadn't spoken at

14   all since we ran into each other at the reunion.

15   Q.   When you arrived at the reunion dinner in 2014, did you

16   already know that Amin was going to be present?

17   A.   Yes.

18   Q.   Okay, you'd been told he was coming?

19   A.   Yes.

09:36 20   Q.   Okay, so describe -- first of all, where did you first lay

21   eyes on Amin at that weekend, the reunion weekend?  Do you

22   recall where it was, the location?

23   A.   I think at dinner that night.

24   Q.   Okay.  Do you remember what the restaurant was?

25   A.   Capital Grille, downtown Providence.
```

```
 1    Q.   So tell the ladies and gentlemen of the jury, as best as
 2    you recall, you know, years ago, the interaction you had with
 3    Amin.
 4    A.   Uhm, yeah.  I mean, it was lovely to see him and to see
 5    some of the other members of our team that were back, some of
 6    whom, you know, I see periodically, some of whom I hadn't seen
 7    in years.  But I attended that reunion with a group of friends
 8    that is the same group that I attended in whatever years I had
 9    been able to make it back, and so they were there as well, and
10    so it was kind of a bigger group than usual, or at least I was
11    kind of, you know, bouncing between two big groups.  It was
12    just nice to see everybody.
13    Q.   A little bit of catching up going on in terms of what
14    happened in Amin's life in all those years?
15    A.   Sure.
16    Q.   And likewise you shared with Amin what had happened in
17    your life?
18    A.   I don't know how much detail we got into.  I don't know
19    that we got kind of caught up on a decade, but it was just, you
20    know, yeah.
21    Q.   Dinner and drinks at the Capital Grille?
22    A.   Yes.
23    Q.   Okay.  Were you actually sitting at Amin's table or at a
24    different table?
25    A.   A different table.
```

1    Q.    Did there come a point in time during that weekend or that
2    evening -- let's start with the evening of the dinner.  Did you
3    come to learn that Amin had children?
4    A.    Yes.
5    Q.    And tell us about the conversation you had with Amin about
6    children.
7    A.    At some point in the evening, and my recollection is it
8    was not at the dinner but it was at the event back on campus
9    later that evening, either Amin or Tim Donovan mentioned that
09:38 10   Amin had a daughter who was a junior in high school and playing
11   tennis, and beginning to look at colleges, and might be
12   interested in looking at Wesleyan.
13   Q.    Was this the first you heard of Amin having a daughter,
14   and a daughter who would be a junior, and a junior who would be
15   interested in potentially going to college, and the college
16   being Wesleyan?
17   A.    Yeah.
18   Q.    Okay.  You said it could have been Amin or it could have
19   been Donovan.  What's your best recollection of how the
09:38 20   conversation happened?
21   A.    I don't recall at all how it began.  I remember vaguely
22   that we were all involved in that conversation, both Tim
23   Donovan and Amin and myself amongst a bigger group of people,
24   and it was a quick conversation that didn't extend much more
25   than what I just mentioned.

1    Q.    Okay.  Did Amin ask you about the program, or was there

2    any detail about the Wesleyan tennis program at all?

3    A.    I remember Amin mentioning that his daughter was a little

4    bit under the radar from his perspective too, that the school

5    she was at was pretty restrictive academically in terms of her

6    ability to play tournaments, and so their ranking might not be

7    exactly what her level could be, and that she was a good

8    athlete, and that was basically about it.  We didn't really

9    discuss anything in more detail about Wesleyan's level or her

09:39 10   level beyond that.

11   Q.    Okay.  Do you recall any other interaction with Amin

12   Khoury that night of significance in terms of memory of any

13   other conversations that you had?

14   A.    No.

15   Q.    Did you have a few laughs together?

16   A.    We did.

17   Q.    Okay.  After that night, did you see him the next day on

18   campus?

19   A.    I don't remember.  I would say I don't think so because I

09:39 20   don't remember.

21   Q.    Okay.  But after that night, have you seen him since?

22   A.    No.

23   Q.    Today's the first day you've seen him since the reunion?

24   A.    It is.

25   Q.    Do you recall any other conversations with Amin since?

1    A.    No.

2    Q.    Okay.  How about with Tim Donovan, do you recall having

3    additional conversations with Tim Donovan about Amin's daughter

4    Katherine applying to Wesleyan?

5    A.    Yes.

6    Q.    Tell the ladies and gentlemen of the jury about that.

7    A.    So sometime shortly after that reunion, Tim Donovan sent

8    me Katherine's transcript.  That was about it.

9    Q.    When Donovan sent you Katherine Khoury's transcript, in

09:40 10   what capacity did you understand Donovan to be acting?

11   Professional capacity?

12   A.    Yes.

13   Q.    Okay.  Tell the ladies and gentlemen of the jury what that

14   means.  In other words, what was Donovan's role in reaching out

15   to you with the transcript of a student athlete?

16              MR. MARKHAM:  Objection.  Lack of personal knowledge

17   as to what the defendant was asking Tim Donovan to do.

18              THE COURT:  Yes.  Just what were his words?

19              THE WITNESS:  Uhm, I honestly don't know that there

09:41 20   were words attached to it.  It's traditional for him -- and he

21   does this, you know, several times a year with prospective, you

22   know, recruits for Wesleyan and all the other schools that he

23   interacts with -- he'll send academic information, sometimes

24   tennis information if it's not readily available on its own,

25   and then kind of wait for feedback from me as to our level of

1    interest.

2    Q.   And so when Donovan sent you the transcript, what was it

3    that you were going to do with that transcript as it pertains

4    to Katherine Khoury?

5    A.   Give Tim Donovan some feedback, you know, in terms of,

6    again, that intersection of her tennis and her academics, which

7    is kind of how the recruiting process would continue, in any,

8    you know, instance.

9    Q.   And from your other experiences with Donovan, did this

09:41 10   appear to be Donovan acting as a person representing Katherine

11   Khoury or representing the Khoury family as a professional

12   matter?

13   A.   Yes.

14        MR. MARKHAM:   Objection, leading.

15        THE COURT:   Well, overruled.

16   Q.   Well, did Donovan say, "Hey, I'm just doing this as a

17   friend to Amin?"  Did he say that to you?

18   A.   No.

19   Q.   And when Donovan on other occasions would send you

09:42 20   transcripts, was that because he was the friend of the

21   prospective student athlete, or did you understand that to be a

22   professional capacity?

23   A.   Professional.

24   Q.   Okay.  And did you understand that Donovan charged fees

25   for his services?

```
 1   A.   Yes.

 2   Q.   And your wife, of course, during a period of time worked

 3   for Donovan, correct?

 4   A.   Yes.

 5        THE COURT:  Was she working for him at this period of

 6   time?

 7        THE WITNESS:  Yes.

 8   Q.   And so when Donovan sends you the transcript of Katherine

 9   Khoury, what was --

10   A.   Sorry.  Let me just go back.  Is the question, was she

11   working for him at the time that this was occurring?

12        THE COURT:  At the time he sent you over the

13   transcripts.

14   A.   Yeah, I don't recall actually, but there's a good chance,

15   no, that she didn't begin doing kind of part-time

16   administrative work for him until a year or two later.

17   Q.   In all events, when you received the transcript of

18   Katherine Khoury, what were the next steps you took as it

19   pertains to Katherine Khoury?

20   A.   I relayed to Tim that she didn't appear to be a great fit,

21   both athletically or academically.

22   Q.   And you came to that decision how?  What kind of research

23   or review did you do to come to that opinion?

24   A.   You know, I looked pretty thoroughly at her transcript,

25   and the Middlesex School profiles had a pretty good sense of
```

1  kind of where she was with her academics there too, and then

2  did an online search of her tennis background and got a pretty

3  good sense of where she was athletically.

4  Q.   And when you did a search of her tennis background, did

5  you find anything that indicated she was, like, a 5-star

6  recruit, or a blue chip, or anything like that?

7  A.   No.

8  Q.   Okay.  And what did you then communicate to Donovan?

9  A.   That she wasn't a viable fit for us.

09:44 10  Q.   As a tennis recruit?

11  A.   Yes.

12  Q.   Did you suggest to Donovan there might be another fit for

13  Katie Khoury at Wesleyan?

14  A.   No.

15  Q.   Okay.  Did you ever discuss with Donovan the idea of

16  presenting Katie Khoury to the Athletic Department as a

17  development prospect?

18  A.   Yes.

19  Q.   Explain to the jury what that means.

09:44 20  A.   So Tim asked me to inquire, given his instinct that the

21  family might be interested in donating to the school in a

22  developmental capacity, if there was a level of projected

23  philanthropy at which the Development Office would take an

24  interest in a prospective applicant.

25  Q.   And the word "development," I want to be sure we're clear.

1    We're not talking about developing as a tennis player, are we?

2    A.    Fundraising.

3    Q.    So then explain the context of that.  When you said

4    "development," I want to be clear --

5                THE COURT:  Who suggested this?

6                THE WITNESS:  Tim Donovan.

7    Q.    And so what was it that you were going to inquire about at

8    Wesleyan in terms of a fundraising capacity?

9    A.    I wasn't going to inquire, and I did inquire with my

09:45 10   Athletic Director exactly that; if there was a level, in his

11   mind, of prospective philanthropy at which the Development

12   Office might become interested in having a conversation or

13   looking deeper at a prospective applicant.

14   Q.    And would this be in connection with tennis or totally

15   independent of tennis?

16   A.    Independent.

17   Q.    And what did you communicate to Tim Donovan about the

18   information you got about having Katherine Khoury being

19   considered as a development prospect at Wesleyan?

09:46 20   A.    My Athletic Director's response was that he wasn't sure;

21   it wasn't a standard thing for him to be involved in exactly.

22   But that his suggestion was that the Development Office assign

23   something called a "relationship manager" to current students

24   who the Development Office families were identified to have the

25   capacity to give $400,000 to $500,000 or more.  And he thought

1    that that level of prospective philanthropy might be the same

2    level at which they look deeper into a prospective applicant.

3    Q.   Based on your knowing of Amin Khoury way back when and his

4    father, et cetera, did you think that that was something that

5    might be interesting to the Khoury family?

6            MR. MARKHAM:  Objection.  Lack of personal knowledge.

7            THE COURT:  Well, yes.  Lay a foundation.

8    Q.   Did you have an understanding of the financial position of

9    the Khoury family by 2015?

09:47 10  A.   I'm not exactly sure what that means.

11   Q.   Okay, were you familiar with any --

12           THE COURT:  Do you know how wealthy they were?

13           THE WITNESS:  Yes.

14   Q.   Okay.  Were you familiar with their philanthropy by that

15   time period?

16   A.   To a certain extent, I suppose, yeah.

17   Q.   Okay, fair enough.  So do you recall communicating with

18   Donovan about this issue of a development prospect by way of

19   text message?

09:47 20  A.   Only because it's been brought to my attention through

21   these recent proceedings.

22   Q.   Okay.

23           MR. SREBNICK:  Your Honor, at this time I'd like to

24   present the witness with what's already in evidence as

25   Exhibit 220.

```
 1              THE COURT:  All right.
 2              MR. SREBNICK:  And if I could ask Keith to publish it.
 3    And if we could just do, let's say -- that's great, Keith.
 4    Thank you so much.  So although it says KK on the top, it's
 5    been renumbered as 220 for everyone's clarification.
 6    Q.   So take a look at Exhibit 220, and do you see that at the
 7    top of that text there's a double F and it says "Friedo," I
 8    guess?  Is that the correct way to pronounce it?
 9    A.   Yeah.
10    Q.   Did you know that you're known as Friedo?
11    A.   I did.
12    Q.   Okay.  So if you could read what you wrote to Tim Donovan
13    in the first bubble of the text.
14    A.   "Don man, need to get score cards back sometime.  Anyone
15    heading this way next couple weeks?"
16    Q.   I'm going to need you to use that microphone for that.
17    A.   Sorry.  "Don man, need to get scorecards back sometime.
18    Anyone heading this way next couple weeks?"
19    Q.   Do you type that fast when you type it into the text
20    message?
21    A.   I'm not that good with my thumbs.
22    Q.   Okay.  And then do you see that the date is August 19,
23    2014, that there's a next bubble that says "Right on Jiggsy.
24    Thanks."  On a separate note, "I just met with AD.  He will
25    meet within next two weeks with admissions director Re: Amo's
```

1    daughter -- will keep you posted.  Anything new on their end?"

2        Do you see that?

3    A.    Yes.

4    Q.    So does that refresh your memory that it was August 19,

5    2014, when you wrote to Donovan what's contained in that

6    bubble?

7    A.    Yes.

8    Q.    Okay.  What is "Jiggsy"?

9    A.    One of several nicknames for him, or each other.

09:49 10   Q.    For Donovan?

11   A.    Yes.

12   Q.    "I just met with AD."  What is "AD"?

13   A.    Athletic director.

14   Q.    So would that be the athletic director of Wesleyan

15   University?

16   A.    Yes.

17   Q.    Okay.  It says, "He will meet within next two weeks with

18   Admissions Director," correct?

19   A.    Yes.

09:49 20   Q.    And do you recall who the Admissions Director was at

21   Wesleyan University back in 2015?

22   A.    Probably Nancy Meislahn.

23   Q.    And it says, "He will meet within next two weeks with

24   Admissions Director Re: Amo's daughter."  Is it fair to say

25   that Amo's daughter was a reference to Katherine Khoury?

 1   A.   Yes.

 2   Q.   "Will keep you posted.  Anything new on their end?"  You

 3   were asking a question, right?

 4   A.   Yes.

 5   Q.   Now, the information you gave to Donovan, you were

 6   explaining that you were told by the Athletic Director that

 7   within two weeks, the Athletic Director was going to be meeting

 8   with the Admissions Director specifically about Katherine

 9   Khoury?

09:50 10   A.   Yes.

11   Q.   And that was your understanding?  You were telling the

12   truth when you wrote that text message, as you knew it,

13   correct?

14   A.   Yes.

15           MR. MARKHAM:  Objection, bolstering.

16           THE COURT:  Sustained.

17           MR. SREBNICK:  So, Keith, if we could scroll down,

18   leave the "sure" one in there.  There you go.  That's it.

19   Q.   Donovan says, "Sure.  I'll get back to you next week

09:51 20   sometime."  Then the next bubble by Donovan, Donovan says to

21   you, "Nothing new on their end.  She will retest to see if she

22   can improve her scores.  I get the sense that 4 or 500 K might

23   be difficult, but let's see."

24       Do you see that?

25   A.   Yes.

1   Q.   Okay.  "4 or 500 K," what did you understand that to mean?

2   A.   That was the number, again, that I had relayed to him that

3   the Athletic Director had relayed to me as his best guess at a

4   level that might get Development interested in looking deeper

5   at a prospective applicant.

6   Q.   And when we say "4 or 500 K," we mean $400,000 to

7   $500,000?

8   A.   Yes.

9   Q.   And so by the time this is written in August of 2014, you

09:52 10   and Donovan have had a conversation that, from what you've

11   heard from the Athletic Director, the level of giving that

12   might be of interest to Wesleyan was $400,000 to $500,000,

13   correct?

14   A.   Yes.

15   Q.   And that was to be a Development applicant at Wesleyan

16   University?

17   A.   Again, it was the level at which the Athletic Director

18   thought the Development Office might take an interest.

19   Q.   And there was a mention in the earlier bubble about taking

09:52 20   it to the Admissions Office.  Do you recall that?

21   A.   Yes.

22   Q.   What did the Development Director tell you about taking it

23   to the Admissions Office, if you recall?

24   A.   He -- you know, it wasn't specifically taking hers.  He

25   had a meeting with the Admissions Director, you know, scheduled

1    for sometime in the following two weeks, and he would include

2    Katherine's information there.  But I think I had kind of asked

3    him to potentially include that, as Amin was a friend who we

4    both kind of acknowledged that it was a long shot and then

5    some.

6    Q.   What happened next, if anything, with respect to this

7    discussion about $400,000 to $500,000 as a development

8    prospect?

9    A.   Nothing.

09:53 10   Q.   Did Amin Khoury ever reach out to you at all?  You said

11   you didn't speak to him, so he never reached out to you about

12   donating money or anything else about Wesleyan, correct?

13   A.   No.

14   Q.   What about Donovan?

15   A.   No.

16   Q.   Did you ask Donovan or did Donovan ask you about the issue

17   any further?

18   A.   I don't recall Tim Donovan ever asking me any further to.

19   I'm sure that at some point, you know, in the following few

09:54 20   weeks I mentioned, you know, or inquired, you know, if she had

21   any interest in Wesleyan still because I was going to put it to

22   bed obviously, if not, and he said "no," he thought she was

23   focussing elsewhere.

24   Q.   When you were having this text message exchange in August

25   of 2014, was it understood by you and by Donovan that she was

1    not going to be a tennis recruit?

2            MR. MARKHAM:  Objection as to --

3            THE COURT:  Sustained, sustained.

4    Q.   This exchange, in your mind, this was apart from being a

5    tennis recruit?  Is that fair?

6    A.   I'm sorry.  Say it again.

7    Q.   Yes.  This exchange was not about tennis anymore, correct?

8    A.   Correct.

9            MR. SREBNICK:  If I could have a moment.  One moment,

09:55 10   your Honor.

11           Your Honor, those are all the questions that I have at

12   this time.

13           THE COURT:  Thank you.

14   CROSS-EXAMINATION BY MR. MARKHAM:

15   Q.   Everyone is having mic trouble this morning, Mr. Fried.

16   Let me just grab my water.

17           Mr. Fried, good morning.

18   A.   Good morning.

19   Q.   So the defendant, Gordon Ernst, and Tim Donovan all played

09:55 20   college tennis together at Brown University, correct?

21   A.   Yes.

22   Q.   And on Memorial Day weekend of 2014, you saw these three

23   men at a Brown University reunion dinner?

24   A.   Yes.

25   Q.   That dinner was at the Capital Grille?

```
 1   A.   Yes.
 2   Q.   And at that dinner, you didn't hear every conversation
 3   that the defendant had with Gordon Ernst, right?
 4   A.   No.
 5   Q.   You were bouncing between groups, as you said?
 6   A.   Yes.
 7   Q.   But you do remember the defendant bringing up the fact
 8   that his daughter, Katherine Khoury, was applying to college?
 9   A.   Yes.
10   Q.   And after that dinner, Tim Donovan reached out to you
11   about the possibility of getting Katherine Khoury a tennis
12   recruitment slot at Wesleyan; is that right?
13   A.   Yes.
14   Q.   At that point in 2014, was Georgetown's tennis program
15   better than the Wesleyan tennis program?
16   A.   Sad to say, yes.
17        (Laughter.)
18   Q.   Yes, it's better.  And Georgetown was a Division 1 program
19   while Wesleyan was a Division 3 program, right?
20   A.   Yes.
21   Q.   Okay.  So as the Wesleyan tennis coach, about how long did
22   it take you to determine that Katherine Khoury could not be
23   recruited to play tennis at Wesleyan?
24   A.   I determined it very quickly.
25   Q.   Yeah, it took you a few minutes, right?  It was obvious?
```

```
 1    A.    Yes.
 2    Q.    And you made that determination because she was not good
 3    enough at tennis to actually play on Wesleyan's tennis team,
 4    right?
 5    A.    Yes.
 6    Q.    And Wesleyan's tennis team was not as good as Georgetown's
 7    tennis team?
 8    A.    Yes.
 9    Q.    At some point you discussed this fact with Tim Donovan,
10    correct?
11    A.    Yes.
12    Q.    Did Tim Donovan seem at all surprised to hear that
13    Katherine Khoury was not qualified to be a recruited tennis
14    player at Wesleyan University?
15    A.    No.
16    Q.    Of course not, right?  That was obvious?
17    A.    It's -- it's what he does professionally.  He knows
18    exactly who's a good fit for what school.
19    Q.    So because of that, you said you wouldn't use a
20    recruitment slot on Katherine Khoury?  You told Tim Donovan
21    that, right?
22    A.    No, it didn't get past the conversation where it was a
23    quick, you know, acknowledgment that she wasn't a good fit.
24    Q.    Okay.  So you never told Tim Donovan that you could use a
25    recruitment slot on her, right?
```

A.    No.

Q.    And you made it clear to Tim Donovan you would not be using a recruitment slot?

A.    Yes.

Q.    And that's not just because you wouldn't do it.  Isn't it right that you couldn't use a recruitment slot on her because she wasn't good enough to play on your team?

A.    Yes.

Q.    Don't you think it's fair to say it would have been dishonest of you to tell your Athletics Department that she deserved a recruitment slot on the Wesleyan tennis team?

          MR. SREBNICK:  Objection.

          THE COURT:  Sustained.

          MR. MARKHAM:  May I rephrase, your Honor?

          THE COURT:  Yes.

Q.    Could you have honestly identified Katherine Khoury as a tennis recruit to Wesleyan University?

A.    As a viable tennis recruit?

Q.    Yes, someone who could actually play on the team?

A.    No.

Q.    Okay.  On a separate note from the recruiting aspect, because obviously that wasn't viable, at some point were you asked whether a donation to Wesleyan could potentially help Katherine Khoury to get accepted at Wesleyan?  You had that conversation, right?

1    A.    Yes.

2    Q.    And you were told that a $400,000 to $500,000 donation --

3    this is from your text -- seemingly was the minimum that could

4    even help the defendant's daughter get a second look, right?

5    A.    A second look, I would say, you know, hypothetical

6    interest from the Development Office.

7    Q.    Right, just hypothetical interest.  It cost about half a

8    million dollars to get some hypothetical interest?

9    A.    Yes.

09:59 10   Q.    And you discussed that with Tim Donovan in these text

11   messages?

12   A.    Yes.

13   Q.    So after you relayed that information that there could be

14   no guaranteed recruitment slot, and that even to get some

15   hypothetical interest from donations, it would cost about half

16   a million dollars, it's fair to say that your conversations

17   about this topic abruptly ended?

18   A.    Yes.

19   Q.    So at some point at the end of the summer of 2014, to the

09:59 20   best of your knowledge, Wesleyan was not something that the

21   defendant and Tim Donovan were pursuing?

22   A.    Correct.

23   Q.    The defendant never called you to ask how he could donate

24   a half a million dollars to Wesleyan, right?

25   A.    Never.

```
 1   Q.   Mr. Fried, is it fair to say that a half a million dollars
 2   is substantially more than $200,000?
 3   A.   Yes.
 4        MR. SREBNICK:  I'll ask the Court to take judicial
 5   notice of that.
 6   Q.   And Tim Donovan told you in these text messages that
 7   defense counsel just showed you that $400,000 to $500,000,
 8   quote, "might be difficult for Amin Khoury," right?
 9   A.   Yes.
10   Q.   $200,000 is a little less difficult than $500,000?
11        MR. MARKHAM:  I'll move on, your Honor.
12   Q.   You mentioned earlier that you could not have honestly
13   identified Katherine Khoury as a tennis recruit to Wesleyan.
14   Now, let's talk about the money aspect of it.  You made it
15   clear from the beginning that any payment would have to be a
16   lawful donation to Wesleyan, correct?
17   A.   There was never conversation beyond --
18   Q.   Well, did you ever tell the defendant that you'd accept
19   that $500,000 in a bag of cash if he'd be willing?
20   A.   No.
21   Q.   Because it violates both NCAA rules and Wesleyan policy to
22   accept cash payments from prospective parents, correct?
23        MR. SREBNICK:  Objection, your Honor.
24        THE COURT:  Sustained.
25   Q.   Does Wesleyan allow you to accept cash payments from
```

1    prospective parents?

2    A.    No.

3    Q.    And if you did, you'd be fired, right?

4    A.    Yes.

5            MR. MARKHAM:  I have no questions, your Honor.

6            MR. SREBNICK:  I just have a few questions.  Can I do

7    it from here, Judge?  Is that all right?

8            THE COURT:  Yes.

9    REDIRECT EXAMINATION BY MR. SREBNICK:

10:01 10   Q.    Coach, at the time you were reviewing Katherine Khoury as

11   a prospective student, you did some research online about her

12   tennis; is that fair to say?

13   A.    Yes.

14   Q.    And when you say she was not a good fit, tell us why you

15   knew she was not a good fit from what you saw online?

16   A.    Her results and rankings were suggestive of somebody that

17   was playing at a level that wasn't consistent with where we

18   were.

19   Q.    Okay, so she hadn't yet proven herself as a tennis player.

10:01 20   Fair statement?

21   A.    Yes.

22   Q.    And so just based on that limited information, she was not

23   a good fit, right?

24   A.    Correct.

25   Q.    Okay.  Did you ever actually observe her play tennis?

```
 1    A.    No.
 2    Q.    Okay.  Did you ever propose to have her come, you know,
 3    try out for -- do like a summer tryout or a summer clinic
 4    before senior year?
 5    A.    No.
 6    Q.    Was there ever any discussion about taking a look, any
 7    videos, anything like that about Katherine Khoury?
 8    A.    Yeah, I think there was a brief conversation with Tim
 9    Donovan that if it looked like, you know, this is going to be a
10    top choice for her, that we would look deeper into her tennis,
11    and whether it would be him sending a video or me getting out
12    to see her play, and it never progressed to that point.
13    Q.    So the only thing you looked at basically was the raw data
14    available online to determine whether, based on that raw data,
15    she would fit the profile of a tennis player at Wesleyan?
16    A.    Yes.
17    Q.    You never actually evaluated her by, like, looking at her
18    and seeing if she had a fast serve or --
19          MR. MARKHAM:  Objection, leading.
20    Q.    Did you ever evaluate her serve?
21    A.    No.
22    Q.    Or any of her strokes or anything like that?
23    A.    No.
24          MR. SREBNICK:  Okay, that's all I have.  Thank you,
25    Judge.
```

```
 1              MR. MARKHAM:  Just one for recross, your Honor.
 2     RECROSS-EXAMINATION BY MR. MARKHAM:
 3     Q.   All the things that defense counsel just talked to you
 4     about about what you were evaluating, when you told Tim Donovan
 5     that she couldn't be recruited to Wesleyan as a tennis recruit,
 6     did he seem at all surprised by that?
 7     A.   No.
 8              MR. MARKHAM:  I have no questions, your Honor.
 9              THE COURT:  Thank you.  You may step down.
10             (Witness excused.)
11             MR. BLACK:  We call Brenda Smith, your Honor.
12                          BRENDA SMITH
13     having been first duly sworn, was examined and testified as
14     follows:
15             THE CLERK:  You can be seated.  Could you please state
16     and spell your name for the record.
17             THE WITNESS:  Brenda Smith, B-r-e-n-d-a S-m-i-t-h.
18             MR. BLACK:  May it please the Court, good morning
19     ladies and gentlemen, and good morning, Ms. Smith.
20             THE WITNESS:  Good morning.
21     DIRECT EXAMINATION BY MR. BLACK:
22     Q.   My name is Roy Black.  I represent Amin Khoury.  Now, up
23     until right now, you and I have never seen each other, have we?
24     A.   No.
25     Q.   I have never met you before?
```

10:03 (line 10)
10:04 (line 20)

 1   A.   (The witness nodded negatively.)

 2   Q.   I've never had the chance to talk to you before?

 3   A.   No.

 4        THE COURT:  When you're saying "no" to those, remember

 5   we have to get it for the record.

 6        THE WITNESS:  Sorry.  No.

 7   Q.   And I subpoenaed you to be here this morning, correct?

 8   A.   I assume it was you.  I don't know who exactly.

 9        THE COURT:  You know, we can't hear a word you're

10:04 10   saying, so please lean into the mic.  That seems to be my big

11   job here is to get you --

12        THE WITNESS:  Sorry.

13   A.   Yes, I assume it was you.  I don't know who.

14        MR. BLACK:  You can even move the mic closer to you or

15   lean forward.  It's important that we can all hear you.

16        THE WITNESS:  Sure.

17   Q.   So you're not here voluntarily, right?

18   A.   Correct, I am not.

19   Q.   You're here because we served you with a subpoena?

10:05 20   A.   Correct.

21   Q.   And, by the way, I have not promised you anything if you

22   come here to testify, right?

23   A.   Correct.

24   Q.   I'm not offering you anything, am I?

25   A.   No.

1    Q.    All right.  At one time were you employed at Georgetown

2    University?

3    A.    Uhm, from about 2004 to 2019.

4    Q.    All right.  How are you employed now?

5    A.    How am I employed now?

6    Q.    Yes.

7    A.    I work for NYU.

8    Q.    All right.  And what was your position at Georgetown?

9    A.    I held various positions, but the position that I was in

10:05 10   last was in fundraising for athletics.

11   Q.    All right.  And was your title the Senior Director of

12   Development for Georgetown Athletics?

13   A.    At one point, yes.

14   Q.    All right.  And you also I think had the title of Lead for

15   Major Gifts for the Athletic Department as well?

16   A.    No.  Before that, I was Director of Development and

17   Associate Director for Development, so Georgetown doesn't have

18   a "Lead for Major Gifts" as a title.

19   Q.    All right.  And where was your office located?

10:06 20   A.    When I was working for Athletics, my office was located in

21   the Athletic Department.

22   Q.    All right, so you had an office right in the gymnasium?

23   A.    Correct.

24   Q.    All right.  And was your client, if "client" is the right

25   word, the Athletics Department at the university?

A.   Yes.  I worked for the Office of Advancement, but I had a dotted line to Athletics.

Q.   And as part of the Office of Advancement, what was it that you did?

A.   I was a fundraiser.

Q.   All right, and a fundraiser for what part of the university?

A.   I wrote -- I closed gifts for the entire university, but I specialized in gifts for Athletics.

Q.   Did you have any participation in determining the talent of athletes?

A.   I did not.

Q.   All right.  Your only job was raising money to support the Athletic Department?

A.   Correct.

Q.   I'd like to direct your attention to the time period of 2014 and 2015.  You were working in the Office of Advancement then, were you not?

A.   I was.

Q.   Was there any problems with the athletic budget at Georgetown at that period of time?

A.   The Athletic Department has often had financial struggles.

Q.   All right.  And by financial struggles, what do you mean?

A.   I mean that it is often in need of additional funding.

Q.   And why did they need additional funding?

```
 1   A.   Because the budget was not sufficient.
 2   Q.   Now, putting aside basketball, the other sports at
 3   Georgetown, were they mainly self-funding?
 4   A.   No.
 5   Q.   Who raised the money for the budgets of the teams other
 6   than basketball?
 7   A.   The Office of Advancement.
 8   Q.   When it came to the tennis team, who were the targets of
 9   the fundraising to support the tennis team?
10   A.   Parents and alumni.
11   Q.   All right.  So when you say "parents," do you mean parents
12   of the tennis players?
13   A.   Correct.
14   Q.   And when you say "alumni," are you talking about former
15   tennis players?
16   A.   Correct.
17   Q.   So it would be fair to say that the tennis players and
18   their families are the ones who mainly funded the budget of
19   tennis at Georgetown?
20   A.   No.  I would say the Athletic Department mainly funded it,
21   but that additional funds came in through alumni and parents'
22   gifts.
23   Q.   What percentage of funding was supplied by the players,
24   their parents, and the tennis alumni?
25   A.   That's something I can't answer.
```

1    Q.    I'm sorry?

2    A.    I don't know the answer to that.

3    Q.    Would it be close to a hundred percent?

4    A.    I don't think so, but I don't know the answer to that.

5    Q.    Did you know Gordon Ernst?

6    A.    Yes, I did.

7    Q.    For how long did you know Gordon Ernst?

8    A.    Uhm, for the majority of the time that I worked at

9    Georgetown, that was during his employment as well.

10:10 10   Q.    All right.  Did he have fundraising duties?

11   A.    His duties included signing letters that the Annual Fund

12   team sent out, and also having his students participate in the

13   phone-a-thon that happened annually.

14   Q.    And was he also involved in soliciting funds for the

15   tennis team?

16   A.    He was not.

17   Q.    All right.  Did you ever propose that donors would pay the

18   salaries of any of the coaches at Georgetown?

19   A.    I proposed a plan where donors would make donations to

10:11 20   Georgetown to help Georgetown augment a coach's salary.

21   Q.    Did you make any plans for donors to directly pay the

22   coach part of his or her salary?

23   A.    I did not.

24   Q.    All right, if we could please put up Exhibit 309.  Now, at

25   the top of the page, this shows that you're part of this

1    e-mail, correct?

2    A.    It does.

3    Q.    And this e-mail was, at least your participation, was in

4    March of 2015?

5    A.    It appears to be.

6    Q.    Now, if we could take a look at the body of the e-mail,

7    this deals with the crew coach, correct?

8    A.    It seems to, yes.

9    Q.    And this deals with funding the crew coach's salary?

10:12 10    A.    Yes.

11    Q.    And as I understand this e-mail, the school wanted to hire

12    a new crew coach?

13    A.    Can I have a moment to read this e-mail, please?

14         THE COURT:  Let me walk the jury through it a little.

15    You've seen some of these e-mails.  "PII" is personally

16    identifying information.  Usually it's the students, and I

17    hadn't seen the asterisks before.  I'm assuming that's also

18    specific names about students, so that was done for their

19    privacy.

10:12 20         MR. BLACK:  Thank you, your Honor.

21    Q.    All right, so according to this, the school or the

22    Athletic Department wanted to bring in a crew coach, correct?

23    A.    It sounds like it, yes.

24    Q.    And the school couldn't afford it?

25    A.    That's what it sounds like.

1              MR. MARKHAM:  Your Honor, I object based on lack of

2      personal knowledge, if she doesn't know whether the information

3      in this e-mail is accurate or not.

4              THE COURT:  Well, do you remember it?

5              THE WITNESS:  I remember in vague terms this

6      conversation, but I don't remember what started this.  I

7      remember that the university was trying to hire a crew coach.

8      I don't remember where this conversation -- I don't know where

9      this conversation started.

10             THE COURT:  All right.

11     Q.   And were you tasked with helping find money to pay for the

12     crew coach?

13     A.   Uhm, it sounds to me -- I'm interpreting this e-mail -- as

14     the crew community gathered together and agreed to provide

15     funding to the university to help augment what the university

16     was providing.

17     Q.   And that was in the amount of 135 --

18             THE COURT:  For salary?

19             THE WITNESS:  Yes.

20             THE COURT:  For salary?

21             THE WITNESS:  For salary.

22     Q.   And that was in the amount of $135,000?

23     A.   That's over five years.  That is what the e-mail says.

24     Q.   All right.  And you were raising that from the parents of

25     the members of the crew team?

1   A.   The e-mail does not say that.  I see that it says parents.

2   It could be parents or alumni.

3   Q.   All right.  If you take a look at the second paragraph,

4   doesn't it say, "And we are calling on other crew parents to

5   join us"?

6   A.   Yes, it does.

7   Q.   So the crew parents in fact were being solicited for money

8   to pay for the coach, or the new coach, of the crew team?

9   A.   To help augment the salary through donations to the

10:14 10   university is what the e-mail seems to say.

11   Q.   Right.  And you could not hire a new crew coach unless the

12   parents of the crew members supply money to pay him?

13        MR. MARKHAM:  Objection on lack of personal knowledge.

14        THE COURT:  Well, do you know?

15        THE WITNESS:  I think what -- I think what the

16   university -- I think the university could hire someone.  I

17   think the question is whether it would be the caliber of what

18   these parents would want, I think is what they're saying in

19   this e-mail.  You can always hire someone.

10:15 20        MR. MARKHAM:  Your Honor, I just object to what she

21   thinks someone is saying in an e-mail that was forwarded to

22   her.

23        THE COURT:  Right, I understand.  Just basically what

24   you know and remember.

25   Q.   All right, so we're talking about, this was seven years

1   ago, right?

2   A.   Yeah, almost eight.

3   Q.   All right, almost eight years ago.  So as typical on these

4   things, we need to look back and hopefully refresh your

5   recollection about what happened, right?

6   A.   Yes.  And please remember that I was not the only person

7   in this office, so I was not exclusively in some of these

8   conversations.

9            THE COURT:  Right, right, but to the extent that you

10:15 10   remember, does this refresh your recollection that there was an

11   attempt to augment crew coach's salaries?

12            THE WITNESS:  Yes, yes.

13   Q.   And would it not be fair to say that the people who were

14   called upon to pay that money were the parents of the crew

15   members?

16   A.   In my recollection, they were parents and alumni who both

17   participated in this kind of conversation.

18   Q.   All right.  And when you say "alumni," you mean former

19   members of the crew team?

10:16 20   A.   Yes, I do.

21   Q.   All right, Keith, we can put that one down.

22        All right, so you mentioned that you -- well, for many

23   years you knew Gordon Ernst, correct?

24   A.   Correct.

25   Q.   And you knew that he was the coach of the tennis team?

1    A.    Yes.

2    Q.    And the tennis team had courts at one time on the

3    Georgetown campus?

4          MR. MARKHAM:  Objection.  This is all leading.

5          THE COURT:  Yes, sustained.  Why don't you ask it more

6    broadly.

7          MR. BLACK:  All right.  The only problem is, the

8    witness is here involuntarily, and I think I should be given

9    some discretion.

10:17 10       THE COURT:  No, no, no.  Okay, I sustain the

11   government's objection to the leading.

12         MR. BLACK:  Okay.

13   Q.    And did something happen that caused the destruction or

14   removal of the tennis courts at Georgetown?

15   A.    There was a building that was being built on top of them.

16   Q.    And what was the name of that building?

17   A.    The John Thompson Intercollegiate Athletic Center.

18   Q.    And who was John Thompson?

19   A.    Form basketball coach at Georgetown.

10:17 20  Q.    So basketball took over from tennis?

21   A.    The center was not entirely basketball.

22   Q.    By the way, is basketball a revenue-raising sport?

23   A.    It is a revenue-raising sport.

24   Q.    Is tennis?

25   A.    No, it is not.

```
 1    Q.   Has tennis ever raised any money by selling tickets?
 2    A.   No, it has not.
 3    Q.   And basketball at Georgetown is -- or how would you rate
 4    basketball as importance in the sports department?
 5    A.   It is very important.
 6    Q.   More than all the rest of the sports put together?
 7    A.   Well, I don't work at the Athletic Department anymore, so
 8    I can't provide context for today, but I would say it has high
 9    importance.
10:18 10   Q.   All right.  And when you were there, was Lee Reed the
11    Athletic Director?
12    A.   Yes, he was.
13    Q.   Did Lee Reed make any public statements about the status
14    of sports other than basketball to Georgetown?
15    A.   I don't think I understand the question.
16    Q.   I know, that was a horrible question.  That's probably
17    why.  Did Lee Reed ever call tennis a "participation sport"?
18    A.   I don't know.
19    Q.   Well, was there not a controversy back in --
10:19 20        MR. MARKHAM:  Objection, leading.
21    Q.   -- 2015 --
22        THE COURT:  Well, let me hear the whole question.  Was
23    there a controversy --
24    Q.   Was there a controversy in 2015 about Lee Reed saying
25    things that were not flattering about the Georgetown sports
```

1    other than basketball?

2    A.    I don't remember one.

3    Q.    Do you recall him ever saying that they were just

4    participant sports?

5    A.    I don't recall that.

6    Q.    All right, did you know whether or not during the summer

7    Gordon Ernst would use the tennis courts?

8    A.    Yes, he did.

9    Q.    And what would he use the courts for?

10:19 10    A.    He would run summer camps.

11    Q.    And where would these summer camps be?

12    A.    On the tennis courts.

13    Q.    And once the tennis courts were bulldozed, was he able to

14    do the camps?

15    A.    Not to my knowledge.

16    Q.    Was he permitted to charge money for people using the

17    courts at Georgetown?

18    A.    In what capacity?

19    Q.    In the summer camps.

10:20 20    A.    He was permitted to charge people for participating in

21    summer camp.

22    Q.    And that was money that he would make outside of

23    Georgetown University, correct?

24    A.    Correct.

25    Q.    People would pay him directly?

```
 1   A.   As far as I know.  I'm not sure how he received payment.
 2   Q.   All right.  Didn't you have any interest in looking into
 3   that source of income for Ernst?
 4   A.   No.
 5   Q.   Do you know how much he charged?
 6   A.   No.
 7   Q.   Do you know how much money he made each summer using the
 8   Georgetown courts?
 9   A.   He informed me that it was somewhere between $70,000 and
10   $100,000 a year.
11   Q.   And did Georgetown have any objection to that --
12            THE COURT:  That was for the summer camps?
13            THE WITNESS:  Yes.  I don't have proof of that.  That
14   was just what he told me.
15            MR. MARKHAM:  Well, your Honor, then I'd object and
16   move to strike because it's hearsay.
17            THE COURT:  Sustained.
18   Q.   And do you understand the ages or did you know the ages of
19   the people who paid to be in his summer camp?
20   A.   I don't know the ages, no.
21   Q.   Do you know whether or not there were high school tennis
22   players training with Gordon Ernst on these courts?
23   A.   I have no idea.
24   Q.   Do you know whether he was getting paid by parents of high
25   school tennis players who were playing on those courts?
```

1   A.    I have no idea.

2   Q.    Do you know whether or not he was getting paid by parents

3   of prospective tennis players who wanted to play at Georgetown

4   University?

5   A.    I have no idea.

6   Q.    Was Georgetown concerned about losing Gordon Ernst as

7   their coach?

8   A.    I don't know.

9   Q.    Do you know whether or not he was attempting to find jobs

10:22 10   at other universities?

11   A.    I don't know.

12   Q.    Was a plan developed to reimburse or to pay Gordon Ernst

13   for the money he was losing because he didn't have the summer

14   camps?

15   A.    A plan was developed to try to help augment his salary

16   because he was losing summer camp.

17   Q.    All right, please put up Exhibit 305, and if we could just

18   highlight -- yeah, that's it.

19        Now, have you seen this e-mail prior to 10:00 a.m. this

10:23 20   morning?

21   A.    This particular verbiage, I don't think so.

22   Q.    Have you, prior to today and this morning, have you been

23   shown any of your e-mails?

24   A.    Yes, I have.

25   Q.    And who showed them to you?

1    A.    Georgetown's attorneys.

2    Q.    So when did you meet with Georgetown's attorney?

3    A.    This week.

4    Q.    How many times?

5    A.    I think I met with them twice.

6    Q.    And, by the way, you did not agree to meet with the

7    defense lawyers, did you?

8    A.    No, I did not.

9    Q.    All right, did you go over this e-mail with the Georgetown

10:24 10    lawyer?

11    A.    This particular paragraph of an e-mail?  No.

12              MR. MARKHAM:  Your Honor, I think we're going to have

13    to object if he starts getting into communications between

14    Ms. Smith and her attorney.

15              THE COURT:  Actually, her attorney is sitting right

16    here, so I imagine he'll pop up if he's worried about it.

17              MR. VARGHESE:  Your Honor, for the record, we are

18    worried about that.

19              THE COURT:  It's a little too late to object now, but

10:24 20    pop up.  I know you're not shy.  Do you want to move up here?

21              MR. VARGHESE:  Sure, your Honor.

22              THE COURT:  Come on in.  Do you want to introduce

23    yourself?

24              MR. VARGHESE:  Sure, your Honor.  Hello.  I'm George

25    Varghese on behalf of Georgetown University.

```
 1              THE COURT:  Okay, thank you.
 2    Q.   All right, there was a document attached to this e-mail,
 3    correct?
 4    A.   To the best of my recollection.
 5    Q.   All right, we'll get to that in a second.  And you were
 6    sending this e-mail, first of all, to Lee Reed?  Do you see
 7    that?
 8    A.   Yes, I do.
 9    Q.   And at the time, he was the Athletic Director?
10    A.   Correct.
11    Q.   And Sharon Brummell.  And who is Sharon Brummell?
12    A.   She's the CFO for Athletics.
13    Q.   The CFO?
14    A.   Yes.
15    Q.   That means the chief financial officer?
16    A.   Yes.
17    Q.   The person in charge of keeping track of all the money at
18    Georgetown?
19    A.   Of the Athletics, not of Georgetown.
20    Q.   All right.  And Daniel Trump, right?
21    A.   Yes.
22    Q.   The Associate Athletic Director?
23    A.   Yes.
24    Q.   And he was the compliance officer?
25    A.   I don't remember his exact title.
```

1    Q.    Okay.  Now, if we could go to Page 2 and start at the top

2    of the page, and let's get under -- this is drafted by you?

3    A.    Yes.

4    Q.    And what motivated you to draft this?

5    A.    Gordie was freaking out about losing his summer camps

6    income.

7    Q.    And so he was very upset, or, in your words, "freaking out"

8    because he had lost this supplemental income?

9    A.    Correct.

10:26 10    Q.    Was he threatening to leave because of that?

11    A.    Not to me, no.

12    Q.    All right, so if we can move down a little bit, Keith.

13    Under this thing, you have what's called "The Challenge" here,

14    correct?

15    A.    Correct.

16    Q.    And that, of course, you're talking here that the Thompson

17    Center has taken place of the tennis courts, correct?

18    A.    Correct.

19    Q.    And that Gordie Ernst has lost his ability to have the

10:27 20    summer camp?

21    A.    Correct.

22    Q.    All right.  Then let's go down to "The Proposal."  So as I

23    understand -- is that correct, that Ernst was making about

24    $50,000 a year?

25    A.    I -- I guess, since it's written there.  I don't -- I

 1   can't verify that.  I wasn't privy typically to coaches'

 2   salaries.  I must have been given that for the proposal's sake.

 3   Q.   Okay.  And who gave you that for the proposal?

 4   A.   I don't remember.

 5   Q.   So you're not the only one involved in drafting up the

 6   proposal?

 7   A.   I was the only one in drafting it, but I must have

 8   requested it from someone.  Maybe it was Gordie; maybe it was

 9   CFO.  I don't know.

10:27 10   Q.   And did you tell Gordie Ernst that you were making this

11   proposal?

12   A.   Yes, I did.

13   Q.   And this is on or about May of 2015.  When is it that you

14   told him that you were going to try to get him more money?

15   A.   Around that time, I guess.  I don't recollect.

16   Q.   All right, so did he come to you with this, or did you go

17   to him?

18   A.   He came to me complaining about not being able to pay his

19   bills if he didn't have summer camp.

10:28 20   Q.   All right.  And how long before you typed this up did

21   Gordon Ernst come to you with this complaint?

22   A.   I don't recall.

23   Q.   And I take it you took it seriously?

24   A.   I was worried about him.

25   Q.   All right.  And you are at the time the senior --

1  A.    I don't recall what my title was at the time.  We'd have

2  to look at the e-mail trail again.

3  Q.    Okay, fair enough.  I couldn't remember it anyway.  You

4  were in Advancement or Development?

5  A.    Correct.

6  Q.    For the Athletic Department?

7  A.    Correct.

8  Q.    Raising money?

9  A.    Correct.

10:29 10  Q.    Okay.  So you were proposing a two-year solution of

11  $100,000 to fill the financial gap for the coach, right?

12  A.    That's what it appears, yes.

13  Q.    All right.  And you proposed two different plans; is that

14  right?

15  A.    Correct.

16  Q.    All right.  Plan A is a joint funding effort -- instead of

17  me saying it, why don't you tell the ladies and gentlemen of

18  the jury what Plan A is.

19  A.    Plan A is where Georgetown agrees to pay Gordie additional

10:29 20  money from their budget, $25,000 a year from their budget, and

21  we find $25,000 a year from donors to augment it.

22  Q.    Okay.  So what's happening in Plan A, Georgetown pays

23  half, and then donors would privately pay half?

24  A.    They would pay through donations to Georgetown.

25  Q.    Where does it say that?  Maybe I missed it right there.

1    Could you point that out.

2    A.    That is the only way that Georgetown accepts donations and

3    works is through donations to the university.

4    Q.    Well, I didn't ask you that.  Could you please show me

5    where that is in that bullet point.

6    A.    I guess you're not going to find the exact words you're

7    looking for, but that's the way we do business.

8    Q.    Oh, okay.  Now, then Plan B, that's called "Donor Funding

9    Effort," correct?

10:30 10   A.    Correct.

11   Q.    I take it that's not including Georgetown University?

12   A.    Correct, and that is, the funding would come entirely from

13   donors, and part of that from funding we already had in hand.

14   We had requested funds from a donor for a special project that

15   did not pan out, and so we were going to ask that donor to

16   redirect those funds towards this, and then, again, ask other

17   donors to also support this.

18   Q.    So the fact that $15,000 had been made to Georgetown to

19   build or to go into the tennis court building program?

10:31 20   A.    It wasn't for a building.  It was for improvements to the

21   surface.

22   Q.    Okay.  By the way, did Georgetown while you were there

23   ever build tennis courts?

24   A.    No, it did not.

25   Q.    And when did you leave?

```
 1   A.    2019.
 2   Q.    All right, and then the second bullet point under Plan B,
 3   it says that seven donors or less would fund 42.5 thousand a
 4   year for two years; is that correct?
 5   A.    Correct.
 6   Q.    And then if we could move down further, this is the
 7   section where you identify potential donors who would pay Ernst
 8   the money, correct?
 9   A.    They would give Georgetown the money to augment Gordie's
10:32 10   salary.
11   Q.    This section listed, although it's no longer there, the
12   names of people who were going to donate the money that would
13   go to Ernst?
14   A.    That we would ask to donate the money.  They had not been
15   asked.
16   Q.    Okay.  And that has been redacted for personal reasons.
17   All right, if we could go then to the e-mail which was the
18   first page, and if we could highlight the second paragraph.
19         What you say here or what you're telling -- and, by the
10:33 20   way, Reed, Brummell, and Trump were all fairly high up in the
21   Athletic Department, correct?
22   A.    Correct.
23   Q.    We could call them executives?
24   A.    Sure.
25   Q.    All right.  And you were saying that you could get the
```

1   funding done with a couple of people if the right people agree.

2   Why did you say that?

3   A.   Well, I mean that if people with larger capacity to give

4   were to agree to help, then we wouldn't have to go to as many

5   donors.

6   Q.   So Plan A, as you mentioned, is the university partnering

7   in the fundraising, right?

8   A.   Correct.

9   Q.   And Plan B is fully funded by private donors?

10:33 10   A.   Correct.

11   Q.   And would it be fair to say -- I know we don't identify

12   the people there -- would it be fair to say that high on the

13   list would be parents of tennis players?

14   A.   I didn't have very many relationships with parents of

15   tennis players, so they were not typically on the lists that I

16   put together.

17   Q.   Would it be fair to say that the parents of tennis players

18   would be targets -- I know "targets" is not the right word -- I

19   mean --

10:34 20        MR. SREBNICK:   Invited.

21   Q.   Invitees, that's very good.  He's a lot smarter than I am.

22        -- invitees to donate money to this?

23   A.   If we had a relationship with them.

24   Q.   All right.  I wanted to ask you about admissions into the

25   university.  The university has an Admissions Department,

1    correct, or Admissions Office?

2    A.    Correct.

3    Q.    And you were not an admissions officer?

4    A.    No.

5    Q.    However, you would communicate with admissions officers,

6    would you not?

7    A.    No.  I never did.

8    Q.    Would you ever get involved in attempting to influence the

9    admission of people into the university?

10:35 10   A.    No, I did not.

11   Q.    Did you ever lobby the Admissions Office?

12   A.    The Admissions Office?  No.

13   Q.    Did you ever advise the Admissions Office about the amount

14   of money people had?

15   A.    No.

16   Q.    Did you ever advise the Admissions Office that an athlete

17   or a potential athlete came from a well-positioned family?

18   A.    No.

19   Q.    Did you ever advise the Admissions Office about the net

10:36 20   worth of parents of potential recruits?

21   A.    I did not.

22   Q.    Did you ever advise the Admissions Office about the value

23   of parents' homes?

24   A.    I did not.

25   Q.    All right, if we could please put up Exhibit 284, and if

1   we could move halfway down the page.  Okay.

2       Now, where it says "Ah, I think that's just his

3   assistant," that's an email from you, correct?

4   A.   That is an e-mail from me.

5   Q.   And the BMS43@Georgetown.edu is or was your Georgetown

6   e-mail account?

7   A.   Correct.

8   Q.   And in the sentence here at the end, it says, "Do we need

9   to intervene on admissions or assume that JJD is taking care of

10  it?"  Now, first of all, who's JJD?

11  A.   That is the president.

12  Q.   Jack DeGioia?

13  A.   DeGioia.

14  Q.   DeGioia, thank you.  All right.  When you said here do we

15  need to intervene on admissions, are you talking about the

16  Admissions Office?

17  A.   Yes, I would assume so.

18  Q.   And about whether or not an athlete could be admitted to

19  the university?

20  A.   I don't know what this e-mail is about, so I don't know if

21  it's about an athlete.  Is there more to the e-mail that I

22  could see?

23  Q.   Now, the term "intervene" seems to indicate --

24       THE COURT:  Wait a minute.  Do you have a hard copy of

25  this?  She could just maybe refresh her recollection about

```
 1    what --
 2    Q.   Well, let's go to the top of the page.  Maybe that will
 3    help.
 4    A.   Can you go to the very bottom of the page?  Does it go any
 5    further?
 6              (Witness examining document.)
 7    A.   Thank you.  Can you scroll up a little bit?
 8              (Witness examining document.)
 9    A.   Thank you.  Can you scroll up again?
10:39 10              THE COURT:  Do we just have this for her?
11              MR. SREBNICK:  We're going to print one now, Judge.
12              THE COURT:  Let me just ask, what number is this?
13              MR. BRETT:  284, your Honor.
14    A.   I believe I have the context.
15              THE COURT:  You do, to answer questions?
16              THE WITNESS:  I believe so.
17              THE COURT:  Okay, go ahead.
18              MR. BLACK:  If your Honor please, we would move to
19    have Georgetown produce an unredacted copy --
10:40 20              THE COURT:  No, you're not doing this.  No, you cannot
21    do this in front of a jury, and you know that.
22              MR. BLACK:  All right.
23              THE COURT:  She remembers now, so ask the next
24    question.
25    Q.   All right, so what does it mean "We need to intervene on
```

1    admissions"?

2    A.   It is about tracking this particular case so that we can

3    make sure that we are taking care in how we communicate.  This

4    is not an athletics -- student athlete case.  This is about

5    someone who has a relationship with the department.

6    Q.   All right, so --

7            THE COURT:  Wait a minute.  With what department?

8            THE WITNESS:  The Athletic Department and the

9    university.  This is just about someone who's important to the

10:40 10  university and Athletic Department.  We just didn't want this

11   person to get lost in the shuffle, so he's just --

12           THE COURT:  Somebody applying?  Was it someone

13   applying?

14           THE WITNESS:  It is a person who has a child applying,

15   and so it's just about making sure that we're tracking the

16   communications related to that.

17           THE COURT:  Okay, do you have it for her?

18           MS. NEYRA:  I do have it.

19           THE WITNESS:  Thank you.

10:41 20          THE COURT:  Thank you very much for getting that.

21   Q.   All right, so you, if necessary, can intervene with

22   Admissions, right?

23   A.   This is not about intervening.  This is just about being

24   in touch with them to insure that they understand that this

25   person is in the process, so that they can be careful and be

1    thoughtful with their communications.

2    Q.    Okay.  All right, let's move to the top of the page.  And

3    then you send on this e-mail chain to Daniel Trump, correct?

4    A.    It looks like it, yes.

5    Q.    He's the number two man in the Athletic Department?

6    A.    I'm not sure what number he would be considered.

7    Q.    All right.  And you say to him, "Can you check on him with

8    your admissions guy?"  What does that mean, "your admissions

9    guy"?

10:42 10   A.    I didn't have a relationship with Admissions at all, so I

11   just wanted Dan to be the one that followed up and said, "Hey,

12   we want to make sure you know that this is an important person

13   to the university in the process, so please track the

14   communication."

15   Q.    And what makes a prospective student important?

16         MR. MARKHAM:  Objection, vague.

17         THE COURT:  Overruled.  Why is it that you would take

18   this extra step of contacting Admissions?

19         THE WITNESS:  Because of the parent, because of the

10:43 20   parent's relationship with the university.

21   Q.    And what kind of relationship is that?

22   A.    A very well-known person within the community at large.

23   Q.    All right, could we put up Exhibit 343.  And this is a

24   person by the name of Nina Ravi -- I'm sure I'm mispronouncing

25   that, I'm very sorry -- sending you an e-mail, correct?

```
 1   A.   Yes.
 2   Q.   And who is Nina -- is it Ravi?  Am I correct?
 3   A.   Ravi.
 4   Q.   Ravi, thank you.  Who is Nina Ravi?
 5   A.   She was a colleague in Advancement.
 6   Q.   All right, and --
 7            MR. VARGHESE:  Your Honor, if I may be heard, it looks
 8   like this e-mail has some names in here that --
 9            THE COURT:  Well, you had the chance to redact.  We're
10   not stopping this stream.  Sorry.
11            MR. BLACK:  All right, I'm not going to mention
12   anybody's name, so --
13   Q.   It says here, "I think it's probably because he was an
14   athletics prospect and already in."  What does that mean?
15   A.   That probably means that he was a recruit.
16   Q.   And at the top here it says with the -- I'll just use the
17   letter A -- it says, "A is a JJD nod, as we were told he is
18   being taken care of by Admissions."
19            Now, would Admissions send information to you about
20   athletes or potential donors?
21   A.   No, they wouldn't.
22   Q.   So then how would you find out that somebody was being
23   taken care of by Admissions?
24   A.   It would be through the coach that would be working with
25   that prospective athlete.
```

```
 1    Q.    And JJD is the president again, right?
 2    A.    He is.
 3    Q.    All right, could we put up 341, and if we could highlight
 4    the bottom of the bottom e-mail.  And this is an e-mail from
 5    you, correct?
 6    A.    Yes, it is.
 7    Q.    Do you recall who Sharon is?
 8    A.    Yes, I do.
 9    Q.    Who is that?
10    A.    She was a fundraiser in the Business School.
11    Q.    All right.  And then you say in this e-mail, "Thanks for
12    your note.  Blank was indeed an 'athletics admit' (as in she is
13    a recruited athlete for women's lacrosse and we lobbied for her
14    admission)."  Did you write that?
15    A.    It appears I did.
16    Q.    And what does it mean to lobby for someone's admission?
17    A.    I was referring to the coach recruiting her.
18    Q.    All right, but you don't say lobbying to the coach, do
19    you?
20    A.    Sorry?
21    Q.    You don't say "lobbying the coach," do you?
22    A.    I'm not sure I understand what you're getting at.
23    Q.    I'm just saying, you don't say "lobbying the coach"?
24    A.    I don't say "lobbying the coach"?  You mean --
25              THE COURT:  What does it mean when you say "we
```

```
 1   lobbied"?
 2          THE WITNESS:  What I mean is, the coach lobbied for
 3   her to be a recruit on his team.
 4   Q.   Right, and you use the word "we," right?
 5   A.   I mean Athletics.
 6   Q.   Okay.  And I think earlier you told me you never did any
 7   lobbying.
 8   A.   I was saying the royal "we" of Athletics in this case.
 9   Q.   All right, if we could turn to 342 and go to the bottom of
10:48 10   the page.  And the reason I'm doing this, the way it comes out,
11   the top of your e-mail is right there.  That shows us an e-mail
12   from you, correct?
13   A.   The bottom shows there's an e-mail from me.
14   Q.   Right, but, I mean, your e-mail is on the next page,
15   though.  That's what I'm trying to say, and I'm not doing a
16   very good job at it.
17          All right, turn to Page 2.  All right, what you're saying
18   here is that this person is probably not -- by the way,
19   Mr. Wilk was the baseball coach, right?
10:49 20   A.   He was.
21   Q.   All right.  So you're saying here that "He's not probably
22   a recruit for Wilk's team.  So the question is, does athletics
23   lobby for him or somebody else?"
24          Now, doesn't that say that somebody lobbies the Admissions
25   Office on behalf of a prospective student?
```

```
 1              MR. MARKHAM:  Objection, leading.

 2              THE COURT:  Overruled.

 3     A.   Can I get more context on this e-mail?

 4     Q.   Sure.  What do you need?

 5     A.   Can I get where it starts?

 6     Q.   Further down the page?

 7     A.   Yeah, that would be great.

 8     Q.   Sure.  Let's move down.

 9     A.   Okay, perfect.

10:49 10              (Witness examining document.)

11     Q.   All right, if we could go back up.

12     A.   Thank you.

13              (Witness examining document.)

14     A.   Okay.

15     Q.   And then it says below the e-mail that was forwarded to

16     you, it says, "So I need to push for someone again.  This time

17     I know the kid will go.  What should I do?  Baseball player

18     from Atlanta has the numbers."

19          Now, what is that person telling you?

10:50 20     A.   This is an alum who is trying to lobby -- we use that

21     word -- for a student that he thinks would be a great asset to

22     the baseball team.

23     Q.   Okay, and it turns out he is not, right?

24     A.   He is not.

25     Q.   But nevertheless somebody is going to lobby for him,
```

1  whether it's Athletics or someone else, right?

2  A.   I don't know that someone will, but apparently I asked a

3  question.

4  Q.   All right, if we could put up 316, please.  And if we

5  could go to down at the bottom of the page, there is an e-mail

6  from you in which you say, "It is totally possible one girl

7  decided she wanted out of the family tradition and didn't

8  realize the special handling..."

9      What is special handling?

10:51 10  A.   I'm not sure in this context.

11  Q.   All right, could we turn to -- do you need to look at

12  anything else to assist you with that?

13  A.   I think, if you want to ask more questions about the

14  e-mail, I need more context.

15  Q.   Is there a special interest designation at Georgetown?

16  A.   A special interest designation?

17  Q.   Yes, that certain prospective students are put on the

18  special interest list?

19  A.   There is a special interest list.

10:52 20  Q.   All right, could we go to Exhibit 314, and if we go to the

21  bottom of the page.  And this is an e-mail to you?

22  A.   Yes.

23  Q.   All right.  And I wanted to go to the second half of that

24  message where it says, "As for fundraising, he told me he's not

25  opposed to directing his gifts towards athletics.  His biggest

1    priority is getting his daughter into the school.  She is a

2    senior applying to 2014 admission," correct?

3    A.   I mean, that's what the e-mail says.  I don't remember

4    this.  I'm not sure what the context is.

5    Q.   All right.  And in fact, this is what you were doing, is

6    that people would tell you that donors wanted to give to the

7    university so long as their kids could get admitted.

8    A.   I'm sorry.  Do you have a question?

9    Q.   Sure.  This is the kind of things that are directed to

10   you, that donors to the university ask you to lobby on behalf

11   of their children to get admitted to the university?

12             MR. MARKHAM:  A long leading question.  Objection.

13             THE COURT:  Yes, sustained as to leading, but you can

14   ask it in a different way.

15   Q.   Let me see if I can do that.  Do you get e-mails from

16   donors?

17   A.   Yes.

18   Q.   And do donors ever ask you anything about their children?

19   A.   Uhm, not typically.

20   Q.   Do donors ever ask for your help --

21             THE COURT:  Well, maybe not ever but -- all right, go

22   ahead, the next one.

23   Q.   Do donors ever ask you for help in getting someone

24   admitted to the school?

25   A.   They often wanted to highlight that someone that they were

1    interested in or that they had a connection to was interested

2    in attending the school.

3    Q.   Do donors ever ask you to intervene with the Admissions

4    Office?

5    A.   No.

6    Q.   Do donors ever ask you to lobby for the Admissions Office?

7    A.   That, I think there's a semantics issue.  What they wanted

8    was support for their child.  No one ever asked me to be

9    involved with the Admissions Office.

10:55  10    Q.   How much money do they have to give to get you to lobby

11    Admissions?

12    A.   They do not have to give money to get me to lobby

13    Admissions.

14    Q.   All right, can we turn to Exhibit 285, and if we could

15    highlight the middle paragraph.  By the way, who is -- let's go

16    to the top first.  I'm sorry.  Who is David Nolan?

17    A.   He is the women's soccer coach.

18    Q.   All right, and he's asking you if she is somebody you want

19    to cultivate, correct?

10:56  20    A.   That is what the e-mail says.

21    Q.   Good.  Tell me what the word "cultivate" means.

22    A.   Develop a relationship with typically.

23    Q.   All right, if we could -- oh, and you put down there in

24    the second one, you wrote "$5.6 million house," right?

25    A.   Correct.

1    Q.    So I guess you do find out how much parents' homes are

2    worth, right?

3              MR. MARKHAM:  Objection.  It misstates her testimony.

4              THE COURT:  Overruled.

5    A.    You asked me earlier if I share that information with

6    Admissions.  I do not.  This is an e-mail with a coach.  This

7    is different.

8    Q.    So as I understand it then, you're telling the soccer

9    coach that a prospective athletics soccer player parents own a

10:57 10   home worth $5.6 million, right?

11   A.    Yes.

12   Q.    Now can I ask you this:  What does that have to do with

13   their ability to play soccer?

14   A.    Nothing.

15   Q.    Does that have something to do with the ability to get

16   them to donate money to the soccer team?

17   A.    No.  It is simply the part of the family relationship that

18   I would be interested in.

19   Q.    And you're interested in it because you want money from

10:57 20   them, right?

21   A.    Because I am a fundraiser.

22   Q.    All right, if we could move to the middle of that page.

23   This dealing with the same thing, and if I could mention that

24   the last sentence of the first paragraph there, it says, "She's

25   interested in being part of your team in any capacity."  Do you

1    have any idea what that means?

2    A.   No, I do not.

3    Q.   What other capacities are there other than players?

4    A.   I don't have any idea.

5    Q.   All right.  And then underneath it, it says, "The family

6    is prepared to make a significant donation to Georgetown,"

7    correct?

8    A.   It does say that.

9    Q.   And if we could move up a little bit.  No, the other way.

10:58 10   Thank you.  And then the coach sends to you, "This is the girl

11   we spoke about," right?

12   A.   It does say that.

13   Q.   Do you recall the conversation with the soccer coach about

14   this potential soccer player?

15   A.   I do not.

16   Q.   Now, you wouldn't talk to the coach about this young

17   lady's soccer ability, would you?

18   A.   I would not.

19   Q.   So am I correct in thinking that the amount of money a

10:59 20   prospective student athlete's parents could pay the university

21   is something that's taken into consideration when the coach

22   decides who to recruit?

23        MR. MARKHAM:  Objection as to her knowledge of what

24   the coach thinks.

25        THE COURT:  Well, based on anything that was said to

1  you, would you understand that?

2          THE WITNESS:  Yes.  In my experience, recruiting

3  positions are never given based on development potential.

4  Q.   I'm sorry.  I missed that.

5  A.   In my experience, recruited positions are never given

6  based on development potential.

7  Q.   Okay.  So if that's true, why are you talking about the

8  wealth of the family of this recruit?

9  A.   Because I am a fundraiser, and the coach knows that if he

11:00 10  recruits the student, that I will have an interest in building

11  a relationship with them afterwards.

12          THE COURT:  Let me ask you, about how much longer do

13  you think you have?

14          MR. BLACK:  Oh, I have a substantial amount, your

15  Honor.  If this is a good time to take a break --

16          THE COURT:  Is this a good time?

17          MR. BLACK:  Sure.

18          THE COURT:  All right, we'll take our morning break.

19          THE CLERK:  All rise.

11:01 20          THE COURT:  We'll come back here around 11:20-ish and

21  start organizing.

22          (Jury excused.)

23          THE COURT:  Excuse me.  Ma'am, please don't speak

24  about your testimony with anybody.

25          About how much longer do you think?

1          MR. BLACK:  Maybe an hour.

2          THE COURT:  Oh, all right.  So say we come back 11:20,

3    12:20, how long do you think cross would be?

4          MR. MARKHAM:  Five minutes, your Honor.

5          THE COURT:  Five minutes?  All right.  So let's just

6    say we're done by 12:30, roughly, with this witness, who's

7    next?

8          MR. BLACK:  Next we have scheduled Dan Trump, and then

9    after him Lee Reed, but we will probably discuss whether or not

11:02 10   we need them as witnesses, but at the present time we do, but

11   I'm not a hundred percent sure we will call them.

12         THE COURT:  Are they up here already?

13         MR. BLACK:  Yes, they're here.  Well, I assume they're

14   here.

15         FROM THE FLOOR:  Yes.

16         THE COURT:  Okay.  Well, ideally speaking, I would

17   like to --

18         MR. BLACK:  Oh, we may have one more witness after

19   that, your Honor, I'm advised.

11:02 20        THE COURT:  Who would that be?

21         MR. SREBNICK:  So maybe after lunch we have Katie,

22   Katherine Khoury possibly, Amin Khoury, Sr., and the summary

23   witness Alpert.

24         THE COURT:  Who?

25         MR. SREBNICK:  His name is Alpert, Professor Alpert

         1    from South Carolina.  He's just going to publish some data.

         2            THE COURT:  Oh, so that's a huge amount of additional

         3    witnesses.

         4            MR. SREBNICK:  We listed them before.

         5            THE COURT:  I'm not --

         6            MS. KEARNEY:  Well, Your Honor, I just want to point

         7    out, though, on the summary witness, Professor Alpert is I

         8    believe a criminology professor.  He's not just like a

         9    paralegal from their office who's coming in to read e-mails,

11:03   10    so --

        11            THE COURT:  Have you given them the summary that

        12    you're planning on?

        13            MR. SREBNICK:  Yes.

        14            THE COURT:  You had notice.

        15            MS. KEARNEY:  Last night at 10:00 p.m. they gave us

        16    their summary document that they want to use.  But my concern

        17    is more that Professor Alpert, as a criminology professor, I

        18    just want to make sure he's not giving expert opinions because

        19    he was not disclosed as an expert.

11:03   20            THE COURT:  Fair enough.

        21            MR. SREBNICK:  No opinions.  And the data has been

        22    in -- the government has had the data from Georgetown forever,

        23    and we provided those exhibits long ago.  All he's doing is

        24    publishing them because they're in minute print that can't be

        25    read easily, and then organizing them in a way the jury can see

 1    them.  It comes from public data.

 2           THE COURT:  All right, as long as they've had the

 3    information.

 4           Okay, so we'll take a break.  See you in about 20, 25

 5    minutes.  Okay, thank you.

 6           (A recess was taken, 11:04 a.m.)

 7           (Resumed, 11:39 a.m.)

 8           THE COURT:  The witness can come up.  Thank you.

 9           THE CLERK:  All rise for the jury.

11:41 10       (Jury enters the courtroom.)

 11           THE COURT:  Okay, thank you.

 12           MR. BLACK:  May it please the Court, good morning

 13    again, ladies and gentlemen, and good morning again, Ms. Smith.

 14    BY MR. BLACK:

 15    Q.   Does the Admissions Office at Georgetown disclose what

 16    factors influence the admission of students?

 17    A.   Not that I'm aware.

 18    Q.   Do they want to keep that private?

 19    A.   You would have to speak with the Admissions Office.

11:42 20  Q.   Do they ever issue pronouncements about how people are

 21    admitted that are less than honest?

 22    A.   I'm sorry, I don't -- I don't understand the question.

 23    Q.   Did they ever lie about what factors they take into

 24    consideration in admitting students?

 25    A.   I don't know.

```
 1   Q.   All right, can we put up Exhibit 362, and if we can
 2   highlight the top of the page.  That's an e-mail that you
 3   wrote, right?
 4   A.   It is.
 5   Q.   Talking about how Admissions handles legacy applicants?
 6   A.   Can I see the bottom of this e-mail, please.
 7   Q.   Sure.
 8              (Witness examining document.)
 9   A.   Okay, thank you.  Below that.
10              (Witness examining document.)
11   A.   Okay.
12   Q.   The bottom half -- I'm sorry, have you -- are you still
13   reading?
14   A.   I have it.  Thank you.
15   Q.   Okay.  So that was a memo issued by the Admissions
16   Department, right?
17   A.   The below part seems to be.
18   Q.   All right, and the top is your response to it?
19   A.   It seems to be.
20   Q.   And you thought that they were being less than honest,
21   right?
22   A.   I seem to be worked up.
23   Q.   And when you say, "Just tell us what the party line is,"
24   what did you mean by that?
25   A.   I'm not sure.  I don't remember writing this e-mail.  I'm
```

         1    not sure what I was worked up about.
         2    Q.   Well, the party line means whatever the university wants
         3    people to think, right?
         4              MR. MARKHAM:  Objection, leading.
         5              THE COURT:  Overruled.  Is that what you meant?
         6              THE WITNESS:  I don't remember writing this e-mail.  I
         7    don't know.
         8    Q.   That's pretty harsh language that you use in this e-mail,
         9    isn't it?
11:45   10    A.   It is.
        11    Q.   You must have felt very upset by it.
        12              MR. MARKHAM:  Objection, leading.
        13              THE COURT.  Yes, sustained.
        14    Q.   Well, did you feel good about this?
        15    A.   Right now?
        16    Q.   No, when you wrote this?
        17    A.   I don't remember writing this.
        18    Q.   All right, let's put up Exhibit 344.  This is -- who is
        19    Daniel O'Neil?
11:45   20    A.   He is an Associate Athletic Director.
        21    Q.   All right, and he says, his only written matter there is
        22    "1.1 million in commitments."  What does that mean?
        23    A.   I'm not sure.  Do you have more context for this e-mail?
        24    Q.   Well, we can look at whatever part that you want.
        25              (Witness examining document.)

```
 1    A.   Okay.
 2    Q.   All right, so what does that mean, "1.1 million in
 3    commitments"?
 4    A.   I don't have any idea.
 5    Q.   And this is in December of 2014, right?
 6    A.   Yes, it is.
 7    Q.   Well, doesn't that mean that some donor has agreed to give
 8    Georgetown $1.1 million?
 9              MR. MARKHAM:  Objection, leading again.
10              THE COURT:  Overruled.  Do you know whether that's
11    what it means?
12              THE WITNESS:  No.  I have no idea.
13              THE COURT:  She doesn't know.
14    Q.   Well, what other kind of millions could there be in
15    commitment?  Why don't you give me a list of them.
16    A.   It could be money already given.
17    Q.   Oh, but it deals with money?
18    A.   I would assume that's what it has to do with.
19    Q.   Okay.  Doesn't "commitments" mean that they're going to
20    give it in the future?
21    A.   No, not necessarily in this context.  In the context of
22    development, the word "commitment" means cash or pledges, or
23    all of those words interchangeably.
24    Q.   All right.  And then your response is, "Meg needs that kid
25    to get in."  What does that mean?
```

 1    A.   I don't know exactly.  I'm assuming that she's hopeful

 2    because she would love to have a relationship with that donor

 3    in a meaningful way.  I don't know.  I don't recognize any of

 4    this trail or the action it was put in.

 5    Q.   Now, Ms. Smith, when it says there "needs to get that kid

 6    in," that means to get into the school, doesn't it?

 7    A.   I assume so.

 8    Q.   So what's happening here is that $1.1 million is --

 9         MR. MARKHAM:  Your Honor, I'm going to object to the

11:48 10    leading.

11         THE COURT:  Yes, it's continually leading.

12         MR. MARKHAM:  Yes.

13         MR. BLACK:  I'm just going to check one thing to be

14    sure the name is redacted.

15         (Pause.)

16         MR. BLACK:  Okay, can we put up 353, if the name is

17    redacted.

18    Q.   Okay, I'd like to show you the bottom there.  So do you

19    see that this is dealing with a student that is on the wait

11:49 20    list?

21    A.   I do.

22    Q.   All right.  And that he is a prospective tennis player for

23    Gordie Ernst?

24    A.   I do.

25    Q.   And that his father is CEO of Acuity and a 2016 Accenture

1   Entrepreneur of the Year?

2   A.    I see all of that.

3   Q.    Okay, why would his father's occupation be important to

4   the tennis coach?

5   A.    I don't know that this is important to the tennis coach.

6   I think that this alum is letting the Athletic Director know.

7   Q.    While you were at the advancement or Development

8   Department, would your office influence which athletes got

9   recruited?

11:51 10   A.    No.

11   Q.    Would the ability of the family of an athlete factor into

12   whether or not that person would be recruited?

13   A.    Not that I know of.

14   Q.    Would you advise the coach of the family's wealth when

15   considering who he should recruit?

16   A.    I would advise the coach or highlight maybe someone's

17   potential, but not in advising them as to recruit.  I would be

18   advising them as to my interest.

19   Q.    Why would you be advising the coach of your interest?

11:51 20   A.    Because I would be interested in the person if the coach

21   decided to recruit them.

22   Q.    All right.  Well, does the coach take it into consideration,

23   the wealth of the parents?

24        MR. MARKHAM:  Objection, lack of personal knowledge.

25        THE COURT:  Overruled.

1  A.   Not in my experience.  The coach cares most about whether

2  or not a kid can contribute athletically to their team.

3  Q.   Okay, can we put up 308, please.  And in the middle of the

4  page, do you see there, there is an e-mail from you?

5  A.   Yes, I see that.

6  Q.   All right, if we could highlight the second paragraph

7  there.  You write, "The coaches will either have to recruit

8  really rich kids who can pay or really 'poor' kids who qualify

9  full financial aid, resulting in either more financial aid

11:52 10  expenses for the university and/or angry rich parents who will

11  in turn get mad that we won't let them buy the things the

12  program needs."

13      Why did you write that?

14  A.   I don't know the entire context of this e-mail, but it

15  looks like we were having a conversation about budget cuts and

16  scholarships.

17  Q.   And then you end it with the term hashtag "collapse."

18  What's collapsing?

19  A.   I don't have any idea.  This is seven years ago.

11:53 20  Q.   You don't recall this e-mail at all?

21  A.   I recall conversations of this nature but not this

22  specific e-mail.

23  Q.   Right.  You know that coaches were told --

24          MR. MARKHAM:  Objection, leading.

25          THE COURT:  Sustained, sustained.

```
 1    Q.   All right, can we put up 321.  All right, at the top of
 2    the page you wrote, "I think he has two prospective swimmers,"
 3    correct?
 4    A.   Yes, I did write that.
 5    Q.   All right, and if we could move down some.  And you also
 6    wrote -- and, by the way, James Holder was a swimming coach,
 7    right?
 8    A.   He was.
 9    Q.   And you told him, "There is family money, maybe not seven
11:54 10   figures, but definitely six figures," right?
11    A.   I do see that.
12    Q.   You don't put down there any times in the hundred-yard
13    dash, do you?
14    A.   No.  Is there more to this e-mail I should see, do you
15    think?
16    Q.   You can look at whatever --
17         THE COURT:  Well, scroll down.  She doesn't have it.
18         (Witness examining document.)
19    A.   Okay.
11:55 20   Q.   Anything else?
21    A.   No.  It doesn't really tell me very much.  Okay.
22    Q.   This is, you were setting up meetings regarding that,
23    right?
24    A.   It sounds like I was introducing someone who had
25    prospective famils (Phon) with the coach that was also someone
```

        1    that we had a relationship with.

        2    Q.   All right, could we turn to 311.  If we could go to the

        3    first e-mail, a little bit further down.  This is an e-mail you

        4    wrote about parents committing donations?

        5    A.   It appears to be someone making a donation.  I don't have

        6    the full context.

        7    Q.   Okay.  And the bottom of the second-to-last paragraph, it

        8    says, "I'm assuming he has a daughter in the 8th or 9th grade

        9    who plays lacrosse," correct?

11:56  10    A.   I do say that.

       11    Q.   That's sort of an afterthought, isn't it?

       12    A.   It is, and if you note at the beginning of this paragraph,

       13    I noted that this is a men's lacrosse alumnus, so it is not a

       14    parent.

       15    Q.   It is a parent, though, right?

       16    A.   Not a parent of Georgetown.  An alum of Georgetown

       17    according to my paragraph.

       18    Q.   Okay, let's go to the top of the page.  And who's Kevin

       19    Warne?

11:57  20    A.   Kevin Warne was the men's lacrosse coach.

       21    Q.   So the men's lacrosse coach is sending you a note, "Just

       22    wanted to make sure we got the money"?

       23    A.   Can you scroll back down.  I think that was in relation to

       24    my request for him to send him a helmet to the alum that made

       25    the gift.

```
 1   Q.   So the lacrosse coach is sending you an e-mail saying,

 2   "Just wanted to make sure we got the money"?

 3   A.   Before sending the helmet, if I understand the trail

 4   correctly.

 5   Q.   And you say, "I sent him wire instructions yesterday"?

 6   A.   Correct.

 7   Q.   All right, if we could turn to 310.  If we can show the

 8   second paragraph here, it says, "I'm checking on this potential

 9   recruit again," right?

11:58 10   A.   It does say that.

11   Q.   Okay.  And then down here you write, "This is one of my

12   $500,000 donors, used to work for BLANK, and let me know that

13   he has a net worth of $500 million plus," correct?

14   A.   I do say that.

15   Q.   And then you end it by saying, "So if BLANK is in your

16   recruiting ballpark at all......" et cetera, leaving the rest

17   of that thought unstated, right?

18   A.   There are a number of periods there.

19   Q.   Yes.  Well, thank you for that.  So that generally means

11:59 20   that both of you know what you're talking about; you just don't

21   write it there?

22            MR. MARKHAM:  Objection, leading.

23            THE COURT:  Overruled.  Is that what you meant?

24            THE WITNESS:  What did I mean?

25            THE COURT:  What did you mean by the dot, dot, dot?
```

```
 1              THE WITNESS:  That I would be interested in this
 2     parent if the kid was recruited.
 3     Q.   Okay, if we could put up 339 and down the bottom of the
 4     page.  Yes, right there.  So this one is -- what's TAC?
 5     A.   The Thompson Athletic Center.
 6     Q.   Okay, so they're talking about somebody donating $25,000
 7     to TAC, correct?
 8     A.   It seems to, yes.
 9     Q.   And it says he could continue to be a good athletics
10     donor?
11     A.   I don't know if it's athletics.  It's just saying that he
12     could do more.
13     Q.   Yeah, and it said, "He could be a good athletics donor,
14     and if his daughter is good enough for Coach Williams, he could
15     be even a bigger donor over the next five years," right?
16     A.   It does say that.
17     Q.   And according to this, it says, "She graduates from high
18     school in 2018"?
19     A.   It does say that.
20     Q.   And this e-mail is in 2015.
21     A.   It does say that.
22     Q.   So even three years before somebody graduates and could
23     apply to the university, there are discussions about the
24     donation potential of parents?
25     A.   It appears to be so.
```

```
 1   Q.   Did you get involved in recruiting for the tennis team?

 2   A.   No, I did not recruit for the tennis team.

 3            MR. BLACK:  Let me just, before I show an e-mail, I

 4   want to be sure that -- this is 357 -- be sure that the name is

 5   redacted.

 6   Q.   All right, please put up 357, and Michelle Spencer is

 7   sending you an e-mail, correct?

 8   A.   Yes.  She seems to be.

 9   Q.   And what was her position at Georgetown?

10   A.   She was a fundraiser.

11   Q.   Okay, she was not involved in athletics, right?

12   A.   No.  She represented the West Coast.

13   Q.   Okay.  And it says "Connecting you with Doug Dillard."

14   Who was Doug Dillard?

15   A.   He was an alum.

16   Q.   And he made a lot of donations over the years, did he not?

17   A.   He did.

18   Q.   And then it says "His good friend and a well-positioned

19   family."  What does that mean, a well-positioned family?

20   A.   I think it means that the family has the potential to be

21   donors, should they become involved with the university.

22   Q.   All right.  And what they're saying here is that the

23   person wants to come to the campus and meet with Gordon Ernst,

24   correct?

25   A.   That's what it says.
```

1    Q.   Excuse me a second.  Could you put up 358 again.  I think

2    I've got two copies.  That's why I'm confusing myself.  Ah, all

3    right.

4         So this is the same recruit, right, that we were talking

5    about in the earlier e-mail where Doug Dillard was mentioning

6    it?

7    A.   Can I see the bottom half of this e-mail trail, please?

8    Q.   Sure.

9             (Witness examining document.)

12:05 10   A.   Okay.

11   Q.   All right, if we could go to the top.

12             (Witness examining document.)

13   A.   Okay.

14   Q.   You tell Gordie Ernst that "But if she/he is in the

15   ballpark, it wouldn't hurt us."  Now, does that mean that it

16   wouldn't hurt us to recruit the person?

17   A.   No.  Gordie is asking me if I want him to meet with the

18   kid, and so I'm saying it wouldn't hurt us if he met with him.

19   Q.   And what he responds to you, "Another mediocre player,

12:06 20   that is my strike zone."  What is he telling you there?

21   A.   That his team is not a very well-performing team.

22   Q.   All right, I want to show you an exhibit.  It's not yet in

23   evidence.  This is Exhibit NN.

24             MR. BLACK:  Is it in or not?

25             MS. NEYRA:  No, it's not.  It's contested.

1           MR. BLACK:  All right, give one copy to the witness as

2    well.

3           MS. NEYRA:  Maryellen, may I approach?

4           THE CLERK:  I'll give it to the Judge.

5           (Discussion between the Court and Clerk.)

6           THE COURT:  Is there an objection?  It's from her.

7           MR. MARKHAM:  Well, your Honor, it's actually several

8    pages, so I'd ask if you would look at the next few pages.

9    None of them are from her.

12:07 10           THE COURT:  Well, how deep are you planning on going?

11           MR. BLACK:  I'm only going to use the first page, your

12    Honor.

13           THE COURT:  Okay.

14           MR. MARKHAM:  Your Honor, the bottom of the first page

15    is not --

16           THE COURT:  Let's just -- let's hear the questions

17    first.

18           MR. BLACK:  We can put it up on the screen.  I don't

19    know what number it is.

12:07 20           THE CLERK:  You need to know what the number is.

21           THE COURT:  It's to her.

22    Q.   Would you have discussions with Gordon Ernst about how

23    much money people had?

24    A.   Yes.

25    Q.   And would you try to influence him to recruit people who

1    had money?

2    A.    No.

3    Q.    Now, let me show you, he sends you this e-mail in which he

4    says, "No idea if he has dough or not.  He struck me as a bit

5    of a tire kicker, but who knows, sometimes those are the big

6    hitters."

7          Now, why in the world would he be asking you or telling

8    you he has no idea if the kid has money?

9    A.    I don't know.  I don't know what this term is about.  Can

12:08 10   you give me a minute here?

11          THE COURT:  Yes.

12   Q.    All right, and your response --

13          THE COURT:  No, no, she needs to read it, she said.

14          MR. BLACK:  I'm sorry.  My hearing is shot.

15          (Witness examining document.)

16   A.    Okay, sorry.  What was your question?

17   Q.    You responded, "He has no money -- at all," right?

18   A.    I do say that.

19   Q.    Why would you be telling that to the -- describing a

12:09 20   potential recruit like that to the tennis coach?

21   A.    I believe because I was trying to get him back on track.

22   If you see his previous comment, it was about money, and I was

23   trying to talk to him about whether or not this kid was a

24   recruit.  The previous e-mails are about this parent wanting to

25   hold his kid out of college for a year and do a gap year, but

1    with the hopes that the kid would be able to play for Gordie;

2    and I was trying to get to the heart of the conversation, it

3    looks like, which is how he would not be a recruit.

4    Q.   But your actual statement is "He has no money -- at all --

5    (show me the money!)"

6    A.   Yeah, that's a joke.  Like, that was a joke in our office.

7    "Show me the money, show me the money," like, it was just a

8    joke in our office.

9    Q.   "What I mean is, is he ever going to be recruited by you?"

12:10 10   Right?

11   A.   Yes.

12   Q.   "This parent is going to keep the kid out a year to play

13   club if he doesn't get in to play with you," right?

14   A.   Yes.

15   Q.   And then you end it by saying, "He sounds dreadful"?

16   A.   Yes, I do.

17   Q.   Why would you say that?

18   A.   I don't know.

19        THE COURT:  Are you moving on?  Are you moving in NN?

12:11 20        MR. BLACK:  Yes, your Honor.

21        MR. MARKHAM:  Your Honor, we'd renew our objection to

22   everything except for the first page.

23        THE COURT:  Overruled, overruled on the -- with

24   respect to the first page?

25        MR. MARKHAM:  Yes, your Honor.  The other four pages

```
 1    are not --
 2              THE COURT:  Yes, the other four pages come out.
 3              MS. NEYRA:  Maryellen, 375.
 4              THE CLERK:  375, thank you.  Page 1 only, Judge,
 5    right?  Thank you.
 6              (Exhibit 375 received in evidence.)
 7              MR. BLACK:  Thank you, your Honor, for reminding me.
 8    I'm sorry.
 9              THE COURT:  So what number are we at?
12:11 10          MS. NEYRA:  375.
11    Q.   All right, could we show or put up Exhibit 355, and this
12    is -- if we could scroll down a little bit, this is an e-mail
13    from Paul O'Neil.  Who is Paul O'Neil?
14    A.   He was the COO of Advancement at the time.
15    Q.   Okay.  And it's talking about a parent asking about his
16    son's fall admission application, correct?
17    A.   Can you give me a moment, please.
18              (Witness examining document.)
19    A.   Okay, he is -- sorry.  What was your question?
12:12 20   Q.   All right, if this is a -- Paul O'Neil is sending you a
21    message about the parent of a prospective -- or a student
22    applying for admission?
23    A.   Yeah, I guess so.  Well, I don't know if the kid is
24    applying.  It says "inquiring."  Or I guess he did apply, yes.
25    Q.   Okay.  And then he says to you, "Question for you:  Would
```

1  Gordie play ANY role in advocating for somebody like,"

2  et cetera.  Now, what did that mean, would he play any role in

3  advocating?

4  A.   I don't remember specifically the circumstances of this,

5  but I think it means would he be interested in recruiting him,

6  or would he be willing to say that he was interested in him as

7  a walk-on.

8  Q.   Well, maybe I'm a little limited, but advocating is

9  different than recruiting, isn't it?

12:14 10  A.   I don't know exactly what Paul meant in this e-mail.

11  Q.   Well, doesn't "advocating" mean that you're talking to

12  somebody on someone's behalf?

13          MR. MARKHAM:  Objection, leading.

14          THE COURT:  Sustained.  What do you understand

15  "advocating" to mean?

16          THE WITNESS:  I mean, in terms of athletics, that

17  typically means recruiting.

18  Q.   And then you say, or was asked, "If not, would so-and-so

19  likely be asked to play if he enrolled?"

12:14 20          Why would that question be asked?

21  A.   I think he's trying to --

22          MR. MARKHAM:  Objection, your Honor.  She's being

23  asked to opine.

24          THE COURT:  Sustained.

25  Q.   Now, before I asked you whether or not the coaches had any

1    role in fundraising, right?

2            THE COURT:  Can I ask you, who's Ricardo Ernst?

3            THE WITNESS:  I'm not sure exactly.  I heard his name

4    periodically.  I think he was an alum and donor.  I'm not sure

5    if he had --I feel like he had a role at the university, but

6    I'm not clear on what it was exactly.

7    Q.    Is that Ernst related to Gordon Ernst?

8    A.    No, no relation.

9    Q.    Okay.  Don't the coaches sign a -- I'm blanking on what

12:15 10   it's called -- they sign a contract to be a coach, right?

11   A.    Yes.

12   Q.    Does that contract require them to raise funds for their

13   teams?

14           MR. MARKHAM:  Objection, lack of personal knowledge as

15   to what Gordon Ernst's contract said.

16           THE COURT:  Overruled.

17   A.    I have never seen a coach's contract, so I have no

18   knowledge of that.

19   Q.    All right.  How large is the Advancement or Development

12:16 20   Department at Georgetown?

21   A.    I'm not exactly sure.  Maybe 180.  I have no idea anymore,

22   to be honest.

23   Q.    Okay.  And they research the assets of parents, don't

24   they?

25   A.    They do.

1    Q.   And they check what the value of their homes are?

2         MR. MARKHAM:   Your Honor, these are all leading

3    questions.

4         THE COURT:   I know, but you don't have to object to

5    every one.

6         MR. MARKHAM:   I'm not, your Honor, but, yes, I'll

7    stop.

8    A.   They assess what someone's wealth may be.

9    Q.   They check on their real estate holdings?

12:17 10  A.   I don't know exactly all the items they check in assessing

11   that.

12   Q.   They check what their jobs are?

13   A.   Sorry.   Is that a question?

14   Q.   Yes.

15   A.   I think the parents provide us with that information

16   actually.

17   Q.   Oh, doesn't the Advancement or Development Department have

18   sophisticated researching tools to find out about the families?

19   A.   They typically use a vendor to do that.

12:17 20  Q.   They rely on what?

21   A.   A vendor.

22   Q.   Does Georgetown use a program Salesforce?

23   A.   It is my understanding that they do.   In the last year

24   that I was there, they were transitioning from Advance to

25   Salesforce.

1    Q.   And what is Salesforce?

2    A.   It's a customer relations management tool.

3    Q.   And does that keep track of the assets of parents of

4    students?

5    A.   That is not the purpose for it, no.

6    Q.   And does Salesforce make an estimated amount of how much

7    money the school may be able to get out of a parent?

8    A.   I don't believe that is the purpose of Salesforce.

9    Q.   Have you ever worked with Salesforce?

12:18 10    A.   Just briefly in the last year that I was at Georgetown.

11    Q.   All right.  Well, let me then show you a document marked

12    NU --

13          MR. MARKHAM:  Your Honor, at this point we object on

14    relevance grounds.  They're talking about a program that was

15    instituted three years after --

16          THE COURT:  Yes, sustained.  It was after the period

17    of time.

18    Q.   Well, were you familiar with Salesforce documents back in

19    2015 through 2019?

12:19 20    A.   I don't think Salesforce was instituted at Georgetown

21    until 2018 maybe?

22    Q.   All right, so were you familiar with it in 2018 and 2019?

23    A.   Moderately.

24    Q.   What vendor do you use to research the assets of parents?

25    A.   I don't know.  I'm not involved in it.

1          MR. BLACK:  Could I just have a moment, your Honor?

2          (Discussion off the record between defense counsel.)

3          MR. BLACK:  If your Honor please, I'd like the record

4    to reflect that I finished in less than an hour.  Thank you.

5          THE COURT:  It will do so, and thank you.

6          MR. BLACK:  Thank you.

7          MR. MARKHAM:  I'll try to beat that time, your Honor.

8    CROSS-EXAMINATION BY MR. MARKHAM:

9    Q.   Ms. Smith, you just got asked a lot of questions about

12:21 10    donations, right?

11   A.   Yes.

12   Q.   Is a bag of cash given to a coach personally a donation?

13   A.   Not in my experience.

14   Q.   In all your experience at Georgetown, you've never seen

15   anything like that, right?

16   A.   No, I have not.

17   Q.   You testified that the Athletic Department raised money,

18   correct?

19   A.   Yes.

12:21 20   Q.   Would it in any way benefit the Athletic Department for

21   coaches to be personally accepting cash for their own benefit?

22   A.   No.

23   Q.   Wouldn't it indeed hurt the Athletic Department if coaches

24   were doing that?

25   A.   In my opinion, yes.

1    Q.   The defense appears to have had access to your e-mails

2    from Georgetown, right?

3    A.   Yes.

4    Q.   They showed you a number of those e-mails from five to

5    eight years ago?

6    A.   Yes.

7    Q.   And as the record now reflects, they spent, well, I guess

8    a little less than an hour on the second part, but plus a

9    little bit before then talking about them, right?

12:22 10   A.   Yes.

11   Q.   Was defense able to show you a single e-mail that

12   contained the name Amin Khoury?

13   A.   No.

14   Q.   Was the defense able to show you a single e-mail that

15   contained the name Katherine Khoury?

16   A.   No.

17   Q.   On or before May of 2015, which is when the defendant's

18   daughter got her final acceptance to Georgetown, did you have

19   any idea who the Khourys were?

12:22 20   A.   I had only ever heard of them in the last couple months.

21   Q.   In relation to the lead-up to this case?

22   A.   Yes.

23   Q.   Okay, so they weren't on your radar at all?

24   A.   No.

25   Q.   So since none of those e-mails were about the Khourys,

1   it's fair to say that, even if donations could potentially play

2   a role in Admissions, that's not what happened from anything

3   you saw at Georgetown with the defendant, Amin Khoury?

4   A.   Correct.

5   Q.   You were shown an e-mail talking about a legacy student,

6   right?  Do you remember that, him showing you an e-mail where a

7   legacy was referenced?

8   A.   I don't remember that.

9   Q.   Okay.  Well, are you aware that Amin Khoury is not a

12:23 10   legacy of Georgetown?

11   A.   Yes.

12   Q.   Do you remember them showing you an e-mail using the word

13   "commitments"?

14   A.   Yes.

15   Q.   In 2015, isn't it true that the defendant had not made a

16   single commitment to Georgetown University?

17   A.   I don't have any idea.

18   Q.   You were shown an e-mail talking about wire instructions.

19   Do you remember that?

12:23 20   A.   Yes.

21   Q.   Did the defendant ever reach out to you asking you for

22   wire instructions to Georgetown University?

23   A.   No.

24   Q.   They showed you e-mails where you were talking to Gordon

25   Ernst about certain parents, correct?

1 A. Correct.

2 Q. But there was never a single e-mail with Gordon Ernst

3 talking about the Khourys?

4 A. No.

5 Q. You were asked about summer camps that Gordon Ernst ran on

6 Georgetown campus.  Do you remember him talking about that?

7 A. Yes, I do.

8 Q. And those campus, to the best of your knowledge, were

9 authorized by Georgetown University?

12:24 10 A. Yes, I believe they were.

11 Q. Well, they were in plain sight, right?

12 A. Yes.

13 Q. So they weren't hidden from Georgetown University?

14 A. Correct.

15 Q. To the best of your knowledge, when Gordon Ernst was paid

16 for those camps, there was no middleman or cash involved?

17 A. Correct.

18 Q. So after there was some issue with the tennis courts at

19 Georgetown University, the defense brought to your attention a

12:24 20 proposal you submitted to help increase Gordon Ernst's pay when

21 he actually lost those camps; is that right?

22 A. Correct.

23 Q. And that proposal was sent on May 19, and it said, quote,

24 "first stab."  So does that mean as of May 19, that was not

25 actually approved; that was just a draft?

1    A.    Correct.

2    Q.    Prior to that, Gordon Ernst was complaining to you, right,

3    about wanting to get more money?

4    A.    Yes, correct.

5    Q.    So at the exact time that Katherine Khoury was applying to

6    college in 2015, Gordon Ernst was expressing to you clear

7    frustration that he doesn't have enough money?

8    A.    Correct.

9    Q.    Your proposal to help Gordon Ernst allowed people to

12:25 10   donate to the school, and then some of those donations to the

11   school would then be used to increase Gordon Ernst's pay?

12   A.    Correct.

13   Q.    That proposal was never approved, correct?

14   A.    No.

15   Q.    And May 19 when you sent that e-mail, am I right to say

16   that's six days after May 13?

17   A.    That is six days.

18   Q.    And that proposal required money to come to Georgetown in

19   the form of donations, right?

12:26 20   A.    It did.

21   Q.    So nothing in that proposal authorized Gordon Ernst to

22   start accepting cash personally from the parents?

23   A.    No, it did not.

24   Q.    Is it a quote "donor," which was used in some of those

25   e-mails, if the money is paid in cash to a coach personally?

        1    A.    No, it's not.

        2    Q.    You are a donor relations professional, right?

        3    A.    I am.

        4    Q.    Donations to Georgetown are tax deductible?

        5    A.    They are.

        6    Q.    Has any parent in your entire career ever come to you

        7    asking to pay in cash and not take the tax deduction when

        8    they're giving donations?

        9    A.    No, they have not.

12:26  10    Q.    Because that would make no sense, right?  It would just be

       11    burning money?

       12    A.    No.  They get upset if they don't get the receipt on time.

       13    Q.    You were shown some e-mails where you had sometimes passed

       14    names of potential donors along to coaches to see if they might

       15    be interested in that player, right?

       16    A.    Yes.

       17    Q.    Did you ever ask a coach to provide a protected slot to an

       18    athlete that you knew could never or would never play for the

       19    team?

12:27  20    A.    No, I did not.

       21    Q.    And that was not allowed, right?

       22    A.    No, it was not.

       23    Q.    And to be clear, even if you ordered a coach to do that,

       24    you have no authority to order a coach to do anything, right?

       25    A.    No.

```
 1    Q.   Are you Gordon Ernst's boss?
 2    A.   No.
 3    Q.   Even outside the context of the Athletic Department, you
 4    work in donor relations, correct?
 5    A.   Correct.
 6    Q.   Are you personally allowed to receive cash to yourself,
 7    while working at Georgetown, from people?
 8    A.   No.  No, I'm not.
 9    Q.   Why not?
10    A.   Because it would be unethical according to Georgetown's
11    policies.
12    Q.   It's fair to say that was abundantly clear to you as
13    someone working at Georgetown?
14    A.   Since day one.
15    Q.   And if you did that, you would be fired, right?
16    A.   Accurate.
17         MR. MARKHAM:  No more questions, your Honor.
18    REDIRECT EXAMINATION BY MR. BLACK:
19    Q.   You were asked about prospective students and your
20    knowledge of them.  Remember that?
21    A.   Right.
22    Q.   All right, in 2015 there were 19,500 applicants to
23    Georgetown.  How many of those are you aware of?
24    A.   I don't know.
25    Q.   The school issued invitations to 3,300 of them.  How many
```

1    of those are you familiar with?

2    A.    I don't know.

3    Q.    And 1,567 students arrived at the campus in September of

4    2015.  How many of those were you familiar with?

5    A.    I'm not sure.

6    Q.    You said that Gordie Ernst's summer camp was authorized by

7    Georgetown, correct?

8    A.    As far as I know, that they allowed him to have it.

9    Q.    All right.  Well, good, I was going to ask you, how do you

12:29 10   know that?

11   A.    Because it was happening on the courts.

12   Q.    So you assumed that they authorized it?

13   A.    Yes, I did.

14   Q.    And you said that the Athletic Department -- oh, by the

15   way, let's backtrack a minute.  There are things called "slots"

16   where recruited athletes can get admitted to the school, right?

17   A.    That is true.

18   Q.    And you were just asked a question about the use of slots

19   by the Athletic Department.  Do you recall that?

12:30 20   A.    By my coaches.

21   Q.    Yes.  Are you aware that in February of 2015, which is

22   three months before May that we're dealing with, that the

23   Athletic Department authorized the use of a slot for somebody

24   who was not a recruited athlete?

25   A.    No, I'm not aware of that.

```
 1              MR. MARKHAM:  Your Honor, objection.  I'd move to
 2    strike that --
 3              THE COURT:  I can't hear you.
 4              MR. MARKHAM:  I'd move to strike that.  She said she
 5    didn't know it, and he's just saying things into the record.
 6              THE COURT:  Well, she said she didn't know.
 7              MR. BLACK:  Thank you, your Honor.  Nothing else.
 8              MR. MARKHAM:  Nothing from the government, your Honor.
 9    Thank you.
12:30 10          THE WITNESS:  Do I leave this here?
11              THE COURT:  Yes.  You can step down.
12              THE WITNESS:  Do I leave this here?
13              THE COURT:  Yes, leave that right there.  Thank you.
14              (Witness excused.)
15              MR. SREBNICK:  Judge, may we approach before the next
16    witness?
17              THE COURT:  Yes.
18    SIDEBAR CONFERENCE:
19              MR. SREBNICK:  The next witness is Katherine Khoury.
12:31 20   She's in the bathroom.  I just wanted to let you know.  They
21    just whispered to me that she's coming.  I didn't want you
22    to -- and we're going to being proposing to introduce text
23    messages that she wrote to her father back in 2015, May of
24    2015.
25              THE COURT:  Have you shown those to the government?
```

 1          MR. SREBNICK:  Yes.

 2          MR. MARKHAM:  They're redacted, and all these messages

 3   from the father have been deleted.

 4          MR. SREBNICK:  This is just her statement of her state

 5   of mind.  That's exactly why we're offering it, to confirm her

 6   emotional state of mind, which will corroborate her testimony

 7   that as a result of the divorce in 2015, she went into a

 8   depression.

 9          THE COURT:  What does that have to do with the ability

12:32 10   to perform?

11          MR. SREBNICK:  That she withdrew from tennis and --

12          THE COURT:  And the academics?

13          MR. SREBNICK:  That's right.  And so we are sensitive,

14   obviously.  I assume that they have to be made public unless

15   there's some other method by which to do it.

16          MR. MARKHAM:  I'll be cross-examining her on all the

17   statements that we think are relevant about this, your Honor.

18          THE COURT:  Yes, yes.  And as I said before, it's

19   interesting.  We couldn't find any cases, and you all didn't

12:32 20   cite any to me, under the doctrine of completeness, is it just

21   the bunch of bubbles that she wrote, or does it include the

22   responses from the father?  I don't -- I think as long as

23   you're producing all the bubbles from her --

24          MR. MARKHAM:  We're redacting some of them, your

25   Honor, that they don't like.

1           THE COURT:  Well, I think you need to get the complete

2    bubbles from her.

3           MR. SREBNICK:  I gave the bubbles.  There are some

4    that use words like S-l-u-t.

5           THE COURT:  They still need to have it.

6           MR. SREBNICK:  They have it.

7           THE COURT:  Oh.

8           MR. MARKHAM:  We have them, your Honor.  We just

9    object to the introduction of them, deleting all the defense

12:33 10   text messages and then only allowing unredacted versions of the

11   texts they like.

12          THE COURT:  I asked for briefing on this.  I don't

13   know the answer to this, but as long as I have her complete

14   statement and not a sanitized statement from her, and then you

15   can point out that that doesn't include the response.

16          MR. SREBNICK:  Let me just be clear about the

17   redaction.  I had given the government 29 of them, and over the

18   last few days I decided to redact, I think it was three out of

19   29 because of word choices like "slut" and "sex."

12:33 20          MS. KEARNEY:  She also caused her father to

21   (Inaudible).

22          MR. SREBNICK:  That will come out anyway.

23          THE COURT:  That's all part of the doctrine of

24   completeness.  I'm not sure his statements in response are.

25          MR. SREBNICK:  They have the full body of the texts,

```
 1   and they're welcome to use --
 2            THE COURT:  All right.  Is she here?
 3            MR. SREBNICK:  I believe so, yes.
 4            (End of sidebar conference.)
 5            MR. SREBNICK:  So, your Honor, we call Katherine
 6   Khoury.
 7                        KATHERINE KHOURY
 8   having been first duly sworn, was examined and testified as
 9   follows:
10            THE CLERK:  Can you please state your name and spell
11   it for the record, please.
12            THE WITNESS:  Yes.
13            THE CLERK:  Thank you.
14            THE WITNESS:  Katherine, K-a-t-h --
15            THE COURT:  Okay, now we've got to hear you, so pull
16   in the mic.
17            THE WITNESS:  Okay.  Sorry.  Katherine,
18   K-a-t-h-e-r-i-n-e, last name Khoury, K-h-o-u-r-y.
19            THE CLERK:  Thank you.
20   DIRECT EXAMINATION BY MR. SREBNICK:
21   Q.   Katherine, if you could introduce yourself to the jury in
22   terms of your date of birth and -- or how old are you?  Let me
23   start that way.
24   A.   I'm 25 years old.
25   Q.   Okay.  And tell us a little bit about your schooling,
```

1    where you grew up and where you went to high school.

2    A.   Yes, so I was born in Boston, Massachusetts, and then I

3    grew up in Stuart, Florida.  I attended the Pine School for

4    middle school, and then in ninth grade I attended the Middlesex

5    School in Concord, Massachusetts.

6    Q.   And then where did you go to college?

7    A.   I went to Georgetown University.

8    Q.   And then where did you go for postgraduate studies?

9    A.   Fordham University.

12:36 10   Q.   And what degree did you obtain from Fordham University?

11   A.   A master's in real estate science.

12   Q.   Okay, and what was your grade-point average at Fordham?

13   A.   3.84.

14   Q.   Okay, that's almost -- out of 4.0?

15   A.   Yes.

16   Q.   Okay.  And what did you study at Fordham exactly?

17   A.   So the degree was in real estate science, and I took real

18   estate accounting, real estate finance, real estate law.  It

19   was about a year-and-a-half program, and you finished with a

12:36 20   master's degree at the end of that.

21   Q.   And then after that, what did you do for employment?

22   A.   I went on to work at Cushman & Wakefield as a capital

23   market analyst.

24   Q.   And tell us, who is or what is Cushman & Wakefield?

25   A.   So Cushman & Wakefield is a commercial real estate

1    company.  I worked in mainly office and industrial spaces, and

2    put together offering memorandums for our prospective clients,

3    and toured properties; and it was an internship that lasted

4    from December or January, 2021, to May, 2021.

5    Q.    And then after Cushman & Wakefield, where did you go to

6    work?

7    A.    MCM Homes.

8    Q.    And what does MCM Homes do?

9    A.    MCM homes sells and leases manufactured homes in

12:37 10   communities in both Michigan and North Carolina and Ohio.

11   Q.    And does your family have an interest in that business,

12   your father or grandfather?

13   A.    Yes.  So my grandfather is the CEO of the company, and my

14   father also works there.

15   Q.    And is this your grandfather, Amin Khoury?

16   A.    Yes.

17   Q.    And then your father Amin Khoury, we call him "junior"

18   here just for clarity for the moment?

19   A.    Yes.

12:37 20   Q.    And do you see your dad in the courtroom?

21   A.    I do.

22   Q.    Okay.  And so what is it that you do for MCM?

23   A.    So I work as a market analyst.  So basically when we're

24   looking at new communities that we want to purchase, I will

25   look at the demographics and see the need for affordable

1   housing in that area.  I'm also responsible for putting

2   together a monthly forecast basically saying, all right, here's

3   how many homes we sold or leased, and here's what we need to do

4   next month in order to make those goals.

5        And, yeah, so the great thing about a startup is, I can

6   wear a lot of different hats, sort of, and get sort of a

7   hands-on learning experience.

8   Q.   How many people do you work with at MCM?

9   A.   So my direct boss -- I have two direct bosses, and MCM is

12:38 10   comprised of about forty individuals or employees.

11   Q.   Okay.  And the nature of this business about manufactured

12   homes, what's the nature of that business?  What do you all

13   actually do for the community?

14   A.   So basically our goal, and the way that my dad first sort

15   of talked to me about it is, you know, we're building, it's

16   more than just selling manufactured homes.  You know, we're

17   trying to get rid of the stigma of trailer parks, or, you know,

18   when you have that picture, we want to create safe, beautiful

19   communities for families to live in.  And most of the parks or

12:39 20   communities that we own are all ages, so that means you have

21   children growing up there; you have families there.

22        And so when we look at communities, we'll also look at the

23   amenities that the community has to offer, such as playgrounds,

24   swimming pools, picnic areas.  You know, there is something to

25   be said about forming a community that a family can raise their

1    kids and feel comfortable with.

2    Q.    Okay.  And for how long have you been working there?

3    A.    So it was a year around May 10th, I want to say.

4    Q.    Okay.  Katherine, growing up, did you play tennis?

5    A.    I did, yes.

6    Q.    Okay.  And who taught you how to play tennis?

7    A.    My dad.

8    Q.    And how old were you when you learned to play tennis?

9    A.    I want to say I was about five or six years old.

12:40  10    Q.    Okay.  And where did you learn to play tennis?  Was it a

11    club or a park, or how did that come about?

12    A.    So my dad and I would play in Stuart, Florida, at Sailfish

13    Point a lot, and that's sort of, you know, where my love for

14    tennis began is just, you know, hitting balls with him.  And I

15    played my entire childhood up into high school where I would

16    practice in Mashpee, Massachusetts, at the Willowbend Club.

17              THE COURT:  You know, you need to keep your voice up a

18    bit.

19              THE WITNESS:  Oh, I'm sorry.

12:40  20              THE COURT:  So where in Mashpee were you?

21              THE WITNESS:  I was at Willowbend.  That's where I

22    would take the lessons.  Sorry.

23    Q.    Let me ask Keith to put up Exhibit 82.  It's a photograph,

24    and see if you can help us identify the people in the

25    photograph.  First, let me direct your attention all the way to

```
 1   the back right.  Do you see the name of the club, I think, that

 2   you just mentioned?

 3   A.   Yes, Willowbend.

 4   Q.   Okay.  And where are you in that picture?

 5   A.   I am second from the right in the green outfit.

 6   Q.   Do you know approximately how old you were at that time?

 7   A.   I want to say I was about ten there, eleven maybe.

 8   Q.   Okay.  And is this the place where you would play tennis

 9   with your dad?

10   A.   Yes.

11   Q.   Okay.  And was there any other sport that you played more

12   consistently than tennis?

13   A.   No.

14   Q.   Okay.  And for how many years did you play tennis until

15   you reached high school?  Was it every single year?

16   A.   Yes, so from the age of, you know, I would say about

17   twelve years.

18   Q.   Okay.  And your dad, when you said you would play tennis

19   with your dad, was it just hitting the balls, or was there

20   anything more instructive about the relationship, the tennis

21   relationship with your dad?

22   A.   Well, so, yes, my dad is an amazing tennis player.  He did

23   play at Brown, and so I guess in a way we not only had a

24   father/daughter relationship, but in a lot of ways he was my

25   primary coach.  He would help me with drills, techniques, my
```

1   serve, which was the weakest part of my game.  Set up cones

2   around the tennis court to try and, you know, boost my tennis

3   skills.  So it was something he enjoyed, but also something

4   that he encouraged me to work hard on.

5   Q.   How passionate was your dad about tennis?

6   A.   Oh, he loves tennis and loved tennis, yes.

7   Q.   How passionate was he about playing tennis with you?

8   A.   Uhm, I think it was one of our favorite things we did

9   together, so I think he was passionate.

12:43 10        MR. SREBNICK:  Keith, could you put up Exhibit No. 83.

11   It's another photograph.

12   Q.   Is that also a picture at Willowbend?

13   A.   Yes.

14   Q.   Okay.  Is that you and dad?

15   A.   Yes.

16   Q.   Do you know more or less how old you were in that

17   photograph?

18   A.   I want to say I was like in high school then, so maybe

19   about fifteen, sixteen.

12:43 20   Q.   Okay.  Of all the people on the planet earth, who is the

21   person with whom you played most hours of tennis in your

22   lifetime?

23   A.   My dad.

24   Q.   Okay.  Now, did you play high school tennis?

25   A.   I did.

1    Q.   And tell us about your high school tennis activities at
2    Middlesex.
3    A.   Sure.  So I was on junior varsity tennis both my freshman
4    and sophomore year, and then junior year I played on varsity as
5    well as senior year.
6    Q.   Okay.  And do you know at what rank or what position you
7    played on the Middlesex varsity tennis team during your junior
8    and senior years?
9    A.   I believe I was number six, if I recall correctly.
12:44 10    Q.   Okay, does that mean six singles or six women who place --
11    A.   I think there was eight, and I was number six, if I recall
12    correctly.
13    Q.   Okay.  Did you play doubles as well?
14    A.   I did.  I played number three doubles, sometimes number
15    two.
16    Q.   Okay.  Would your dad come to watch you play at Middlesex
17    from time to time?
18    A.   He would, yes.
19    Q.   And tell the jury, Middlesex is a boarding school, right?
12:44 20    A.   Yes.  Middlesex is a nine through twelve boarding school
21    in Concord, Massachusetts and -- yeah.
22    Q.   And where was your dad living while you were in Concord,
23    Massachusetts, in boarding school?  Where did he live full
24    time?
25    A.   So when I was in high school, he lived in Stuart, Florida,

```
 1    for the majority of it, and then he lived in Palm Beach,

 2    Florida; but we also had a residence in Mashpee, Massachusetts,

 3    which was about, I want to say like an hour and 20 away from

 4    Middlesex, so it would be easy for him to, you know, drive to

 5    and from the games.

 6    Q.   While he was in Florida, it was a little more difficult,

 7    right?

 8    A.   Yes.

 9    Q.   Do you have a sister?

10    A.   I do.

11    Q.   And what is your sister's name?

12    A.   Alexandra Khoury.

13    Q.   And is she a tennis player?

14    A.   Yes.  She also played.

15    Q.   Was she as active a tennis player as you were?

16    A.   No.  I think it was, you know, she enjoyed playing, but it

17    wasn't -- I don't know.  I think it was more just a fun hobby

18    for her.

19    Q.   Okay.  Were you serious about tennis when you were in high

20    school?

21    A.   I was, yes.

22    Q.   Okay.  And did you like to compete?

23    A.   I did.  I thought it was a lot of fun.

24    Q.   Okay.  And how big a part of tennis was your dad part of

25    in terms of your feeling about tennis?
```

A.    Uhm, so like I said earlier, that was one of our favorite
things that we did together, so I guess the two could, you
know, go hand in hand growing up.  And I thought about tennis,
I thought about my dad, I thought about how wonderful he was at
the sport, and how much fun it was to play with him.

Q.    What is your mom's name?

A.    Melanie Khoury.

Q.    Okay.  Was Melanie a tennis player?

A.    No.

Q.    Okay.  Tell us about your experience at Middlesex.  How
did you like the school?  And tell us about the experience you
had there.

A.    Sure.  So Middlesex is, like I said earlier, a boarding
school.  It is about 350 kids in the entire school, nine to
twelve.  And I met, you know -- I'll start with the
positives -- I met some of the most incredible people there
that, you know, ten best friends I still talk to on a daily
basis.  And, you know, there were times at Middlesex that were
challenging for me in the sense that, you know, I moved away
from home when I was about fifteen years old, and I think
especially freshman year I was just sort of finding my -- my
footing.

      And I think a very important part of Middlesex is the
environment that they foster.  They emphasize a very strong,
well-rounded environment; and sort of what I mean by that is,

1    both students, in my opinion, and teachers are spread very

2    thin.  So all students were expected to play three sports a

3    year, fall, winter, spring.  And teachers would often be your

4    dorm parent, your coach, your math teacher, you know, whatever.

5    Everybody wore different hats, which I think, you know, classes

6    were held on Saturdays, and Saturday afternoons were reserved

7    for sporting meets, and then Sunday was sort of a free day, I

8    guess, the weekend.

9    Q.   How about the academic curriculum at Middlesex?  Easy,

10   hard, demanding?

11   A.   In my opinion, it was very difficult.

12   Q.   Okay.  What were some of the subjects that you found most

13   challenging?

14   A.   Math was really hard, I thought.

15   Q.   All right, what other subjects did you take at Middlesex?

16   A.   I took Chinese for four years.  I took biology,

17   trigonometry, a Jane Austin English class which I loved,

18   writing workshop.  You know, it was a very well-rounded

19   education, so it was five classes every semester, so --

20   Q.   And was it challenging to get high grades there?

21   A.   Yes.

22   Q.   Did you have or did you discover any learning challenges

23   that you had along the way?

24   A.   Uhm, specifically at Middlesex or --

25   Q.   At any time in your lifetime.

1    A.    Yes.

2    Q.    Why don't you tell us when you learned about it and --

3    A.    Yes.  Yes, so I...  So I have obsessive compulsive

4    disorder, and I have been struggling with that since I was

5    about eleven or twelve years old, where I would engage -- where

6    I would have obsessive thoughts and then engage in compulsions.

7         I think that if anyone in this room has it, or knows

8    someone that has it, can tell you what an excruciating mental

9    health issue it is to have.  I, you know, at first I didn't

12:50 10   know what it was because, you know, when you think of OCD, in

11   my opinion, you think of someone -- the stereotype, so someone

12   who obsessively and compulsively, like, washes their hands.

13   That's the stereotype I feel like used in every TV show, movie.

14   So I wasn't really able to identify that at the age of twelve.

15   I was sort of, like, why am I so anxious?  Why am I being

16   distracted in tests with obsessive anxious thoughts?  And it

17   wasn't until college that I realized it was OCD.

18   Q.    How did you discover that you were afflicted with OCD?

19   A.    So luckily I took psychology as my major, and I remember

12:51 20   that my freshman year, I want to say it was -- general psych

21   was the course because I remember it was freshman year that I

22   learned.  And they brought up intrusive obsessive thoughts, and

23   I thought -- when I was learning about it, I thought, "Oh, my

24   gosh," you know, "this sounds a lot like me and what I have

25   been dealing with for the past," you know, "how many years,

1    twelve years."

2         And so I remember in college it really spiked, and that's

3    not uncommon for about -- for women, OCD can spike in your

4    early twenties, and at a certain time in Georgetown, it had

5    become worse than ever, where I couldn't sleep, I couldn't eat;

6    my mom had to come down to Georgetown just to feed me and get

7    me to shower.  And it is through that psychology class, though,

8    that I read every single book and article on the Internet I

9    could about intrusive obsessive thoughts.

12:52 10        And when it got so bad I couldn't bear it anymore, there

11   was this author who I loved who wrote about OCD, and I called

12   her office.  She had an office about two hours away, Maryland,

13   and I Ubered there, and said, you know, "I need help."  And

14   that was the beginning of my journey to recovery.  At that

15   point I was in therapy five days a week for about two months

16   and just learning to live with this disorder.  And, you know,

17   it's something that will never go away.  You can go into

18   remission.  I still have that exact same therapist who I meet

19   with on Zoom once every couple of months.  But it's definitely

12:53 20   not what it used to be, and, you know, I'm grateful to first

21   and foremost, I guess, my psychology class, but then also my

22   doctors.

23   Q.   Looking back, did you feel like it affected your high

24   school experience as well?

25   A.   I think it affected almost all my experiences since I was

1    about twelve years old.

2    Q.   Okay.  Now, while you were in high school, the grades that

3    you achieved in high school, do you know what your class rank

4    is, or did Middlesex provide a class rank?

5    A.   I'm not sure what my class rank was.

6    Q.   Okay.  Do you remember your grade point average in high

7    school graduating, more or less?

8    A.   Uhm, 2.9.  I'm not sure.  That was a guess.

9    Q.   Okay.  And at Georgetown, do you remember your grade point

12:54 10   average when you graduated from Georgetown?

11   A.   3.38.

12   Q.   Okay, that's out of 4.0?

13   A.   Yes.

14   Q.   Okay.  So that's a B-plus average to an A-minus?

15   A.   Yes, yes.

16   Q.   That's after four years at Georgetown?

17   A.   Yes.

18   Q.   I want to talk to you about Middlesex tennis.  You were

19   telling us a little earlier.  Do you remember your coach from

12:54 20   Middlesex?

21   A.   Yes, I do, Ms. Holcombe.

22   Q.   Okay.  Was she a tennis instructor in her capacity as

23   coach?  Did she actually teach you how to play tennis?

24   A.   No.  She more so ran drills.  And, you know, it's eight

25   girls, and we're all in different courts, and so she would sort

1    of walk around and look at our game and the way it was

2    progressing.  But as far as instructions on my technique and my

3    strokes and my footwork, I don't recall ever having one-on-one

4    time with her to discuss those things and, uhm, yeah.

5    Q.    So in addition to your dad, who else provided you tennis

6    instruction to help you develop your game?

7    A.    Andy Berler at Willowbend.

8    Q.    Okay.  And tell us about your interactions with Coach

9    Berler.

12:55 10    A.    Coach Berler I thought was an excellent coach.  I grew up

11    from, I want to say the age of about ten to fourteen playing

12    with him three hours every day.  That's just a guess, you know,

13    for the ages.  I continued to practice in high school with him

14    every single summer, him and his team of people.  And he would

15    really, you know, we would hit serves for two hours at a time,

16    work on my strong points, my weak points, and he would instruct

17    me on those techniques.

18    Q.    So the summertimes, was that a time when you concentrated

19    more on tennis than during the school year in high school?

12:56 20    A.    Yes, because we had to play -- so, for example, I played

21    cross-country in the fall and then squash in the winter, so

22    there is a three-sport mandatory at Middlesex.

23    Q.    At Middlesex, you could not play tennis all three seasons?

24    A.    No.

25    Q.    Okay.  But what about the summertime, what were you able

1    to achieve in terms of tennis practice in the summertimes?

2    A.   I would play all the time in the summertime.  You know,

3    specifically with my dad, Coach Berler and Coach Berler's team

4    is when I really was able to -- you know, I would walk out of

5    the summer season being the best I'd ever been in tennis.  And

6    then, you know, school starts, cross-country starts, and

7    there's sort of less time to hone those skills.

8    Q.   So between the end of August when summer is over until

9    tennis season at Middlesex, which started when?

12:57 10   A.   So it started, like, March.

11   Q.   Okay.  How much tennis were you able to get in during the

12   months that tennis season was not in play?

13   A.   So I, you know, I remember, I want to say it was junior or

14   senior year, my dad pulled me out several times to practice at

15   a local country club near Concord just to, you know, brushing

16   up on my skills, to not let my game suffer too much.  But I

17   don't recall, I don't know, I forget the exact amount of time I

18   was able to play.

19   Q.   Okay.  In the summertime, was it an activity several days

12:57 20   a week?  Or just tell us more or less what it was.

21   A.   Yes, several days a week for a couple hours each day.

22   Q.   Okay.  Now, while you were in high school, did you

23   participate in very many tournaments, USTA tournaments?

24   A.   No.

25   Q.   Okay.  Did you participate in any ITF tournaments?

1    A.    No.

2    Q.    Okay.  So it's fair to say you did not develop a profile

3    on the Internet regarding your tennis play other than your high

4    school performance, correct?

5    A.    That is fair to say.

6    Q.    Okay.  And on your tennis team, were there competitors on

7    your team that could beat you on the tennis court?

8    A.    Yes.

9    Q.    Okay.  There was the number one and number two, for

12:58  10   example.  Would they be able to play a match against you and

11   win more often than not?

12   A.    Yes.

13   Q.    Okay.  How about your dad?  When you guys would play

14   against each other, would you ever play a few sets and compete

15   against each other?

16   A.    Yeah.  He won always, but --

17   Q.    Did you ever get a game off him, at least?

18   A.    Maybe, but I'm sure there was a rematch.

19   Q.    All right.  Katherine, I'd like to ask you now about the

12:59  20   process of applying to college.

21   A.    Okay.

22   Q.    And so that we go into the -- your junior year, you have

23   to take standardized exams?

24   A.    Sorry.  Yes.

25   Q.    Tell us about how much fun it is to take the SAT four

1    times.

2    A.    Not that fun.

3    Q.    Okay.  So tell us about the efforts you made to try to do

4    as well as you could on the standardized tests.

5    A.    Right, like you pointed out, I took them four times.

6    Especially my math section was, you know, not great.  And so,

7    you know, I took them four times, and I studied from, you know,

8    standardized test books and with tutors and did practice

9    questions in hopes of, you know, boosting those scores.

12:59 10    Q.    Okay.  Did you have any particular schools, colleges I

11    mean, that were of interest to you while you were a junior in

12    high school that you were thinking about where you'd like to go

13    to college?

14    A.    Yes.  So I really loved Boston College.  I loved

15    Northeastern.  So one of the reasons why is I love the

16    Northeast.  I love Massachusetts.  Even though Middlesex had up

17    and downs, you know, New England and Boston and Concord are

18    beautiful cities where I was very lucky to spend four years.

19    And I thought, you know, I can see myself being here long term,

01:00 20    you know, and that sort of sparked, you know, I mean, many

21    reasons.  BC is an excellent school, and I also did like that

22    it was a Jesuit college.  Obviously Georgetown is too, but I

23    thought that spirituality aspect of it was very nice.  So, yes,

24    I was thinking -- I would say BC was my first choice back then.

25    Q.    You mentioned Northeastern.

```
 1   A.    Yes.
 2   Q.    Who in your family had gone to Northeastern?
 3   A.    My grandfather.
 4   Q.    Okay, so was that a favorite of his?
 5   A.    Uhm, I mean, it didn't hurt that he went there, but
 6   Northeastern is also an incredible school who's, yeah, doing
 7   amazing things.
 8   Q.    Had you thought about Georgetown in that time period?
 9   A.    I had not, no.
10   Q.    Okay.  So when was the first time that the idea of
11   applying to Georgetown came to your attention or you started
12   thinking about Georgetown?
13   A.    The first time Georgetown was even on my radar is when
14   Gordon Ernst asked me how I would like to play tennis at
15   Georgetown.
16   Q.    Tell us about that.  Where did that occur?
17   A.    That occurred -- my family was throwing a 4th of July
18   party.  Obviously, my dad and Gordon Ernst played together on
19   the tennis team at Brown and, you know, I guess remained
20   friends or friendly.  And he was at that party, and, you know,
21   he said to me, "How would you like to play tennis at
22   Georgetown"?
23   Q.    Had you even thought about playing collegiate tennis up
24   until that point?
25   A.    No.
```

1   Q.   Okay.  Had your dad talked to you about playing collegiate

2   tennis?

3   A.   No, not really.

4   Q.   Okay.  So had you ever met Gordon Ernst before the

5   July 4th party at your house?

6   A.   No.

7   Q.   Okay.  And how did he introduce himself to you, or who did

8   you think he was, or how did that happen?

9   A.   He basically said, you know, "I'm Gordie Ernst, a friend

01:02 10   of your dad's.  I'm a tennis coach at Georgetown, and, you

11   know, you should -- like, have you ever thought about playing

12   tennis at Georgetown?  It could be fun."

13   Q.   And what did you tell him?

14   A.   I said, "Wow, that sounds amazing.  I would love that, but

15   I don't think I'm good enough."

16   Q.   And what did he say?

17   A.   He said, "Well, you know, train hard, and maybe you

18   could --" he said basically, "If you up your training and, you

19   know, train harder than you ever have before that, you know,

01:03 20   there's a chance that you could be on the team."

21   Q.   This is July 4th party of 2014?

22   A.   Yes.

23   Q.   Okay.  And this is, of course, the summertime.  You're at

24   home from school at that point?

25   A.   Yes.

1    Q.   Okay.  Can you recall anything else that you discussed

2    with Coach Gordon Ernst at that July 4th party?

3    A.   No.

4    Q.   Okay.  Did you describe for the coach your tennis skills

5    or anything about your tennis game?

6    A.   Like I said, I told him that, uhm, you know, "It sounds

7    amazing, but I don't think I'm good enough."  And I don't

8    recall exactly what I said, but I probably did give him my

9    ranking at that time to show, you know, "I'm not a 5-star

01:04 10   recruit, if that's what you're thinking."

11   Q.   Okay.  After Coach Ernst encouraged you to think about

12   tennis at Georgetown, did you?

13   A.   I did, yeah.  I was very excited by the idea.

14   Q.   Okay.  And with whom did you share that enthusiasm?

15   A.   My dad, my mom.

16   Q.   Okay.  And what did mom and dad say about that?

17   A.   They said, "Wow, it would be amazing, but you're going to

18   have to amp up your game."

19   Q.   So did you amp up your game that summer?

01:04 20   A.   I did, yes.

21   Q.   Tell the jury what you did to amp up your game.

22   A.   So I remember, so at that point my family was still living

23   in Florida.  So when we would go home, I would train with my

24   dad for, I want to say it was like two hours in the morning,

25   two hours in the evening every single day for a couple weeks;

1    and for the rest of that summer, you know, I played more than I

2    ever had.

3    Q.   And what was motivating you to amp up your game?

4    A.   The thought of hopefully being good enough to, you know,

5    be recruited by Georgetown.

6    Q.   Did you think you'd be walking on the Georgetown team and

7    taking a position, number one on the Georgetown team?  Is that

8    something you --

9    A.   No, I -- you know, when I was talking to my dad about it

01:05 10   later being, you know, sort of saying, you know, "I don't want

11   him to get the wrong idea here.  Like, I'm not a superstar

12   tennis player.  I love it.  I played all my life.  I think I

13   could carry my own with more training."  And, you know, it was

14   expressed to me that I could potentially be a red shirt, which

15   is someone that maybe doesn't compete but attends practices and

16   could maybe compete if they stuck with their training and

17   become, you know, good enough to play in competitions one day.

18   Q.   The term "red shirt," was that a term you may have heard

19   from your dad or Gordie Ernst or both?

01:06 20   A.   So that was a term I heard from my dad, who possibly heard

21   it from Gordie Ernst.  I don't know.

22   Q.   Okay.  So did you apply to Georgetown?

23   A.   I did.

24   Q.   Okay.  And during the application process, did you have

25   any further contact with Gordon Ernst?

1   A.   Uhm, no, I don't believe I did, but I think my dad -- or I

2   know my dad and my college counselor, Matthew DeGreeff, did.

3   Q.   All right.  Did you share with Matthew DeGreeff, your

4   college counselor, your interest now in Georgetown?

5   A.   I did, yes.

6   Q.   Okay.  Did you tell him about the conversation you'd had

7   with Coach Ernst?

8   A.   I did.

9   Q.   Okay.  And what did your college counselor tell you about

01:07 10   the idea of you trying to be on the Georgetown tennis team?

11   A.   He thought it was a great idea and said he would help in

12   any way he could, and he was helpful.

13   Q.   Did you ever discuss this with your high school coach,

14   Coach Holcombe?

15   A.   I don't recall if we ever -- I don't remember.  I'm sorry.

16   Maybe.

17   Q.   Okay.  Timewise, that would have been the fall of -- you

18   would be applying in the fall of 2014, right?

19   A.   Right.

01:07 20   Q.   That would be the month where you're not in tennis season,

21   correct?

22   A.   Right.

23   Q.   So you were not playing tennis as a competitor in high

24   school during those months because tennis was not in session,

25   correct?

1    A.    Correct.

2    Q.    Okay.  Did you have any other contact with Coach Holcombe

3    during that time period?  Was she a teacher of yours that

4    semester, if you remember?

5    A.    No.  So my relationship with Ms. Holcombe sort of -- she

6    was actually my dorm parent in my freshman year dorm, but, like

7    I said, I took Chinese in high school, and she was a Spanish

8    teacher, so besides tennis and freshman year her being a dorm

9    parent, I never took a class from her.

01:08  10   Q.    Did you ask her to do anything to support your application

11   as your tennis coach?

12   A.    I believe I asked for a letter of recommendation, but I

13   can't recall.

14   Q.    Okay.  Do you know whether she spoke to the coach at

15   Georgetown or had any other involvement in your application

16   process?

17   A.    I don't know.

18   Q.    Okay.  Now, when you were thinking about tennis at

19   Georgetown, did you have a vision of what life would be like on

01:08  20   the tennis team at Georgetown?

21   A.    Yes, I did.  I sort of thought it -- you know, in my mind,

22   I was not under the impression that I would walk in and

23   dominate and beat everyone there; but, you know, for me, tennis

24   has always been so much fun, and I thought with the opportunity

25   of being a red shirt, I would, A, meet really cool people and

1    get to play and practice and learn from them.  And, you know, I

2    know that Georgetown had a couple 5-star recruits that year, so

3    I could maybe practice with them and learn from them and cheer

4    them on at matches.  And so as far as tennis in Georgetown,

5    that is sort of, you know, what I pictured.  I thought it would

6    be a great experience.

7    Q.    When you talk about cheering them on, do you recall that

8    peer support was an activity of yours at Middlesex?

9    A.    Yes.

01:09 10    Q.    Tell us about that.

11    A.    So peer support, basically when you are a senior at

12    Middlesex, they'll, you know, assign you a responsibility, and

13    I was chosen for peer support, which I was honored.  In my

14    opinion, I think it's one of the most important jobs where you

15    basically are a mentor to freshmen, which is, you know, a big

16    task.  You have a bunch of scared fourteen-year-olds away from

17    home for the first time, and you're there to be their guide and

18    sometimes a shoulder to lean on.  And I can talk to the group

19    called Choices with some of the faculty members where we would

01:10 20    sort of sit around one of our teacher's houses -- I know,

21    boarding school is weird like that -- but we'd go to their

22    house, and basically we would discuss with them their future at

23    Middlesex and the importance of, you know, being kind to

24    people, being respectful and making good choices, not just

25    academically but for their own personal growth.

```
 1                THE COURT:  Let me ask you, it's ten past.  About how
 2       much longer?  I'm assuming --
 3                MR. SREBNICK:  Yeah, we're going to go way past lunch,
 4       yes.
 5                THE COURT:  All right, I think lunch is here, so we'll
 6       break and I'll -- hopefully we'll be back around quarter of is
 7       what my hope is.  Okay, thank you.
 8                MR. SREBNICK:  Good.
 9                THE CLERK:  All rise.
01:11 10          (Jury excused.)
11                THE COURT:  Thank you.  You can step down.  Don't talk
12       to anyone about your testimony, all right, during lunch.  All
13       right, thank you.
14                So how much longer do you think you might have?
15                MR. SREBNICK:  About 45 minutes.
16                THE COURT:  Say we get in around quarter of, and then
17       what?  And how long do you think you'd be, maybe?
18                MR. MARKHAM:  I don't know what the witness is going
19       to say, so it's really hard to tell, but not 45 minutes
01:12 20      certainly.
21                THE COURT:  More or less?
22                MR. MARKHAM:  Oh, much less.
23                THE COURT:  All right.  Okay, so then who?
24                MR. SREBNICK:  I think Mr. Black is calling --
25                MR. BLACK:  Mr. Trump and then Mr. Reed.
```

```
 1           MR. SREBNICK:  And then I'll be calling --
 2           THE COURT:  Oh, so there's no way we're finishing
 3      today.  I don't know what you were saying before.
 4           MR. BLACK:  Well, things changed regarding --
 5           MR. SREBNICK:  Availability, so you're right, we're
 6      not going to finish by today.
 7           THE COURT:  We're not finishing today, but we will
 8      have the charge conference this afternoon.  So do you think
 9      that you're going to -- I'm just trying to think it through,
10      whether it will spin over into tomorrow, most likely if you
11      have those two witnesses on.
12           MR. SREBNICK:  Yes, and we still have the grandfather,
13      Mr. Khoury, Sr., and we have the summary witness, both of whom
14      will be brief.
15           THE COURT:  All right, so -- and then at some point I
16      will also -- can I just see you at sidebar for one minute, and
17      then everybody else can be seated.
18      SIDEBAR CONFERENCE:
19           THE COURT:  It's my practice at some point of asking
20      Mr. Khoury what his choice is.  At least you've been telling me
21      it's unlikely he was going to, but of course he has the right
22      to change his mind at any minute.
23           MR. BLACK:  We agree it's a good idea.
24           THE COURT:  So when should I do it?
25           MR. SREBNICK:  I would propose when all the evidence
```

1    is in for the record would be best.

2         THE COURT:  I don't want to do it in front of the jury

3    is the thing.  So can you script that a little for me because I

4    usually do ask them on the record, or at least ask you on the

5    record with him sitting there one way or the other.  And then

6    we may actually have closing arguments tomorrow.

7         MR. BLACK:  Yes.

8         THE COURT:  I would charge the next day.  I'm not sure

9    at this point because I don't know yet -- we'll have to figure

01:14 10   that out -- whether I could do them all on the same day.

11        MR. SREBNICK:  Has your Honor ever charged before

12   doing closing arguments so that the lawyers can have the

13   benefit of the law to do closing arguments?  I've done that in

14   many places.

15        THE COURT:  I have, but I may not be prepared.  Given

16   the hundreds of objections that you launched, you're out.

17        MS. PERCZEK:  It was not me.

18        MR. SREBNICK:  I'd take as much blame as you'd like to

19   dish.

01:15 20        THE COURT:  It's just overwhelming, the amount, and it

21   came in last night, and I didn't get a chance to look at it

22   until this morning, so I don't know that I'd be ready to do

23   that.  Yes, I've done that before but not like this, so --

24        MR. SREBNICK:  So we'll play it by ear, but I'd like

25   the Court to at least consider that, given the complexity of

1     these statutes.

2          THE COURT:  Given the complexity of your objections, I

3     don't know that I would be ready, but I will give you -- if

4     there's certain things, I'll give big-picture things like, yes,

5     I'll probably have to do something on statute of limitations;

6     yes, I'll probably agree with you that this case shouldn't go

7     up or down on the overt acts issue.  And then there are a few

8     that I might not give, but I don't know that I'll have a full

9     written charge to give at that point.  I mean, you've objected,

01:15 10    and it could take me hours just to read it, so --

11          MR. SREBNICK:  The whole *Bravo-Fernandez* issue is

12     complicated.  Bribery versus gratuity is an important

13     distinction that --

14          THE COURT:  I understand that, and you're making my

15     point.

16          MR. SREBNICK:  Yes, yes, for sure.  We're not in any

17     rush.

18          MR. MARKHAM:  Your Honor, one point.  We got the

19     reverse *Jencks* materials from the defense while Ms. Khoury was

01:16 20    on the stand.  I anticipate they're going to be saying that

21     Amin J. Khoury, the father, which means we would have to move

22     the Court for a break in the middle --

23          MR. SREBNICK:  Nothing on the grandfather.

24          MR. MARKHAM:  The grandfather has not made a single

25     statement about this case to you?

 1            MR. SREBNICK:  In writing?  No, none in writing.  His

 2    text message "Meet me in the lobby for breakfast," I'm not sure

 3    that you want that, but I'll go through them if that's

 4    important to you.

 5            MR. MARKHAM:  Yes.

 6            MR. SREBNICK:  Okay.  And then we turned over the

 7    balance of the texts that we have as to Katie or Katherine

 8    Khoury and her dad.  That's all I have.

 9            MR. MARKHAM:  Yeah, I have no idea what's in that.

01:16 10    I'll check it out at lunch.

11            MR. SREBNICK:  Thank you, Judge.

12            (Noon Recess, 1:16 p.m.)

13            (Resumed, 2:00 p.m.)

14            THE CLERK:  All rise.

15            (Jury enters the courtroom.)

16            THE COURT:  Thank you.  You may be seated.

17            MR. SREBNICK:  Ready?

18            THE COURT:  Yes.

19    BY MR. SREBNICK:

02:00 20    Q.    Katherine, I wanted to focus on the time period of the

21    application period to college in the fall of 2015.

22    A.    Okay.

23    Q.    2014, excuse me.  Did you consider applying to Wesleyan

24    University?

25    A.    I did.

1    Q.    And tell us what decision you made about whether or not to

2    apply to Wesleyan.

3    A.    So in the end, I actually did not apply, but I was -- if I

4    remember correctly also thinking about playing tennis at

5    Wesleyan.

6    Q.    Okay.  Did your dad have a relationship with the coach at

7    Wesleyan, if you recall?

8    A.    I don't recall.

9    Q.    Okay.  Wesleyan is Division III?

02:00 10   A.    Yes.

11   Q.    Whereas Georgetown is Division I?

12   A.    Yes.

13   Q.    Where else were you thinking of applying?  I think you

14   said Boston College, right?

15   A.    Yes.

16   Q.    Northeastern?

17   A.    Yes.

18   Q.    Were there any other schools, to use your phrase, on the

19   radar during that time period that you actually thought about

02:01 20   even if you didn't apply?

21   A.    So I mean, at that point I was still exploring, like, all

22   my options about where I could see myself for the next four

23   years.  And I remember clearly that those were my top choices,

24   but I want to say that while maybe I was thinking about other

25   schools and looking at other schools, those were my main

     1    interests.
     2    Q.    Let me ask you if you remember a person by the name of
     3    Donovan, Tim Donovan?  Does that name -- did that name ring a
     4    well, or does it ring a bell?
     5    A.    Yes.  I remember that he was a tennis coach who was in
     6    communication with I think my mom and dad about sort of what I,
     7    you know, needed to do tennis wise for a better shot at getting
     8    in at Georgetown.  And I think maybe they also updated him on
     9    my SAT scores.  I forget, but I never had any communication
02:02 10    with Tim Donovan.
    11    Q.    You don't recall ever meeting him in person?
    12    A.    Not that I recall.
    13    Q.    You don't recall talking to him on the phone?
    14    A.    No.
    15    Q.    Okay.  So do you recall more or less when it was -- well,
    16    did you ever meet anyone from Georgetown that visited
    17    Middlesex?
    18    A.    I did.  I met Meg Lysy.
    19    Q.    And who did you understand Meg Lysy to be?
02:02 20    A.    An admissions officer at Georgetown.
    21    Q.    Okay.  And how did you come to meet Meg Lysy at Middlesex?
    22    A.    So Middlesex will arrange for admissions officers to come
    23    to campus, and basically anyone who's interested in that
    24    particular college will then go meet with that admissions
    25    officer.  So I want to say it was about me and six other of my

1    peers went to go talk to Ms. Lysy.

2        I almost want to call it more of a meet-and-greet because

3    I, you know, didn't have the opportunity to really talk

4    one-on-one with her.  And I did send her a follow-up email

5    thanking her for coming to Middlesex, and it was lovely to meet

6    her.

7    Q.   Okay.  Did you actually have a chance to actually speak to

8    her one-on-one, or it didn't come to that?

9    A.   I remember, you know -- it's a group of kids, and I

02:03 10   remember we talked about her kids for a little bit, her and I

11   briefly.  And, you know, she sort of just gave an overview on

12   Georgetown and the requirements and, you know, what

13   Georgetown's values are, that type of thing.  And then it was

14   done.

15   Q.   Did you ever communicate any information to Meg Lysy about

16   tennis, if you recall?

17   A.   Not that I recall.

18   Q.   So after you submitted your application to Georgetown, do

19   you recall receiving a letter from Georgetown indicating that

02:04 20   you were likely to be admitted?

21   A.   I do recall.

22       MR. SREBNICK:  If we could publish Exhibit -- I think it's

23   Exhibit 35.

24   Q.   Okay.  Do you see it on the screen, December 9, 2014?

25   A.   I do.

1    Q.    And do you recall receiving this letter?

2    A.    Yes.

3    Q.    And do you recall your reaction to receiving the letter?

4    A.    I was really excited.

5    Q.    Okay.  The letter says that, "The Committee on Admissions

6    has conducted an initial review of your application to the

7    class of 2019 at the request of Mr. Gordie Ernst, tennis coach.

8    I am pleased to report that the committee has rated your

9    admission as likely."  Do you see that it then says that

02:05 10    typically means you have a greater than 95 percent chance of

11    being admitted?

12    A.    Yes.

13    Q.    Okay.  And that Georgetown had said that there were 1,580

14    spaces for that class?

15    A.    Yes.

16    Q.    And Georgetown was expecting 20,000 candidates for that?

17    A.    Mm-hmm.  Yes.

18    Q.    So did you understand that there was a really high

19    likelihood, better than 95 percent, you'd be one of the 1,580?

02:05 20    A.    Yes.  That's why I was so excited.

21    Q.    And did you understand it was because of the coach -- I'll

22    use a baseball analogy -- going to bat for you?

23    A.    Yes.

24    Q.    Okay.  So that's December 9 of 2014.  After that date, did

25    you apply to any other schools, if you recall?

```
 1    A.    I don't believe so.

 2    Q.    When did you -- did you apply to Boston College

 3    eventually?

 4    A.    I did.

 5    Q.    Do you remember when that was?

 6    A.    Or maybe that was -- I'm sorry.  I forget the exact date

 7    that I applied.

 8    Q.    Okay.

 9          MR. SREBNICK:  I'm going to offer Exhibit ON.  Let me

10    check with government counsel.

11          Your Honor, let me just use it to refresh.  Your

12    Honor, if I could approach the witness just to refresh her

13    recollection.

14    Q.    Take a look at what I've put before you, ON, and see if

15    that reminds you more or less when it was that you submitted

16    your application to Boston College.

17    A.    December 28, 2014.

18    Q.    Is that when Boston College acknowledged receipt of your

19    application?

20    A.    Yes.

21    Q.    Okay.  Thank you.

22          So some time shortly before December 28, 2014?

23    A.    Yes.

24    Q.    By the way, were those applications electronic, or did you

25    have to mail them in, or do you remember?
```

```
 1    A.   So yes, the common app is electronic.

 2    Q.   So you just upload it and on its way?

 3    A.   Right.

 4    Q.   And you get an automated response telling you --

 5    confirming it got there?

 6    A.   Yes.

 7    Q.   And so that's December 28, 2014.  That's after you've

 8    already been told by Georgetown that you are 95 percent-plus

 9    likely to be accepted for the fall of 2015, right?

02:07 10    A.   Right.

11    Q.   At that point in time, in the Christmas holidays, had you

12    made up your mind which of the two schools you'd prefer to go

13    to?

14    A.   No.  I was still -- I mean, I was very excited about

15    Georgetown.  But like I said earlier, I loved Boston College.

16    I think it's gorgeous.  The campus is wonderful.  I put an

17    emphasis on the Jesuit school of study before.  So yes -- it

18    was -- they were both -- I loved them both.  I actually did not

19    have to make that decision because I either got wait listed or

02:08 20    rejected from Boston College.

21    Q.   Okay.  What about Northeastern?  You submitted an

22    application to Northeastern?

23    A.   Yes.

24    Q.   Did you go through it, or did you eventually withdraw it?

25    A.   I eventually withdrew it.
```

```
 1    Q.   And when did you withdraw it, if you recall, and why?

 2    A.   I don't recall when I withdrew it.

 3    Q.   Okay.  Do you recall receiving a letter from Georgetown in

 4    March telling you you'd been officially accepted?

 5    A.   Yes.

 6              MR. SREBNICK:  Keith, could we publish No. 35?

 7              MR. BRETT:  38.

 8              MR. SREBNICK:  What number is it?

 9              MR. BRETT:  38.

10              MR. SREBNICK:  38.  Excuse me.  38.

11    Q.   Now, do you see this letter is March 26, 2015?

12    A.   Yes.

13    Q.   And do you see it's from -- if we just scroll down just a

14    little bit -- it's from Charles Deacon, the Dean of Admissions

15    at Georgetown?

16    A.   Yes.

17    Q.   Okay.  And so this was the letter officially inviting you

18    to enroll at Georgetown, right?

19    A.   Yes.

20    Q.   Okay.  And what was your reaction to getting that letter?

21    A.   I was so happy.

22    Q.   Okay.

23              MR. SREBNICK:  Is the enrollment right behind it?

24              MR. BRETT:  No.  The enrollment would be 80.

25    Q.   Do you recall having received the invitation to attend,
```

```
 1  that you actually went ahead and sent in your deposit to enroll
 2  at Georgetown?
 3  A.   Yes.
 4       MR. SREBNICK:  And, Keith, if you could put up number
 5  80.  If we'd go to the next page.  If you'd scroll down.  Stop
 6  right there.
 7  Q.   Do you see that Georgetown requires that you enter into an
 8  agreement, like a contract, that you're going to attend
 9  Georgetown?
10  A.   Yes.
11  Q.   Okay.  And they ask for a $900 deposit.  Do you see that?
12  A.   Yes.
13  Q.   Okay.  And as part of that, you had to take an honor
14  pledge, middle of the page, right in the middle of the page.
15       MR. SREBNICK:  Next one down.  There you go, Keith.
16  Q.   Do you see that's your signature?
17  A.   Yes.
18  Q.   And it's dated April 13 of 2015?
19  A.   Yes.
20  Q.   Okay.  At this point you're a senior in high school.
21  You've got about -- what, about six weeks to go before you're
22  done with your high school, right?
23  A.   Right.
24  Q.   Did there come a point in that time period where there was
25  an episode where you were at a restaurant drinking champagne?
```

```
 1    A.    There was.

 2    Q.    Tell us about that.

 3    A.    I used a fake ID, which I'm not proud of, in April of 2015

 4    with my sister and a good friend.  And, you know, we were

 5    celebrating getting into college and stuff and made a mistake

 6    of using a fake ID at a restaurant off campus.

 7    Q.    And did you have an alcohol beverage, wine or champagne or

 8    something like that?

 9    A.    Yes.  I think it was a glass of Prosecco.

10    Q.    Okay.  And for a glass of Prosecco, what happened?

11    A.    So I was suspended for, I want to say, five days.

12    Q.    Okay.  How did it all come about?  Was there somebody who

13    saw you there?  Tell us what happened that came to your

14    attention you were in trouble at the school.

15    A.    So I -- if memory -- if I'm recalling correctly, somebody

16    who worked at the restaurant knew one of the teachers at

17    Middlesex and just sent a photo of our ID -- of our IDs to them

18    because they thought we looked young.

19    Q.    Okay.  And who contacted you from Middlesex to say that

20    this was an issue for Middlesex?

21    A.    I believe my advisor, Carmen Beaton.

22    Q.    Okay.  At that point in time, did Middlesex tell you there

23    were going to be consequences for using a fake ID to buy

24    Prosecco?

25    A.    Yes.
```

1    Q.    Okay.  And what did you understand those consequences

2    would or could be?

3    A.    Suspension.

4    Q.    Did that concern you in terms of how it might affect

5    whether you would be able to attend Georgetown in the fall?

6    A.    Oh, yes.  I thought, Oh, my God.  I can't believe I acted

7    so stupidly and I almost blew my chances at, you know, what

8    were the best four years of my life.  But back then, I was just

9    like, I can't believe I acted so dumb, poorly.

02:13 10   Q.    Were you upset?

11   A.    Very.

12   Q.    Nervous?

13   A.    Yes.

14   Q.    Anxious?

15   A.    Yes.

16   Q.    Did you communicate that state of mind to your family?

17   A.    I did.

18   Q.    How did your parents react to these -- these events?

19   A.    I mean, they were, of course, disappointed and angry.  I'd

02:13 20   made a bad decision.  And, you know, to be honest, it was my

21   first time getting in trouble -- in trouble at Middlesex, which

22   made it all the more terrifying because, you know, it went from

23   never being in trouble to sort of, you know, being suspended.

24   So I was scared and shocked, also, at my own behavior.  And I

25   think my parents were, too.  And, yeah, I definitely told them

```
  1   how nervous I was.
  2   Q.   As a result of the suspension, were you able to
  3   participate in the graduation ceremony?
  4   A.   No.
  5   Q.   But you were able to graduate?
  6   A.   I was able to graduate.
  7   Q.   Did you have any interaction with Georgetown about the
  8   discipline that had occurred at Middlesex and if it would
  9   affect your ability to attend in the fall?
02:14 10   A.   Yes.  So I actually wrote Meg Lysy an apology letter,
 11   telling her how gravely sorry and regretful I was for my
 12   actions and that, you know, I would anything to prove that I'm
 13   not that reckless person.
 14   Q.   And you sent that to the admissions officer, Meg Lysy?
 15   A.   Yes.
 16   Q.   And at the end of all of that interaction, did Georgetown
 17   take any action against you to prevent you from attending in
 18   the fall?
 19   A.   No.  I had to meet at the conduct office when I arrived at
02:15 20   Georgetown.  And, you know -- I don't know if I was on
 21   probation then, but I never got in any sort of trouble at
 22   Georgetown.  So I had one meeting, and then that was done.
 23   Q.   Now, when you found out that you were having the issue
 24   with the suspension at Middlesex, at that point in time, had
 25   you been admitted to any other school?
```

            1    A.    No.

            2    Q.    At Boston College, you were not accepted there, correct?

            3    A.    Right.

            4    Q.    And you had withdrawn your application to Northeastern,

            5    right?

            6    A.    Right.

            7    Q.    So it was Georgetown or really no other option at that

            8    moment in time?

            9    A.    Right.

02:15      10    Q.    And so did that increase the amount of stress surrounding

           11    these events?

           12    A.    Yes.

           13          MR. SREBNICK:  One moment.

           14    Q.    Let me ask you a few questions about Boston College and

           15    that application process.

           16    A.    Mm-hmm.

           17    Q.    Do you recall meeting with a Mario Gabelli from Boston

           18    College, a trustee?

           19    A.    Yes.

02:16      20    Q.    Tell the ladies and gentlemen of the jury about the

           21    interaction with Mario Gabelli.

           22    A.    So this was years ago.  So to be honest, I don't really

           23    recall.  I remember meeting with him and telling him my

           24    interest in Boston College and telling him how much I would

           25    love to attend.  And that it's always been, you know, a dream

```
 1    of mine to go to BC, which, you know, it was, since I was
 2    probably like in the 6th grade.  And that's the extent I
 3    remember of that conversation.
 4    Q.   Was your grandfather with you, if you recall?
 5    A.   Yes, he was.
 6    Q.   The three of you together; you, grandfather, and Gabelli?
 7    A.   I believe so.
 8    Q.    As a consequence of the suspension, did you have to miss
 9    some of the tennis matches that you were scheduled to
02:17 10    participate in, if you recall?
11    A.   I believe so, yes.  I mean, it was during tennis season.
12    This was April, yeah.  So it was -- I don't -- so I believe I
13    was suspended four or five days.  I don't recall when the
14    suspension started and ended exactly.
15    Q.   But if there was a match during that suspension period --
16    A.   I wouldn't.  Yeah, I can't play in it.
17    Q.   Katherine, I want to talk to you now about some of your
18    family circumstances that arose in -- in May of 2015.  This is
19    after you've been accepted at Georgetown, and you've already
02:17 20    enrolled with that form we talked about.  Do you know what time
21    period I'm talking about?
22    A.   Mm-hmm.
23    Q.   During the months of April and the first week of May, your
24    parents, Melanie and Amin, did you understand them to be still
25    married and living as a family?
```

1    A.    I did until like the second week of May.

2    Q.    Tell the ladies and gentlemen of the jury what you learned

3    in the second week of May.

4    A.    So in the second week of May, I was actually at a tennis

5    match.  I believe it was a match, not a practice.  And my mom

6    had flown from Florida to Middlesex, which wasn't uncommon.

7    She liked to visit us a lot.  But, you know, I could tell

8    something was wrong.

9         And we -- after that, she sort of took me to my grandma's

02:18 10   house and explained that there was a reason for this visit and

11   basically told my sister and I that my dad no longer wanted to

12   be married to her, and that they were getting a divorce.

13   Q.    Up until that moment in time, did you have any idea that

14   your parents were divorcing?

15   A.    No.

16   Q.    Okay.  How did the news affect you?

17   A.    You know, I was, of course, I think like any -- I don't

18   believe any divorce is easy.  And even though I was 17, 18 at

19   the time, I was still, I think more than anything, shocked and

02:19 20   then, you know, distressed and distraught, kind of thought

21   that -- sort of like how could I have been that off?  How did I

22   not know?

23        And it was, you know, very hard, especially on my mom.

24   And my sister's a year younger than me, so I've always been,

25   like, her protector, I think.  And, so, you know, it was hard

1    on all of us.

2    Q.   How did it affect your feelings towards your father?

3    A.   I was really very angry with him for that decision to

4    leave the marriage.

5    Q.   And how did you express yourself to your dad?

6    A.   With tears and anger and some mean words.  I had lost

7    respect for him at that moment in time and was -- yeah, I felt

8    betrayed.

9    Q.   How was your mom handling it?

02:20 10   A.   She was not handling it well at all.  She -- you know, it

11   broke her, for lack of a better word.  She's still not

12   completely healed.  She -- you know, I think it's interesting

13   things could change over the course of one day.  And one day

14   what I thought was my family unit changed, and also in the

15   sense where I felt like I had to step up and do the work that

16   my dad couldn't do then, and that was to put my mom back

17   together.

18   Q.   Do you recall expressing hatred toward your father?

19   A.   Yes.

02:21 20   Q.   And did you communicate that to him?

21   A.   Yes.

22   Q.   And did you communicate that to him in writing?

23   A.   Yes.

24        MR. SREBNICK:  Your Honor, at this time, I'd like to

25   offer a composite exhibit RI.  It's without objection.  I think

1    it's number 376.

2         THE COURT:  All right.

3         **(Exhibit No. 376 received into evidence.)**

4    Q.   Katherine, did you and I go through yesterday a series of

5    text messages from that time period in preparation for today?

6    A.   Yes.

7    Q.   So you've had a chance to review these with me?

8    A.   Yes.

9    Q.   And so I'm going to put them on the screen so that you can

02:22 10  use them as a guide to the expression of your feelings towards

11   your dad.  And I know it's not easy.  Okay?

12        MR. SREBNICK:  If I could publish the first page of

13   RI.  Keith, if you could enlarge it.

14   Q.   Do you recognize this as a text message you sent to your

15   father on May 9 of 2015?

16   A.   Yes.

17   Q.   And the jury can read it for themselves.  Does this --

18   does this text message express the way you genuinely felt at

19   that moment in time?

02:22 20  A.   Yes.

21        MR. SREBNICK:  Keith, could we go to the next page,

22   please?  Next page.

23   Q.   Do you see a text message on the next day, May 10 of 2015?

24   A.   I do, yes.

25   Q.   Do you see expressing a lack of approval that your dad

```
 1    had -- was involved with another woman?

 2    A.    Yes.  I was angry.

 3    Q.    And you felt that your dad had been selfish?

 4    A.    Yes.

 5    Q.    You described him as deceitful?

 6    A.    I did.

 7    Q.    But you continued to try to express your love to your

 8    father?

 9    A.    Yes.

10          MR. SREBNICK:  Keith, could we go to the next page?

11    Q.    Also on May 10, you described your dad to -- directly to

12    him that he's pathetic?

13    A.    Yes.

14    Q.    And hoping there will be a day when he'll be strong again?

15    A.    Yeah.

16          MR. SREBNICK:  Next page, Keith.

17    Q.    This is two days later on May 12.  You write to him, "I

18    wasn't the one who traded our family for the feelings of being

19    young again.  You're a grown man.  Don't equate my actions with

20    yours.  Just from that statement, it's apparent how selfish you

21    are."

22    A.    Yes.

23    Q.    Is that how you felt at that time?

24    A.    Yes.

25    Q.    Had you ever felt that way about your father before?
```

```
 1   A.   No.
 2          MR. SREBNICK:  If we could go to the next page.
 3   Q.   Also on May 12 of 2015.  "I'll always love you, but you
 4   need to prove that you're still the man I thought you were.
 5   It's unrealistic to expect forgiveness in days.  You need to
 6   get it together and prove that we come first, and then I'll be
 7   ready to let you all the way back in my life."  That's how you
 8   felt?
 9   A.   Yes.
10   Q.   At that moment in time on those days, would you say that
11   the relationship was estranged between you and your father?
12   A.   Most definitely.
13          MR. SREBNICK:  Keith, go to the next page.
14   Q.   Do you recall your dad trying to explain himself and you
15   telling him, "You have not done anything wrong?  LOL."  Laugh
16   out loud?
17   A.   Yeah.
18   Q.   You felt very strongly that, in your opinion, he had done
19   something wrong?
20   A.   Yes.
21   Q.   And doing wrong, is that abandoning the marriage?
22   A.   Yeah, one of the things, yeah, back then.
23   Q.   If we could turn the page.  Now it's May 15.  You write
24   that you have zero interest in seeing him ever again.  That's
25   how you felt?
```

```
 1   A.   Yes.  I was very angry.
 2   Q.   Next page, May 15, your dad had invited you to lunch, and
 3   you didn't want to, right?
 4   A.   Correct.
 5   Q.   Next page, on May 16.  You tell your dad he's clueless,
 6   and you have no interest in associating with him; is that
 7   right?
 8   A.   That's correct.
 9        MR. SREBNICK:  Keith, if we could go to the next page.
10   Q.   Is what's on the screen how you felt?
11   A.   Yes.
12   Q.   That's May 16 of 2015, right?
13   A.   Correct.
14        MR. SREBNICK:  Keith, if we could go to the next page.
15        THE COURT:  How many pages is the --
16        MR. SREBNICK:  Fifteen more.
17        THE COURT:  Fifteen more?
18        MR. SREBNICK:  Yes, Your Honor.
19        THE COURT:  The jury will have this, right?
20        MR. SREBNICK:  Yes.  That's why we're publishing it so
21   that --
22        If you could go to the next page called "Describing."
23   Next page, please.
24   Q.   You felt like your dad had broken your mom's heart?
25   A.   Yes.
```

1   Q.   And then was there a discussion about having family

2   therapy?

3   A.   Yes.

4        MR. SREBNICK:  Keith, if you'd turn to the next page.

5   Q.   What was your hope?  Was your hope that the marriage could

6   be fixed?

7   A.   At that point yes, because it was all so sudden.  I mean,

8   I had no idea.  And I was sort of like, wait, what's happening,

9   you know?  And I think every -- maybe not everyone, but I think

02:28 10   a lot of kids at first are -- you don't know.  I mean, I didn't

11   grow up in an environment where my parents were screaming and

12   yelling at each other.  So it's not like the divorce brought me

13   a sense of relief.  It brought me, if anything, confusion.

14   Q.   Okay.  And so, for example, you had your graduation coming

15   up.  Did you invite your dad to go to your graduation?

16   A.   No.

17        MR. SREBNICK:  Turn to the next page, Keith.  Next.

18   Keep going, Keith.  Next page.  Right there.

19   Q.   So you asked your dad not to attend your graduation

02:29 20   dinner?

21   A.   Correct.

22        MR. SREBNICK:  Next page, Keith.

23   Q.   This is May 22nd.  Had you even spoken to your father of

24   any substance until then?

25   A.   Not really, I don't think.

1    Q.   But you tried to express your love to him?

2    A.   Yes, of course.

3         MR. SREBNICK:  Next page, Keith.

4    Q.   Can you recall for us -- you see your words, but the

5    feelings towards your father, how did that affect you in your

6    daily life during that month?

7    A.   Well, as you can see, these texts are angry and raw and,

8    you know, I think my anger is pouring off the page.  You know,

9    I was fed up, honestly, especially at this moment, which is

02:31 10   yeah, August 9th.  So I found out about the divorce in May and

11   had hoped that he would at least give us a couple months to

12   heal and focus on Lexi and I.

13        But then I found out that he lied about going to a

14   business trip, or maybe it was a business trip, but then the

15   woman he was seeing was there.  And Lexi was -- and Lexi, my

16   younger sister and I were, you know, left alone when we were

17   trying to spend quality time with my dad, and I was livid.

18   Q.   Between May and August of that year, during this time

19   period, what happened to your tennis game?

02:31 20   A.   So starting in May, I -- so I find out -- I find out about

21   the divorce at a tennis match in May.  And then my mom starts

22   staying in Concord -- you know, basically she got a room at the

23   Concord Inn about ten minutes away because she needed us.  She

24   was falling apart, a mess.  And I felt like I had to take care

25   of her.

And, you know, tennis was something that my dad and I
shared.  When I thought of tennis, I thought of my dad.  And I
wanted nothing to do with him at that point.  I was disgusted
and hurt.  And I basically was, like -- like, you know, screw
it.  I feel like you've ruined the sport for me.  I think of
you when I'm out there.  I'm not going to follow, you know --
keep on following like your leads and everything when you don't
set good examples.  And to be honest, it was just too painful
to be out there with those reminders.

Q.   When was the last time you played competitive tennis?

A.   May, like right before.

Q.   And did you -- have you ever since played tennis?

A.   Not really.  Maybe one day.  I want to love the sport
again.  You know, like, I don't want to just -- I used to love
it.

And I think the thing about families and family issues is
that these texts that I'm reading today, not all of these -- I
mean, every family goes through ups and downs, but the issues
that I've had with not only my dad and my mom still play a
prominent role if my life and the way I operate on a daily
basis just through the emotional trauma of it all.

And, you know, one day when hopefully we've all found
peace and a stable, you know, familial unit, I will be able to
be at peace with, you know, playing the sport that reminds me
of my dad that does hold so many good memories again.

```
 1   Q.   Has it strained the relationship even to this day?

 2   A.   Yes.

 3            MR. SREBNICK:  Counsel, I'm going to offer HA, the

 4   email.

 5            MR. MARKHAM:  We're objecting on -- objection on

 6   hearsay grounds, Your Honor.

 7            THE COURT:  I'll allow in the email from Katherine

 8   Khoury but not the response.

 9            MR. SREBNICK:  Understood.

10            Keith, if you could show the bottom half of HA, which

11   is now Exhibit 377.

12            (Exhibit No. 377 received into evidence.)

13   Q.   Do you recall sending an email to your dad May 18 of

14   2015 -- it will be on the screen in a moment whenever Keith's

15   ready.  Would you feel up to -- to reading it out loud?

16   A.   Yes.  "Dear Daddy.  I would like to take this opportunity

17   to explain why I have been so distant lately.  After the

18   initial shock of the divorce, I was not at all calmed or

19   comforted by your reasons or actions.  Whenever I would speak

20   with you, I never felt as if I were talking to the formidable,

21   capable man I have known my whole life but rather to a scared,

22   nervous, frantic teenage boy who is unable to take

23   responsibility for his actions.  Until I am able to once again

24   identify you as a trustworthy, strong male presence, I do not

25   wish to associate with you, which breaks my heart because
```

there's no one I'd rather share these critical moments with.

Since I am now 18, I not only look up to you as a parent but

also as a human being.  However, due to your weak, scared

actions, I do not have the patience to see or even speak with

you.  I am looking forward to therapy this summer and hopefully

the opportunity to become a family once again.  P.S.  Do not

mistake Lexi's kindness for acceptance.  You have broken Lexi's

heart in the worst way.  You were supposed to be the one person

who wouldn't.  Although she constantly makes a point to call

you, she tells me that you rarely call her, which pains her in

unimaginable ways.  I was equally disappointed to hear that.

These pathetic, selfish actions reflect a man that I do not

know."

Q.   Katherine, the feelings -- did those feelings continue

through the summer leading up to your arrival at Georgetown?

A.   Yes.

        MR. SREBNICK:  Keith, if you could go back to 376, and

it's this page right here.

Q.   I'm showing you a text from that -- from that composite

exhibit, August 28, 2015.  Keith will put it on the screen in a

moment.

        MR. BRETT:  5663, the last three?

        MR. SREBNICK:  4568.

        MR. BRETT:  4568.  Got it.

Q.   Can you read that for us?

```
 1    A.    "I don't want to talk about why I was so upset at lunch.
 2    The truth is I am very sad, as I go to college, about our
 3    family.  All Lexi and I want is a happy family.  The idea that
 4    the holidays will be spent apart is terrible.  It is also so
 5    sad that mom is going away in September to try to heal.  She
 6    has been so happy these last few days, and it makes us miss her
 7    being like that.  Please make sure we will always be a family.
 8    This is so hard for us.  I love you, Daddy."
 9          MR. SREBNICK:  Keith, if we could go to the next page.
10    Q.    Katherine.
11    A.    "I hope you know that if our family isn't able to exist
12    peacefully together and don't spend another holiday together, I
13    will forever blame and resent you.  And I have zero interest in
14    sharing vital parts of my life with you."
15          MR. SREBNICK:  Next page, Keith.
16          MR. MARKHAM:  Your Honor, we're going to object at
17    this point to relevance.  This is going on to text messages,
18    every text message she sent.
19          THE COURT:  Sustained.
20          MR. BLACK:  Well, that's part of the charges in this
21    case.
22          THE COURT:  Excuse me.  If you want, you can see me at
23    sidebar, but this is --
24          MR. SREBNICK:  Or I can -- I'll finish it, Roy.  I've
25    got it.
```

BY MR. SREBNICK:

Q.   Katy, Katherine, do you recall being so despondent in the fall, first year at Georgetown, that you'd indicated to your dad, "If you cause us another ounce of pain, I'm going to jump off a building"?

A.   Yes.

Q.   And you wrote that to your father in the text message that's here?

A.   Yes.

02:39 Q.   When you arrived at Georgetown, were you going to -- were you planning on playing tennis anymore?

A.   No.

Q.   Had you told that to your father?

A.   Yes.

Q.   And do you expect he communicated that to Coach Ernst?

A.   Yes.  That is what I thought.

Q.   Did you reach out to Coach Ernst at all?

A.   No.

Q.   You barely reached out to your father, right?

02:40 A.   Correct.

Q.   Okay.  When you arrived at Georgetown in the fall, that first year, first fall, is that when you are taking that psychology class you described?

A.   It was either my first semester or second semester.

Q.   You indicated that there was a time when your mom had to

1    come help you at Georgetown because you were having some

2    challenges?

3    A.    Yes.

4    Q.    Could you describe that for the jury?

5    A.    About the OCD?  Did I talk about that earlier --

6    Q.    Yeah.

7    A.    -- or no?  To reiterate?

8    Q.    Yeah.  What was the -- physically, what was the issue that

9    your mom had to come help you?

02:40 10   A.    Yeah.  So I mean, like I said, it was obsessive-compulsive

11   disorder.  And it's not uncommon that it spikes in women in

12   their early 20s.  And, you know, so I think, you know, a lot of

13   people will deal with mental health issues or illnesses, and

14   sometimes you can manage it fine alone.  And other times it

15   reaches a point where you need help.

16        And I got to that point where, you know, I didn't feel

17   like myself anymore.  My brain was not my friend.  It was

18   working against me.  And I needed -- I could no longer live

19   like that anymore.  I wasn't even living.  It was, you know,

02:41 20   hell every day waking up and dealing with that.

21   Q.    And how were the family dynamics during your first

22   semester at Georgetown in terms of the relationships between

23   all of you?

24   A.    Not good.  I was not -- you know, there were periods or,

25   you know, weeks I would speak with my dad and then not.  You

```
 1    know, I didn't -- I don't really think I had a great
 2    relationship with my mom at that point either.  Yeah, the only
 3    consistent relationship I've had familial wise is with my
 4    sister, Lexi, for our nuclear family, that is.
 5    Q.   How about your grandfather?
 6    A.   Yes.  We've always been close.
 7    Q.   Okay.  How much peer support were you providing for your
 8    mom while you were a freshman at Georgetown?
 9    A.   A ton.  You know, a lot of crying conversations, a lot of
02:42 10   talking her down to, you know -- it's not the end of the world.
11    Like we'll get through this, you know.  To this day there are
12    still issues.  While she's come a long way through treatment
13    and therapy, you know, it is a battle that has fallen upon my
14    sister and I to make sure her -- she's mentally healthy and
15    capable.
16              MR. MARKHAM:  Your Honor, I just object to any more
17    questions about her sister's mental health at this point.
18              THE COURT:  Are you moving into a new area?
19              MR. SREBNICK:  One moment, Your Honor.
02:43 20             Judge, those are all the questions on direct.
21              MR. MARKHAM:  Thank you, Your Honor.  At this point,
22    the government would move to admit all the text messages that
23    the defendant has provided under the rule of completeness.
24    They go to her state of mind, Your Honor, just as they admitted
25    the ones that they admitted.
```

```
    1            THE COURT:  I don't know -- as you pointed out before,
    2    some of it may be beyond a time period.
    3            MR. MARKHAM:  No, Your Honor.  These are --
    4            THE COURT:  Well, let me ask:  Does the defense have
    5    any objection?
    6            MR. SREBNICK:  No.
    7            THE COURT:  Okay.
    8            MR. SREBNICK:  MaryAnn, 378.
    9            THE COURT:  Maryellen.
02:44 10            MR. MARKHAM:  I'm sorry.  Maryellen.
   11            MR. SREBNICK:  378 would be the next number, all the
   12    emails?
   13            MR. MARKHAM:  All the texts, yes.
   14            MR. SREBNICK:  378?
   15            MR. MARKHAM:  Yes.
   16            (Exhibit No. 378 received into evidence.)
   17            MR. MARKHAM:  May I proceed, Your Honor?
   18            THE COURT:  Yes.
   19                         CROSS-EXAMINATION
02:44 20    BY MR. MARKHAM:
   21    Q.   Good afternoon, Ms. Khoury.
   22    A.   Good afternoon.
   23    Q.   If at any point -- I know this is a tough conversation.
   24    So if at any point you need a break, just raise your hand and
   25    we'll take a break.  Okay?
```

A.   Thank you.

Q.   You shared some very personal texts with your father from May of 2015, right?

A.   Yes.

Q.   And in those texts, you were very upset with your dad; fair to say?

A.   Yes.

Q.   On May 10, 2015, you went over a text where you described your dad as deceitful?

A.   Yes.

Q.   And then you said that during that month, he had lied to you?

A.   Yes.

Q.   In the email they showed you that was marked as Exhibit HA, you said that your dad was unable to take responsibility for his actions; is that right?

A.   Yeah.  If we could put it up just so I could see.  Is that possible?

Q.   Yeah.

A.   I'm sorry.  I just can't see it.

          MR. MARKHAM:  Exhibit HA is what it came in as.

          THE COURT:  It didn't get a number?

          THE CLERK:  It was 377, HA.

          MR. MARKHAM:  377, please.

          THE CLERK:  It was the bottom half only at that time.

1         Oh, you want me to switch over?  I'm sorry.  That's my
2   fault.
3   A.   Okay.
4   Q.   Do you see where it says that he's unable to take
5   responsibility for his actions?
6   A.   Yes, I see that.
7         MR. MARKHAM:  Okay.  You can take that down.
8   Q.   And you didn't know at this time, in May of 2015, that
9   your father had paid Gordon Ernst $200,000, right?
02:46 10   A.   I did not know that.
11   Q.   He kept that from you?
12   A.   I did not know that, like I said.
13   Q.   Did you know that he took the money out of your and your
14   sister's trust funds?
15   A.   No, I did not know that.
16   Q.   Now, a number of your text messages just went into
17   evidence.  Do you remember going over those with the defense?
18   A.   Like the text messages they just read?
19   Q.   Yeah, the text messages you were just reading.
02:46 20   A.   Yeah, yes.
21   Q.   And those were conversations with your dad, right?
22   A.   Correct.
23   Q.   But none of your dad's text messages are in there?
24   A.   No.  Yes, I realize that.
25   Q.   Okay.  So that was just a one-sided conversation where no

        1   one can see what the defendant was saying during that time?

        2   A.   That's correct.

        3          MR. SREBNICK:  Objection, Your Honor.  The exhibit

        4   with the email, the top half, I'd move for its admission, given

        5   that comment.

        6          MR. MARKHAM:  I said specifically the text messages,

        7   Your Honor.

        8          THE COURT:  Overruled.

        9   Q.   You testified before that when Gordon Ernst first

02:47  10   approached you about playing tennis at Georgetown, that it was

       11   at a July 4th, 2014, party; is that right?

       12   A.   That is correct.

       13   Q.   And prior to that, you had never approached Gordon Ernst

       14   about playing tennis, right?

       15   A.   No.

       16   Q.   He initiated that with you at that party?

       17   A.   Yes.

       18   Q.   And you were honest with him at that party completely

       19   about your tennis ability, right?

02:47  20   A.   I was.

       21   Q.   You didn't tell him you were an all American?

       22   A.   No.  And as my application indicates, I never lied about

       23   who I was.

       24   Q.   And you were honest with him in that conversation, July of

       25   2014, that you didn't think you were probably good enough to

1    play on his team, right?

2    A.    Correct.

3    Q.    But Gordon Ernst still wanted to recruit you anyways as of

4    July 4th, 2014?

5    A.    Yes, I think so.

6    Q.    Okay.  Well, let's go back a little over a month earlier,

7    Memorial Day weekend of 2014.  On that weekend, you weren't

8    with your dad at the Brown reunion dinner, right?

9    A.    I was not.

02:48 10   Q.    So you weren't at the Capital Grille with Gordon Ernst and

11   Tim Donovan?

12   A.    No.

13   Q.    So you don't know what he talked about with them at that?

14   A.    No.

15   Q.    Ms. Khoury, are you aware that between May of 2014 and May

16   of 2015, there were 115 phone calls from your dad's phone to

17   either Tim Donovan or Gordon Ernst?

18   A.    I was not aware of that.

19   Q.    And you weren't on those calls, right?

02:48 20   A.    No.

21   Q.    So you don't -- you don't know what they were talking

22   about?

23   A.    No.

24   Q.    On May 8th, 2015 -- I know this is a long time ago -- but

25   were you still at Middlesex at that point, right?

1    A.    Yes.

2    Q.    And Middlesex is located in Concord, Massachusetts?

3    A.    Yes.

4    Q.    So you weren't with your father in Palm Beach when he took

5    out the $200,000 in cash, right?

6    A.    No.

7    Q.    And he didn't tell you he did that?

8    A.    No.

9    Q.    And on May 15th, he was actually back up in Cape Cod.

02:49 10    Were you down on Cape Cod with him on May 15, 2015?

11    A.    No.  If anything, the only time I saw my dad in that month

12    of May was when he came to Concord to see Lexi and I and

13    apologize for the divorce.  I had no idea about any money at

14    all.

15    Q.    Okay.  So when the money exchanged hands on Cape Cod, you

16    weren't there?  You had no idea?

17    A.    No.

18    Q.    In July of 2016, Gordon Ernst was asking your dad to

19    square up multiple times.

02:49 20          MR. SREBNICK:  Objection, Your Honor.  This is an

21    improper format of questioning.

22          MR. MARKHAM:  I'm just asking whether she knew about

23    the text messages, Your Honor.

24          THE COURT:  Did you -- did you know of any text

25    messages?

```
 1              THE WITNESS:  No.
 2    BY MR. MARKHAM:
 3    Q.   Okay.  It says July of 2016.  You still had no idea your
 4    dad was paying money to Gordon Ernst?
 5              MR. SREBNICK:  Objection, Your Honor.
 6              THE COURT:  Overruled.
 7    BY MR. MARKHAM:
 8    Q.   You had no idea, right?
 9    A.   I had no idea he paid Gordon Ernst until I read the
10    indictment.
11    Q.   When you got to Georgetown, you didn't -- you didn't end
12    up playing tennis, right?
13    A.   I did not.
14    Q.   And Gordon Ernst wasn't -- you weren't working with the
15    team, correct, in any way?
16    A.   No, I did not play tennis at all at Georgetown.
17    Q.   And Gordon Ernst wasn't giving you tennis lessons, right?
18    A.   No.
19    Q.   So if someone claimed that they paid for tennis lessons
20    with Gordon Ernst while you were in college --
21              MR. SREBNICK:  Objection.
22    Q.   -- that would not be accurate, right?
23              THE COURT:  Sustained.
24    BY MR. MARKHAM:
25    Q.   Now, despite all this, your dad's done a lot for you,
```

```
 1   right?

 2   A.   Right.

 3   Q.   You care about him a lot?

 4   A.   Yes.

 5   Q.   And you do not want anything bad to happen to him, right?

 6   A.   Of course not.

 7        MR. MARKHAM:  Okay.  No more questions, Your Honor.

 8        MR. SREBNICK:  No more questions.

 9        THE COURT:  Thank you.  You may step down.  Thank you.

10        MR. SREBNICK:  Your Honor, we'll call Professor

11   Alpert.

12        GEOFFREY ALPERT, sworn.

13        THE CLERK:  Can you please state and spell your name

14   for the record.

15        THE WITNESS:  Geoffrey Alpert.  G-e-o-f-f-r-e-y

16   A-l-p-e-r-t.

17        THE CLERK:  Thank you.

18                    DIRECT EXAMINATION

19   BY MR. SREBNICK:

20   Q.   Professor Alpert, at what university are you a professor?

21   A.   University of South Carolina.

22   Q.   And for how many years have you been a professor?

23   A.   I've been there about 35 and probably a professor over 40.

24   Q.   Okay.  And before that, you were at the University of

25   Miami?
```

```
 1   A.   Yes, sir.

 2   Q.   Okay.  We're going to do a real tight, short resumé.  You

 3   have a degree in?

 4   A.   My Ph.D. is in sociology.

 5   Q.   Okay.  And as part of your professorships and study, do

 6   you do quantitative analysis?

 7   A.   Yes, sir.  That's probably -- most of my career has been

 8   what we call evidence-based policy analysis.

 9   Q.   Okay.  The answer is yes?

10   A.   Yes.

11   Q.   I took up too much time on the previous witness, and now I

12   have to shorten you.  Okay?

13   A.   Yes, sir.

14   Q.   So you're going to be a summary witness today.  So you're

15   overqualified for the job, but we're going to ask you help us

16   publish some exhibits.  Okay?

17   A.   Yes, sir.

18   Q.   As part of your preparation for today, did you go over

19   some materials regarding information provided by Georgetown and

20   various surveys regarding their college admissions practices?

21   A.   Yes, sir.

22   Q.   Tell the ladies and gentlemen of the jury generally what

23   you did.

24   A.   Generally, I looked at the U.S. News & World Report

25   statistical surveys of universities at Georgetown.  I looked at
```

1       those from, gosh, 2009 to about 2019.

2           I looked at the Georgetown profiles for schools and

3       candidates that was -- I think I looked from 2012 to about

4       2018.  I looked at the statistical reports that were available

5       online at Georgetown on their website.  I looked at the -- the

6       prospectus for Georgetown students.  I looked at records that

7       dealt with tennis information and -- and budgets and --

8       Q.  Okay.  That's pretty good.

9           What I'm going to do now is I'm going to start publishing

02:54 10     some of the evidence in this case so you can help us see it

11      because some of it's in real fine print, and you can explain it

12      for us.

13      A.  Yes, sir.

14      Q.  Okay.  Great.

15          MR. BRETT:  Maryellen, could we have the defense

16      input?

17          THE CLERK:  Yes.

18          MR. SREBNICK:  Keith, could we put up Exhibit 112?

19      Q.  Does Georgetown report to U.S. News & World Report

02:54 20     information regarding applications and admissions and things of

21      that nature?

22      A.  Correct.

23      Q.  And is there a survey done by U.S. News that's now on the

24      screen, U.S. News & World Reports?

25      A.  Yes, sir.

```
 1    Q.   Is it sort of the media outlet that is well known for this
 2    exact type of information?
 3    A.   Yes, sir.
 4    Q.   Okay.  Now, does Georgetown list what it considers to be
 5    the admissions requirements?
 6    A.   Yes, sir.
 7    Q.   Okay.  If we could go to page 26.  And does it categorize
 8    certain criteria as very important?
 9    A.   Correct.
10    Q.   And so have you compiled them -- or with the help of Keith
11    our technology expert, have you guys put together just a --
12    culled it from Exhibit 112 and you put it all on the screen for
13    the jury?
14    A.   Yes, sir.  It lists the very important admission
15    requirements.
16    Q.   And what are those that Georgetown reports to be very
17    important?
18    A.   It starts with the rigor or the secondary school record.
19    It then goes to academic GPA, standardized test scores, class
20    rank, recommendations, application essay, talent/ability,
21    character/personal qualities.
22    Q.   Does the report indicate Georgetown setting any minimum
23    rock-bottom limit for any one of these categories?
24    A.   No, sir.
25    Q.   Does it say that anybody with an SAT score below X need
```

1    apply?

2    A.    No, sir, it does not.

3    Q.    Does it say anything about nobody with a GPA below Y need

4    apply?

5    A.    No, sir.

6    Q.    And, by the way, Georgetown charges a fee?

7              MS. KEARNEY:   Objection.

8    A.    I believe it's $75.

9              MS. KEARNEY:   Personal knowledge.

02:56 10              THE COURT:   What?

11              MS. KEARNEY:   Objection.   Lack of personal knowledge.

12              MR. SREBNICK:   It's in evidence, Judge.

13              THE COURT:   Charges a fee for what?

14              MR. SREBNICK:   Application.

15              THE COURT:   That's in evidence.

16              MR. SREBNICK:   Yes.

17    Q.    Now, those are the very important criteria, according to

18    Georgetown.

19              MR. SREBNICK:   Keith, if we could turn the page.

02:56 20    Q.    Do they also list some that are important but not quite

21    very important?

22    A.    Correct.

23    Q.    And what are those?

24    A.    Interview and extracurricular activities.

25    Q.    Okay.   And does Georgetown set some threshold level to

1  help define what that means?

2  A.   No, sir.

3  Q.   Okay.  And then are there other factors that Georgetown

4  says they consider?

5  A.   Yes, sir.  First, they consider first-generation alumni.

6  Q.   What do you understand that to mean?

7  A.   I'm not sure.  I mean, I -- in my experience, it would be

8  first generation going to college.

9          MS. KEARNEY:  Objection.

02:57 10          THE COURT:  Sustained.

11  Q.   Okay.  What else?

12  A.   Alumni --

13          MS. KEARNEY:  Objection.

14          THE COURT:  I haven't heard a question yet.

15  Q.   What are the -- what are the criteria that are listed by

16  Georgetown on government -- excuse me -- on Exhibit 112, pages

17  29 through 30?

18  A.   It would be first-generation alumni relation, geographical

19  residence, state residency, racial/ethnic status, volunteer

02:57 20  work, and work experience.

21  Q.   Again, any set minimum threshold for any of those?

22  A.   No, sir.

23  Q.   Okay.  So from looking at what Georgetown reports to U.S.

24  News & World Report, is there any way to know whether anybody

25  with -- anybody applying to Georgetown, whether they're

```
 1   definitely going to go in or definitely not get in?
 2   A.   No, sir, there's no way.
 3        MR. SREBNICK:  Keith, if we could go to the next page.
 4   Q.   By the way, is athletics listed as any one of the criteria
 5   that Georgetown reports?  Athletics?
 6   A.   No, sir.
 7        MR. SREBNICK:  One moment.
 8   Q.   Okay.  You may have been in court when we published these.
 9   Do you see that Georgetown reports approximately 20,000
10   candidates for 1,580 spaces for the class of 2019?
11   A.   Yes, sir.
12   Q.   And that's reported twice in evidence, once in the likely
13   letter and once again in the admission letter?
14   A.   Yes, sir.
15   Q.   Okay.  And is that data contained in U.S. News & World
16   Reports?
17   A.   Correct.
18   Q.   Okay.  Do you see there --
19        MR. SREBNICK:  Keith, if we could go back one second.
20   Q.   Do you see that, according to the Georgetown letter of
21   acceptance, a student who's accepted, it's an invitation to
22   enroll at Georgetown and sign that contract that we just
23   published a few minutes ago with Katherine Khoury, right?
24   A.   Yes, sir.
25        MR. SREBNICK:  Okay.  Thank you, Keith.  Next page.
```

1  Q.   Okay.  Do you see that Georgetown reports the number of
2  applicants that applied for that year?
3  A.   Correct.
4  Q.   How many are they?
5  A.   19,478.
6  Q.   And did Georgetown report how many were issued letters of
7  acceptance, invitations to enroll at Georgetown?
8  A.   Yes, sir.
9  Q.   And then did Georgetown report the number of people that
02:59 10  were put on a wait list?
11  A.   Correct.
12  Q.   And how many people were wait listed?
13  A.   2184.
14  Q.   Okay.  If we could turn the page.  Now, of the persons
15  that were invited to attend, 3,300 or so, and the wait listed,
16  how many did Georgetown actually enroll?
17  A.   1,567.
18  Q.   Okay.  Now, of the 2,184 people that were offered a chance
19  to be on the wait list, did Georgetown report how many chose to
03:00 20  go on the wait list?
21  A.   Yes, sir.
22  Q.   How many is that?
23  A.   1,249.
24  Q.   Okay.  That's at the bottom left of the screen there?
25  A.   Yes, sir.

```
 1   Q.   That means of the 2,184 that were given a chance to be on
 2   the wait list, only 1,249 of them decided to wait around and
 3   see if Georgetown would accept them, right?
 4   A.   That's correct.
 5   Q.   Of those 1,249, how many actually were invited to enroll
 6   at Georgetown?
 7   A.   149.
 8        MR. SREBNICK:  Keith, if we could go to the next page.
 9   Q.   And so if we do the math -- you did the math for us?
10   A.   Yes, sir.
11   Q.   3,358 acceptance letters were issued, right?
12   A.   Yes, sir.
13   Q.   Of that --
14        MR. SREBNICK:  Keith, if you could light it up.
15   Q.   We know on the right side, 149 people were accepted off
16   the wait list.  Does that tell you how many people -- how many
17   students who were invited to attend Georgetown with acceptance
18   letters actually decided to enroll and send in their deposits?
19   A.   Yes, sir.
20   Q.   How many?
21   A.   I mean, I can't see the screen.
22   Q.   You can't see the screen?
23   A.   No, sir.
24        MR. SREBNICK:  Hold on.  Is it black, or is it --
25        THE WITNESS:  It's blinking.
```

```
 1              THE CLERK:  We have trouble.  It's been good the whole
 2    time until today.
 3              MR. SREBNICK:  It's still not on?
 4              THE WITNESS:  No, sir.
 5              THE CLERK:  We'll switch to the flat screen.
 6              MR. SREBNICK:  Oh, okay.
 7              THE CLERK:  This has happened before.  It happens.
 8    But we can just turn that around, and you can pull it closer to
 9    him, if that's okay.
03:01 10              THE WITNESS:  Thank you.
11              THE CLERK:  Sorry about that.
12              THE WITNESS:  No worries.
13              THE CLERK:  Technology.
14    BY MR. SREBNICK:
15    Q.    Professor, do you see that 1,418 students that were issued
16    acceptance letters committed to Georgetown; they enrolled?
17    A.    Correct.
18    Q.    And the remainder decided not to accept Georgetown's
19    invitation?
03:02 20    A.    That's correct.
21    Q.    So is it fair to say from the statistic you have there,
22    more that 50 percent of the people that were -- or applicants
23    that were invited to attend declined to go to Georgetown?
24    A.    Yes, sir.
25    Q.    And if you add up the total, U.S. News & World Report
```

1    tells us that Georgetown reported how many students enrolled

2    for the fall of 2015?

3    A.   They reported 1,580.

4    Q.   Actually enrolled?

5    A.   Oh, actually enrolled.  I'm sorry.  1,567.

6    Q.   And the 1,580 reflected?

7    A.   That was the number of spaces they said they had

8    available.

9    Q.   And so from this -- what math can you quickly do to tell

03:02 10   us about the difference between the two?

11   A.   Well, there were 13 unfilled spaces.

12   Q.   Okay.  So Georgetown -- to summarize, Georgetown had

13   reported 1,580 available seats but only filled 1,567?

14   A.   That's correct.

15   Q.   Okay.  Leaving 13, according to Georgetown, seats they

16   chose not to fill?

17   A.   Correct.

18           MR. SREBNICK:  Keith, if we can go to the next page.

19   Q.   And so if we break it down, that shows the breakdown,

03:03 20   right?

21   A.   Yes, sir.

22           MR. SREBNICK:  Keith, if we could go to the next page.

23   Q.   Did you do the same exercise for the years before -- the

24   year before and the year after?

25   A.   I did.

1    Q.    Okay.  And of the 1,580 seats that Georgetown said it had

2    available, for 2014, the year before Katherine Khoury got

3    there, how many seats did Georgetown actually still?

4    A.    1,578.

5    Q.    And in the year after?

6    A.    1,574.

7    Q.    And so for those years --

8          MR. SREBNICK:  Keith, if we go to the next page.

9    Q.    -- is it fair to say Georgetown left seats empty for those

03:03 10   two years?

11   A.    Yes.  For the three years on the board, yes, sir.

12   Q.    What happened in the year after?

13   A.    The year after, they had 1,597.

14   Q.    So they overbooked -- they overbooked the flight, so to

15   speak?

16   A.    Well, they admitted more -- yes, sir.

17   Q.    So according to the report, Georgetown found 17 extra

18   chairs for students to sit in?

19   A.    That's correct.

03:04 20         MR. SREBNICK:  Okay.  If we could go to the next

21   slide, Keith.

22   Q.    Now, the SAT, are you familiar with that test?

23   A.    Yes, sir.

24   Q.    Okay.  And Georgetown, correct to say that Georgetown

25   allows students to choose between the SAT and the ACT?

1    A.    ACT, yes, sir.

2    Q.    Okay.  And according to the data, 1,228 students that

3    enrolled at Georgetown took the SAT to get in, correct?

4    A.    Yes.

5    Q.    And what percentage of all the enrolled students took the

6    SAT, in other words?

7    A.    78 percent took the SAT, and 21 percent -- 21.2 percent

8    took the ACT.

9    Q.    Okay.  And was there data regarding the SAT scores for --

03:05 10   the average scores for students that were enrolled?

11   A.    That's correct.

12   Q.    And that's in the data at Exhibit 112?

13   A.    Yes, sir.

14   Q.    Okay.  And we're just going to do critical reading.  Is

15   that the data that we have?  And does it show where Katherine's

16   critical reading score -- do you know that Katherine's critical

17   reading score from the evidence was a 630?

18   A.    630, yes, sir.

19   Q.    Where does that put her in comparison with other

03:05 20   classmates who decided to enroll at Georgetown?

21   A.    Well, it put her in the -- in the -- as you can see in the

22   chart, it put her in the 600 to 699 category, which showed that

23   there were about 32 percent of the students had the same --

24   same type of scores.

25   Q.    And there were students who had lower scores?

A.    Yes, sir.

Q.    Okay.  And the SAT goes from who 400 to 800, apparently?

A.    That's correct.

Q.    Now, according to this, according to the news reported by -- excuse me, the data reported by Georgetown, more than half of the students scored higher than Katherine, right?

A.    Yes, sir.

Q.    And roughly 10 percent, 9 percent plus 1 percent, scored below 600, right?

A.    Correct.

Q.    And then 32 percent scored in that 600 to 699 range where Katherine had scored?

A.    Correct.

        MR. SREBNICK:  If you could put the profile up, Keith.

Q.    Now, the data that's provided -- this is in the Georgetown -- the profile for schools information that you compiled, right, that you reviewed?

A.    Yes.  It was profile for schools and candidates.

Q.    Okay.  Now, you're going to have to explain this to us for those of us who don't look at this on a daily basis.  What does this chart show?

A.    Excuse me.  Well, this is a chart showing the top -- the row on the top where it says "top 5 percent, second 5 percent, second decile, third decile, fourth decile," that's how they rank in their class rank.

1      And then you look all the way over to the right where it

2    says "non-ranked," and that's for students who did not submit

3    rankings.  And we -- they report in the other document that

4    about 70 percent don't report ranking.

5    Q.   Certain schools don't rank their high school students?

6    A.   That's correct.

7    Q.   Now, the top left column where it says "CR, do you

8    recognize that as critical reading part of the SAT"?

9    A.   Yes, sir.

03:08 10   Q.   800, that's the best score any student in the country --

11   or for that matter in the world -- can achieve, right?

12   A.   The top score.  Yes, sir.

13   Q.   Top score, 800.  And so for a student coming out of a high

14   school in the top 5 percent of their class scoring a perfect

15   critical reading score of 800, how many of those students had

16   applied to go to Georgetown?

17   A.   124.

18   Q.   124?

19   A.   Yes, sir.

03:08 20   Q.   Of those 124, did all of them get accepted with that

21   score?

22   A.   No, sir.

23   Q.   How many?

24   A.   64.

25   Q.   So my math says 60 students with a perfect SAT verbal

1    score, top 5 percent of their high school class rejected from

2    Georgetown?

3    A.    Didn't -- or didn't go, that's correct.

4    Q.    Didn't get accepted, right?

5    A.    Right.

6    Q.    Okay.  And for the math, if we go down to the blue line,

7    only 41 out of 118 --

8          MR. SREBNICK:  Keith, can you just circle that?

9    Q.    41 out of 118 in the top 5 percent of their high school

03:09 10   class still couldn't get into Georgetown, right?

11   A.    That's correct.

12   Q.    Now, if we go over to the right-hand column, non-ranked,

13   meaning kids that go to schools where there's no ranking

14   available?

15   A.    Well, either there's no ranking available, or they didn't

16   report the rank.

17   Q.    Okay.  Fair enough.  Even then, are you able to tell -- if

18   someone gets a perfect SAT score, whether they're getting into

19   Georgetown?

03:09 20   A.    You can't tell, no, sir.

21   Q.    Okay.  Now, there are students, if we go to the below 500,

22   there were some students that were accepted --

23         MR. SREBNICK:  If we go to the below 500 in the CR column,

24   Keith.

25   Q.    Do you see there were students with an SAT score below 500

```
 1   in the top 5 percent of their class --
 2           MR. SREBNICK:  You're in the math.  I'm in the verbal.
 3   There you go.
 4   Q.   So Georgetown accepted students that scored below 500?
 5   A.   That's correct.
 6   Q.   Okay.  And, likewise, accepted math students -- excuse me,
 7   students with math scores below 500?
 8   A.   That's correct.
 9   Q.   Right?  And is there any way to tell from the data what it
10   was about those students that made them attracted to
11   Georgetown?
12   A.   No, sir.
13           MR. SREBNICK:  If you could put the next one up.
14           We're almost done, Judge.
15   Q.   Do you recognize this as a chart that -- for the 2015
16   applicants?
17       MR. SREBNICK:  And if we go to the column that says
18   "number 1," can you highlight that for us, Keith?
19   Q.   Professor, what does this column reflect?
20   A.   That's the number one ranked out of the high school, the
21   valedictorian.
22   Q.   So these are the valedictorians that applied to
23   Georgetown?
24   A.   That's correct.
25   Q.   And of the 2,478 valedictorians that applied to
```

1    Georgetown, how many of them were admitted?

2    A.   1,247.

3    Q.   And roughly how many were declined or rejected?  About the

4    same?

5    A.   About the same, yes, sir.  It's 50 percent.

6         MR. SREBNICK:  Okay.  Judge, let me just consult with

7    my colleague.

8         Judge, those are all the questions I have.

9         THE COURT:  Anything?

03:12 10         MS. KEARNEY:  Yes, Your Honor.

11                          CROSS-EXAMINATION

12    BY MS. KEARNEY:

13    Q.   Good afternoon.

14    A.   Good afternoon.

15    Q.   You reviewed U.S. News & World Reports to prepare that

16    chart along with --

17         MS. KEARNEY:  I only know your first name -- Keith.

18    A.   That's correct.

19    Q.   And those U.S. News & World Reports, they don't disclose

03:12 20    the number of tennis recruitment slots available at Georgetown,

21    do they?

22    A.   I'm sorry?  They don't report what?

23    Q.   They don't report the number of tennis recruitment slots

24    at Georgetown?

25    A.   That's correct.

1    Q.   And Georgetown doesn't report the number of tennis

2    recruitment slots that are available or the number that are

3    used in a particular year, correct?

4    A.   That's correct.  There's no information about that.

5    Q.   And it doesn't say anything about Katherine Khoury taking

6    one of those tennis recruitment slots, does it?

7    A.   No.

8    Q.   Now, you don't work in Georgetown admissions; fair to say?

9    A.   That's true.

03:13 10   Q.   And you had to rely on what was published in these public

11   reports?

12   A.   Correct.

13   Q.   You don't actually know what the admissions office

14   considers in making admissions decisions, correct?

15   A.   Well, I know what they say they consider and what they

16   hold as very important and important.

17   Q.   But you don't know, when we looked at some of the

18   statistics on SAT scores, for instance, why Georgetown was

19   admitting a student with a 500 SAT score, correct?

03:13 20   A.   That's right.  I don't know why they would accept one over

21   the other.  There's no empirical data for that.

22   Q.   And nothing in the U.S. News & World Reports discloses

23   whether any of those applicants with low test scores were

24   athletes who were getting in?

25   A.   That's correct.

```
 1   Q.   Same thing for the applicants who were valedictorians and
 2   rejected.  You don't know what else was in their application
 3   that might have caused the Georgetown admissions office to
 4   reject them, correct?
 5   A.   That's correct.
 6   Q.   In anything that you reviewed in preparation for your
 7   testimony today, did you see anything that indicated that
 8   Georgetown said students could buy an admission slot for
 9   $200,000?
10   A.   No, ma'am.
11            MS. KEARNEY:  Nothing further.
12            MR. SREBNICK:  No other questions.
13            THE COURT:  Thank you.
14            THE WITNESS:  Thank you, ma'am.
15            MR. SREBNICK:  Next witness is --
16            MR. BLACK:  David Trump.
17            THE CLERK:  You can take the stand, and I'll have you
18   raise your right hand.
19                     DANIEL E. TRUMP, sworn
20            THE CLERK:  You can be seated.  Could you please state
21   and spell your name for the record?
22            THE WITNESS:  Daniel Eric Trump.  D-a-n-i-e-l,
23   E-r-i-c, T-r-u-m-p.
24            THE CLERK:  Thank you.
25            MR. BLACK:  May it please the court.  Good afternoon,
```

ladies and gentlemen.

                    DIRECT EXAMINATION

BY MR. BLACK:

Q.   Good afternoon, Mr. Trump.  You are employed by
Georgetown University?

A.   Yes.

Q.   And for how long have you been employed there?

A.   Nine years.

Q.   And what is your position at Georgetown?

A.   I am currently the Deputy Athletics Director For Internal
Operations.

Q.   And you're also a compliance officer, are you not?

A.   I oversee our compliance office, yes.

Q.   All right.  Now, you and I have never met before, correct?

A.   Correct.

Q.   All right.  And you're here pursuant to a subpoena?

A.   Yes.

Q.   Now, we have -- in this particular case, we have heard
about a term called a "slot."  Now, of course you're well
familiar with that?

A.   The athletic admission slots, yes.

Q.   Yes.  And a slot is primarily designed to allow the
admission of an athletic recruit?

A.   Correct.  It is for a coach to utilize an athletic slot
for a student athlete to add to his or her team, correct.

         1    Q.    However, there are times when slots are used to admit a
         2    non-athletic recruit for some other university purpose?
         3    A.    That, I -- I don't know a process for that.  I am only
         4    familiar with the athletic slot process.
         5    Q.    All right.  So you're not aware of a person being admitted
         6    to Georgetown using a slot but not because they were being
         7    recruited as an athlete on a particular team?
         8    A.    There very well may be other processes.  I am not aware of
         9    how those processes work.
03:18   10    Q.    Okay.  Well, let me ask you about one that we have some
        11    materials on.
        12          MR. BLACK:  And, Keith, if we could put up Exhibit 287.
        13    Now, we're going to have to go back a few pages because this is
        14    a long series of emails.  Can you go back to the beginning of
        15    the -- Keith, if you can go back several -- I think five pages
        16    to the beginning -- that's it.
        17    Q.    First, let me look at -- show you the bottom of the page.
        18    Do you see that -- do you know to Vanessa Krebs is?
        19    A.    Yes.
03:18   20    Q.    And who is she?
        21    A.    She works in the admissions office.  She is a counselor as
        22    an assistant director.
        23          MR. BLACK:  All right.  Now, if we could go to the
        24    next page so we could see the beginning of this email.  Okay.
        25    Q.    The reason I'm doing this, this is a long chain of emails.

1   So I've got to show you the beginning.  This is in January of

2   2015, and they are talking about somebody's application.

3           MR. BLACK:  And if we could go down a little bit,

4   Keith.

5   Q.   Do you see that it talks about verbally committing via the

6   baseball coach?

7   A.   Yes.

8   Q.   And Mr. Wilk is the baseball coach?

9   A.   Correct.

03:19 10  Q.   And how many athletic slots is the baseball coach given?

11  A.   The number of slots allocated will vary on a year-to-year

12  basis depending on what the needs may be for the team, how many

13  seniors may be graduating.  But generally, baseball it's eight

14  or nine.

15          MR. BLACK:  All right.  And if we could move up.  You

16  went past it.  Go back down.

17  Q.   All right.  So then here is -- unfortunately, this is

18  redacted.  We don't know --

19          MR. BLACK:  No, a little bit higher.  You were right.

03:20 20  I'm wrong.

21  Q.   This is by Kelly Young.  And who is Kelly Young?

22  A.   Kelly Young also is a counselor in the admissions office.

23          MR. BLACK:  Okay.  And if we could scroll up a little

24  bit further, Keith.  All right.  Right there.

25  Q.   So here we have, and we're going to get to your end when

```
 1   we move on a couple of pages.  So I'm just showing you the

 2   beginning.  This is from Kelly Young to Vanessa Krebs again,

 3   talking about this person as a possible baseball recruit.  Do

 4   you see that?

 5   A.   Yes.

 6   Q.   And what they're doing is asking that the coach be asked

 7   if that is true or not, or forwarding this to the coach, asking

 8   him to clarify it; is that right?

 9   A.   Yes.

10   Q.   Okay.  Thank you.

11        MR. BLACK:  And if we could scroll up a little bit.

12   Q.   Then it says here -- we have Vanessa Krebs sending an

13   email to James Colman.  Could you tell us who James Colman is?

14   A.   Yes.  Mr. Colman is also a member in the admissions office

15   and is a liaison with myself.

16   Q.   Okay.  And those are the people who decide who gets

17   admitted to the university?

18   A.   Correct.

19   Q.   And then it says here that, "I received this email from

20   Kelly.  I talked to Pete Wilk.  And he said this kid is a

21   confirmed development case, but he's not on the official list

22   of recruits."

23        Would it be possible for you to interpret this for us?

24   A.   Sure.  I can provide some context to this.  So this is a

25   baseball recruit individual that was going to be coming to
```

1   Georgetown and had conversations with the coach about joining

2   the team the next year as a freshman.

3        In addition to this, this person is also the son of a --

4   one of the board members of the university, a -- someone that

5   has worked closely with Georgetown, was an alum.  Someone we're

6   aware of.  And in this case in particular, it was believed that

7   this individual was going through a different admission route

8   in terms of being admitted to the university.  It was not going

9   to be an athletic slot for this individual.

03:23 10   Q.   Could you tell us, what does it mean in quotation marks

11   "confirmed development case"?

12   A.   That's what I mean by he was taking a different route for

13   admission.  I could not speak to what that means exactly, as

14   I'm not familiar with that process.

15        MR. BLACK:  All right.  If we could move up the thing.

16   All right.  Then next -- well, let's show the top of that

17   email, so okay.  Right there.  A little bit further.

18   Q.   So then Colman is -- I think this is addressed to you,

19   isn't it?

03:24 20   A.   Yes.

21   Q.   All right.  And he asked, "Can you check on something for

22   me?  A school counselor contacted us about a student who was

23   under the impression that his admission to Georgetown is a sure

24   thing and that he is a baseball recruit."

25        And then it says "Per Pete Wilk" -- we won't use the name,

1    just J -- "is not a baseball recruit, but he is a development

2    case that is a sure thing."

3        And then further down, "Can you confirm for me this young

4    man has been given the green light by someone, development, I

5    presume?  I do not want this young man to be disappointed if he

6    has been misinterpreting his communications with Pete."

7        Now, what does it mean to get the green light by

8    development?

9    A.   My interpretation of that comment is that he was going

03:25 10   through a different process for admissions, that he was not on

11   the athletic list as a baseball admit.  In terms of Mr. Wilk's

12   comment regarding a recruit, I believe that that is his

13   indication that he is not going to --

14            MR. MARKHAM:  I'm going to object at this point to

15   speculation.

16            THE COURT:  Sustained.  Sustained.

17   BY MR. BLACK:

18   Q.   Well, this email was to you, correct?

19   A.   Correct.

03:25 20   Q.   All right.  Could you tell us how you interpreted this

21   when you received it?

22   A.   I interpreted it that -- that this young man was on a -- a

23   different process for admissions to the university.

24   Q.   So who at the development department could we subpoena to

25   find out what the story is here?

1            MR. MARKHAM:  Objection, Your Honor.

2            THE COURT:  Sustained.  Sustained.

3            MR. BLACK:  All right.  If we could move up a little

4    bit.  All right.

5    Q.   So you say yes.  I guess you must have investigated this,

6    right?

7    A.   Yes.  I had asked a question.  And I believe, as you go

8    through the chain of emails, you will see the communication

9    with another individual regarding this case.

03:26 10   Q.   Okay.  Well, we'll get there.  And then Mr. Colman thanks

11   you for that information, right?

12   A.   Yes.

13   Q.   So at this point, this young man is getting green lighted

14   through development, right?

15   A.   Through a different process, correct.

16           MR. BLACK:  Okay.  If we could move up a little bit.

17   Q.   Now, here is an email sent by you -- I can't tell who --

18   who it is -- who you're sending it to.  You say down in this

19   email, "The kid does play baseball and is planning on coming

03:27 20   out for the team, but he isn't a recruit for Pete.  However,

21   he's important to the university and department."

22           By "department," you mean the athletic department?

23   A.   Yes.

24   Q.   So now you find out he is not getting a slot for baseball,

25   right?

1    A.    Correct.

2    Q.    All right.

3    A.    And by the quotation mark "recruit," I am indicating that

4    he is not on one of his eight or nine slots for being an

5    athletic slot because the belief is he was on a different list

6    to be admitted.

7    Q.    All right.  Very good.  Because people can get in for a

8    number of different reasons other than athletics, right?

9    A.    Again, as I mentioned previously, I'm not aware of how

03:28 10   those processes work, but that was my understanding for this

11   case in particular.

12   Q.    You know that development is involved in fundraising,

13   right?

14            MR. MARKHAM:  Objection, leading.

15            THE COURT:  Overruled.

16            THE WITNESS:  Can you repeat the question?

17   BY MR. BLACK:

18   Q.    Yes.  You know that development's involved in fundraising?

19   A.    Correct, yes.

03:28 20   Q.    And to be on a development list, does that mean that your

21   family is a potential fundraising -- a potential donor?  Excuse

22   me.

23   A.    Potentially.

24            MR. BLACK:  All right.  If we could move up a little

25   bit.

1    Q.    So now James Colman sends back another note to you.  And

2    he says, "I think he is fine to be admitted, but he won't be

3    admitted unless somebody puts him on a list.  Pete is not going

4    to make him a baseball recruit, so he had better be on someone

5    else's list.  I would hate to have the kid expecting to be

6    admitted only to have it not happen because somebody somewhere

7    did not get approval from Charlie."  Who's Charlie?

8    A.    Charlie is Charlie Deacon, the Dean of Admissions at

9    Georgetown University.

03:29 10   Q.    Okay.  And, as I understand what you said, this man's

11   father was on the board of trustees?

12   A.    Correct.

13   Q.    And the board of trustees is like the board of directors

14   to the university?

15   A.    Correct.

16   Q.    These are very important people?

17   A.    Yes.

18                MR. BLACK:  Okay.  And if we could move up.

19   Q.    And then you say, "Well, if that's the case, we would slot

03:29 20   him.  I may have an extra one or two, pending the final

21   football numbers that I'd allocate to Pete."  Do you see that?

22   A.    Yes.

23   Q.    All right.  So you're volunteering, even though he's not

24   an athletic recruit, you're volunteering to find a slot for

25   him, right?

```
 1   A.   I'm volunteering.  I'm offering that -- that slot because

 2   he was someone that our coach had had conversations with about

 3   joining the team, was coming to the -- was coming to the

 4   university and was a Division I caliber baseball player that we

 5   didn't believe we needed an athletic slot allocated for because

 6   there was a different process.

 7        So when Pete is saying that he was not going to make him a

 8   baseball recruit, it's because he was at his max number of

 9   athletic recruits already -- or athletic slots already.

10   Q.   So you take one from football?

11   A.   Correct.  And part of that process with the admissions

12   slot process, especially if you're looking at the timeline here

13   in February, admission letters generally go out late February,

14   early March.  There's a lot of back and forth with those final

15   slots for numbers, with teams pending, decisions from recruits,

16   and they might decide to go somewhere else.  And there's always

17   some back and forth.  So football was not going to utilize all

18   of their spots, so there was the opportunity to -- to use that

19   for baseball.

20   Q.   And so he didn't have to be a top flight wide receiver,

21   right?

22   A.   Correct.

23   Q.   Okay.

24        MR. BLACK:  Now, if we could move up a little bit

25   further.  Let's leave it for Colman.  All right.
```

```
 1   Q.    So James Colman sends back, "That would be my
 2   recommendation if the development side cannot confirm that this
 3   is a done deal, given that Pete has told the kid that it's
 4   assured."
 5         "As we (you and I) do not work with the development piece,
 6   I do not want to pretend to know what they have committed to or
 7   not.  If the kid will play on Pete's team, he can be a baseball
 8   recruit.  I think we just want to avoid the situation in which
 9   non-players are being slotted.  Those should really be dealt
10   with via Blanton's successor.  I have completely forgotten the
11   person's name."
12   Q.    So, first of all, who is Blanton?
13   A.    Blanton Jones was a development office at Georgetown that
14   was assigned to Athletics.
15   Q.    All right.
16         MR. BLACK:  And so if we could move a little further up
17   the page.
18             THE COURT:  I lost that.  Was that you writing?  Down,
19   Mr. Black?
20             MR. BLACK:  That was Mr. Colman.
21             THE WITNESS:  That was Mr. Colman.
22             MR. BLACK:  He's writing, and now we're up to where
23   you respond?
24             THE WITNESS:  Correct.
25   Q.    All right.  So then you respond to this, correct?
```

A.    Yes.

Q.    "Yes, agreed 100 percent.  In this case, however, he does
play baseball and will be given the opportunity to make the
team.  If there's a way to confirm on if he's on someone else's
list sooner rather than later, that would be great.  All I know
is that I had been told by Blanton that he wouldn't need to be
a baseball slot -- he'd be development.  Anyway, whatever we
need to do."

So when you say, "Anyway, whatever we need to do," this
young man is either coming in through development, through
baseball, through football, or however it needs to be done,
correct?

A.    It needs to be -- I -- I would not say football.  I would
say through as a baseball admission slot or through a
development slot.

Q.    Even though he didn't qualify for a baseball recruitment
slot, correct?

A.    He qualified for an athletic slot.  Those slots vary from
what sport they're allocated to, on a daily basis.

Q.    However, the baseball coach decided he did not qualify for
a baseball slot, correct?

A.    That's incorrect.  He had already used his slots for other
individuals that he was recruiting.  He had already capped out
with what he had been told his number of recruits would be for
that incoming fall.

```
 1   Q.   All right.  So what happened, then, is the baseball coach
 2   used this slots on better players and didn't have one left for
 3   this young man?
 4   A.   I wouldn't characterize it necessarily as better players.
 5   I can't comment on if they were better players or not.  They
 6   were players that may have committed already that he had been
 7   recruiting.  I'm not aware -- I'm not sure of how that timing
 8   would have worked.
 9            MR. BLACK:  Okay.  Let's move up a little bit further.
10   Q.   All right.  This is an email written by you --
11   A.   Yes.
12   Q.   -- back to James Colman?
13   A.   Yes.
14   Q.   And Colman is in -- is a -- isn't he an Assistant Director
15   of Admissions?
16   A.   He is in the admissions office, correct.
17   Q.   But he's an assistant director, isn't he?
18   A.   I'm not exactly sure what his title is.  His -- he and I
19   are liaisons from athletics to admissions and back and forth.
20   He and I would communicate with the number of slots allocated
21   to different teams.
22   Q.   Isn't he a senior admissions officer?
23   A.   Yes, I believe that's correct.
24   Q.   All right.  So you write back, "Well, if the kid isn't on
25   the list for Charlie" -- that's Blanton or somebody else?
```

```
 1   A.    I -- I believe Charlie there means -- that would be the --
 2   the Dean of Admissions, Charlie Deacon.
 3   Q.    Okay.  Does admissions have their own list?
 4   A.    Admissions is the group that actually makes the admissions
 5   decisions, the final admission decisions, and admits all of the
 6   incoming first-year class.
 7   Q.    All right.  Then you say, "Can I just make blank the
 8   number 10 slot for baseball and move football down to 25?"
 9   Correct?
10   A.    Correct.
11   Q.    And that's because you're moving the football slot over to
12   accommodate him?
13   A.    Correct, because football was not going to be utilizing
14   all of the slots that had been allocated for them.
15   Q.    Then you go on to say, "Blanton just texted me and said
16   blank should be on the President's list, but now I'm nervous he
17   falls through somehow, which cannot happen," correct?
18   A.    Correct.  I was concerned that this person was not going
19   to be admitted after we had talked to him about joining the
20   baseball program and the coach talking to him about joining the
21   baseball program.
22   Q.    Well, Mr. Trump, isn't it a fact the reason that you're
23   nervous about him getting listed is because his father is a
24   trustee of the university?
25            MR. MARKHAM:  Objection, leading question.
```

```
 1              THE COURT:  Overruled.  Is that why you -- was that
 2      why you were concerned?
 3              THE WITNESS:  No.  I am concerned because -- there's a
 4      lot of factors why I'm concerned.  The biggest factor is that
 5      this was a student that we had had communication with from an
 6      early process about him joining the team.  And, of course, I
 7      think his -- his father being a board member, we were aware of
 8      him.  This is someone that we know, and we had had
 9      communications with as well as the coach.  And it -- it was
03:38 10      believed that he was being admitted to the university.  And so
11      I just wanted to be sure that that was the case.
12      BY MR. BLACK:
13      Q.    All right.  Did you -- you were Gordon Ernst's supervisor?
14      A.    Yes.
15      Q.    And would he send you annual performance reviews?
16      A.    He had sent them to me in the past.  I don't know if that
17      happened annually.
18      Q.    Well, isn't it called the annual performance review?
19      A.    Yes.
03:39 20      Q.    Seems to indicate that it happens every year, right?
21      A.    Yes.  But I don't know -- I don't believe it did.
22              MR. BLACK:  If we could put up Exhibit 299.
23      Q.    Is this an April 2014 employee self-assessment form that
24      is sent to you?
25      A.    Yes, from Coach Ernst.
```

```
 1    Q.   All right.  And he said -- the number 1 question is, "How
 2    does my performance impact the challenges faced by my
 3    department and the achievement of my department's goals?"
 4    Correct?
 5    A.   Yes.
 6    Q.   And his answer is, "Hitting fundraising goals, help budget
 7    challenges of the department."  Correct?
 8    A.   Yes.  That is his --
 9    Q.   Did Ernst have fundraising goals?
10    A.   All coaches in sports programs had fundraising goals.
11    Again, they were -- they were goals to help with -- with --
12    with their overall budget challenges and being able to -- to
13    compete at a Division I level.
14    Q.   The coach would raise funds to supply the budget for his
15    team; is that correct?
16    A.   That was one of the goals for our sport programs, yes.
17    Q.   All right.
18         MR. BLACK:  And if we could move down to number 3.
19    Q.   The list is, "What new skills have I developed and
20    demonstrated, and how do they add value to the department?"
21    And his answer is, "Continue to master the art of playing money
22    ball."
23         Now, when you received this from him in April of 2014, did
24    you ask him what he meant about the "the art of playing money
25    ball"?
```

```
 1   A.   I don't recall if I asked him that.  My interpretation of
 2   that is you're -- you're doing more with less.
 3   Q.   What he's really doing is -- is doing a lot of work
 4   raising money, right?
 5            MR. MARKHAM:  Objection, leading.
 6            THE COURT:  Do you know whether he was or not?
 7            THE WITNESS:  I do not know.
 8   BY MR. BLACK:
 9   Q.   As part of your work at Georgetown, I think you told us
10   that you were a compliance officer?
11   A.   I over -- I'm sorry.  Go ahead.
12            MR. BLACK:  I'm sorry.  Hold on one second.
13   Q.   All right.  As part of your job, you handled compliance
14   for the athletic department?
15   A.   I oversee our compliance office.  I don't necessarily do
16   the compliance duties on a day-to-day basis.
17   Q.   All right.  And by "compliance," are you talking about
18   complying with NCAA rules?
19   A.   Yes.
20   Q.   Now, the NCAA is a voluntary organization; is it not?
21   A.   It's an organization that, yes, Georgetown is a member of.
22   Q.   But almost all the colleges and universities in the United
23   States belong to the NCAA?
24   A.   Either the NCAA, the NAI.  There are a few different
25   organizations out there, but...
```

1    Q.    Clearly the NCAA is the largest and most recognized?

2    A.    I believe so, yes.

3    Q.    As part of the NCAA rules, is there a requirement that if

4    a university admits athletes at a different standard than a

5    regular student, they have to publish the guidelines?

6    A.    I am not aware of -- is there a particular bylaw that you

7    have in mind?

8    Q.    Yes.

9          MR. BLACK:  All right.  If we could keep the page at

03:44 10   Exhibit 163.  And if we go to page 149 where there's -- under

11   admission, enrollment, and academic credentials.

12         I'm sorry.  There's a lot of pages in this manual.  So

13   they have to get to the right one.

14         All right.  Yeah, if we could do the first two

15   paragraphs in the middle there under 14.  That's it.  All

16   right.

17   Q.    So this deals with admissions of student athletes to the

18   university.  Do you see that?

19   A.    Yes.

03:45 20   Q.    And it says in 14.1.1 that a student athlete shall not

21   represent an institution in intercollegiate athletics

22   competition unless the student has been admitted as a regularly

23   enrolled, degree-seeking student in accordance with the

24   regularly published entrance requirements of that institution.

25   A.    Correct.

```
 1    Q.    Do you see that?  Does Georgetown abide by that?

 2    A.    Yes.

 3    Q.    And where do you publish the -- the entrance requirements?

 4    A.    I believe those entrance requirements are on the

 5    admissions page.  They're essentially a decision by the

 6    admissions office based on the parameters of what's on their

 7    website in terms of their admission guidelines.

 8    Q.    Well, where do I find these parameters?

 9    A.    I believe it would be on the admissions website.

10    Q.    Then it has under 14.1.1.1 Special Admission, it says, "A

11    student athlete may be admitted under a special exception for

12    the institution's normal entrance requirements if the

13    discretionary authority of the President or Chancellor (or

14    designated admissions officer or a committee) to grant such

15    exceptions as set forth in an official document published by

16    the university (e.g., official category) that describes the

17    institution's admissions requirements.

18          Now, does Georgetown publish a set of standards for

19    athletes that are different than the standards of the regular

20    degree-seeking student?

21    A.    No.  They publish the admission standards for students.

22    Q.    So there are no --

23    A.    Which would include athletes.

24    Q.    I'm sorry.  I didn't mean to step on your answer.  Okay.

25          So there are no rules for -- no special admission rules
```

```
 1   for athletes?
 2              MR. MARKHAM:  Objection.  Misstates testimony.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  Repeat the question, please.
 5   BY MR. BLACK:
 6   Q.   Certainly.  So there are no published special admission
 7   standards for athletes at Georgetown?
 8   A.   Not that I'm aware of.  The admissions process goes
 9   through the admissions office for them to make the final
10   determination on the admission of all students, which may
11   include student athletes.
12   Q.   All right.  I want to show you a document which we've
13   marked Exhibit SV.  That means it's not in evidence yet, so I'm
14   going to show it to you, but --
15              THE COURT:  I'm not sure I have it.
16              THE CLERK:  We don't.
17              (Exhibit No. SV marked for identification.)
18              MR. MARKHAM:  Your Honor, I don't believe I've seen
19   this before.  If I could have a moment.
20              THE COURT:  Do you remember this document at all?
21              THE WITNESS:  I do not.
22              THE COURT:  Are you offering it?
23              MR. BLACK:  Yes, Your Honor.
24              THE COURT:  I don't have time to read it.  It's about
25   20 pages long, so...
```

1          MR. BLACK:  There's only one page I'm going to ask him

2     about.

3          THE COURT:  Where is that?

4          MR. BLACK:  It's not numbered, but it's --

5          MR. MARKHAM:  The government objects to its admission.

6          MR. BLACK:  -- seven pages.

7          THE COURT:  Excuse me?

8          MR. MARKHAM:  The government objects to admission on

9     authenticity and lack of personal knowledge.  If it refreshes

03:50 10    his recollection as to something.

11          THE COURT:  Yes.  So far sustained, but now he's going

12    to one page.

13    BY MR. BLACK:

14    Q.   Is Defendant's Exhibit SV for identification an official

15    publication of Georgetown University?

16    A.   Can you repeat the question?

17    Q.   Yes.  Is Defendant's Exhibit SV for identification an

18    official publication of Georgetown University?

19    A.   It appears to me that this was a slide presentation of

03:50 20    some sort for a committee meeting.

21    Q.   All right.

22          THE COURT:  Do you remember seeing this?

23          THE WITNESS:  I do not.

24          THE COURT:  So what page do you want him to turn to,

25    to see if --

```
 1            MR. BLACK:  It's seven pages in.  It says "Academic
 2      accomplishments."
 3            THE COURT:  It says "Year-to-date review 2013 to
 4      2014."  Do you have that?  Have you seen it?
 5            THE WITNESS:  Yes, I have that.  I'm on that page.
 6            THE COURT:  So what's your question?
 7      BY MR. BLACK:
 8      Q.   This was a what?  This was used in a meeting relating to
 9      the athletic department; is that correct?
10            MR. MARKHAM:  Objection, Your Honor.  He says he
11      doesn't know what the document is.
12            THE COURT:  Sustained.
13            MR. BLACK:  Well, I'm trying to lay the predicate.
14            THE COURT:  Sustained.  He doesn't know.
15            MR. BLACK:  All right.  So...
16            THE COURT:  You can ask him about the information in
17      it.
18      BY MR. BLACK:
19      Q.   What is an athletics committee meeting?
20      A.   This meeting, I believe it's a group of typically alumni.
21      It could be former student athletes.  But it's a presentation
22      that happens maybe two or three times a year where we
23      provide -- when I say "we," the Athletics Department provides
24      an update to this committee on the happenings of what's going
25      on within the athletic department.
```

```
 1   Q.   And is information reported during this committee meeting?
 2   A.   Yes.
 3   Q.   And is that information accurate?
 4        MR. MARKHAM:  Your Honor, I'm objecting to this
 5   committee meeting.
 6        THE COURT:  Sustained.  Sustained.  He doesn't know
 7   about it.
 8   BY MR. BLACK:
 9   Q.   Does Georgetown publish accurate information about what
03:52 10   goes on in its athletic department?
11        MR. MARKHAM:  Objection, vague.
12        THE COURT:  Sustained.
13   BY MR. BLACK:
14   Q.   Would the Athletics Department ever publish or issue
15   inaccurate information?
16   A.   Would athletics purposely publish inaccurate information?
17   Q.   Yes.
18   A.   No, not purposely.
19   Q.   All right.  Does the -- as part of the statistics
03:53 20   gathering of the athletic department, does it report the
21   average GPA of student athletes entering into the university?
22        MR. MARKHAM:  Objection.  This is all hearsay.  He
23   doesn't recognize the document.
24        THE COURT:  He's the head of athletics.  Are you
25   familiar with that statistic yourself?
```

```
 1              THE WITNESS:  That we -- that athletics produces the
 2      average GPA of the students that are coming into the
 3      university?
 4      BY MR. BLACK:
 5      Q.   Yes.
 6      A.   Is that the question?
 7      Q.   Yes.
 8      A.   We may have pulled that information from -- and in terms
 9      of their -- are you're talking about GPA, their high school
03:54 10      GPA?
11      Q.   Yes.
12      A.   If we did, we would only do that from the NCAA eligibility
13      center for student athletes that are entering Georgetown that
14      we were aware of.
15      Q.   All right.  Could you pull -- go seven pages in to page
16      that says "Year-to-date review?
17      A.   The academic accomplishments?
18      Q.   Yes.
19      A.   Yes, I'm on that page.
03:54 20      Q.   Okay.  I'm just going to ask you some questions to lay the
21      predicate.  So don't give us the information yet.  But does the
22      athletic department compute the average GPA for student
23      athletes entering the university?
24      A.   You said not to answer.
25      Q.   Don't give me the number.  Just say yes or no.
```

```
 1              THE COURT:  Let me just clarify.  These are people
 2      from their high school average, or from their first year at
 3      Georgetown.
 4              MR. BLACK:  This is from high school.
 5              MR. MARKHAM:  Your Honor, just to be clear, we have no
 6      idea what this is because the witness doesn't know what it is.
 7              THE COURT:  Objection sustained.
 8      BY MR. BLACK:
 9      Q.   Is there a concern -- well, let me -- does Georgetown have
03:56 10     mental health services for athletes?
11      A.   Yes.  We have two counselors that are dedicated for
12      student athletes that work as a component of the mental health
13      services for the university.
14      Q.   Isn't it true that NCAA student athletes are subject to a
15      lot of mental stress?
16              MR. MARKHAM:  Objection, Your Honor.  It calls for
17      speculation.
18              THE COURT:  Overruled.  I'll allow that.
19              THE WITNESS:  Repeat the question, please.
03:56 20     BY MR. BLACK:
21      Q.   Yes.  Do NCAA student athletes suffer under mental stress?
22      A.   I don't know if "suffer" is the right characterization,
23      but I would say all students we've seen across the board
24      have -- we've seen an increase in mental health issues.
25      Q.   All right.  Has that been particularly -- well, let me
```

1    withdraw that.

2            MR. BLACK:  Let's put up Exhibit 200.

3    Q.   This is a memo from you to Lee Reed?

4    A.   Yes.

5    Q.   And this was done as part of your job as the Assistant

6    Athletic Director?

7    A.   Yes.  This is a process that we initiated about that time,

8    yes.

9    Q.   Okay.  And you're talking here about student athletes that

03:57 10  were admitted in the fall of 2018, correct?

11   A.   Correct.

12   Q.   And I'd like to ask you about the second half of the

13   second paragraph.  It says, "The three students who are not

14   members of the team they were recruited for informed their

15   coaches over the summer or early fall that they would not

16   participate in intercollegiate athletics because of anxiety,

17   stress, and feeling overwhelmed."  Did I read that correctly?

18   A.   Yes.

19   Q.   So would it be fair to say -- and athletes entering in the

03:58 20  fall of their first year are usually about -- are usually 18

21   years old?

22   A.   Correct.

23   Q.   And can these young people feel overwhelmed?

24   A.   I think regardless of age, anyone can feel overwhelmed.

25   Q.   Yes.  But I'm particularly talking about student athletes.

1    I mean, I feel overwhelmed all the time too, but...

2    A.   I can't speak for them, but yes.

3    Q.   Okay.  Would it be fair to say that student athletes at

4    times can feel more stress and anxiety than anyone else?

5    A.   I mean, I can't speak for them.  But maybe.  They have a

6    lot going on, as do all of the students.

7    Q.   Well, certainly, these three have a high level of anxiety,

8    stress, and feeling overwhelmed, correct?

9            MR. MARKHAM:  Your Honor, I'd object to this point.

03:59 10    One to hearsay.  But, two, this is in 2018.  It's not relevant.

11            THE COURT:  Yes.  At this point, we've gone through

12    it.  So why don't we move on?  How much longer do you have with

13    this witness?

14            MR. BLACK:  I would say about three minutes.

15            THE COURT:  Okay.  How long do you think you'll have?

16            MR. MARKHAM:  Your Honor, I think I can be five

17    minutes or less.  I don't want to stand between the jury and

18    freedom.

19            THE COURT:  I just wanted to be able to get him on a

03:59 20    flight tonight.  So if it's only five minutes, I don't want to

21    hold him over.

22            Anybody running for a train or something?

23            Okay.  All right.  Let's try to get him out of here,

24    if possible.

25            MR. BLACK:  Yes, Your Honor.

```
 1    Q.   Is it true that, according to the NCAA, that student
 2    athletes dedicate nearly 80 hours a week in a combination of
 3    athletics and academics?
 4    A.   In a combination?  That seems like a -- a good estimate.
 5             MR. BLACK:  All right.  Mr. Trump, thank you very
 6    much.
 7             Thank you, Your Honor.
 8             THE COURT:  Thank you.
 9                         CROSS-EXAMINATION
10    BY MR. MARKHAM:
11    Q.   Mr. Trump, we're going to get you on an airplane.
12    A.   Much appreciated.
13    Q.   Did Georgetown allow parents of applicants to pay coaches
14    cash in exchange for recruiting slots?
15             MR. BLACK:  Objection.
16    A.   No.
17             THE COURT:  Sustained.
18             MR. MARKHAM:  Your Honor, this is the compliance
19    officer who's in charge of Gordon Ernst.
20             THE COURT:  Sustained.
21    BY MR. MARKHAM:
22    Q.   Okay.  Did Georgetown allow parents to pay coaches
23    directly money for any reason?
24             MR. BLACK:  Objection.
25             THE COURT:  Overruled.
```

```
 1   A.    No.
 2   Q.    Did Georgetown have a special exception for Amin Khoury?
 3   A.    I am not aware of any special exception.
 4   Q.    You're not aware of any special exception in the policy
 5   specifically this defendant, Amin Khoury, right?
 6   A.    Correct.
 7   Q.    And there's no special exception for Gordon Ernst?
 8   A.    Correct.
 9   Q.    Did you ever tell Gordon Ernst -- you supervised Gordon
10   Ernst, correct?
11   A.    I did at the time, yes.
12   Q.    In 2015.  And you never told him -- you never even gave
13   him tacit approval to accept cash from prospective parents,
14   right?
15   A.    No.
16   Q.    And isn't it true that both Georgetown and NCAA
17   regulations require coaches to act with honesty in their
18   recruiting practices?
19   A.    Correct.
20         MR. BLACK:  Objection.
21         THE COURT:  Overruled.
22   BY MR. MARKHAM:
23   Q.    From a Georgetown perspective, is it considered honest if
24   Gordon Ernst is recruiting players that could never or would
25   never play for the team?
```

```
 1                    MR. BLACK:  Objection.

 2                    THE COURT:  Overruled.

 3    A.    Correct.

 4    Q.    From a Georgetown perspective, is it considered honest if

 5    Gordon Ernst is receiving cash payments from prospective

 6    parents without disclosing it to Georgetown?

 7                    MR. BLACK:  It calls for a legal conclusion.

 8                    THE COURT:  Sustained.  Sustained.  I've already --

 9    I've already sustained that objection.

04:02 10    BY MR. MARKHAM:

11    Q.    In this case, the defendant received confirmation on May

12    13, 2015, that his daughter was going to Georgetown.  On or

13    before that date, did you have any idea who Amin Khoury was?

14    A.    Athletics did not.

15    Q.    When is the first time you heard the name Amin Khoury?

16    A.    Not until we were subpoenaed.

17    Q.    What about Katherine Khoury?  When was the first time you

18    heard of her?

19    A.    At the same time.

04:02 20    Q.    But you oversaw the tennis program in 2015, correct?

21    A.    Correct.

22    Q.    And isn't it true that every year around April, Gordon

23    Ernst was required to provide you the names of incoming tennis

24    players?

25    A.    Yes.  During that time, we would receive from all of our
```

         1    coaching staff the rosters for the next year so we could then
         2    put them on the NCAA IRL list so we could track their
         3    eligibility as well as add them to the NCAA squad list, which
         4    is a requirement by the NCAA.
         5    Q.   So around April 2015, Gordon Ernst was required to tell
         6    you who were going to be his tennis players for the next year?
         7    A.   Correct, if he had not yet already.
         8    Q.   In 2015, did Gordon Ernst identify Katherine Khoury?
         9    A.   He did not.
04:03   10    Q.   So despite identifying her as a protected recruiting slot
        11    to admissions, he never even told you about her?
        12    A.   Correct.
        13    Q.   Defense has clearly obtained a large number of your
        14    emails, correct?
        15    A.   Yes.
        16    Q.   And they went through some of them with you?  I know it
        17    doesn't sound like a question, but it was.
        18    A.   Yeah.
        19    Q.   Did defense put a single email in front of you containing
04:04   20    the name Amin Khoury?
        21    A.   No.
        22    Q.   Did the defense put a single email in front of you
        23    containing the name Katherine Khoury?
        24    A.   No.
        25    Q.   There were no emails that Amin Khoury or Katherine Khoury

1   relating to development, donations, or anything else?

2   A.    No.

3   Q.    And that's because, as we just discussed, Gordon Ernst

4   never told you about Katherine Khoury, correct?

5   A.    Correct.

6   Q.    Some of those emails discuss other potential players at

7   Georgetown.  To be clear, were coaches allowed to use protected

8   slots on applicants that either could not or would not play for

9   the teams?

04:04 10   A.    No.  Those are to be used for student athletes that will

11   be on the rosters.

12   Q.    Okay.  So even if a coach decided personally to consider

13   things like leadership or legacy or donation potential, they

14   still had to have the ability to play on the team, correct?

15   A.    At a bare minimum, yes.

16   Q.    Some of the emails also discussed fundraising at

17   Georgetown.  By definition, fundraising involves money going to

18   Georgetown, right?

19   A.    Correct.

04:05 20   Q.    And donations and fundraising that goes to Georgetown,

21   that is used to benefit the school, correct?

22   A.    Correct.

23   Q.    So things like scholarships for student athletes?

24   A.    Correct.  Any sort of donation.  There's a process for

25   that to be donated to the university through our university

1    development office.

2    Q.   And when cash goes to a coach's pocket, that's just not

3    fundraising, right?

4    A.   Correct.

5    Q.   The athletic department has a set number of recruiting

6    slots every year.  Is that what you testified to on direct?

7    A.   Yes.

8    Q.   And Gordon Ernst had a subset of those.  He had his own

9    set number for tennis players specifically?

04:05 10   A.   Yes.

11   Q.   And those recruiting spots were highly coveted?

12   A.   Yes.

13   Q.   So if Gordon Ernst hadn't used a recruiting slot on

14   defendant's daughter, he could have used it on another young

15   woman, correct?

16   A.   Yes.

17   Q.   After 2015, without going into any of the details, is it

18   fair to say that Georgetown identified some serious issues with

19   Gordon Ernst's recruiting process?

04:06 20            MR. BLACK:  Objection.

21            THE COURT:  Sustained.  We need to finish this.

22   BY MR. MARKHAM:

23   Q.   Does Gordon Ernst work at Georgetown anymore?

24   A.   He does not.

25            MR. MARKHAM:  No more questions, Your Honor.

REDIRECT EXAMINATION

BY MR. BLACK:

Q.   I believe you just testified that Georgetown does not allow its coaches to be paid directly; is that correct?

A.   Paid directly by who?  What?  Can you --

Q.   Donors, people.

A.   Correct.

Q.   Okay.  Now, Gordon Ernst ran a summer camp at Georgetown, didn't he?

A.   Yes.

Q.   Who went to the summer camp?

A.   Kids.

Q.   Did you check on it?

A.   I'm sorry?

Q.   Did you audit that?

A.   We did not.  Those camps are their own.

Q.   Did you check to see how much he was paid?

A.   I did not.

Q.   Did you ask whether or not he got paid by check or cash?

A.   I did not.

Q.   Did you check whether or not any of his recruited athletes were at his summer camp?

A.   I did not.

Q.   Do you know whether or not the parents of any of his recruited athletes paid him so their kid will get trained by

```
  1    him at a summer camp?
  2            MR. MARKHAM:  Your Honor, I'm going to object to all
  3    of these questions as being leading.
  4            THE COURT:  Overruled.  But we need to finish.
  5    A.   I do not, but summer camps are not a Georgetown athletic
  6    department run --
  7    Q.   No.  But the coach is, right?
  8    A.   They're allowed to run their own LLC business, which is
  9    very common for coaches to do that.
 10    Q.   So the coach can get paid by people, right?
 11    A.   For those types of endeavors.
 12    Q.   Ah.  So long as it's some type of an endeavor, the coach
 13    can be paid by a person, right?
 14            THE COURT:  You know, we need --
 15    Q.   Right?
 16    A.   Yes.  For goods or services, yes.
 17    Q.   Ah.  So long as goods and services are involved, it's okay
 18    for somebody to pay the -- the coach directly?
 19    A.   Yes, if that's through their own business.
 20            MR. BLACK:  Thank you, Your Honor.
 21            THE COURT:  Thank you.
 22            MR. MARKHAM:  I just have one question, Your Honor.
 23            THE COURT:  Yup.
 24
 25
```

<pre>
   1                    RECROSS-EXAMINATION
   2    BY MR. MARKHAM:
   3    Q.   Is a recruiting slot at Georgetown University a good or a
   4    service that can be sold by a coach?
   5    A.   No.
   6              MR. MARKHAM:  No more questions.
   7              THE COURT:  Thank you.  Have a nice trip home.
   8              THE WITNESS:  Thank you.
   9              (Witness excused.)
04:09 10          THE COURT:  I'll see you tomorrow morning.  Thank you.
  11              THE CLERK:  All rise.
  12              (Jury exits.)
  13              THE COURT:  Who are the next witnesses?
  14              MR. SREBNICK:  We have two more witnesses.  We have
  15    Dan Trump and Amin Khoury.  I'm sorry.  Lee Reed and Amin
  16    Khoury, Sr.
  17              THE COURT:  Okay.  Would that likely be the morning?
  18              MR. SREBNICK:  Not even.  One hour, max.
  19              THE COURT:  But for all, for both?
04:10 20          MR. SREBNICK:  Correct.
  21              MR. MARKHAM:  We anticipate our cross-examinations
  22    will continue to be short.
  23              THE COURT:  At the very least, we'll probably be doing
  24    openings tomorrow.  But I'd like to do a five- or ten-minute
  25    break for the court reporter and all of us and start at least
</pre>

1    the process of doing a charge conference.  And then we may come

2    back early tomorrow morning again to continue with it,

3    depending upon how far along we get.  So why don't we take a

4    ten-minute break right now.

5              (A recess was taken.)

6              MR. SREBNICK:  Without objection from the government,

7    I was going to move in Katherine Khoury's Georgetown transcript

8    previously marked as Exhibit PT.  So now it would be the next

9    number.

04:22 10        THE CLERK:  You need your paralegals here because we

11   don't know what the next number is.

12             MR. SREBNICK:  Oh, forgive me.

13             THE CLERK:  So it's PT?

14             MR. SREBNICK:  Yes.

15             THE CLERK:  And that would be the next number?

16             MR. SREBNICK:  Yes, please.

17             THE CLERK:  I don't want to say the wrong number.

18             379?  I don't think that's it.

19             THE COURT:  Where did he just go?  He just

04:23 20   disappeared.

21             LAW CLERK:  I think he went to fetch his paralegal.

22             MR. SREBNICK:  379 is the next number.

23             THE CLERK:  379 and that was PT, right?

24             MR. SREBNICK:  And with an objection, we're moving in

25   PS, which is the transcript from Fordham University for

```
 1    Katherine Khoury.  The government objects.
 2              THE COURT:  Allowed in.  Let's go.
 3              MR. MARKHAM:  Your Honor, it's not authenticated and
 4    it's irrelevant.  It's a printout from -- the Georgetown one is
 5    like her official transcript from Georgetown.  It's during the
 6    relevant time frame.  Fordham is not during the relevant time
 7    frame, and it's a printout from the Internet.
 8              THE COURT:  Does it show the GPA she talked about
 9    before?
10    MR. SREBNICK:  Yes.  3.802.
11              THE COURT:  I'm going to let it in.
12              MR. MARKHAM:  Understood, Your Honor.
13              THE CLERK:  That was PS, and now that's 380.
14              (Exhibit No. 379 received into evidence.)
15              (Exhibit No. 380 received into evidence.)
16              THE COURT:  It's not important for us to be spending
17    time on this.  These are side issues.  What's important is we
18    get to the jury instructions.
19              I'm going to start with the government's jury
20    instructions, which were relatively simple in terms of the
21    objections.  And one question I had is there was a statement
22    that there were no stipulations.  Is that so, there were no
23    stipulations?
24              MR. MARKHAM:  So there are stipulations as to
25    admissibility but not to any facts.  And we didn't read them in
```

 1    front of the jury.  So our concern is it might be even more --

 2    if they've never heard the word "stipulation" before, and they

 3    are not going to see that.

 4              THE COURT:  I'm happy to strike it out.

 5              MR. MARKHAM:  Yeah, as long as the defense has no

 6    objection.  They are essentially stipulations we entered into

 7    before, to make sure things would come in at trial.

 8              THE COURT:  All right.  So I need you all to be with

 9    me.  Page 6 of the government's objection.  Do you have those

04:24 10    in front of you?  I'm going to take out stipulations.

 11              MS. McGEE-TUBB:  Yes.  And, Your Honor, I'm Mathilda

 12    McGee-Tubb from Mintz on behalf of defendant, Amin Khoury.  So

 13    I haven't seen you before.

 14              THE COURT:  What's your name, ma'am?

 15              MS. McGEE-TUBB:  Mathilda McGee-Tubb.

 16              THE COURT:  Welcome.

 17              MS. McGEE-TUBB:  Thank you.  Or good afternoon, I

 18    suppose.

 19              But we have no objection.

04:25 20              THE COURT:  And then I'm going to keep going through

 21    yours.  And maybe you have -- the next one of yours is -

 22              MR. SREBNICK:  May we remain seated for this part?

 23              THE COURT:  Yes.

 24              There was something about valuing the bribe.  Is that

 25    right?

1          MS. KEARNEY:  I'm sorry?

2          THE COURT:  Page 28, I think they're right.  It's an

3     omission of a material fact or matter.

4          MS. McGEE-TUBB:  So we object to that insertion

5     because it's adequately captured by the concealment language.

6     And what the government has proposed is a deviation from the

7     First Circuit pattern instruction, which is the 1341

8     instruction.

9          THE COURT:  Well, concealment of a material fact or

04:26 10     matter or omission are two different concepts.  Do you have a

11     case?

12          MS. KEARNEY:  Not on hand, but we can get one.

13          THE COURT:  Why don't you find one for me tomorrow but

14     I'm inclined to allow that in because it's a material omission.

15     It's pretty black letter law.  It's not just concealment.  It's

16     not like you've concealed it, that you've hidden it.  It's that

17     you just didn't say something that was material to the mix of

18     information.

19          MS. McGEE-TUBB:  Our objection is that this is

04:26 20     otherwise tracking the pattern instruction which does not

21     include that language.

22          THE COURT:  Do you have any case that says that's

23     wrong?

24          MS. McGEE-TUBB:  I don't, but we will report back.

25          THE COURT:  Okay.  So I'm inclined to allow that.

```
  1    Material omission is standard for a fraud case, but I would
  2    like you to find me a case --
  3              MS. KEARNEY:  Yes, Your Honor.
  4              THE COURT:  -- tonight that did that.
  5              MS. KEARNEY:  Yes, Your Honor.
  6              THE COURT:  I'm inclined to allow that in.
  7              I'm not going to allow in the addition on 32.
  8    Consider whether Mr. Khoury knew that Timothy Donovan or Gordon
  9    Ernst were acting with reckless disregard.  I think that overly
04:27 10    confuses this instruction.  So I'm not inclined to do that.
 11              MS. KEARNEY:  Understood.
 12              THE COURT:  I didn't understand "interstate carrier."
 13              MS. KEARNEY:  I think that was just a typo.  The word
 14    "carrier" was missing.
 15              THE COURT:  Oh, all right.  I'll add that in.
 16              This actually -- you want me to take out the word
 17    "tacit"?
 18              MS. KEARNEY:  Yes, Your Honor.
 19              THE COURT:  Page 28.
04:27 20              MS. McGEE-TUBB:  Your Honor -- I'm sorry.  Go ahead.
 21              THE COURT:  I think "tacit approval" should stay in
 22    there.  What do you think?
 23              MS. McGEE-TUBB:  Yes, absolutely.  I think the word
 24    "tacit" means understood or implied without being stated.  And
 25    so we need that concept.  But we did -- and I know we'll get to
```

         1   our proposed instructions later -- we did propose a

         2   modification.  We're not sure that the word "tacit" is commonly

         3   understood.  And so we suggested, I think it was directly or

         4   indirectly, some alternative but absolutely we think that

         5   concept needs to stay in the instructions.

         6         THE COURT:  I think "tacit" is widely enough

         7   understood.

         8         MS. KEARNEY:  I think it is understood, Your Honor,

         9   especially in this --

04:28   10         THE COURT:  I think, also, it may be there again with

        11   the conspiracy charge, isn't it?  In any event, I'm going to

        12   stick with that, but I'm also going to get rid of the word

        13   "kickback" because I don't think this is a kickback case.

        14         MR. MARKHAM:  Your Honor, I think we would ask that to

        15   stay in.  What the defense is arguing is that because Katherine

        16   Khoury got her final admission on May 13 and the payment was on

        17   May 15, that it could not have been a bribe.

        18         THE COURT:  No, I'm going to accomplish that in

        19   another way.  I agree with you that -- I agree with you that we

04:29   20   need to -- both sides, actually -- I need to do more with that

        21   instruction.  But it's not a kickback as one usually thinks of

        22   a kickback.  This is a bribe case.  Right?

        23         MR. MARKHAM:  Well, we think the kickback would be

        24   that once you get in, you get paid the kickback for getting his

        25   daughter in.  So we think it's appropriate.  If you think the

1    term is inflammatory or something --

2         THE COURT:  I just -- is it in the indictment,

3    actually, even?  The word -- this is a bribe case.

4         MS. McGEE-TUBB:  Your Honor, we agree.  There's never

5    been a reference to a kickback before today in this case.

6         MS. KEARNEY:  It is in the indictment, Your Honor, in

7    Count One.

8         THE COURT:  I'm inclined not to use the word

9    "kickback."  I think it's a bribe case.  So I'm going to stick

04:29 10    with "bribe."  But I do agree with you I have to deal with the

11    payment issue, so I'm going to get there.

12         And I am going to add on page 41 the exact quote out

13    of the First Circuit case about the value of the bribe.

14         MS. McGEE-TUBB:  Your Honor, we object to that

15    insertion in there, and I recognize that that language is

16    borrowed from a First Circuit case.

17         THE COURT:  Plagiarized directly from there, indeed.

18         MS. McGEE-TUBB:  We object to the insertion of it.  I

19    think the case explains more conceptually why it could but is

04:30 20    not always a guidepost, and Judge Woodlock in the Bizzack case,

21    which is a related Varsity Blues case, really expressed some

22    scepticism about using the amount that was paid as a proxy for

23    value.

24         MS. KEARNEY:  Your Honor, that's not exactly what

25    happened.  This was at the sentencing of Mr. Bizzack.  And

1      Judge Woodlock was expressing concern about what was

2      foreseeable to the defendant, not about what the value of it

3      was.

4                  THE COURT:  It's right out of the First Circuit.  I'm

5      going to do it.  I'm happy to couch it a little more if

6      there's -- you may, but are not required to -- I think -- it's

7      sort of just --

8                  MS. KEARNEY:  It is couched, Your Honor.

9                  THE COURT:  Yeah, it's couched.  I agree.  All right.

04:31 10            That's it for the government?

11            And now I plunge into the defense.  I don't believe

12      that I could possibly get through everything today.  But let's

13      hit some of the biggies and then backtrack.  Okay?

14            I think on balance, my law clerk has looked into it,

15      that given the First Circuit case law that you need an overt

16      act for honest services fraud.  I think it is a better and

17      safer approach to use "overt acts" for each of the objects.

18                  MR. MARKHAM:  Yes, Your Honor.  And we would not

19      object to that.  We just would like language making it crystal

04:31 20      clear that it can be the same overt act for all three objects.

21      So you don't have to do different things for each of the

22      objects of a conspiracy.

23                  THE COURT:  I'm moving directly to the middle portion

24      right now, and then I'll circle back to what I'll call more of

25      the boilerplate.

1           So we will do overt acts for each of them, but I will

2    add it can be the same one, but you have to be unanimous as to

3    which one it is.  I'm going to apply the rule of unanimity to

4    the overt piece of it.

5           MS. McGEE-TUBB:  And, Your Honor, that they -- they

6    must find an overt act for each piece.

7           THE COURT:  Yes.  But it could be the same one.  It

8    just has to be that they have to unanimously agree on what it

9    is.

04:32 10          MS. McGEE-TUBB:  Okay.

11          THE COURT:  All right.  So now I'm starting with

12   specific instructions on page 27.  So I've dealt with overt

13   acts, which is huge.

14          So I'm going to start going through these, and I don't

15   know how far we'll get.  But perhaps on one of the biggest ones

16   will also be this language out of one of the First Circuit

17   cases, that a payment after the fact is not a bribe.  However,

18   it doesn't quite say that when I went and read the case.  It

19   depends on when the agreement to pay was, and I'm going to try

04:33 20   and craft language that reflects that.

21          Like if it's simply payment after the fact, it doesn't

22   qualify as a bribe.  But if the agreement to pay was before the

23   fact, the fact that the payment afterwards occurred is a bribe.

24   So it's the timing of the agreement that becomes the critical

25   indicia.

 1          So that's just sort of a big picture thing.  I'm going

 2     to steal from the language, once again, being the greatest

 3     plagiarist in the world when it comes to jury instructions, of

 4     *U.S. v. Fernandez* 722 F.3d 119, which says, "Although the

 5     timing of the payment may not prove a conclusive answer" --

 6     "may not provide a conclusive answer as to whether the payment

 7     is a bribe or gratuity, the timing of the agreement to make or

 8     receive a payment may," and then there's additional language.

 9     So it's the timing of the agreement that's essential to

04:34 10     deciding whether or not it's a bribe.

11          So now, just going back to instruction number 15.

12          MS. KEARNEY:  I'm sorry, Your Honor.  On that, I think

13     in the *Fernandez* case it's more about intent and not timing.

14     So I just don't want to confuse the jury.

15          THE COURT:  Let's go through it as we get to it.  But

16     I think I have to be careful on this one because if it's just

17     simply a payment afterwards and there was no preagreement, I

18     think they may be right.  If there was a preagreement but the

19     payment didn't come until later --

04:34 20          MS. KEARNEY:  Well, if --

21          THE COURT:  -- then it's illegal.

22          MS. KEARNEY:  Well, agreement I think is synonymous

23     with the intent in that situation.

24          THE COURT:  That may be.  It's the quid pro quo piece

25     of it.

1          MS. KEARNEY:  Yes.

2          THE COURT:  So on page 27, I agree with the defense's

3     addition.  Basically, a separate verdict for each one kind of

4     thing.  That's fair enough.

5          On page 28, it's a statute of limitation.  I'm going

6     to give that issue to the jury.  That it should be an acquittal

7     unless they find that the conspiracy extended into the required

8     time period as in on or after September 1, 2015.

9          MS. McGEE-TUBB:  Your Honor.

04:35 10          THE COURT:  Is that wrong?

11          MS. McGEE-TUBB:  I believe you said the correct date

12     is September 1, 2015.  But we don't believe there's any

13     evidence in the record at all to support any extension beyond

14     that date.  So we would --

15          THE COURT:  Well, there's "I'll take a bite out of it"

16     in 2016.  I think that -- or "Here's a bite.  I'll meet you at

17     Starbucks."

18          MS. McGEE-TUBB:  That refers only to potential further

19     exchange of money, which all of the predicate elements for each

04:36 20     of the crimes charged, if the government is correct, would have

21     been completed before September 1st.

22          THE COURT:  I'm overruling that, but I will put the

23     question of statute of limitations.  I am -- you-all saw my

24     verdict slip.  Is everybody --

25          MR. MARKHAM:  Yes, Your Honor, from the government.

                    1          THE COURT:  -- satisfied with that?  I gave it, I

                    2   think, last Thursday or Friday.

                    3          MS. McGEE-TUBB:  Just a moment.  We're looking into

                    4   that.

                    5          Your Honor, we did file our motion for judgment of

                    6   acquittal on statute of limitations grounds.

                    7          THE COURT:  Yes, you did.  And I read it over lunch.

                    8   I think there's enough evidence to support it going into 2016.

                    9   Although I will say I don't find any enough -- I want the

    04:36    10   government to focus on me for one second.  I don't find there's

                   11   enough evidence to say that the conspiracy went through to

                   12   2019.  I think my law clerk over lunch had no lunch, and he

                   13   looked it up.  And you have to have an express agreement to

                   14   have a cover-up, to have it last that long after the agreement.

                   15   It ended with the payment.

                   16          MR. MARKHAM:  Well, Your Honor, just to be clear what

                   17   the government's position is, the entire time Katherine Khoury

                   18   is at Georgetown, the cover-up remains.  And there was an

                   19   investigation specifically into Katherine Khoury in which they

    04:37    20   knew about it, and they had to keep covering it up.  And the

                   21   payments continued while she was at Georgetown as well.

                   22          THE COURT:  I only have evidence through 2016.

                   23          MR. MARKHAM:  Understood, Your Honor.

                   24          MR. SREBNICK:  But with regard to that --

                   25          THE COURT:  Not through 2016.  I forget.  "Take a

1  bite," when was that?

2      MS. KEARNEY:  That was through July 2016.  But just to

3  echo what Mr. Markham was saying, that the purpose of the

4  conspiracy here was to facilitate her admission.  When

5  Georgetown discovered that all of these students were getting

6  in through recruitment slots that they weren't entitled to,

7  they actually did expel some of those students.  So it would

8  not facilitate her admission had this been discovered.

9      THE COURT:  Well, the conspiracy covered getting her

04:38 10  in.  And they had to be under First Circuit law, an express

11  agreement that it included cover-up.  And I haven't seen that.

12      MS. McGEE-TUBB:  And, Your Honor, further, there's

13  no -- none of what Ms. Kearney said is in the record about the

14  investigation.

15      THE COURT:  About?

16      MS. McGEE-TUBB:  About any investigation into --

17      MS. KEARNEY:  We tried to put it in.

18      THE COURT:  Well, no, it's not going to happen because

19  that would be prior bad acts and too prejudicial.  So I stopped

04:38 20  it.  I tried to anyway.

21      What about the difference between funds and benefits?

22      MR. SREBNICK:  Before we move out of the verdict form

23  on Count 1-A on this issue of statute of limitations, I

24  understand the Court's ruling that a payment into 2016 could be

25  part of a bribery -- the bribe itself, for example.

```
 1              But as to Count 1-A, conspiracy to commit mail fraud
 2     of property where payment is not an element of the offense at
 3     all, it's depriving Georgetown of that recruitment slot.
 4     Whether paid for or not makes no difference.  That crime, if
 5     committed, was complete upon Georgetown losing its property.
 6     How someone then moves on from there.
 7              THE COURT:  It wasn't a mail fraud count.  It's a
 8     conspiracy count.  So...
 9              MR. SREBNICK:  But the object, Count 1-A, a conspiracy
10     to take Georgetown's property is complete and finished upon the
11     taking of the property.
12              THE COURT:  What's your position on that?
13              MS. KEARNEY:  Your Honor, it's a scheme to defraud.
14     The payments are part of the scheme.  So the conspiracy
15     continued.
16              THE COURT:  I -- I agree with you.  That's denied.
17     Okay.
18              I just want to -- it does say "benefits" in the
19     statute, so I'm inclined to say "benefits."
20              MS. KEARNEY:  No objection, Your Honor.
21              THE COURT:  And that's on page 28.
22              I thought the two -- on page 29 are okay.  On page
23     30 --
24              MS. KEARNEY:  Your Honor, I would just add on those,
25     in concept, the government has no objection to that.  It's just
```

1    that it's repeated so many times throughout these instructions,

2    but I don't think the jury needs to have it banged over their

3    heads that many times.

4              THE COURT:  All right.  Thank you.

5              As I said, I think I adopt everything that's being

6    said on page 30.

7              MS. KEARNEY:  Your Honor, the government would object

8    to the deletion of "spoken or unspoken" on page 31.

9              THE COURT:  Yeah.  I agree with you.  That's going to

04:40 10   stay in there.  I could add in "tacit" if anyone wants.

11             MR. MARKHAM:  No, thank you, Your Honor.

12             MR. SREBNICK:  Judge, may I ask the protocol if the

13   court sustains the government's objection, for example, our

14   record is preserved?  We don't need to repeat it now if we

15   objected?  You have our position?

16             THE COURT:  No.

17             MR. SREBNICK:  You want us each time you rule to

18   articulate?

19             THE COURT:  No.  Nothing you say here actually matters

04:41 20   other than getting me to do a correct charge.  You have to

21   repeat everything at sidebar.

22             MR. SREBNICK:  Welcome to Boston.  Thank you.

23             THE COURT:  Welcome to the First Circuit, to preserve

24   this.

25             MR. SREBNICK:  So we'll do it again at sidebar after

 1    you instruction?

 2             THE COURT:  It's not even again.  The objection is at

 3    sidebar, so...

 4             MS. McGEE-TUBB:  Your Honor, for preservation

 5    purposes, I believe you already know this, but we will be

 6    filing our redline on the docket so that we can make a record

 7    of having raised these prior to the charge conference as well.

 8             THE COURT:  Do what you want.  You've got the whole of

 9    Mintz Levin to help you on what the First Circuit practice is.

04:42 10    I'm not ruling on it, whether that's good enough.  Okay?  I'm

 11    just not.  Right now I'm doing it to just try to get the charge

 12    as accurate as I can.

 13             MS. McGEE-TUBB:  Thank you.

 14             THE COURT:  We're bound to agree on some and disagree

 15    on others, and you just have to preserve it.

 16             MS. McGEE-TUBB:  Thank you.

 17             MS. KEARNEY:  On the other edit that defense has

 18    proposed on page 31, that a conspiracy generally ends after the

 19    central criminal purpose has been accomplished, first, that's

04:42 20    vague.  What does that mean the conspiracy generally ends?

 21    But, also, that's not the case.  But...

 22             THE COURT:  Well, I don't like the sentence either

 23    because it's vague, but the reality is that I'm not sure it

 24    matters here.  But what I don't think you can argue is that --

 25    and so I'm instructing that the cover-up was part of the

1   conspiracy.

2          MS. KEARNEY:  Not for that Your Honor, but --

3          THE COURT:  I think that may be the purpose of why

4   that was on there.  But that's fair.  We've all been at it all

5   day.  Thank you for correcting.  Go ahead.

6          MS. KEARNEY:  I was just going to say, the concern is

7   that where the payments continued after she received her

8   admission, that the jury would misinterpret that line to think

9   that the payments don't count.  And those are certainly part of

04:43 10   the conspiracy.

11          THE COURT:  Yeah.  I think I'll knock out that

12   sentence.

13          MS. McGEE-TUBB:  Your Honor, for the jury to

14   understand when the conspiracy ended, they need some

15   instruction on when a conspiracy ends.  So we would submit that

16   the jury --

17          THE COURT:  It's up to them to decide when it ends

18   because that's one of your big points on the statute of

19   limitations.

04:43 20          MS. McGEE-TUBB:  Right.

21          THE COURT:  And her view is the payment stopped.  And,

22   therefore, the statute of limitations bars it.  Their position

23   is no, a small bite means they were continuing.  I can't give

24   them a date.  That's one of the jury findings.

25          MS. McGEE-TUBB:  Well, we're not asking you to give a

1  date.  We're asking you to instruct the jury on when a

2  conspiracy ends as a legal definition.

3       THE COURT:  I'll just say it's up to you to decide

4  when the conspiracy ends.  How's that?

5       MS. McGEE-TUBB:  I think the case law says that a

6  conspiracy ends when the central criminal purpose of the

7  conspiracy has been achieved, and that's the definition in the

8  First Circuit.

9       THE COURT:  But that begs -- that begs the question as

04:44 10  to whether that's -- I think I agree with the government.  It's

11  when the payments were being made to get the money might have

12  been the central purpose, at least for Mr. Ernst.  It's not the

13  admission.

14       MS. McGEE-TUBB:  Not as alleged in the indictment, at

15  least at a minimum with respect to the first object of Count 1.

16       MR. BEIRNE:  If Your Honor leaves it up to the jury,

17  they could think that just by continuing to keep it secret,

18  that the conspiracy is ongoing.

19       THE COURT:  Maybe you can come up with a creative

04:44 20  sentence, but I agree with the government this is too vague.

21       MS. McGEE-TUBB:  We're happy to submit a revised

22  instruction to the court.

23       THE COURT:  Do you have an idea?

24       MR. MARKHAM:  We can submit revised language, Your

25  Honor.  I agree with you if you're specifically providing the

1  jury a question if it hits the statute of limitations, then

2  they should be deciding whether the purpose -- or whether the

3  conspiracy was continuing.

4       If you're making the statute of limitations a jury

5  question, then it should be a jury question.

6       THE COURT:  I am making it a jury question.  So just

7  make this a jury question as to when the conspiracy ended and

8  perhaps taking into account the central purpose of the

9  conspiracy or some such.

04:45 10      MS. McGEE-TUBB:  I would ask that Your Honor use the

11  language in the First Circuit case law, which is that a

12  conspiracy is completed when the central criminal purpose is --

13       THE COURT:  Tell you what.  We'll look at it.

14       MR. MARKHAM:  That's misciting what the First Circuit

15  case law is.

16       THE COURT:  Well, we're going to look at *SEC v. Papa*,

17  and if you come up with another one, you'll tell us.  Okay?

18       MS. McGEE-TUBB:  And there are other cases cited in

19  the motion we filed earlier today.

04:45 20      THE COURT:  Yes.  But can I say there are a gazillion

21  of you and two of us.  So I haven't looked at all the cases

22  that you filed today at lunch.  Okay?

23       MS. McGEE-TUBB:  I appreciate that, Your Honor.  There

24  aren't quite a gazillion of us, but I appreciate the

25  distinction.

             1          THE COURT:  These all look okay to me on page 32, 33.

             2   I know you-all just saw this last night, too, but please stop

             3   me if I'm wrong.

             4          MR. MARKHAM:  No, Your Honor.

             5          THE COURT:  34.  Yeah, 34.  You've preserved an

             6   objection on what property is on page 36.  So I'm not going to

             7   accept that, but I do understand that that is a very ripe issue

             8   on what's property.  That basically seems to be the only

             9   objection.

     04:47   10          MS. McGEE-TUBB:  Your Honor, may I ask, will you be --

            11   is your intention to instruct the jury consistent with the

            12   property definition you had in here?  I'm just trying to find

            13   it again in my redline.

            14          THE COURT:  At some point, I said an admission slot is

            15   property.

            16          MR. MARKHAM:  Yes, Your Honor.  You direct the jury

            17   that an admission slot is property.

            18          THE COURT:  And they have to find whether or not he

            19   intended to steal it.

     04:47   20          MR. MARKHAM:  Yes, Your Honor.

            21          THE COURT:  I understand that's a serious issue.  I

            22   was batting it around in my own head again today.  I'm not sure

            23   what I'll do at the end.  That's why I'm separating everything

            24   out so that no matter what happens, it won't invalidate the

            25   whole verdict.

1          MS. McGEE-TUBB:  So we do object to the instruction

2     that an admission slot is property.  I know we've briefed it

3     and we've raised the objection.

4          THE COURT:  Yes, you have.  You've preserved it.

5          MS. McGEE-TUBB:  We would ask that you present it as a

6     factual issue for the jury to decide.

7          THE COURT:  What's your view on that?

8          MR. MARKHAM:  That you should not do that, Your Honor.

9     That you're the judge of what the law is.

04:48 10          THE COURT:  I believe Denise Casper ruled as a matter

11     of law, right?

12          MR. MARKHAM:  Yes, Your Honor.

13          MS. KEARNEY:  Yes, Your Honor.

14          THE COURT:  I said I'd do that as the law of the case.

15     Okay.

16          MS. McGEE-TUBB:  And, Your Honor, may I --

17          THE COURT:  It's now quarter of.  Don't beat a drum.

18     You've preserved it.  I can't do anything more for you on

19     property.  Okay?

04:48 20          MS. McGEE-TUBB:  Sure.

21          THE COURT:  So on page 40 --

22          MR. MARKHAM:  Your Honor, we're objecting to --

23          THE COURT:  Am I going too fast?  I'm trying to get

24     through as much as of the big stuff as I can.

25          MR. SREBNICK:  Does this mean everything we submitted

```
 1   through page 40 is not going to be included?  Is that the
 2   point?
 3            THE COURT:  Right.
 4            MR. MARKHAM:  Kristen is helping me keep up, Your
 5   Honor.
 6            THE COURT:  I had a big question mark next to the top
 7   of page 40.  I haven't ruled on that yet.
 8            MS. McGEE-TUBB:  The paragraph that begins, "Moreover,
 9   if the only actions" --
10   THE COURT:  Yeah.  I want to talk about that.  I do
11   think there's been evidence in the past couple of days that
12   Georgetown did consider wealth.
13            MR. MARKHAM:  Well -- I'm sorry, Your Honor.
14            THE COURT:  I think that that would be fair.  In fact,
15   I couldn't understand why the Georgetown employees were running
16   away from it so fast.  But in any event, they do consider
17   wealth, and they do provide slots for people who might also be
18   donation opportunities, et cetera.  So the question is where I
19   put that in.  It's that concept of condone, and I'm not sure it
20   comes in here.
21            MR. MARKHAM:  Your Honor, if we could just, for the
22   record, state that we had a motion in limine on this because
23   none of those people had any idea -- no one at Georgetown knew
24   who Amin Khoury was.  That was not a consideration in his case
25   so it was irrelevant testimony that we lost on the motion in
```

1    limine.

2         But in addition to that, I don't think a single

3    Georgetown witness said you can get a protected recruiting slot

4    based on fundraising potential.  That was not in the testimony.

5         THE COURT:  I think the emails would undermine that or

6    at least a jury could find that.  Especially this recent guy

7    with the baseball or was it baseball or was it football, and he

8    was the kid of a trustee.  And I -- but I'm trying to figure

9    out legally so what?  That's what I'm trying to think about.

10        And, also, we have the issue of plan A and plan B

11   where arguably that email would suggest that he was allowed to

12   go out and do -- or at least a reasonable doubt as to whether

13   he was going out to do his own fundraising for his salary and

14   his tennis courts.

15        So I'm trying to figure out where that comes in.  And

16   it could just be an honest services fraud aspect and not with

17   respect to this charge on mail fraud.

18        MR. MARKHAM:  Correct, Your Honor.  It would only be

19   an honest services fraud.  Again, I think the testimony today

20   was that plan was never put in place, and Gordon Ernst never

21   saw it.  So it's completely irrelevant.  But, again, we have

22   lost that fight.

23        THE COURT:  Okay.  I think I'm not going to put it in

24   here, but I am going to put it in under the honest services

25   fraught.

1          MS. McGEE-TUBB:  And, Your Honor, we did propose a

2     condemnation instruction for honest services.  We'll get to it

3     on page 45.

4          THE COURT:  I don't know why it comes in here if it,

5     in fact --

6          MS. McGEE-TUBB:  So the spacing probably was not very

7     clear.  This was part of our proposed instruction relevant to

8     property.  Some of this language is not quoted from -- derived

9     from the concept in Kelly, the *Bridgegate* case.  So it was

04:52 10     meant to be offset here to show that it was part of our

11     comprehensive request.

12          THE COURT:  Standing by itself, it doesn't make much

13     sense.  I do believe it's at least an argument that can be made

14     on honest services fraud.

15          MS. KEARNEY:  Well, Your Honor, I think an issue,

16     though, is that with respect to honest services fraud, it has

17     to do with loyalty.  So even if Gordie Ernst was doing what

18     this school expected of him, he was doing it for his benefit as

19     opposed to the school's benefit.

04:52 20          THE COURT:  Can I get that just so that we can -- I'm

21     just sequential in thought.  So I'm denying that property piece

22     of it.

23          And I thought that the -- what do you think about the

24     arrangements of words "or the circumstances in which they are

25     used may convey the false and deceptive appearance"?  I don't

1    know that that really applies here, and it's sort of confusing.

2         MR. MARKHAM:  The only thing, Your Honor, is if you

3    tell the Athletics Department that this young woman is a tennis

4    recruit.

5         THE COURT:  Well, that's just a -- that's just a lie.

6    I don't know why we have this in here.  It seems to soften the

7    issue.

8         MR. MARKHAM:  I understand.  We don't feel strongly

9    about it, Your Honor.  So if you want to take it out.

04:53 10        THE COURT:  Okay.  We'll get rid of it.

11        All right.  I do agree, and you apparently agree here,

12   that omissions matter.  But I do think if they were going to

13   make the same decision, it may not be material without the

14   omission.  So I think that's okay.  So I'm doing okay on that.

15        MR. MARKHAM:  Your Honor, we don't object to that.

16        THE COURT:  Okay.  Okay.  On page 43, acted

17   voluntarily and intentionally.  Do you disagree with either --

18   any of those there?

19        MS. KEARNEY:  Your Honor, I think -- or with the

04:54 20   specific intent to fail to do something the law requires to be

21   done, I think it's part of the pattern instructions.  We would

22   ask for that.

23        THE COURT:  Isn't it in there?  I'm sorry.

24        MS. KEARNEY:  They proposed deleting it.

25        THE COURT:  Yeah.  I'm going to -- I'm going to keep

1    it in.

2              MR. SREBNICK:  We withdraw the objection, Your Honor.

3              THE COURT:  Okay.  On page 44.

4              I'm okay with, I think, page 45.

5              MS. KEARNEY:  Your Honor, actually, on the second

6    addition.  So, "In addition, Georgetown, as in any acts

7    collectively," that would be inconsistent with both honest

8    services fraud and federal programs bribery because if the --

9    if the collective knowledge doctrine applied, you could never

04:55 10   have an unfaithful employee.

11              THE COURT:  That's a good point.

12              MS. McGEE-TUBB:  I'm sorry.  We're on page 45.  I

13   thought we were on --

14              MS. KEARNEY:  We're on collective knowledge.

15              MS. McGEE-TUBB:  Okay.  Your Honor, with the

16   collective knowledge instruction we proposed, it talks about

17   acting within the scope of their employment.  So it's limited

18   in that fashion.  The purpose of it is to get at the -- one of

19   our theories of defense.

04:55 20             THE COURT:  Yeah, because the issue -- I'm just --

21   none of them are sitting here, so I'm not insulting anyone, I

22   hope.  But some of what -- for example, what Ms. Lysy said is

23   just not credible.  But it may be that she was being honest,

24   and it was the people in development or the head of the

25   admissions who may have done the fundraising stuff.

1          In other words, she may have been testifying

2    truthfully from what she knew, but it's not -- or at least the

3    defense has a plausible argument that people's wealth and donor

4    ability were a plus factor.  So that's quite plausible.  In

5    fact, indeed likely.  But she might not have known it.  She

6    seemed like a lovely person.  She just may not have -- she may

7    have been too low down, not to be insulting, to actually have

8    the -- but even she had a few emails there that were

9    suggestive.

04:56 10          So I think if it's -- why would not having it be

11    limited within the scope of employment, why wouldn't that be --

12          MS. KEARNEY:  Well, I think the concern would be that

13    that's not something the jurors are going to understand.  So

14    the fact that the knowledge of all Georgetown employees is

15    imputed to Georgetown.

16          THE COURT:  So why don't we say so long as they were

17    acting?  Just emphasize that.

18          MS. KEARNEY:  But, also, I mean Gordie Ernst, within

19    the scope of his employment, was to recruit students.  So I

04:57 20    just -- I'm concerned that the jury is going to get confused.

21          THE COURT:  Well, I added a line that says, "I

22    emphasized they had to be acting within the scope of employment

23    if their knowledge is to be imputed."

24          MS. KEARNEY:  Your Honor, I think the issue is going

25    to be, though, that Meg Lysy testified -- I know Your Honor has

1    concerns about whether she was capable of knowing about the

2    role of development, but she testified that the reason she'd

3    admitted Katherine Khoury was because of the recruitment slot.

4    So the suggestion that development sort of in the ether can

5    play a role, it just is going to lead to confusion.  And --

6              THE COURT:  Well, I'm inclined to do something like

7    this because it's pretty -- A, common sense and, B, the emails

8    show that development does play a role.  So it may be that

9    Ms. Lysy didn't know that.  I mean, I don't know.

04:58 10             MS. KEARNEY:  In addition --

11             THE COURT:  Trump didn't deny it.

12             MS. KEARNEY:  But there's also no evidence it played a

13   role with respect to the defendant's daughter.

14             THE COURT:  It sounds like great argument.  All right?

15   So I don't know how to word it.  It's possible tomorrow you'll

16   come up with better wording of this.

17             MR. MARKHAM:  Yes, Your Honor.  And I believe we also

18   owe you a fiduciary duty instruction.

19             THE COURT:  Yes, a fiduciary duty, scope of

04:58 20   employment.

21             By the way, what are the mails you're relying on?

22   It's plural here.  I just remember the admissions letter being

23   mailed.

24             MS. KEARNEY:  Both the likely letter and the

25   admissions letter were mailed.

1          THE COURT:  I may have been daydreaming.  Did that

2     come out in testimony, that they were both mailed?

3          MS. KEARNEY:  Yes, Your Honor.

4          THE COURT:  Snail mail?

5          MS. KEARNEY:  Yes.

6          THE COURT:  All right.  So it should be plural.  There

7     it is.

8          I'm okay with number 47.  I'm okay with 48.

9          MS. McGEE-TUBB:  Your Honor, before we move on to

04:59 10   honest services fraud, may I just state one thing, likely for

11    the record.  But when you do -- I understand Your Honor is

12    going to instruct the jury that an admission slot is property

13    as a matter of law.  I would just ask that it conform to

14    language in the indictment which says to-wit:  Admission to

15    Georgetown, that that be what you're instructing the jury on.

16          THE COURT:  Is there a distinction?

17          MS. McGEE-TUBB:  I think so.

18          THE COURT:  What?

19          MS. McGEE-TUBB:  I think there is.  As you've noted,

05:00 20   it's a hot appellate issue, and the instructions I think should

21    conform to the language in the indictment.

22          THE COURT:  I don't have a problem with that.

23          MS. McGEE-TUBB:  Thank you.

24          MR. SREBNICK:  If I could have a moment with my

25    colleague.  Judge, I'm going to propose an instruction, if it's

1    not already in here, that says so long as Georgetown got full

2    value from the defendant for that slot, meaning full tuition,

3    Georgetown was not deprived of anything.

4            MR. MARKHAM:  We'll be objecting to that, Your Honor.

5            THE COURT:  No, I'm not giving that.  Although I have

6    to say that may be a big issue at sentencing if it ever got to

7    that.

8            MR. SREBNICK:  If anyone's interested, there's a

9    really interesting Eleventh Circuit case called *Takhalov* on

05:01 10   that issue.

11           THE COURT:  What do they say?

12           MR. SREBNICK:  This was the case where -- I know

13   you're pressed for time -- but where men were lured into a bar

14   by women posing as tourists when, in fact, they worked at the

15   bar.  The men would spend lavishly on the women only to find

16   out later they were employees making a commission.  And the

17   Eleventh Circuit, after these guys got convicted, said so long

18   as the men got what they paid for, meaning the alcohol, it

19   didn't matter that they were lied to.

05:01 20        THE COURT:  I didn't know what was coming next.

21           MR. SREBNICK:  That's what the three-judge panel said

22   to me when I argued it.

23           THE COURT:  Okay.

24           MS. KEARNEY:  Your Honor, I think we're on page 48.

25           THE COURT:  I was on page 49, but I may have missed

           1    something.

           2           MS. KEARNEY:  Back to page 48, the government doesn't

           3    object to adding something about official act.  But it just is

           4    concerned talking about -- oh, I'm sorry, Your Honor.  I'm on

           5    the wrong one.

           6           THE COURT:  I think you are on the wrong one.

           7           Those seemed okay to me.  49 seemed okay to me.

           8    Except for "might suffer an economic harm" is not going to

           9    happen.

05:02     10           MS. KEARNEY:  Thank you.

          11           THE COURT:  That's probably what you were jumping up

          12    for.

          13           MS. McGEE-TUBB:  Your Honor, we do.  Our objection is

          14    in the papers, but *United States v. Martin* has not been

          15    overturned, and that case requires foreseeable economic harm.

          16           THE COURT:  You spoke a little quickly there.

          17           MS. McGEE-TUBB:  Apologies.  There is a First Circuit

          18    case, *United States v. Martin*, that requires that economic harm

          19    to Georgetown be foreseeable.  We briefed it at the motion to

05:02     20    dismiss stage, so we've litigated over it before.  And I

          21    believe the government's position is that post-Skilling meant

          22    *United States v. Martin* is no longer good law.  So it's our

          23    position that *Martin* has not been overturned.  *Skilling* did not

          24    overturn it.  And, therefore, that is a necessary element of

          25    honest services fraud.

1          MS. KEARNEY:  And, Your Honor, Ms. McGee did summarize

2     that the government believes *Skilling* overruled Martin because

3     otherwise the fact that honest services is an intangible harm,

4     you wouldn't need a 1346.  You could always just charge 1341 if

5     it required economic harm.

6          THE COURT:  I'm unlikely to give that one.

7          MS. KEARNEY:  In addition, Judge Casper did consider

8     this.

9          THE COURT:  And ruled on it?

05:03 10          MS. KEARNEY:  Yes.

11          THE COURT:  The bottom seems right to me, the

12     fiduciary duty.

13          MR. MARKHAM:  Yes, Your Honor --

14          THE COURT:  I think there's a slight nuance which the

15     defense has pointed out, which is interesting, because I

16     actually teach a course on this.  Is fiduciary duty a question

17     of fact or law?  Under state law, when I used to be a state

18     court judge, we would instruct that it's a fact matter.  Some

19     courts have called it mixed law and fact.  And other people

05:04 20     have said no, it's a legal duty.  It's actually more complex

21     than one might think whether or not I put the question about

22     whether or not there was a fiduciary duty to begin with.

23          MS. KEARNEY:  Yes, Your Honor.  I think *Skilling* holds

24     that employees are fiduciaries under federal law.  This issue

25     also came up before Judge Gorton, and he gave the instruction

```
 1    that an employee is a fiduciary.
 2            THE COURT:  I'm not sure of the right answer.  Of
 3    course, you'd have to prove that they breached -- that he
 4    breached the fiduciary duty.
 5            MS. KEARNEY:  Yes, Your Honor.
 6            THE COURT:  So you think Skilling just flat out says
 7    an employee is a fiduciary?
 8            MS. KEARNEY:  Under federal law.
 9            THE COURT:  Under federal law.  Okay.
10            MR. SREBNICK:  Is the government saying every employee
11    of every company is a fiduciary of that company?
12            MS. KEARNEY:  For purposes of 1346, yes.
13            MS. McGEE-TUBB:  We'll look at Skilling again but I
14    don't recall that being a holding of Skilling.  And D.C. law
15    should apply to determine whether Gordie Ernst as an employee
16    owed a fiduciary duty to Georgetown.
17            THE COURT:  I don't know the answer.  We'll look at
18    it.  Here's the problem:  It's now five past 5:00.  My sense is
19    that it would probably take another 20 minutes to half an hour
20    to get through this, and this court reporter has been so lovely
21    to sit with us.  Are there -- I'm not sure I want to sit
22    through -- for another half an hour --
23            MR. SREBNICK:  Would the court --
24            THE COURT:  -- given the fact that we've been going
25    since 8:30 this morning.
```

1          MR. SREBNICK:  Would the Court consider having the

2     jury come in a little later tomorrow since we're going to be --

3          THE COURT:  I think the best bet is -- is there

4     anything else that's big here?  I'm not going to be giving that

5     whole long thing on federal programs.  I think a Pell Grant

6     legally suffices.  Do you have a case on that, by the way?

7          MS. KEARNEY:  Yes, Your Honor.  It is the -- I am

8     going to butcher the name of it.  *United States v. Paixao*.

9     It's P-a-i-x-a-o.  It's 885 F.3d 1203 from the Ninth Circuit,

05:06 10     2018.

11          THE COURT:  And it says a Pell Grant is enough to make

12     it --

13          MS. KEARNEY:  It's not about Pell Grants.  It's

14     actually about a veterans program, but it's the idea that --

15     the fact that the entity receiving the federal funds

16     administers the funds for the benefits of others qualifies as

17     federal benefits under 666.

18          THE COURT:  We'll take a look at it, but let me just

19     say I'm pretty sure I'm not going to go through that whole long

05:06 20     instruction.  But is there anything else that's pretty big?

21          MS. McGEE-TUBB:  On that, we would ask for some

22     instruction.  I recognize the Court may not give the full one,

23     but we do think it's an issue for the jury.

24          And the bribe versus gratuity piece is probably a big

25     one.

           1            THE COURT:  Yes.  I think we should jump to that

           2     and --

           3            MS. McGEE-TUBB:  And we did submit a proposed

           4     standalone instruction on this.  At the risk of papering the

           5     court more, we emailed it to your clerk this morning.  And the

           6     government has it as well, but I'm happy to give you a copy.

           7            THE COURT:  Well, I think I did see it, but I do want

           8     to talk -- it can't be just an after-the-fact payment gets you

           9     off the hook.  It has to be about the timing of the agreement.

05:07     10     So we're going to add language on something along those lines.

          11     But if there were no pre-existing agreement, the fact that he

          12     got paid afterwards would not be a bribe.  So that's going to

          13     be important for the jury.

          14            I'm not going to talk about legal impossibility.

          15     That's just confusing.

          16            MS. McGEE-TUBB:  Well, Your Honor, I think it's

          17     important for the jury to understand if they don't find there's

          18     any property that was at issue, then there's no -- well, I

          19     suppose you've overruled our objection on that.

05:08     20            THE COURT:  That's right.  It doesn't make sense here.

          21            MS. McGEE-TUBB:  If they don't find that there's a

          22     bribe, then there's no conspiracy on 666 either.

          23            MR. MARKHAM:  Your Honor, as you know, we were in

          24     court all day, so we're just seeing this honest services mail

          25     fraud new instruction.  Can we provide our own proposed

1      language on this as well?

2            THE COURT:  What does it even say?  I'm not sure I

3      remember.

4            MR. SREBNICK:  Our requested instruction reads, "If

5      you find that the defendant gave something, offered something,

6      or agreed to give something of value to someone in exchange for

7      an act that the person has already taken as an expression of

8      gratitude or appreciation or in return for a request for such a

9      gesture, such giving or offering or agreement constitutes a

05:09 10    legal gratuity.  A gratuity is not a bribe."

11           THE COURT:  But that doesn't quite track that one

12     case.  If the agreement was beforehand but the payment was

13     afterwards.  I just need to do more with that.

14           MR. MARKHAM:  Yes, we can provide for that.

15           MS. McGEE-TUBB:  At the risk of it being lost in the

16     shuffle, page 66 at the top of our mark-up does have language

17     that is probably not word for word *Bravo-Fernandez* but pretty

18     close.  The sentence that says, "If the agreement to exchange a

19     thing of value for an act is made after the act has been

05:09 20    performed, then that agreement cannot properly be viewed as an

21     agreement to offer or accept a bribe."

22           THE COURT:  Right, but it doesn't give you the pre.

23     It doesn't tell them but if the agreement was beforehand, it

24     is.

25           MR. BEIRNE:  Your Honor, that's verbatim from the

1     *Fernandez* case.

2         THE COURT:  Yeah, I know, but I read the *Fernandez*

3     case.  It has the first part, too.  The key is the timing of

4     the agreement.

5         So let's do this:  We're going to have to hopefully

6     get through this and meet tomorrow morning at 8:30 and go

7     through it, but I think you have enough to prepare closings.

8     And if you don't, worse comes to worse, what we'll do is put

9     the closings to the afternoon, if we have to.

05:10 10         How long do you think you'll need for your closing?

11         MS. KEARNEY:  Half an hour.  And then some time for

12     rebuttal.

13         THE COURT:  How about you-all?

14         MR. SREBNICK:  Mr. Black is doing it, and I'm sure

15     he's going to be well over an hour, probably an hour and a

16     half.

17         THE COURT:  Okay.  So I don't like to break them up.

18     Like, I wouldn't do theirs on one day and yours on another.

19         So I think I need, at the very least, from 2:00 to

05:10 20     4:00 tomorrow afternoon to do closings.  And if you finish like

21     at 10:00, that surprised me when you said that, I'll probably

22     take a quick break to go through the rest of the charge and

23     then go into the closings.

24         MR. SREBNICK:  I was proposing if -- just bring in the

25     jury a little later, we can get all our work done in the

1    morning.

2            THE COURT:  It's too late.

3            MR. SREBNICK:  You don't have that technology.

4            THE COURT:  No, we're not doing that.  How about --

5    what are we -- how are the exhibits?  Are they in good shape to

6    send into to the jury?

7            THE CLERK:  No.  I have to go through -- some of them

8    but not all the ones they moved in today.  Up to today, I did

9    them.  They haven't looked through anything.  Now I have to go

05:11 10   through all the ones that came in today I don't have yet that

11   the paralegals are working on.  But nobody has looked at it.

12           THE COURT:  So that's about what, fifteen exhibits

13   that came in today?

14           THE CLERK:  I have no idea.  I don't know.  We'll get

15   through it.

16           THE COURT:  Okay.  All right.  We're all tired.  You

17   need to practice your closings, and I'm going to try to do it

18   tomorrow.  But if not, for sure it will be Wednesday.  So we're

19   doing our best here.  Okay.  Thank you.

05:11 20          MR. MARKHAM:  Thank you, Your Honor.

21           THE CLERK:  All rise.

22           (Court exits.)

23           (Proceedings adjourned at 5:12 p.m.)

24

25

1              C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8           I certify that the foregoing is a correct transcript

9    from the record of proceedings taken June 13, 2022 in the

10   above-entitled matter to the best of my skill and ability.

11

12   /s/ Lee Marzilli

13   Lee Marzilli, RPR, CRR
     Official Court Reporter

14

15   /s/ Kathleen Mullen Silva                    6/13/22

16   Kathleen Mullen Silva, RPR, CRR              Date

17   Official Court Reporter

18

19

20

21

22

23

24

25