1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS
2

3      UNITED STATES OF AMERICA,            )
                                            )
4                    Plaintiff             )
                                            )
5           -VS-                            )   Criminal No. 20-10177-PBS
                                            )   Pages 1 – 64
6      AMIN KHOURY,                         )
                                            )
7                    Defendant             )

8
                         **JURY TRIAL – DAY SIX**
9
                              **–EXCERPT–**
10
                        **CLOSING ARGUMENTS**
11

12

13          BEFORE THE HONORABLE PATTI B. SARIS
               UNITED STATES DISTRICT JUDGE
14

15

16
                              United States District Court
17                            1 Courthouse Way
                              Boston, Massachusetts  02210
18                            June 14, 2022, 3:14 p.m.

19

20

21

22

23                    LEE A. MARZILLI
                  OFFICIAL COURT REPORTER
24             United States District Court
               1 Courthouse Way, Room 7200
25                  Boston, MA  02210
                   leemarz@aol.com

1    A P P E A R A N C E S :

2        KRISTEN A. KEARNEY, ESQ. and CHRISTOPHER J. MARKHAM, ESQ.,
     Assistant United States Attorneys, Office of the United States
3    Attorney, 1 Courthouse Way, Room 9200, Boston, Massachusetts,
     02210, for the Plaintiff.
4
         EOIN P. BEIRNE, ESQ., MATHILDA McGEE-TUBB, ESQ., and
5    EDMUND P. DALEY, ESQ., Mintz, Levin, Cohn, Ferris, Glovsky
     and Popeo, PC, One Financial Center, 42nd Floor, Boston,
6    Massachusetts, 92111, for the Defendant, Amin Khoury.

7        ROY BLACK, ESQ., HOWARD M. SREBNICK, ESQ. and
     JACKIE PERCZEK, ESQ., Black Srebnick, P.A., 201 S Biscayne
8    Boulevard, Suite 1300, Miami, Florida, 33131, for the
     Defendant, Amin Khoury.

9        GEORGE P. VARGHESE, ESQ. and JUSTIN METZ, ESQ.,
10   Wilmer Cutler Pickering Hale, 60 State Street, Boston,
     Massachusetts, 02109, for the Movant, Georgetown University.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

CLOSING ARGUMENTS:                PAGE

By Ms. Kearney:                   4

By Mr. Black:                     20

By Ms. Kearney (Rebuttal):       56

<u>P R O C E E D I N G S</u>

<u>CLOSING ARGUMENT BY MS. KEARNEY:</u>

MS. KEARNEY:  May I proceed?  Brown paper shopping bag
filled with neat, crisp stacks of cash, $180,000 worth, plus an
IOU for another $20,000 that the defendant gave to a middleman
to pass on to Gordie Ernst, the Georgetown tennis coach, in
exchange for getting the defendant's daughter into Georgetown
as a fake tennis recruit.  That was the agreement that the
defendant entered into with Gordie Ernst and Tim Donovan.  And
it worked.  Ernst recruited the defendant's daughter as a
tennis recruit.  He led the Georgetown admissions office to
believe that he wanted her for her talent, that he wanted her
to play on his team.  And Georgetown approved her admission
based on that, and despite that her grades and test scores were
well below those of the typical Georgetown student, because
they trusted Gordie Ernst.  But here's what the Georgetown
admissions office did not know:  They did not know that
Katherine Khoury was a mediocre tennis player.  They did not
know that she would never play on the Georgetown tennis team,
and they did not know that the defendant had agreed to pay
Gordie Ernst $200,000 in a paper bag cash to fool the Admissions
Department into letting her in.

For his actions, the defendant is charged with two
crimes.  Count 1 charges him with conspiracy to commit mail
fraud, honest services mail fraud, and federal programs

1    bribery; and he's charged in Count 2 with a separate count of

2    federal programs bribery.  The Judge will instruct you on the

3    elements of these crimes, but it essentially boils down to

4    this:  First, that there was a conspiracy and/or a scheme to

5    defraud, and, second, that the defendant willfully joined it.

6         Now, I'm going to walk you through the evidence that

7    establishes those elements beyond a reasonable doubt.  First,

8    you know from the evidence that there was a scheme.  Tim

9    Donovan explained it to you.  It was hatched in May of 2014 at

11:23 10   the Brown reunion.  The defendant had recently reconnected with

11   his old tennis teammate Donovan, who invited him to the reunion

12   even though it wasn't for the defendant's class year.  And at

13   the reunion that night, the defendant connected with another

14   former teammate, Gordon Ernst, who was then the head tennis

15   coach at Georgetown, and the two came up with a plan:  They

16   would get the defendant's daughter Katherine into Georgetown,

17   one of the most prestigious universities in our country, as a

18   tennis recruit.

19        You met Katherine.  She's a nice girl.  She loves her

11:24 20   father very much, but here's the hard truth:  Katherine was not

21   a very good student, and she was not a very good tennis player.

22   She had no chance of getting into Georgetown on merit, but

23   under the terms of the deal, Ernst would designate Katherine as

24   a tennis recruit, which would allow her to get in despite her

25   lower grades and test scores.  And in exchange for that

1  recruiting slot, the defendant would pay Ernst $200,000.

2  Donovan told you that was the deal that Ernst described to him

3  that night when it was just the two of them on their walk back

4  to the hotel.

5       Now, Donovan told you that he and Ernst were close.

6  They talked weekly, they were in each other's weddings, they

7  were Godparents to each other's children, and at the first

8  moment when Ernst was alone --

9       THE COURT:  Is there a problem with the technology?

11:25 10      MS. KEARNEY:  I think we can figure it, your Honor.

11      THE COURT:  You can wait a second.

12      MS. KEARNEY:  Thank you, Your Honor.

13      THE COURT:  You're all set?

14      Do you all have it?  I'm sorry to interrupt.

15      MS. KEARNEY:  At the first moment that Ernst was alone

16  with his good friend Donovan, he told Donovan he intended to do

17  what he called a "deal" with Amin, and that in exchange for a

18  recruiting slot, that he would be paid by the defendant

19  $200,000.  Ernst and the defendant had already worked out some

11:25 20  of the details.  Ernst told the defendant that he wanted him to

21  be a -- excuse me.  Ernst told Donovan that he wanted him to be

22  a go-between and agreed to give Donovan $10,000 to act as a

23  middleman.  Ernst told Donovan that the defendant would

24  compensate him as well, and Donovan agreed to join Ernst and

25  the defendant in the scheme.

1          Donovan told you that after that weekend, they began

2   working on the deal, and you know that's true because the phone

3   records -- this is Exhibit 270 -- they show you that days after

4   that reunion, the defendant called Ernst on May 29 of 2014, and

5   they talked for 16 minutes.  A half hour after that call ended,

6   the defendant called Tim Donovan, and they talked for more than

7   17 minutes.  And Donovan told you, other than an upcoming 4th

8   of July party, the only thing he discussed with the defendant

9   over that summer and fall was this deal.

11:27 10          And that wasn't the only call they had.  Donovan told

11   you he had numerous calls about the deal with the defendant

12   over the next few months.  And you know that's true from the

13   phone records, which show the dozens of calls between the

14   summer and fall of 2014; and in those calls, they discussed

15   that the defendant would pay $200,000 to Ernst personally, in

16   cash, in exchange for a recruiting slot for the defendant's

17   daughter.

18          They also discussed in those calls that Katherine's

19   high school counselor, Matt DeGreeff -- you met him -- he might

11:27 20   be suspicious, and that they needed to have a cover story for

21   why someone at Katherine's level would be recruited to a strong

22   Division 1 program like Georgetown.  So they came up with a lie

23   to describe Katherine as a good athlete, with the potential to

24   improve, in order to convince Matt DeGreeff, her counselor,

25   that this was legitimate.  That's what Tim Donovan told you,

1   and you know it's true because you saw the defendant give that

2   exact story to Matt DeGreeff.

3        This is Exhibit 7.  It's an e-mail from July of 2014,

4   and in it the defendant wrote to DeGreeff that Katie had the

5   raw ability to lead the team if she was red-shirted and if

6   Gordo gave her the coaching that is required to advance a

7   talented but raw kid into a varsity leader at the Georgetown

8   level of competition.  And you know that was a lie.  Katherine

9   didn't have the raw ability to lead the Georgetown tennis team.

11:28 10   She didn't even have the ability to lead her high school team.

11   Katherine's former high school coach, Amanda Holcombe, told you

12   that Katherine was ranked at the bottom of her team, which was

13   ranked at the bottom of their league.  You know that Katherine

14   was not going to go from the bottom of an uncompetitive team to

15   a competitive player on the Georgetown team which recruited

16   athletes like Cecelia Lynham.  She told you she was ranked as

17   52nd in the country that year and number one in her home state

18   of Maryland.

19        You know how else you know that Katherine wasn't

11:29 20   recruited for her tennis talent?  Her own words.  She told you

21   that she told Ernst she wasn't good enough, but he gave her a

22   recruitment slot anyway?

23        During the calls over the summer and fall of 2014, the

24   defendant and Donovan also discussed that Katherine wouldn't

25   actually play on the Georgetown tennis team when she arrived on

campus.  Donovan told you they had a cover story for that as
well, that Katherine's old shoulder injury would flare up and
prevent her from playing.  And, of course, you know that once
she got to Georgetown, Katherine did not play.  In fact, she
never even discussed tennis with Cecelia Lynham, an actual
member of the tennis team:

"QUESTION:  You said you knew Katherine Khoury
socially.  Did she ever mention to you trying to join the
Georgetown women's tennis team?

"ANSWER:  No."

But even with their plan in place to get Katherine
into Georgetown as a tennis recruit, it wasn't clear that the
plan was going to be successful because Katherine's grades and
test scores were so low, there was a risk that the Georgetown
admissions officer, Meg Lysy, would not give her a positive
pre-read.  Without that, Ernst could not designate Katherine as
a tennis recruit.  Tim Donovan and Meg Lysy both told you
that's how tennis recruitment worked.  First, Ernst had to send
Katherine's grades and test scores to Lysy, and she would say
yes, no, or maybe.

Now, because Katherine's grades and test scores were
so low, even for a tennis recruit, you saw Ernst trying to
soften Lysy up and convince her to approve Katherine Khoury's
recruitment.  Here is Exhibit 17.  In October of 2014, Ernst
told Lysy that Katherine had some work to do on grades and test

1    scores, "but I think she's doing better."  And later in that

2    same exhibit Ernst told Lysy that Katherine is obviously not a

3    math whiz, but a great kid.

4         Similarly, in the fall of 2014, Gordie Ernst and Tim

5    Donovan were regularly checking on updates on Katherine's

6    grades and test scores.  Here's Exhibit 19, an e-mail from Tim

7    Donovan to the defendant and his then wife.  It's from

8    mid-October, 2014, and Donovan was reminding the defendant that

9    Katie's new SAT scores, along with her first-quarter report,

11:32 10   continue to be very important.  And in Exhibit 17, Gordie Ernst

11   asked Matt DeGreeff, her counselor, for Katherine's grades on

12   October 29 and again on November 5.  He also was antsy to get

13   her grades and test scores because that's what stood between

14   him and a $200,000 bribe.  The defendant also knew that

15   Katherine's grades and scores presented a potential hurdle to

16   their plan.

17         This is what he told Matt DeGreeff in the summer of

18   2014, that he needed to place the transcript in the best light

19   and that, with some improvement during senior year and a little

11:33 20   better SATs, Katherine could be a recruit.  That's Exhibit 7.

21   By designating Katherine as a recruit, Ernst was representing

22   to Meg Lysy and the Georgetown Admissions Office that Katherine

23   had the talent to contribute to the team.  But you know from

24   her high school coach, from Tim Donovan, from Mike Fried, the

25   Wesleyan coach, from Cecilia Lynham, and from Katherine

herself, that that was not true.  But you know who didn't know

that?  Meg Lysy.  She relied on the coach's word because it was

his job to do the recruiting, and her role was to look at the

transcripts and academic preparedness.  And Lysy told you that

Ernst was her friend.  They're both from Rhode Island.  She

trusted him.  Ultimately Lysy approved Katherine to be

recruited based on Ernst's representation that Katherine was a

tennis recruit.

         "QUESTION:  What did you base your decision to admit

Katherine Khoury to Georgetown on?

         "ANSWER:  Her tennis talent."

         And here's the likely letter that Georgetown sent

Katherine telling her she was all but guaranteed admission.

That's Exhibit 35.  Meg Lysy told you that these letters were

sent out by the U.S. mail, and this letter confirms that

Georgetown had reviewed Katherine's application at the request

of Mr. Gordie Ernst, tennis coach.  And it confirms what Lysy

told you, that she based her admission decision on Katherine's

recruitment.  And Lysy told you she was not aware of the Khoury

family's potential to donate to Georgetown at any time up to

this point:

         "QUESTION:  What role did the Khoury family's

development potential play into your decision?

         "ANSWER:  It didn't."

         Now, you know that after Katherine was caught drinking

alcohol with a fake ID at a local restaurant, she was suspended
from school.  But even while that was getting sorted out, the
defendant was getting ready to make good on his deal with Ernst
and start paying the bribe.  This is the timeline you saw at
Exhibit 271.  It shows that on May 5 of 2015, before the
defendant had received final confirmation that Katherine's
admission was confirmed, the defendant flew from Boston down to
Florida.  There he initiated a wire transfer from his daughter's
trust fund, $100,000 from Katherine's trust fund and $100,000
from his other daughter's trust fund, and that he had them go
to his own account at Wells Fargo Bank.  That's Exhibit 49.
Three days later on May 8 of 2015, the defendant withdrew the
money, all $200,000, and flew back to Boston with the cash.
You see that in Exhibit 266.

And on May 15, 2015, Donovan met with the defendant at
his house in Mashpee, and Donovan told you what happened when
he got there.  The defendant gave him a brown paper shopping
bag of cash.  He told him there was $180,000 in the bag and
acknowledged that he owed Ernst another $20,000.  He said he
would take care of that later, which you know from the
defendant's texts he continued to do into 2016.

Then the defendant and Donovan haggled over Donovan's
cut.  Donovan told you it was an awkward exchange, but that the
defendant eventually agreed to give him $20,000, which he took
from a desk drawer and put into a small separate bag.  Donovan

told you that when he got back to his car, he took an

additional $10,000 out of that big bag of cash and put it into

the smaller bag.  That's what Ernst had agreed to give Donovan

for his cut of being the middleman.  After that, Donovan drove

the bags of cash over to Falmouth to Gordie Ernst's

mother-in-law's house where his wife Lisa was waiting.  And

after putting that big bag of cash with $170,000 in it on the

dining room table, Lisa Ernst and Tim Donovan sat down and

counted it.  And then Donovan drove Lisa to the bank so she

could rent a safe deposit box to store it, and you know that's

true because the phone and bank records confirm what Donovan

told you.

So, first, the phone records, which is Exhibit 162,

they show that, on the morning of May 15, 2015, Donovan

traveled down the Cape, through Plymouth, down to Mashpee, then

over to Falmouth, and then back up the Cape all the way to

Quincy near where Donovan lived in Milton.  The phone records

confirm the timing as well.  They show that Donovan had a short

call with the defendant at 9:31 on the 15th and two more at

9:33 as Donovan was arriving in Mashpee.

They show that at 9:53, just 20 minutes after Donovan

had his last call with the defendant, 20 minutes, the same

amount of time that Donovan told you he was meeting with the

defendant, Donovan had another call, and who does he call?

Gordon Ernst, first his cellphone, then his landline.  Lauren

1    George told you what those numbers were, and you can see them

2    in Exhibit 270 as well.

3          The phone records further show that Donovan was in

4    Falmouth from approximately 10:07 to 10:56, the time it took to

5    drive to Gordie Ernst's mother-in-law's house to meet with Lisa

6    Ernst and count out $170,000 in cash, to drive Lisa to the

7    bank.  And the bank records confirm this timing as well.

8    Exhibit 55 shows that Lisa Ernst rented a safe deposit box on

9    May 15, 2015, and that her first access was at 11:43 that

11:40 10   morning.  You know what she was putting in that safe deposit

11   box:  $170,000 in cash.

12          And, of course, you have the defendant's own text

13   messages admitting to paying Gordon Ernst.  As you'll recall,

14   the defendant still owed Ernst another $20,000, and here he is

15   on March 14th of 2016 agreeing to square things away with Gord

16   in late spring for part of it.  And, again, in July of 2016,

17   this conspiracy was still ongoing; bribe payments still needed

18   to be made, and he agreed to take another bite out of what he

19   owed Ernst after Ernst again reached out to square up soon, and

11:40 20   still later that month, when the defendant texted Ernst that he

21   could take a small bite today, not as big as the last.  This is

22   devastating evidence of the scheme and defendant's knowing

23   involvement in it.  You don't square things away if it's a

24   gift.  You don't take another bite out of a gift.  You know

25   what he was squaring away, and you know what he was taking a

1   bite out of.

2          Members of the jury, that was the scheme.  Tim Donovan

3   described it to you, and the testimony of the other witnesses

4   plus the e-mails, phone, and bank records back up what he told

5   you.  And you know from the evidence that the defendant joined

6   the scheme willfully and that he knew it was wrong.  Here are

7   some of the many ways that you know that:

8          First, the defendant and Donovan discussed that the

9   defendant needed to pay Ernst in cash for using the recruitment

11:42 10   slot.  He didn't write a check; he didn't send a wire because

11   he didn't want there to be a trail.  Common sense tells you

12   that's a bribe.

13          Second, the defendant and Donovan discussed a cover

14   story that they would tell Katherine's high school counselor to

15   make him believe that this recruitment was real, and the

16   defendant told Matt DeGreeff falsely that Ernst was interested

17   in Katherine because she had the raw ability to lead the team.

18   But you know that wasn't true.  Katherine told you, so and the

19   defendant knew it as well.  Remember, he played college tennis

11:42 20   at Brown.  Of course he knew that Katherine was not a player at

21   that level.

22          Here's how else you know it was wrong:  He made up

23   another cover story, a year in advance, that a shoulder injury

24   would prevent Katherine from being on the team.  That was

25   before she was even admitted.

                    And he didn't pay the bribe directly.  He used a

     middleman.  His Cape house was 20 minutes down the road from

     where Lisa Ernst was at her mother's house, Ernst's

     mother-in-law's.  The defendant could have easily driven from

     Mashpee to Falmouth.  Instead, he made Donovan, who told you he

     lives up in Milton, drive down the Cape, meet with the

     defendant, take the money to Ernst before going home.

                    And here's how you know to a certainty that the

     defendant knew what he was doing was wrong:  When he found out

     that Ernst got arrested, he called Donovan, and they came up

     with another cover story.  Let's look again at Exhibit 270.  On

     the day Ernst was arrested, the defendant called Donovan at

     11:46 and he left a voicemail.  When Donovan didn't call him

     back right away, the defendant called Donovan again an hour

     later.  Of course he was anxious to talk; their co-conspirator

     had just been arrested.  They then spoke for approximately

     25 minutes, and Donovan told you what they discussed.  The

     defendant came up with another cover story, that they would say

     that the money, the $200,000, was for tennis lessons.  You

     don't need a cover story for a legitimate transaction.

                    As I mentioned briefly earlier, the defendant is

     charged with three forms of conspiracy:  conspiracy to commit

     mail fraud, conspiracy to commit honest services mail fraud,

     and conspiracy to commit federal programs bribery.  He's also

     charged in a separate count of federal programs bribery, and I

expect that the Judge is going to instruct you that a

conspiracy is just an agreement between two or more people to

do something that's against the law.  Here you know there's an

agreement between the defendant, Tim Donovan, and Gordie Ernst

to get Katherine Khoury admitted to Georgetown by designating

her as a tennis recruit in exchange for money.  That's honest

services fraud.  That's a bribe, in violation of Ernst's duty

to his employer, Georgetown, by misleading his colleagues in

the Admissions Department.  And you know there are mailings

involved in the scheme, including the likely letter that we

looked at at Exhibit 35 and the admissions letter at

Exhibit 38.  Those were mailed to Katherine.

You also know that this fraud mattered.  You heard it

from Meg Lysy, that Katherine would not have gotten in on her

own merit:

"QUESTION:  Based on your experience as a Georgetown

admissions officer and your review of her application, would

Katherine Khoury have been admitted to Georgetown without a

tennis recruitment slot?

"ANSWER:  Absolutely not."

Georgetown admits only twelve to fifteen percent of

students who apply, but by falsely presenting Katherine as a

tennis recruit, the defendant effectively guaranteed her

admission.  Meg Lysy told you that the odds of admission for

recruited athletes at Georgetown was pretty much one hundred

1    percent.

2         Now, Special Agent Mark Deckett also testified that

3    Georgetown receives more than $10,000 annually from the federal

4    government.  That means that when the defendant agreed to give

5    money to Ernst to designate his daughter as a tennis recruit,

6    he was also conspiring to commit federal programs bribery.  The

7    one separate count of federal programs bribery is based on this

8    defendant's offer, agreement to give, and payment of those

9    bribes to Ernst.

11:47 10        Now, the defense has focused on the importance of

11   fundraising at Georgetown and whether the university gave

12   preferential treatment to applicants whose families had the

13   potential to donate to the school.  They have tried to distract

14   you with suggestions like Katherine Khoury was admitted based

15   on the Khoury family's fundraising potential, that Matt

16   DeGreeff encouraged it, in fact.  But you know that that is all

17   a sideshow.  You haven't seen a single Georgetown e-mail

18   discussing Katherine Khoury's development potential.  You

19   haven't heard a single Georgetown witness tell you that they

11:48 20   were aware of the Khoury family prior to Katherine's admission

21   because Katherine Khoury's admission had nothing to do with

22   fundraising.  The defense has raised this to distract you from

23   the one thing they didn't ask any witness about, that brown

24   paper bag of cash.  Katherine Khoury wasn't admitted to

25   Georgetown based on her family's wealth.  She was admitted

because the defendant agreed to pay Gordie Ernst $200,000 as a
bribe to designate her as a tennis recruit, and Meg Lysy told
you she admitted Katherine based on that recruitment.

Over the course of this trial, you have learned a lot
about the college admissions process and tennis recruitment.
You've seen lots of documents and e-mails, phone records and
bank records, and you've heard from a handful of witnesses, but
at the end of the day, the only thing you need to decide this
case is what you walked into the courthouse with a week ago,
your common sense.

Common sense tells you it's wrong for a coach to
pretend to recruit a student to get her admitted to college as
a tennis recruit when she's not good enough to play.  Common
sense tells you it's wrong for a coach to mislead his
university's Admissions Department into believing that the
student is a legitimate recruit when that spot should have gone
to a qualified tennis player, and common sense tells you it's
wrong to do that in exchange for a $200,000 cash payment to a
middleman in a brown paper shopping bag.  This isn't a gift,
and it wasn't a donation either.  Common sense tells you it's a
bribe.

Now that you have seen and heard all the evidence, you
know that the defendant did those things, that he crossed a
line, and in the process, he broke the law.  All the evidence
in this case, the e-mails, the text messages, the other

documents, the testimony from the witnesses, all of it leads to

a single inescapable conclusion, that the defendant, Amin

Khoury, is guilty beyond a reasonable doubt as charged.

        Thank you.

CLOSING ARGUMENT BY MR. BLACK:

        MR. BLACK:  May it please the Court.

        THE COURT:  Yes.

        MR. BLACK:  And good morning, ladies and gentlemen.

Let me show you where this case falls apart.

        Keith, can you put up 213.

        This is how the government started this trial, telling

you that -- of course, what they got from Mr. Donovan, not

themselves -- that's how they supposedly get this information --

telling us that Katherine Khoury is going to masquerade as a

tennis player and go to Georgetown University and tell them

that she has an old shoulder injury, and therefore she can't

play tennis anymore.  That's the scheme.  That's how they

started off this trial with this scheme, and they repeated it

today, that Katherine Khoury, this 18-year-old girl, was going

to go to Georgetown masquerading as a tennis player with a bad

shoulder.  There's no chance in the world this man would have

his 18-year-old daughter be dragged into some crime and force

her to go to a school and come up with a story that she has a

fake shoulder.  There's no way in the world any father is going

to do that with his 18-year-old daughter.

            Now, maybe there is in the world; not in the world I
know of.  But take a look at Katherine Khoury.  You saw her in
this case.  She testified at 25 years old.  Think about her at
18 years old.  Think about who she was, what kind of person she
was.  You heard from the teachers.  You read the things in the
application, that she had the admiration of everybody at her
school.  She was the hardest-working kid at the school.  She
may not have been the best student.  She may not have been
great at math.  She was not a 5-star tennis player, but she was
honest and had integrity and stood up for people.  There's
simply no way in the world the girl that you know, that you
saw, that you read about, that you heard about in this
courtroom, would masquerade at a university claiming she has a
shoulder injury.  There's simply no way that that unbelievable
story, that demeaning, ugly story has any truth to it, none.
It's made up by Tim Donovan as part of his scheme to get
immunity, and that's all it is.  That's the scheme in this
case.  That's the Tim Donovan scheme.  That's what he and his
lawyer came up with.

            And you know what their problem was?  They didn't know
about the text messages.  They didn't know about the text
messages between Katie Khoury and her father throughout the
summer of 2016 leading up to her freshman year at Georgetown
University.  They don't know what went on in the Khoury family
and what happened to Katherine Khoury, and why she really

didn't play tennis at Georgetown, because they had never seen
those text messages, so they didn't know.

         Now, the text messages are irrefutable because they
were from 2015 during May and the summer through October of
2015.  And these text messages are ugly.  You know that
expression, "The truth will set you free"?  Well, this is the
truth.  It may be ugly, it may be painful, it may be hard to
listen to.  It is certainly hard on Amin Khoury to reexperience
this, but it's a hard truth, and it's true.  It's not like this
phony story that this guy and his lawyer have made up in order
to escape the fact that he's a criminal and a tax evader.  The
whole thing was made up by the two of them; and using this
young girl and accusing her of this, to me, is one of the most
outrageous parts of this case.

         And what happened then in the summer of 2015?  Why
didn't she play tennis?  What happened to her?  Well, we've got
the evidence right here.  We've got these text messages.  They
were sent to her father.  This had to be one of the most
difficult things in his life to get these text messages from
his daughter:

         "I literally hate you.  Of course I think you are
despicable.  It was selfish and deceitful.  I'm ashamed of you.
Because mommy made me be nice and invite you, but, truthfully,
I have zero interest in seeing you ever again.  I talked to
mommy, and she said she'll try to be in the Cape in order to

1    make the therapy as functional as possible."

2          They're in therapy in the summer of 2015, not making

3    up shoulder injuries.

4          "The night of my graduation is supposed to be a fun

5    celebration.  I don't think it will be if you come.  Lexi and I

6    are not doing that well.  I hope you know that your family

7    isn't able to exist peacefully together.  And don't spend

8    another holiday together.  I will forever blame and resent you

9    and have zero interest in sharing vital parts of my life with

12:00 10   you."

11          That's what Katie Khoury was saying in the summer of

12   2015, not making up some story about a shoulder injury.

13   They're in therapy.  Think about the angst.  Think about the

14   pain of an 18-year-old girl writing that to her father, the

15   father that she loved more than anything else in life, that

16   played tennis with her since she was five years old.  Just

17   think of where the source of that pain is coming from, and you

18   think about what this girl is going through.  And I didn't read

19   the last one.  This is October 14, one month at college:

12:00 20         "If you cause us another ounce of pain, I'm going to

21   jump off a building."

22          Now, we didn't get to read that the first time around.

23   You know why?  Because they objected.  They said this is

24   irrelevant.  They didn't want to hear this.  Even in the

25   courtroom, they would not recognize the truth.  "It's

1  irrelevant."

2           I don't know how many of you remember this, but this

3  was what I thought a shocking event.  You had a young girl at

4  the Olympics, Simone Biles --

5           MS. KEARNEY:  Objection, not in evidence.

6           THE COURT:  Well, let him have his closing.

7           MR. BLACK:  I'm sorry, your Honor?  Can I --

8           THE COURT:  Yes, you can move forward.

9           MR. BLACK:  And she came up to her number one event

12:02 10  that she spent her whole life training for, her whole life, and

11  she was unable to do it.  Her mental state was such, she said,

12  "I just cannot do it."  And there she is in front of

13  millions -- no, billions of people on television, and she had

14  to say that.  And what happened?  Had this backlash:  "You have

15  to toughen up.  We lost a gold medal because of you."  Just

16  imagine feeling like that.

17           Now, think about Katie Khoury in her first semester.

18  Things are so bad, her mother had to come down to school to get

19  her out of bed, to put her into the shower.  Her world was

12:03 20  collapsing all around her, and they expected her to go and play

21  tennis?  I mean, when your world -- when your family is falling

22  apart, when you're all in therapy together, when you're worried

23  about your sister, your father, your mother is having all kinds

24  of problems, the last thing on your list is tennis.

25           And think about Amin Khoury.  His family is falling

apart.  His daughter has gotten into school.  She goes out and
has a drink with her sister and her friend, and all of a sudden
they're thinking of revoking her admission to the school.  Can
you imagine if that happened on top of everything else that
this girl was suffering?  What do you think that might do to
her?

And he calls up his friend.  They suggested that he
call Gordie Ernst, "Why don't you get him involved to save
this?"  It wasn't his idea.  He was told, and we have the
e-mail there.  Meg Lysy tells Matt DeGreeff, "Have Amin Khoury
talk to Gordie Ernst to help her."  And he does.  If you're
ever going to give somebody in your life a gift, a thank-you,
money, help when they're in need, it's going to be the person
who helped you in your toughest period of time.  Who else would
you want to help?

Here is the man who's losing more than half of his
income, who's desperate, who keeps asking Georgetown for help,
and they draw up these plans.  We don't know what happened to
them.  By the way, they say that, well, it wasn't implemented.
I'm sorry.  I don't believe anything they say unless they come
with a document that shows it, and they didn't come here with
any document.  But putting that aside, what does the Georgetown
family do for them?  You know, "We all get together.  We're the
Georgetown family.  We all help each other out"?  They did
nothing, nothing.  After destroying over half the source of his

1  income, they did nothing, the Georgetown family.  Give me a

2  break.

3       They abandoned him.  The only family that helped him

4  was the Khoury family, and they want to turn that into a crime.

5  When your friend who helped you out, who did things for you

6  that nobody else could do, that helped save your family or

7  saved it from not being worse, that somehow you ought not to

8  help him out in his time of need.  You saw it.  He not only

9  lost half his income, his family is sick, his brother died, his

12:06 10  father was dying.  This guy was desperate.  And where was

11  anybody else?  All these people that come in here, all these

12  over-educated, arrogant people come in here willing to judge

13  everybody else.  What did they do?

14       Now, I believe that the credible evidence in this case

15  shows there was never any bribe, there was never any agreement

16  made, that Katherine Khoury got into school on her own with the

17  help -- with the help of her father's best friend from Brown,

18  as it was disclosed to the school.

19       So it starts at the Brown tennis reunion at the

12:07 20  Capital Grille.  You heard the voicemail from Tim Donovan:

21  "Let's have two or three or five or six drinks and have a good

22  time."  That's all it was.  There's nothing in the horizon

23  about Katie Khoury or tennis or Georgetown at all.  Nobody

24  knows anything, and they go to the dinner.  And they're sitting

25  around the table, Gordie Ernst, his brother Bobby, Kevin Wyman,

Mike Fried, Amin Khoury, and they're drinking.  They're having

a good time.  And what does Tim Donovan want you to believe?

That when they find out that Katherine Khoury is going to

college and wants to play tennis, instead of saying like old

friends, "Sure, we'll help you out because this is what old

friends do, old teammates, we were together all those years

ago," no, somebody said, "Yeah, I'll do it for a $200,000

bribe."  Have you ever heard of such a thing happening around

the table like that, with old friends just getting together,

and all of a sudden, out of the blue, your family needs help?

"Sure, I'll help them for a $200,000 bribe."

And what is the first thing that Donovan does after

the dinner?

Keith, can we put up 220.

The first thing he does after the dinner is, he sends

a text message.  And this is what we have.  We only have a

couple of -- three or four text messages from Tim Donovan, and

I'll get into that a little bit later about what happened with

his text messages, but he sends a text message to Mike Fried,

the coach at Wesleyan, saying that, "Well, maybe would you be

interested in Katherine if Khoury can donate $400,000 to

$500,000?"

Now, wait.  They want to convince you, these people

from Georgetown come in here and they want to convince you that

money has nothing to do with college admissions.  If you

believe Meg Lysy, you can believe that one, right?  She has not
even applied to Wesleyan, and they're negotiating with the
coach and the athletic director how much money they're willing
to take to let her into the school.  That's these people.  This
is what these schools do.  Did the government come in here and
say, "Money has nothing to do with admission into the schools"?
We have the proof right here.  How more stark could it be than
that?

And why in the world is Tim Donovan contacting Mike
Fried at Wesleyan?  According to him, on the way back on
May 23rd, on the way back to the hotel, he agrees to join this
conspiracy with Gordie Ernst that he's going to get paid to get
Katherine into Georgetown.  So if that's true, why is he
talking to Wesleyan?  Why is that the first message he sends
out?  He's not getting paid; he's just going to get a success
fee there, according to what he testified to here at the trial.
But why would you do that?  If you really had a bribe or agreed
to pay a bribe to get into Georgetown, why in the world would
there be text messages trying to get into Wesleyan and finding
out how much it would cost?  Just evidence there was no
agreement, there was no bribe.

And what was his testimony?  If we could put up
Slide 20.  This is before she files the application.  The money
is support for the Athletic Department.  That's what they call
it:

1          "Were you willing to donate to support the Athletic

2     Department, to support athletics at Wesleyan?  Yes.  Support

3     things like the tennis team at Wesleyan?  Yes."

4          And then we get to the key exhibit in this case,

5     Exhibit 7.  And, by the way, they had Donovan come up with some

6     story to try to devalue this e-mail, but it can't be done

7     because what happens?  Here you have Amin Khoury sending an

8     e-mail to Matt DeGreeff asking him to contact Gordon Ernst to

9     ask him about whether or not Katherine can be recruited for a

12:13 10    slot.  And what does he say?  "Because these types of

11    discussions can always be easy to misinterpret."  Why could it

12    be easy to misinterpret?

13         Keith, please put up Slide 32.

14         This is part of Donovan's testimony.  At the dinner

15    alone there is several bottles of wine for six people.  They

16    were drinking all night.  So what does Amin Khoury do?  He

17    says, "Look," he talks to the college counselor -- and, by the

18    way, at Middlesex, I have to give them credit; they do an

19    unbelievable job helping kids apply for college.  And he calls

12:13 20    up the counselor, or e-mails him here and says, "Look, I had

21    these conversations, but I'm not sure what went on."  You know,

22    this is during the dinner.  This is not something like a formal

23    contract.  "Can you contact because I'm worried that I may have

24    misinterpreted it?"

25         Did you ever hear of anybody entering into a bribe

asking a third party, "Oh, would you please call up the person
I'm going to pay a bribe to and ask the terms of the bribe"?
Is that believable?  Is it believable that you would put this
man, Matthew DeGreeff, in the middle of some bribe conspiracy?
You saw Matt DeGreeff.  He has a Harvard degree, an MBA from
Harvard, worked in the Admissions Office, has been a counselor
at Middlesex for 20 years, was on NCAA committees, was on the
SAT committee, has put hundreds of kids, hundreds of kids into
college.  Nobody does that job unless they love kids, unless
they love working with kids.  That's who he is.  He's not some
criminal.

        And so he's the one who contacts Gordie Ernst to find
out what's going on, and here is his testimony, if we could put
up 106.  I always find it's useful to show parts of the
transcript to refresh your recollection about what witnesses
testify to because you just can't remember everything, and here
is his testimony.  And he said that Amin Khoury wanted him to
confirm it because it was easy for him to misunderstand what
happened, and he was anxious that he misunderstood it.  He's
telling you he's anxious because he's worried that maybe he
misunderstood or misinterpreted or misheard what Gordie Ernst
told him, right?  "Answer:  That's exactly what he's telling
us, yes."

        So what happens?  He contacts -- well, before we get
to that, let's put up 222 because they go a little bit in

1    chronological order.  This is a text message from Tim Donovan

2    to Amin Khoury July 30, 2014.  "Georgetown admissions would not

3    take Gordie's top 50 recruit without taking the SAT, which she

4    didn't want to do.  She just accepted a scholarship offer from

5    BC.  We dodged a bullet."

6         "We dodged a bullet."  And I'll show you in a minute

7    why that is, because Gordie Ernst had already recruited two

8    5-star recruits.  He's got three slots.  He's already used up

9    two.  The third one was going to this young lady who is a top

12:17 10   50 recruit, but Admissions at Georgetown wanted her to retake

11   the SAT, and she said "no."  So instead she went to BC to play

12   tennis there.  The only reason the slot opened up is because

13   this young lady declined to take it.  This is not some sure

14   thing like a bribe.  A bribe, you wouldn't care about this

15   because he wouldn't have recruited her, but he recruited her

16   right through July, and she refused to cooperate and went

17   elsewhere.

18        If you could put up 107.

19        Matt DeGreeff testified that Gordie Ernst had three

12:18 20   slots.  The two All Americans were committed.  And he wanted to

21   use the third slot for Katherine because he and Amin Khoury

22   were friends.  He and Amin Khoury were friends.

23        And if we could put up Slide 6.

24        And here is Tim Donovan saying the same thing:  "He

25   already had two 5-star recruits that he got during the summer.

The third one was a young lady who went to BC instead, and
that's why you said 'We dodged a bullet.'"  Why would a
co-conspirator say "We dodged a bullet"?  If it was a
guaranteed thing, there's nothing to dodge.

Put up Slide 5.

And then we heard about the SAT examinations.  And, by
the way, I think it was very unfair the way that was presented.
With a number of witnesses, the government showed the results
on the first two tests.  She took four tests and improved each
time.  But how misleading is it just to put up the first two to
try to make her look bad?  That was not the deciding factor at
college.  They take the highest scores that you have.  But I
think it was just so unfair to denigrate her like that.

So she kept taking the SATs.  She took it four times,
and she kept improving.  Not only that, but she talked to
DeGreeff about how she could improve her GPA at Middlesex,
"What courses can I take?  Are there other things I can do?
How do I study for the SATs?"  Her father there saying she's
going to be studying over the holidays in order to raise her
scores.  Well, why do you have to raise your scores?  Why do
you have to worry about your GPA?  Why time after time, how
many times did you say, "Send her transcripts, send her updated
transcripts, send her updated SAT scores"?  Why did anybody
care about that?  If it was a guaranteed thing, why care?  Why
go through all that?  It's some sort of charade that you just

1    keep taking these tests and keep doing this work?  They're

2    going to want you to believe, I'm sure, that, oh, that's

3    another cover story they came up with.

4         Well, she was a hardworking young lady.  Don't you

5    remember what -- some of those things that were said in her

6    application I thought were extraordinary.  There was one from

7    her math teacher, and we know math was her most challenged

8    subject, that her trigonometry and analytical geometry teacher

9    said, "She was the most highly focused, hardest-working student

12:22 10    I ever had.  I ever had, the most."

11        And we know she was struggling with her ADHD at the

12   time, but this was a young lady who worked very hard to try to

13   get ahead, to try to get into college, to try to improve

14   herself, to improve her scores.  She's not part of some

15   conspiracy.  I think that's just anathema to even suggest that.

16        And then Matt DeGreeff -- this is Exhibit 132, if we

17   could put that up -- said that when he spoke to Gordie Ernst,

18   he didn't say, "oh, yes, I have a slot for Katie Khoury.  Don't

19   worry about it."  No, no.  He told to DeGreeff that he's going

12:23 20   to have to wait until he has a good handle on his recruiting

21   class before he makes a decision about Katie Khoury.  This is

22   not a done deal.  He's going to wait all the way till the end.

23        If we could put up 228.  Oh, before that, put up 17.

24   I'm sorry, Exhibit 17.

25        We're now five months later, mid-October.  You

remember that Gordie Ernst said, "Well, I'm going to have to see how my recruiting class goes"?  Well, Matt DeGreeff -- and I asked him, "Why did you do this?"  He said, "That's my job. I follow up on things."  Five months later he said, "Do you have any further progress or any more thoughts on Katie being part of your recruiting class?"  And what is he saying? Exhibit 13.  He's happy to talk about Katie, but he had the best recruiting year in memory, two 5-star recruits, the same thing we heard from Donovan, the same thing we heard earlier from DeGreeff.  Now we're hearing it directly from Gordie Ernst, that he has three slots.  Two were taken up by the two 5-stars, the SAT girl dropped out, and now there's one spot or one slot available.

        And then if we could put up Slide 121.

        Gordie Ernst replies to the e-mail saying, "Well, send me Katie Khoury's transcripts and scores."  And what did Matt DeGreeff say?  "Well, I had already sent them to you back in July."  He had forgotten that he had even gotten them because Katie Khoury was not anywhere on his mind for five months. Even though he had the scores, the transcripts and what have you, he asked for them all over again, and Matt DeGreeff sends it to him.

        And then if we could put up 17.  When he gets the updated transcripts and scores, what does he do?  He sends them to Meg Lysy.  And Meg Lysy, what does he say?  "This is the

daughter of my best bud from Brown."  Total transparency.  He

tells the admissions officer about the relationship.  He

doesn't hide it from them.

If we could put up Slide 110.

Mr. DeGreeff testified that he talked to Gordie Ernst

about her academic performance, that Ernst said that she had to

improve her grades, that she had to work on improving her

scores.  Why would he say that?  If this was a done deal, why

would he even say that?

And then what happens?  Exhibit 223.  This is a text

message in March of 2015 from Tim Donovan congratulating the

Khourys on their daughter being admitted to Georgetown.  And

what does he say?  "The Vatican might want to see it as proof

that miracles still happen!"  That miracles still happen.

You know, you pray for a miracle.  You don't pay for a

miracle.  If this was a bribe that was preordained, why would

Tim Donovan say that to Amin Khoury?  It's the only two people

on this conversation.  He calls it a miracle that she got in.

And why was it a miracle?  Think of all the things that had to

line up.  They had to wait for Gordon Ernst's recruiting class,

that he had had three 5-star recruits that filled up his

recruiting class, but one of them decided not to go to the

school, so that freed up a slot.

And Katie Khoury kept improving her grades.  The deal

was work time and time again to try to get her better, to get

better GPA, get her better SATs.  All these things fell into

place.  That's the only reason that she got this slot, the only

reason why, not because of a bribe but because all these things

worked out.  And if this really was a bribe, why would you

worry about all these things?  Why would they even be on the

horizon?  Why would they be talking about them?

The government's case relies upon a conspiratorial

agreement being entered into at the reunion dinner, and I ask

you, at what point in this dinner was a deal struck?  Where is

the evidence of it?  You heard what Donovan says about Ernst,

but where is one word about Amin Khoury agreeing to commit a

crime, one word?

Can we put up Slide 25.  I asked him this:

"QUESTION:  While you were sitting there, did anybody

say, for $200,000, we'll get your daughter into school?

"ANSWER:  No.

"QUESTION:  As a matter of fact, there was no

discussion of any crime during that dinner, was there?  So

there was no discussion at that dinner of someone committing a

crime?

"ANSWER:  No."

And then I ask him:

"QUESTION:  Finally, maybe you misunderstood.  Is

there any evidence, anything that happened of somebody

suggesting a crime or a bribe that you heard?

1    "ANSWER:  No."

2        I put up Slide 22, and once again this is the source

3    of information that the government is relying upon.  I think

4    it's 32, not 22.  I'm sorry.  There were several bottles of

5    wine drinking at that dinner, and then they went to the party

6    and had more to drink.  That's the source of the information

7    that they're relying upon for their testimony.

8        Now, the prosecutors try to convince you that the

9    timing of the payment is of no consequence to the charges, but

12:31  10    you will hear that the opposite is true; that if you agree to

11    pay before an official act is done, that is a crime, but if you

12    pay afterwards as a thank-you for somebody who has done

13    something for you, that is not a crime.  And the Court will

14    instruct you, "If you find that Mr. Khoury agreed to pay only

15    after Mr. Ernst designated Mr. Khoury's daughter as a tennis

16    recruit, you must find that he is not guilty of bribery."

17    "Finally, if Georgetown condoned or provided its tacit

18    approval, either directly or indirectly for the payment, then

19    the government has not proved there was a bribe."

12:32  20        We'll get to that in a minute about the tacit

21    agreement, but the important part here is, if Khoury only

22    agrees to pay after his daughter was admitted, after she was

23    admitted, after she had the problems with the alcohol, after or

24    during the time that they're thinking of revoking her

25    admission, when she's going to the disciplinary committee, when

1   she's suspended at Middlesex, when she has to go to Georgetown,

2   when she has to write letters of apology, when Gordon Ernst

3   comes in and helps her with Meg Lysy, the admissions officer

4   who's making that decision regarding discipline, if in fact

5   Amin Khoury is thanking him for doing that, for saving what's

6   left of his family, that is not a bribe and it's not a crime.

7          Bribes are paid in advance; thank-you's are paid

8   afterwards.  You don't pay the building inspector afterwards,

9   after he's passed your building.  People have to pay in

12:33 10   advance.

11          Could you put up Slide 22.

12          And the government, of course, makes much about the

13   fact that the payment is in cash.  And what did they tell you

14   in the opening statement?  "You will hear the defendant, when

15   paying it, he didn't use a check.  He didn't use a wire

16   transfer.  He didn't call his bank and ask them to transfer the

17   money.  He didn't e-mail his personal assistant and ask him to

18   transfer the money, none of that."

19          Well, put up 227, please.  In fact what happened --

12:34 20   and please take a look at these.  They're Exhibits 49 and 50.

21   Mr. Khoury's personal assistant, Karl Saunders, on May 5, 2015,

22   e-mailed two Credit Suisse representatives, Lorrie Malanga and

23   Maria C. Alliferis.  We have the e-mail, there's a letter

24   attached to it where they said that he didn't ask his assistant

25   to do it?  Well, here it is in evidence.  And attached to the

1    e-mail was the letter executed by Amin C. Khoury requesting

2    $200,000 in wire transfers to his account at Wells Fargo.  He

3    had the money wire transferred from Credit Suisse to Wells

4    Fargo.  And then Exhibit 51 is a withdrawal slip from the

5    checking account at Wells Fargo in the name of Amin C. Khoury

6    authorizing and signing for the in-person withdrawal.  So for

7    them to say that this is not documented is simply not true.

8           And what was the motivation?  Why was Donovan paid in

9    cash or why did Donovan want cash?  Well, we know he has done

12:35  10    this a number of times.  He admits it.  There was a young lady

11    called MK -- we can't use her name -- but he got a fee, a

12    success fee of $50,000 for getting her into Swarthmore,

13    $50,000.  And he told the parents, even though there's no crime

14    involved, no paying of coaches, nothing, "I want you to pay me

15    in cash," and they paid him $50,000 in cash.  Why?  So he could

16    avoid paying taxes.

17           He's the one who has the tax obligation.  He's the one

18    who committed the tax crime.  Giving him the cash is not a

19    crime.  There's no tax consequences to giving someone a gift or

12:36  20    giving them any money.  The tax consequences is receiving it as

21    income.  That's why he wanted it in cash, so he didn't have to

22    report it.  And he did this on his success fees.  Why?  Because

23    they're not documented; they're not in his contracts.  It's

24    something separate.

25           Please put up 55.  And I asked him:

1          "QUESTION:  That allowed you to hide the money and not
2    pay taxes on it, correct?
3          "ANSWER:  Yes.
4          "QUESTION:  You wanted it in cash so you could hide it
5    and not pay taxes?
6          "ANSWER:  I did not pay taxes.
7          "QUESTION:  And how did you get the cash?"
8          This is talking about MK's father bringing the cash to
9    him.
12:37 10        And Slide 54.  And I asked him, "So you demanded it to
11   be paid to you in cash?" and he said, "I don't know if I
12   demanded it, but I was happy with it.
13         "Even though it was entirely legitimate, the $50,000
14   was paid in cash, right?
15         "Yes."  And then he admits that he didn't pay any of
16   the tax on it.
17         And, by the way, I think we brought out he never told
18   the government about this to begin with.  It's somewhere down
19   the line that he finally tells them about it.
12:38 20        If we could put up Slide 189.  This is from the
21   testimony of Meg Lysy, the admissions officer that the
22   government relies upon to say that fundraising potential and
23   money doesn't get you admitted to the school.  And I asked her:
24         "QUESTION:  Do you do investigations of families?
25         "ANSWER:  No.

1          "QUESTION:  Are the parents made targets?

2          "ANSWER:  No."

3          Now, here, let me get it from here:

4          "QUESTION:  Do you have investigations into the net

5     worth of parents of potential students?

6          "ANSWER:  No, we don't do that.

7          "QUESTION:  Isn't it a fact you put down things like

8     how much their home is worth?

9          "ANSWER:  No.  You didn't see that, did you?

12:39 10          What kind of businesses they have?  Remember the CEOs

11    and how important their business was and what their

12    philanthropic history is?  What does she say?  "I've never

13    heard of that."

14          "QUESTION:  Are you aware that Georgetown sets targets

15    for the fundraising for the parents of potential students?

16          "ANSWER:  No.

17          "QUESTION:  You've never heard of that?

18          "ANSWER:  No."

19          None of that's true.  We know that because we got all

12:39 20    the e-mails.  That's what they talk about at the school there.

21    They've got how much people's homes are worth, what their net

22    worth is, how much they've given in the past, how much we can

23    expect to get from them, what their net worth is, what they're

24    the president and CEO of.

25          And if we could put up Slide 158.

1      And this is when she got on the witness stand and she
2  was asked the question by the prosecution about whether
3  Katherine Khoury was worthy to be admitted to her school, and
4  she gave her opinion.  And then we found out while questioning
5  that she would just say "yes" to the answers regardless of what
6  it was.  I'll show you that in a minute, but she admitted on
7  cross-examination she never read her application.  Even coming
8  to this trial, she didn't read her application.  Even though
9  she went to the U.S. Attorney's Office, met with them I don't
12:41 10  know how many times, they show her these documents; she never
11  reads them.  And then she comes in here and gives an opinion
12  that she's not worthy for their school without even reading the
13  application.  She didn't read it the first time; she didn't
14  read it when she was preparing.  The only time she read it is
15  when I forced her to read part of the essay when she was on the
16  witness stand.  And she comes in here to give an opinion about
17  this young lady without doing any research, without reading it.
18  That's an insult to this process.  It's an insult to what we do
19  in this courtroom.  It's an insult to the American justice
12:41 20  system.  If somebody's going to come into court and give an
21  opinion about another person and say they're not worthy to go
22  into a school, you have to at least read the documents.  I just
23  can't imagine that this is what goes on in the school, that she
24  doesn't read them; and worst, that when she came here, she
25  didn't read it.

And then I had asked her -- the government on direct examination had her look at one of the essays, and, of course, they're trying to make the point that she's not really a tennis player and doesn't have anything to do with tennis, and they have her look at the essay, and they say, "Well, is there anything about tennis in that essay?"  It's right there, right in front of her eyes, and what does she say?  "No, she doesn't say anything about tennis," because she knows that's what they want to hear.  Really, she's willing to answer whatever question they want how they want it.  That's the power of federal prosecutors.  You don't think it's intimidating for people to go to their office and deal with FBI agents and federal prosecutors?  They're happy to say "yes" to all their questions.  They don't meet with us.  They only meet with them, and that's where they get -- practice their testimony.

And she says, "No, it doesn't say anything about tennis."  Why?  Because the prosecution is trying to point out she's not really a tennis player and doesn't care about tennis and doesn't bother to mention it, even though, I know you know because it came out, you've got several paragraphs throughout there, particularly in the letter from Middlesex talking about her being from a tennis family, and what her strokes were like, and what she was like on the team, and she was a great teammate, and she also played squash.  All of that is in there.  But, oh, no, they point Lysy to that one page and try to get

1   her -- do get her to say it doesn't mention tennis so they can

2   get up here and argue to you, "See, she's a fake tennis player,

3   she's just masquerading, this 18-year-old girl, she's just

4   making it all up, she's a phony tennis player."  That's their

5   mantra from the beginning of this case:  She's a phony tennis

6   player.

7           Now, one thing you can't say about Katie Khoury that

8   she's phony anything.  Did she ever lie about who she was?  Did

9   she ever exaggerate her qualifications?  Did she ever say she

12:44 10   was a 5-star tennis player?  Did she say she was a great

11   player?  No, just the opposite.  She told the truth time and

12   time again.  And they try to twist that into her masquerading

13   as a tennis player.  And she never claimed to be the best

14   student.  She doesn't get the highest SAT score, but she

15   reported every single one of them and told the truth about

16   them.  Every word in that application that she filed that

17   you've seen is truthful.  She told the truth over and over

18   again, even when it wouldn't help her.  And they accuse her of

19   being a fake, of pulling a masquerade, of claiming she has

12:45 20   phony injuries.  That's how far they're willing to go to

21   convict this man, to get at him through his daughter.  There's

22   no chance she is any of what they say.  You saw her.  You read

23   these materials.

24           The Court is going to tell you, and I just read

25   that -- I'm not sure what I did with it -- if Georgetown gave

explicit or tacit approval for Gordie Ernst to accept money,
then it is not a crime; it is not a bribe.  So what is the
evidence on that?  If we could put up Exhibit 305.  This is the
Plan B e-mail and memo.  This is on May 19, 2015.  This is not
a coincidence.  We know that the money was withdrawn on May 6,
2015, by Amin Khoury.  This is two weeks later, and we know
that this is ongoing conversation.  What are they talking
about?  Gordie Ernst has lost his courts, lost half his income.
He's desperate to find money somewhere because he can't live
off the salary that Georgetown pays.  And what does Georgetown
do when they want to do something?  They fundraise.  They don't
take it out of their budget.  They don't take it out of their
endowment.  They fundraise.  They go ask people to give us
money.  That's what this is, Plan B.  Plan A is the university,
in conjunction with donors, will supplement the salary.  Plan B
is that private donors can come in and pay his salary.

Now, they try to cover this up by saying, "Oh, it's
going to go through the university."  Well, did you see any
documents to that effect, one document?  I'm sorry, I don't
believe anything they say unless they've got a document to back
it up.  We've got the document right here.  We know what was
going on, and attached to this is the actual plan.

Now, you know that Brenda Smith didn't submit that
without knowing what people were thinking of doing.  There's a
reason why this is being sent to Lee Reed, the Athletic

         1    Director, and Dan Trump, the assistant and the CFO of the
         2    Athletic Department.  And don't you think that Brenda Smith in
         3    preparing this spoke to Gordie Ernst and told him, "This is
         4    what we're going to do, is to get donors to give you money"?
         5    They say, "Oh, no, you can't take an outside source of money
         6    when you're a coach," but this is exactly what they're talking
         7    about is taking an outside source of money, and you can read
         8    the attachment which sets forth the plan.
         9            And remember in May when this is under consideration,
12:49   10    this is going to be the first summer that he doesn't have his
        11    tennis camps, the first summer after the courts were ripped up
        12    in 2014.  That's why all this has come to a head in May of
        13    2015, because Gordie Ernst is asking for help.
        14            They didn't make a pledge to him, at least as far as
        15    we can determine, but Amin Khoury made a pledge.  And that's
        16    why you see these text messages afterwards, because he made a
        17    promise, and he's a man who stands by his promise.  When he
        18    promised to pay a certain amount, he paid it, and that's what
        19    those subsequent text messages were about, because he's a man
12:50   20    of his word.
        21            And if we could put up 309.
        22            And, by the way, Gordie Ernst is not the first coach
        23    they did that.  In fact, Lee Reed admitted that, that they've
        24    done this with other coaches, got donors to supplement their
        25    salaries.  Here we have the crew coach.  This is saying, "We're

going to hire a crew coach, but we have no money.  Go find some

so we can pay the crew coach."  That's what they do at

Georgetown.  They don't pay out of the budget.  They don't pay

out of their endowment.  When something comes up in sports,

they go to the people who pay.  And who are the people who pay?

I think we've seen that every time:  It's the parents of the

players and the alumni who were in this sport.  These are the

people who support these programs.  And so he's lost somewhere

around $80,000 a year, and they're trying to come up with the

funds to replace it.

        And then if we could take a look at Exhibit 287.  I'd

ask you to -- I'm not going to go through the entire string of

e-mails, but this is the one where they're all in a tizzy

because there's one young man whose father is on the Board of

Trustees, and they've got to find a way to get him admitted to

Georgetown.  They say, "Well, he's not really a baseball

recruit," although he can play baseball, so, you know, he

didn't get a slot doing that.  And it goes all the way up to

Trump, and Mr. Trump testified here:  They started out with

Development, getting him a slot out of Development.  Then they

shifted it to baseball to try to get him a slot on baseball,

but baseball had used up all its slots.  So what did they do?

"Well, let's take a slot from football, and we'll move it over

to baseball, and we'll make believe that he really got

recruited for baseball, so in that way he'll get admitted."

1          Now, these are the people who want to tell you all the

2     integrity of these slots.  While you're debating that, please

3     take a look at this e-mail.

4          Now, this is probably the only time they put it down

5     in writing.  Usually these things are not in writing.  I'm sure

6     they sit around their office and decide how they're going to do

7     it.  But if the person is important enough, they will bend over

8     backwards, and they will give him a slot, even though he's not

9     a recruited athlete.

12:53 10          I think it's clear that Georgetown recruits athletes

11     based in part on whether the parents will support the program.

12     That's what Gordie Ernst was doing, we know other coaches were

13     doing.  That's where they get their budget from.  And I think

14     probably the best evidence of this is in 308.  They're talking

15     about doing away -- they don't have enough money for baseball

16     scholarships, so they're talking about doing away with baseball

17     scholarships.  And what do they say in their Subsection 2?

18     "The coaches will either have to recruit really rich kids who

19     can pay..."  The coaches will have to recruit really rich kids

12:54 20     who can pay.  They have denied this time and time again, and

21     here it is right in writing in their own e-mails:  "We recruit

22     really rich kids who can pay," meaning their parents will pay.

23          When it comes to Tim Donovan, we lost the search for

24     truth.  All we did was see an effort to hide it.  I had asked

25     him -- he supplied, I think, three text messages.  That's all

1    we've seen.  He admits there were thousands of text messages on
2    his phone.  Well, where are these text messages?  We found out
3    right during this trial while I was asking him a question, I
4    asked him about these text messages, and where are they?  And
5    so what did he say?
6              If we could put up Exhibit 30.
7              And I asked him, "Out of these thousands of text
8    messages, why were only three selected?"  Only three.  And, by
9    the way, they were not the original text.  He made what's
12:55 10   called a screenshot by making a copy on his phone and then
11   forwarding it so you can't determine any of the metadata or any
12   of the electronic data with it.  And what does he say?  "I
13   didn't decide which text messages to turn over."
14             Now, come on.  He and his lawyer for a year are
15   negotiating with the government for him to get immunity.  He
16   knew everything that was going on.  You really believe a guy
17   like him knows that he's looking at jail or being indicted for
18   tax evasion, and you think he doesn't know what his lawyer is
19   doing when he goes to talk to the prosecutors?
12:56 20            And I asked him some questions about his phone.  He
21   claims he doesn't know who made the screenshots, and he told us
22   on testimony before the recess that he had turned his phone
23   over to the government prosecutors.  And, of course, he says
24   that -- let me see if I can find it.  If we could put up 4.
25   And I asked him, "Isn't it a fact that you didn't turn your

1   phone over to the government prosecutors?"  He said:

2        "ANSWER:  They had my phone.  They had access to all

3   my text messages."

4        And then after the recess he comes back, the luncheon

5   recess, and we can put up 27.  And I asked him the question:

6        "QUESTION:  You said before we recessed that you

7   turned your phone over to the government, right?

8        "ANSWER:  I misspoke.  I turned my phone over to my

9   lawyer.

12:58 10        "QUESTION:  Oh, you found out during the recess that

11   was false?

12        "ANSWER:  I misspoke.  I didn't turn my phone over to

13   the government.  I turned my phone over to my lawyer."

14        So he never turned the phone over for an examination.

15   It didn't go to the FBI.  It didn't go to their crime lab.  It

16   was not examined by the government.  There are thousands of

17   messages, text messages on his phone, text messages which

18   include messages between him and Gordon Ernst.

19        Now, what could be more important in this case than

12:59 20   looking at the text messages between him and Gordon Ernst?  It

21   seems to me that would be a critical part of this case, and yet

22   I don't know if you will remember this.  When I was questioning

23   him about it, I said, "Well, is your lawyer here in the

24   courtroom?" and he said "Yes."  And then his lawyer was sitting

25   back there, and he stood up and identified him.  By the way,

his lawyer voluntarily stood up to be identified, but did you see him offer to turn over his phone?

Now, the Court will tell you that, first of all, on the conspiracy count, all three objects of the conspiracy require that there be a bribe.  If you find there is not a bribe, that resolves the issues in Counts 1 or 2.  And the Court will tell you a gratuity, a thank-you, a gift is not a bribe.  And a fraud, fraud requires false statements and omissions.  Katie Khoury had none of those, no false statements, nothing at all in her application that could be a crime.

The Court is also going to instruct you on reasonable doubt and that you have to find, before you could find Mr. Khoury guilty, that the evidence has been proven to you beyond a reasonable doubt.  Now, I know that you're all familiar with that term, and it's in popular culture.  And the problem is, with most legal rules, they're abstract.  They don't give you that much direction.  It's not that easy always to apply it to the facts of the case, but you have to find beyond a reasonable doubt that every fact necessary for a conviction was proven by the government.

Imagine the following:  That you go back into the jury room and you sign a verdict form.  You're ready to come out here and announce your verdict, and the Clerk comes in and says, "Oh, there's a new piece of evidence.  We have a tape

```
 1    recording of what went on in the reunion dinner --"
 2            MS. KEARNEY:  Objection, your Honor.
 3            THE COURT:  Sustained.
 4            MR. BLACK:  I think that's fair to comment on --
 5            MS. KEARNEY:  It's the --
 6            THE COURT:  I could talk to you at sidebar if you
 7    want.
 8            MR. BLACK:  Sure.
 9            THE COURT:  It's actually a great time to stretch
10    because Mr. Black told me he'd go about an hour and a half.  We
11    have another 15 minutes or so of that, so it will still be a
12    few more minutes.
13    SIDEBAR CONFERENCE:
14            THE COURT:  You're saying that there's another
15    transcript?
16            MR. BLACK:  No.  This is hypothetical.
17            THE COURT:  That there's --
18            MR. BLACK:  I'm saying that assume that there was all
19    of a sudden a tape recording, would you want to listen to it?
20            THE COURT:  That's speculative because there's no
21    evidence of it.
22            MR. BLACK:  I'll say there's no evidence of it.
23            THE COURT:  Just say there's no evidence, there's no
24    tape recording.  That's fair game --
25            MR. BLACK:  Okay.
```

```
 1              THE COURT:  -- that there's no tape recording.

 2              MS. KEARNEY:  It's just the point that this is purely

 3    hypothetical speculation.

 4              THE COURT:  Of course, the way he worded it was highly

 5    speculative.

 6              MS. KEARNEY:  And --

 7              THE COURT:  Excuse me.  Yes, you're right.  That's why

 8    I sustained the objection, but this alternative formulation

 9    would be that you can also consider the lack of evidence, and

10    there is no tape recording.  I think that would be fair game.

11              MR. MARKHAM:  Yes, your Honor, but may I ask for a

12    specific instruction that the jury only consider the facts in

13    evidence.

14              THE COURT:  -- for reasonable doubt the fact that

15    there is no --

16              MR. MARKHAM:  Yes, your Honor.

17              THE COURT:  Okay.  How much longer do you think you

18    have?

19              MR. BLACK:  Three minutes, four minutes.

20              THE COURT:  That's fine.  All right, I just didn't

21    want to --

22              MR. MARKHAM:  Your Honor, I have one more point I want

23    to address outside the jury.  He just misstated the mail fraud

24    instruction that there has to be a bribe in order for a

25    conspiracy to exist.
```

1          THE COURT:  I will give them instructions.

2          (End of sidebar conference.)

3          THE COURT:  You all set?  Good stretch?  We won't

4    finish this all before lunch anyway, so we're just going to

5    finish with Mr. Black and then take a break.

6          MR. BLACK:  Ladies and gentlemen, I'm not suggesting

7    there is a tape recording.  This is a purely hypothetical

8    issue, purely hypothetically.  If you found out --

9          MS. KEARNEY:  Objection, your Honor.

01:04 10          THE COURT:  Yes, that's not what we talked about.

11          MR. BLACK:  All right.  What the Court will tell you

12   is that a gift, a gratuity, or a reward for prior action is not

13   a bribe, unless it was promised beforehand.  That's why they

14   made the deal.  That's how Donovan sold the whole thing.  They

15   had to have him.  Without Donovan, there's no case.  If you

16   have any doubt about Donovan's credibility, believability,

17   honesty and integrity, then you have to acquit Mr. Khoury.

18          "If the agreement to exchange anything of value for an

19   act is made after that act has been performed, that agreement

01:05 20   cannot properly be viewed as an agreement to offer or accept a

21   bribe."

22          So, ladies and gentlemen, in December I was waiting on

23   a stretcher --

24          MS. KEARNEY:  Objection.

25          THE COURT:  Let him finish.  Go ahead.

1           MR. BLACK:  -- at the Sylvester Cancer Clinic in

2      Miami, and it's times like that when you think back about

3      what's important in life.  All of you are much younger than I

4      am, so perhaps you have not had that experience, but I can

5      assure you...when such a time comes up and you're taking

6      inventory of what you've done in your life and the relationships

7      that you have, you're not going to be thinking about your homes

8      or your cars or your businesses or your trials, even your

9      friends.  The only thing you're going to think about is your

01:07 10   family.  And with all due respect to our spouses, when you

11     think about family, you think about your children and what you

12     did for your children and how you tried to support and help

13     your children.  And when your child is suffering and needs help

14     and you can do something to help him or her, I think you'll

15     look back and say it was the right thing to do.  And to help

16     somebody who helped you at a time like that I think is a very

17     human thing to do.  We all don't have that many friends in our

18     lives, not many people who --

19          THE COURT:  I'm having trouble hearing you.

01:08 20        MR. BLACK:  I'm sorry.  We don't have that many

21     friends in our life.  There aren't that many who stand up for

22     us.  Who are you going to call when you're in trouble?  But

23     when you find somebody like that, you want to help them any way

24     that you can, and I don't think that's a reason to put somebody

25     in the penitentiary.  Thank you.

REBUTTAL CLOSING ARGUMENT:

     MS. KEARNEY:  Good afternoon again.  Before lunch, Mr. Black spent nearly 90 minutes trying to confuse and distract you from the evidence in front of you.  He told you his version of the evidence, and I don't have time to go through every single misstatement, but I expect the Judge is going to instruct you that it's your memory of the evidence that controls.  And in trying to distract and confuse you, he also threw up a lot of irrelevant information, and I want to go through just a few of those.

     He talked to you a lot about Katherine Khoury. Katherine Khoury is not on trial here.  Her father is for agreeing with Gordon Ernst and Tim Donovan to pay a bribe to get Ernst to recruit his daughter to the Georgetown tennis team.  And on that note, many of us have children.  Being a parent does not give you license to break the law.

     The conspiracy here started at the Brown reunion. Mr. Black tried to tell you that the first thing that Tim Donovan did was text the Wesleyan coach, Mike Fried.  You have the evidence in front of you.  That's not what happened.  They were called in May of --

     THE COURT:  Excuse me for one minute.  I hate to interrupt, but do you think you could put the mic closer to you?  I'm having a hard time catching some of your words. Okay?  Thank you.

1          MS. KEARNEY:  Mr. Black also focused on the fact that

2     Katherine Khoury didn't know about the scheme, and she told you

3     that; but there is no innocent explanation for why her father

4     didn't tell her about a $200,000 gift he was supposedly giving

5     to the Georgetown tennis coach, a payment that he took from

6     Katherine and her sister's trust funds, no innocent explanation

7     for why the defendant would not have discussed that with

8     Katherine prior to the indictment in this case.

9          The defense spent a lot of time talking to you about

02:11 10    Katherine's text messages.  First, you'll see those messages:

11    They're one-sided.  The defendant's responses are not in there.

12    But in those text messages, the defendant didn't have to

13    discuss a shoulder injury with Katherine over the summer of

14    2015, after she'd already been admitted to Georgetown, and

15    that's because Dan Trump, the Georgetown athletic director, he

16    told you that by April 2015, coaches have to give him their

17    rosters; and Gordie Ernst did not include Katherine on his

18    roster of April 2015, a month before the defendant's divorce

19    became known to Katherine.  And that's because it was already

02:12 20    understood from the outset of this deal that Katherine was not

21    going to play at Georgetown because she wasn't a real tennis

22    recruit.  This was all part of the plan.

23          And with respect to Katherine's mental health, the

24    only relevance her parents' divorce has is that it explains why

25    the defendant had difficulty making that last $20,000 payment,

because he was paying millions of dollars to his ex-wife and $15,000 a month in alimony. And with all respect to Katherine Khoury, she is no Simone Biles or Naomi Osaka.

Another thing the defense threw at you to see if it would stick is the idea that it wasn't certain that the scheme was going to be successful. He pointed you to an e-mail in which the defendant asked Matt DeGreeff to confirm that Ernst was going to use a slot on Katherine. Of course the defendant was confirming that Ernst could use a slot on Katherine. He didn't want to pay $200,000 without knowing he was going to get his end of the deal in return. He wanted to make sure that Ernst could come through. And, as I said to you earlier, it's still a conspiracy if they're still working out the details, and it's still a conspiracy if it's not clear it's going to be successful, and it's still a conspiracy when the defendant is sending text messages about the money he owes in July of 2016.

The defendant also wants you to spend time focusing on the fundraising practices at Georgetown. Let me be clear: The government does not contend that money doesn't play a role in admissions, but it did not play a role in Katherine Khoury's admission. The defense flew multiple witnesses from Georgetown up to Boston, and not a single one could tell you that they knew who Amin Khoury was prior to his daughter's admission, and they could not show you a single Georgetown e-mail that anyone at Georgetown knew who Amin Khoury was prior to his daughter's

1    admission.  This is all made up specifically to distract you.

2         MR. SREBNICK:  Objection.  Objection, your Honor.

3    Move to strike that statement.

4         THE COURT:  Overruled.

5         MS. KEARNEY:  Meg Lysy told you that she was the one

6    who decided to admit Katherine Khoury, and she based her

7    decision on Ernst's use of a recruitment slot.  And, again,

8    remember, Meg Lysy is in admissions; she's not in development.

9    She is not the one looking up the value of people's houses.

02:15 10   And the evidence backs up what Meg Lysy told you.  When you're

11   back in the jury deliberation room, you'll have the exhibits in

12   front of you.  You can look at Exhibit 144.  That's the e-mail

13   that Meg Lysy sent to the Office of Student Conduct after

14   Katherine's disciplinary issue came up, and she told them

15   Katherine was a recruited athlete for tennis.  She didn't talk

16   about Development; she talked about tennis.  And then in

17   Exhibit 150, when Meg Lysy confirmed to Katherine that her

18   admission was going to go forward, she said "Good luck on

19   tennis."  That's Meg Lysy's state of mind at the time.  She

02:16 20   thought she was a tennis player.  And in that e-mail, Meg Lysy

21   copied, Matt DeGreeff, her high school counselor, and Gordie

22   Ernst, the tennis coach.  She didn't copy anyone from

23   Development because Meg Lysy didn't know that, didn't know that

24   the Khoury family had the potential to donate to the school

25   when she decided to let Katherine Khoury in.

1          And even in August of 2015, after Katherine had

2   arrived on campus and the Office of Student Conduct notified

3   Meg Lysy that Katherine had met with them as required, who did

4   Meg Lysy forward that e-mail to?  Gordie Ernst, not

5   Development.  Even at the moment Katherine was arriving on

6   campus, Meg Lysy thought that she was still going to be a

7   member of the tennis team.

8          The defense has also spent a lot of time talking to

9   you about a Plan A and a Plan B to help Gordie Ernst make up

02:17 10   for lost income when his tennis courts were getting replaced.

11   That Ernst needed money doesn't show innocence.  It shows why

12   he wanted $200,000 in exchange for recruiting the defendant's

13   daughter and why he was willing to accept a bribe.

14          Now, the three Georgetown witnesses that the defense

15   called explained to you that under either of those plans, the

16   expectation was always that the money would go through the

17   school, and you know that's true because your common sense

18   tells you that a parent donating money to fund the coach's

19   salary is going to donate it to the nonprofit institution, the

02:18 20   school, where they can get the tax deduction.  Richard Rampell,

21   the defendant's tax accountant, explained that to you:  A

22   donation is tax deductible; a gift is not.

23          Another thing that the defense tried to throw out to

24   you is that there is no fraud in Katherine's application, but

25   that's not the allegation here.  The fraud was in designating

1    Katherine as a tennis recruit when she was not, and the fraud

2    was in not disclosing the cash bribe in exchange for that

3    recruitment.

4           Now, the defendant has called the payment here a gift,

5    a pledge, a promise.  All of that is absurd.  If you promise a

6    gift in return for an official act designating Katherine as a

7    tennis recruit, it's not a gift, it's a bribe, and the

8    defendant knew that.  That's why he never told his daughter

9    about it, because he knew it was illegal.  That's why he didn't

02:19 10   report the gift to the IRS, despite that his accountant told

11   you he talked to him about the need for that.  That's why he

12   paid it in cash and through a middleman to cover his tracks.

13   You don't need to hide a legal gift, and you don't need to pay

14   a middleman $20,000 to drive 20 minutes down the road to hand

15   off that gift.  And that's why when the defendant was

16   arrested -- excuse me -- when Gordon Ernst was arrested, the

17   defendant called Tim Donovan, and they came up with a cover

18   story for what the money was for.  Gifts don't need fake cover

19   stories.

02:20 20          From the beginning, Gordon Ernst never talked about a

21   gift.  The night of the Brown reunion, he told Tim Donovan he

22   was considering doing a deal, a deal in which the defendant

23   would pay $200,000 in exchange for Ernst using a recruiting

24   slot on his daughter.  And in the summer and fall of 2014, the

25   defendant and Donovan didn't discuss a gift.  They discussed a

1   cash payment to Ernst personally.  The defendant even warned

2   Donovan that it would take him time to come up with that much

3   cash.  You don't need to warn someone it's going to take you a

4   while if it's a gift.

5          The defense tried to suggest to you that there was a

6   trail, that the payment had the e-mail with the wire.  But why

7   would the defendant need to wire money from his daughters'

8   trust funds to his personal account, then withdraw in cash,

9   then fly up to Boston, then hand it to Tim Donovan, the

02:21 10   middleman, before it got to Gordon Ernst, if this was a gift?

11   Why didn't he just wire it directly in the first place?

12   There's no innocent explanation for all those steps he had to

13   take.  The only explanation is that he was trying to hide a

14   bribe.

15          The timing of the payment also tells you that this was

16   a bribe.  The defendant took out the money on May 8.  That was

17   five days before he knew whether Katherine's admission was

18   going to be confirmed on May 13.  He flew back to Boston with

19   the $200,000 before he knew what was going on with Katherine,

02:22 20   and he did that because he knew it wasn't a gift.  He knew it

21   was a bribe payment that he owed, and that was becoming due

22   upon the confirmation of Katherine's acceptance.

23          And the defendant's own words are devastating evidence

24   that this was a bribe payment and not a gift.  You saw his text

25   messages.  His messages talk about squaring away, him squaring

1  up.  His messages talk about taking a small bite out of it,

2  taking another bite out of it.  There's no innocent explanation

3  for that.  That's not how gifts are described.  You can convict

4  the defendant on his text messages alone.

5       The defendant also tried to distract you with Tim

6  Donovan having an immunity agreement, but you saw the evidence.

7  Everything Tim Donovan told you is backed up in the e-mails, in

8  the text messages, in the phone records, and the bank records.

9  And on cross-examination Mr. Donovan told you he hired an

02:23 10  attorney in March, 2018, the same time that Gordie Ernst was

11  arrested.  He asserted his Fifth Amendment, and he received an

12  immunity order compelling him to testify truthfully.  And you

13  know why Tim Donovan was so worried:  He knew it was an illegal

14  scheme, just like the defendant was worried, and that's why the

15  defendant called Tim Donovan to get their stories straight when

16  he found out that Ernst had been arrested.

17       So let's talk about what's not in dispute.  It's not

18  in dispute that Gordon Ernst used a recruitment slot on

19  Katherine Khoury.  It's not in dispute that Katherine Khoury

02:24 20  was admitted as a tennis recruit, and it's not in dispute that

21  Katherine Khoury was not qualified to play on the Georgetown

22  tennis team.  It's also not in dispute that the defendant paid

23  Gordon Ernst $200,000.  The defendant admits all this because

24  he has to.  He just denies that the money was a bribe.  He

25  admits what he can't deny, and he denies the one thing he can't

1    admit.

2         So I want to end where we started, a brown paper

3    shopping bag of cash.  It's not some imaginary evidence that

4    the defense is trying to ask you to conjure.  It's the actual

5    evidence in front of you.  This case is not complicated.  The

6    defense has tried to throw a lot at you to distract you from

7    the simple facts that they cannot dispute.  The evidence here

8    is overwhelming, and the evidence and your common sense tells

9    you that the defendant is guilty beyond a reasonable doubt as

02:25 10    charged.  Thank you.

11         (2:25 p.m.)

12                        *   *   *

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2


3
   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6


7           We, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 64 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Criminal No. 20-10177-PBS,

11 United States of America v. Amin Khoury, and thereafter by me

12 reduced to typewriting and is a true and accurate record of the

13 proceedings.

14         Dated June 16, 2022.

15

16

17

18

19
                /s/ Lee A. Marzilli
20
           _____
21         LEE A. MARZILLI, CRR
           OFFICIAL COURT REPORTER
22

23

24

25